## IN THE UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF ILLINOIS, EAST ST. LOUIS DIVISION

| | | |
|---|---|---|
| JOSE-NICOLAS OSBALDO, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 15 C 0964 |
| | ) | |
| NATHAN BERRY; WILLIAM QUALLS; | ) | |
| JUSTIN SNELL; MATTHEW PURDOM; | ) | |
| ROBERT HUGHES; JASON HART; | ) | |
| RICHARD HARRINGTON; KIMBERLY | ) | Judge J. Phil Gilbert |
| BUTLER; AIMEE LANG; UNKNOWN | ) | |
| MENARD PHYSICIAN; WEXFORD | ) | |
| HEALTH SOURCES, INC, | ) | |
| | ) | |
| Defendants. | ) | JURY TRIAL DEMANDED |

## AMENDED COMPLAINT

Plaintiff, Jose-Nicolas Osbaldo, by and through his attorneys, Loevy & Loevy, complains of Defendants Nathan Berry, William Qualls, Justin Snell, Matthew Purdom, Robert Hughes, Jason Hart, Richard Harrington, Kimberly Butler, Aimee Lang, Unknown Menard Physician, and Wexford Health Sources, Inc., and states as follows:

### Introduction

1.      This action is brought pursuant to 42 U.S.C. § 1983 to redress the deprivation under color of law of Mr. Osbaldo's rights as secured by the United States Constitution.

2.      On February 5, 2014, Mr. Osbaldo was attacked and beaten by Defendants Berry and Qualls.  While Mr. Osbaldo was handcuffed, Defendants Berry and Qualls punched Mr. Osbaldo in the head with closed fists, smashed his

head into a concrete wall, punched him in the stomach, and kicked him in the torso and legs until he fell unconscious.  Defendants Snell and Purdom watched Mr. Osbaldo be beaten, and did nothing to intervene.

3.     Immediately following the attack, Mr. Osbaldo sought medical treatment for his injuries.  Defendants Lang and Unknown Menard Physician failed to take his medical complaints seriously or provide him constitutionally adequate evaluation or treatment for his injuries.

4.     Defendants Berry and Qualls issued Mr. Osbaldo two disciplinary tickets and took him to segregation.  During a disciplinary hearing five days later, Defendants Hughes, Hart, and Harrington failed to provide Mr. Osbaldo the due process of law to which he was entitled.

5.     Instead, they sentenced him to six month of segregation.  During that six months, Mr. Osbaldo was forced to endure conditions that were deplorable and fell well below the most minimal conditions guaranteed by the Eighth Amendment. Defendants Harrington and Butler were aware of these conditions but did nothing to remedy them.

## Jurisdiction and Venue

6.     This Court has jurisdiction of this action pursuant to 28 U.S.C. §§ 1331 and 1367.

7.     Venue is proper under 28 U.S.C. § 1391(b). On information and belief, one or more Defendants reside in this District, and a substantial portion of the events giving rise to the claims asserted herein occurred within this District.

## Parties

8.     Plaintiff Jose-Nicolas Osbaldo is in the custody of the Illinois Department of Corrections (IDOC).  At all times relevant to the events at issue in this case, Mr. Osbaldo was housed at Menard Correctional Center (Menard).

9.     At all times relevant to his involvement in this case, Defendant Nathan Berry was a correctional officer at Menard, and an employee of the IDOC. Defendant Berry is sued here in his individual capacity.  At all times relevant to the events at issue in this case, Defendant Berry was acting under color of law and within the scope of his employment with the IDOC.

10.     At all times relevant to his involvement in this case, Defendant William Qualls was a correctional lieutenant at Menard, and an employee of the IDOC.  Defendant Qualls is sued here in his individual capacity.  At all times relevant to the events at issue in this case, Defendant Qualls was acting under color of law and within the scope of his employment with the IDOC.

11.     At all times relevant to his involvement in this case, Defendant Justin Snell was a correctional sergeant at Menard, and an employee of the IDOC. Defendant Snell is sued here in his individual capacity.  At all times relevant to the events at issue in this case, Defendant Snell was acting under color of law and within the scope of his employment with the IDOC.

12.     At all times relevant to his involvement in this case, Defendant Matthew Purdom was a correctional officer at Menard, and an employee of the IDOC.  Defendant Purdom is sued here in his individual capacity.  At all times

relevant to the events at issue in this case, Defendant Purdom was acting under color of law and within the scope of his employment with the IDOC.

13.     At all times relevant to his involvement in this case, Defendant Robert Hughes was a shift supervisor at Menard, a member of Menard's Adjustment Committee, and an employee of the IDOC.  Defendant Hughes is sued here in his individual capacity.  At all times relevant to the events at issue in this case, Defendant Hughes was acting under color of law and within the scope of his employment with the IDOC.

14.     At all times relevant to his involvement in this case, Defendant Jason Hart was a correctional officer at Menard, a member of Menard's Adjustment Committee, and an employee of the IDOC.  Defendant Hart is sued here in his individual capacity.  At all times relevant to the events at issue in this case, Defendant Hart was acting under color of law and within the scope of his employment with the IDOC.

15.     At all times relevant to his involvement in this case, Defendant Richard Harrington was the warden at Menard, an employee of the IDOC, and was responsible for the implementation, oversight, and supervision of policies and practices at Menard.  Defendant Harrington is sued here in his individual capacity. At all times relevant to the events at issue in this case, Defendant Harrington was acting under color of law and within the scope of his employment with the IDOC.

16.     At all times relevant to her involvement in this case, Defendant Kimberly Butler was the warden at Menard, an employee of the IDOC, and was

4

responsible for the implementation, oversight, and supervision of policies and practices at Menard.  Defendant Butler is sued here in her individual capacity. At all times relevant to the events at issue in this case, Defendant Butler was acting under color of law and within the scope of her employment with the IDOC.

17.    At all times relevant to her involvement in this case, Defendant Aimee Lang was a correctional medical technician at Menard, and an employee of the IDOC.  Defendant Lang is sued here in her individual capacity.  At all times relevant to the events at issue in this case, Defendant Lang was acting under color of law and within the scope of her employment with the IDOC.

18.    At all times relevant to his involvement in this case, Defendant Unknown Menard Physician was a medical doctor at Menard, an employee of Wexford, and was responsible for the implementation, oversight, and supervision of policies and practices regarding medical care at Menard.  Defendant Unknown Menard Physician is sued here in his individual capacity.  At all times relevant to the events at issue in this case, Defendant Unknown Menard Physician was acting under color of law and within the scope of his employment.

19.    Defendant Wexford Health Sources, Inc. (Wexford) is a corporation headquartered in Pennsylvania transacting business in Illinois.  Wexford, pursuant to a contract with the State of Illinois, is a healthcare provider for IDOC prisons throughout the State.  At all times relevant to the events at issue in this case, Wexford was responsible for the implementation, oversight, and supervision of policies and practices regarding medical care at Menard and the IDOC generally.

5

As an agent of the IDOC, Wexford was at all times relevant to the events at issue in this case acting under color of law by and through its lawful agents, including Defendant Unknown Menard Physician.

### Allegations

<u>The Beating</u>

20.     On February 5, 2014, Mr. Osbaldo was returning from lunch when he found his cell locked.  Correctional officers told Mr. Osbaldo and his cellmate, Edgar Diaz, to go down the stairs to the first floor of the cellhouse.  They complied, and were placed in an empty holding cell.

21.     As Mr. Osbaldo and Mr. Diaz were waiting in the holding cell, prisoners from another gallery in Mr. Osbaldo's cellhouse passed by the holding cell on their way to lunch.  As he was passing by the holding cell, one of the prisoners said to Mr. Osbaldo in Spanish: "You good?"  Mr. Osbaldo replied in Spanish that he was good.

22.     Defendants Barry, Qualls, Snell, and Purdom were all present at or near the holding cell.  Defendant Qualls, upon hearing Mr. Osbaldo's conversation with the passing prisoner, yelled at Mr. Osbaldo: "Shut the fuck up and face the wall!"  Mr. Osbaldo complied.  Defendant Qualls told Mr. Osbaldo to sit down, but Mr. Osbaldo told the officer it was too cold.

23.     Officers yelled at both Mr. Diaz and Mr. Osbaldo to "cuff up."  Both men complied, putting their hands together behind their backs, turning their backs to the officers, and walking backwards towards the bars of the cell so that the

officers could easily handcuff the men.  An officer handcuffed Mr. Diaz and led him out of the holding cell.

24.    Defendants then handcuffed Mr. Osbaldo and led him out of the holding cell.  Defendant Qualls hit Mr. Osbaldo with a closed fist on the right side of his jaw, causing Mr. Osbaldo to fall to the ground.  One of the officers picked Mr. Osbaldo off the ground and told Defendant Qualls to move it out of the hallway.

25.    Defendants Berry and Qualls dragged Mr. Osbaldo to a shower in the cellhouse.  Upon entering the shower area, Defendant Berry smashed Mr. Osbaldo's head violently into the concrete wall.  Mr. Osbaldo began bleeding from the mouth.  Defendants Berry and Qualls punched Mr. Osbaldo in the head, back, and stomach as Mr. Osbaldo fell to the ground and curled up into a fetal position.

26.    The beating continued as Defendants Berry and Qualls continued to punch and kick Mr. Osbaldo.  Mr. Osbaldo begged them to stop and began gasping for air.  Rather than stop attacking him, Defendant Qualls mimicked Mr. Osbaldo's pleas and gasps, and told him: "Shut the fuck up!"

27.    Defendants Berry and Qualls continued to beat Mr. Osbaldo until he lost consciousness.  When Mr. Osbaldo regained consciousness, Mr. Berry picked Mr. Osbaldo up by lifting his shoulder—Mr. Osbaldo remained handcuffed during the entire attack—and violently dragged him out of the cellhouse.

28.    Defendants Snell and Purdom were present during all or part of the attack, and saw Defendants Berry and Qualls beat Mr. Osbaldo.  They did nothing to intervene.

## Denial of Medical Attention

29.     Defendant Qualls dragged Mr. Osbaldo out of his housing unit and toward the segregation housing unit at Menard.  Mr. Osbaldo was injured so badly that he was unable to walk with the officers and fell to the ground.  A correctional officer from one of the towers overlooking the walkway from Mr. Osbaldo's cellhouse to segregation told Defendant Qualls to take Mr. Osbaldo to the healthcare unit; Defendant Qualls refused.

30.     Mr. Osbaldo was instead taken to another cellhouse, where he encountered Defendant Lang.  Mr. Osbaldo communicated to Defendant Lang the beating that he had just suffered and the pain he was experiencing.  Defendant Lang refused to perform an adequate evaluation of Mr. Osbaldo, refused to treat him, and refused to refer him to a doctor for further medical attention.  Instead, Defendant Lang left.  Mr. Osbaldo was taken to a cell in the segregation unit at Menard.

31.     As a result of the beating, Mr. Osbaldo suffered severe pain in his head, jaw, ribs, and left side.  Mr. Osbaldo had an abrasion on his forehead, and he could not open or shut his mouth properly because of his jaw.  This prevented Mr. Osbaldo from being able to eat or drink, and the pain in his jaw was so severe that he could not sleep.  In addition, a few days after the attack, Mr. Osbaldo noticed a deep bruise and two tender and painful bulges that had appeared on his left side below his belly button.

32. On February 7, 2014, Mr. Osbaldo saw a nurse who was visiting his housing unit in segregation. Mr. Osbaldo told the nurse about the beating he had suffered two days earlier and the injuries he had sustained as a result. The nurse noted the deformity, swelling, and limited range of motion of Mr. Osbaldo's jaw, as well as his severe pain and inability to eat. The nurse referred Mr. Osbaldo to dentist for evaluation and treatment, and prescribed Mr. Osbaldo Tylenol and a cold pack in the meantime.

33. The dentist prescribed Mr. Osbaldo with a soft diet and pain medication. He told Mr. Osbaldo that his jaw would heal and that the clicking would subside as the swelling went down. He told Mr. Osbaldo to hold a towel with hot water on his jaw for 10-15 minutes several times per day.

34. On February 28, 2014, Mr. Osbaldo saw the same nurse he had seen three weeks earlier on February 7. He told her about the bruise and the painful and tender bulges on his left side below his belly button. She noted the bulges, estimating them to be approximately nickel- and quarter-sized, and noted Mr. Osbaldo's signs of obvious discomfort. She referred Mr. Osbaldo to the doctor and prescribed him Acetaminophen in the meantime.

35. Mr. Osbaldo encountered Defendant Unknown Menard Physician on March 7, 2014. Mr. Osbaldo told the doctor about the beating he had suffered, and showed him the bruise and bulges. Defendant Unknown Menard Physician failed to provide Mr. Osbaldo with any minimally adequate treatment in response to his medical concerns. He told Mr. Osbaldo that it was not a hernia, but did not conduct

any tests or perform any evaluation to discover the source of the tender and painful bulges.  Instead, he left Mr. Osbaldo to suffer.

36.    Mr. Osbaldo continues to suffer pain in his jaw and his left side below his belly button to this day.

Disciplinary Proceedings

37.    In the days following the attack, Mr. Osbaldo received a disciplinary report accusing him of possessing alcohol and an altered television set.  The report was in English.

38.    On February 10, 2014, Mr. Osbaldo was brought before the Adjustment Committee—a committee created by the Illinois Administrative Code to make findings regarding discipline and to determine discipline—comprised of Defendants Hughes and Hart.

39.    Despite his obvious inability to speak and understand English fluently, Mr. Osbaldo was not provided with a translator or staff assistance to enable him to understand the Adjustment Committee proceedings, or help him to communicate to Defendants Hughes and Hart.

40.    Mr. Osbaldo did his best to communicate to Defendants Hughes and Hart that he was requesting to call Defendant Berry as a witness to state where the alcohol and altered television had been found.  Defendants Hughes and Hart refused Mr. Osbaldo's request.

41.    Mr. Osbaldo requested more time to prepare his defense, given the language barrier he faced and his desire to call Defendant Berry as a witness. Defendants Hughes and Hart refused Mr. Osbaldo's request.

42.    Defendants Hughes and Hart asked Mr. Osbaldo:  "guilty or not guilty?"  Mr. Osbaldo replied: "not guilty."  Defendants Hughes and Hart refused to let Mr. Osbaldo speak otherwise.

43.    Defendant Berry noted that the contraband and altered television set were found in a property box that had the serial number 008851.  Defendants knew via IDOC records that Mr. Osbaldo did not have a property box with a serial number of 008851.  Defendants also knew via IDOC records that the television set belonging to Mr. Osbaldo had a different serial number than the altered television set that Defendant Berry found in the cell.  Despite having possession of this information, Defendants failed to disclose it to Mr. Osbaldo at or before the hearing.

44.    At the February 10 hearing, Defendants Hughes and Hart found that Mr. Osbaldo had committed the violations that were charged and sentenced him to six months of segregation, commissary restriction, and contact visit restriction. They also downgraded Mr. Osbaldo's privileges to the lowest level for six months.

<u>Conditions in Segregation</u>

45.    Mr. Osbaldo encountered deplorable conditions of confinement while in segregation at Menard.  The mattress in Mr. Osbaldo's cell was stained with urine and feces.  Mr. Osbaldo's cell was also filthy.  There was dirt and mold on the walls, and hair, dust, and dirt all over the floor and in the air vent.  Mr. Osbaldo's cell was

11

also frequently invaded by insects, especially during the warmer months of the year.  Mr. Osbaldo, like other prisoners, was not given any cleaning supplies or disinfectant to clean his filthy cell, despite his numerous requests.

46.     The cells in the segregation unit at Menard are 4½' x 10', just a fraction of the size of a normal cell.  The open space—the space not occupied by a toilet/sink or bed—is even smaller: just 1' x 8'.  That space is so small that prisoners like Mr. Osbaldo do not even have room to pace back and forth.

47.     Mr. Osbaldo's toilet would constantly leak water onto the floor of his cell, essentially flooding most of the open space in his cramped cell.  The flooding caused the mold in Mr. Osbaldo's cell to grow more aggressively.  Flushing the toilet made the problem even worse.

48.     Mr. Osbaldo was housed in a cell by himself.  Because of his status in the segregation unit, he was locked in his filthy, unsanitary cell 23 to 24 hours of each day.  Mr. Osbaldo was rarely given the opportunity to walk outside, or even take a shower.

49.     During the rare occasions that Mr. Osbaldo was taken to shower, he was forced to shower in stalls that were as filthy as his cell and infested with mold.  On information and belief, the showers were never cleaned.

50.     Mr. Osbaldo was given a clean change of clothes only once during the six months that he was in segregation.  Defendants refuse to give him fresh clothes for months on end.

12

51.     The segregation unit at Menard has no heating or air conditioning.  As a result, during the summer months, Mr. Osbaldo was forced to live in a cell that was approximately 90 degrees on some days.  Mr. Osbaldo requested a fan to lower the temperature, but his request was denied.

52.     Mr. Osbaldo frequently complained about the conditions he was forced to endure.  Yet no member of the IDOC staff, including Defendants Harrington and Butler, ever took any actions to remedy the conditions that Mr. Osbaldo encountered.

## COUNT I
### 42 U.S.C. § 1983 – Excessive Force (Eighth Amendment)
### Defendants Berry and Qualls

53.     Plaintiff incorporates each paragraph of this Amended Complaint as if fully restated here.

54.     As described more fully above, Defendants Berry and Qualls used force against Mr. Osbaldo.  That use of force was unreasonable in light of the facts and circumstances present at the time that the force was used.

55.     In using force against Mr. Osbaldo, Defendants Berry and Qualls intentionally used extreme or excessive cruelty toward him for the very purpose of causing him harm, and not in a good faith effort to maintain or restore security or discipline.

56.     Alternatively, Defendants Berry and Qualls knew that using force presented a risk of harm to Mr. Osbaldo, but they recklessly disregarded that risk

and Mr. Osbaldo's safety by failing to take reasonable measures to minimize that risk of harm.

57.     As a direct and proximate result of Defendants' misconduct, Mr. Osbaldo's rights were violated and he experienced injuries, including pain, physical injuries, suffering, and emotional distress.

## COUNT II
### 42 U.S.C. § 1983 – Failure to Intervene (Eighth Amendment)
### Defendants Berry, Qualls, Snell, and Purdom

58.     Plaintiff incorporates each paragraph of this Amended Complaint as if fully restated here.

59.     As described more fully above, Defendants Berry, Qualls, Snell, and Purdom had a reasonable opportunity to prevent the violation of Mr. Osbaldo's constitutional rights as set forth above had they been so inclined, but failed to do so.

60.     Defendants Berry, Qualls, Snell, and Purdom knew of a substantial risk of harm to Mr. Osbaldo's safety, but consciously disregarded that risk by failing to take reasonable steps to prevent the harm from occurring.

61.     Defendants' failures to act were intentional, done with malice, and/or done with reckless indifference to Mr. Osbaldo's rights.

62.     As a direct and proximate result of Defendants' misconduct, Mr. Osbaldo's rights were violated and he experienced injuries, including pain, physical injuries, suffering, and emotional distress.

## COUNT III
### 42 U.S.C. § 1983 – Denial of Medical Care (Eighth Amendment)
### Defendants Berry, Qualls, Snell, Purdom, Lang,
### and Unknown Menard Physician

63.    Plaintiff incorporates each paragraph of this Amended Complaint as if fully restated here.

64.    As described more fully above, Defendants Berry, Qualls, Snell, Purdom, Lang, and Unknown Menard Physician had notice of Mr. Osbaldo's medical needs and the seriousness of his medical needs, and knew the risk of harm to Mr. Osbaldo if he did not receive appropriate medical care.  Despite that knowledge, Defendants failed to provide him with any proper medical care or access to medical care, in violation of the Eighth Amendment to the United States Constitution.

65.    Defendants' misconduct was undertaken intentionally, with malice, and/or with deliberately indifference to Mr. Osbaldo's objectively serious medical needs.

66.    As a direct and proximate result of Defendants' misconduct, Mr. Osbaldo's rights were violated and he experienced injuries, including pain, physical injuries, suffering, and emotional distress.

## COUNT IV
### 42 U.S.C. § 1983 – Due Process (Fourteenth Amendment)
### Defendants Hughes, Hart, and Harrington

67.    Plaintiff incorporates each paragraph of this Amended Complaint as if fully restated here.

15

68.   As stated more fully above, as a result of the disciplinary charges brought by Defendants, Mr. Osbaldo was sentenced to six months of segregation, among other restrictions.  The conditions that Mr. Osbaldo experienced in segregation were atypical and significant and imposed such a hardship on him that the risk of having to endure those conditions triggered a liberty interest requiring due process.

69.   Defendants Hughes, Hart, and Harrington failed to provide Mr. Osbaldo with due process before depriving him of that liberty interest.  Specifically, Defendants Hughes, Hart, and Harrington failed to:  (1) provide Mr. Osbaldo written notice of the charges against him in a language he could understand; (2) provide Mr. Osbaldo staff assistance or a translator at the disciplinary hearing to allow Ms. Osbaldo to understand what was happening; (3) provide Mr. Osbaldo staff assistance or a translator so that he could communicate to the hearing committee his statements on his own behalf; (4) inform Mr. Osbaldo of evidence or information that showed that he was not guilty of the charged offense; (5) grant Mr. Osbaldo a continuance despite there being good cause; (6) allow Mr. Osbaldo to call a witness; and (7) allow Mr. Osbaldo to speak on his own behalf.

70.   The misconduct committed by Defendants Hughes, Hart, and Harrington were not random and unauthorized, but instead were the foreseeable result of the policies and practices of Defendants.

71.   Prior to the events giving rise to Plaintiff's Amended Complaint, Defendants Hughes, Hart, and Harrington had notice of widespread policies and

practices at Menard pursuant to which prisoners like Mr. Osbaldo were routinely being denied due process of law during disciplinary hearings.  Despite this knowledge, Defendants did nothing to ensure that prisoners at Menard received due process of law before being deprived of a liberty interest.

72.    As a direct and proximate result of Defendants' misconduct, Mr. Osbaldo's rights were violated and he experienced injuries, including pain, physical injuries, suffering, and emotional distress.

**COUNT V**
**42 U.S.C. § 1983 – Conditions of Confinement (Eighth Amendment)**
**Defendants Harrington and Butler**

73.    Plaintiff incorporates each paragraph of this Amended Complaint as if fully restated here.

74.    Defendants Harrington and Butler, as Wardens at Menard, had a responsibility to ensure that prisoners at Menard were housed in constitutionally adequate conditions of confinement, including prisoners confined in segregation.

75.    Prior to the events giving rise to Plaintiff's Amended Complaint, Defendants Harrington and Butler had notice of the existence of the conditions of confinement in the segregation unit described more fully above.

76.    Defendants Harrington and Butler knew that those conditions of confinement were so deplorable that they posed a risk of harm to the health and safety of prisoners like Mr. Osbaldo.  Despite this knowledge, Defendants Harrington and Butler failed to take reasonable steps to remedy or improve those conditions of confinement.

77.     As a direct and proximate result of Defendants' misconduct, Mr.

Osbaldo's rights were violated and he experienced injuries, including pain, physical

injuries, suffering, and emotional distress.

## COUNT VI
## Battery
## Defendants Berry and Qualls

78.     Plaintiff incorporates each paragraph of this Amended Complaint as if

fully restated here.

79.     As described more fully above, Defendants Berry and Qualls

intentionally made physical contact with Mr. Osbaldo without valid cause.  That

physical contact was offensive and harmful.

80.     As a direct and proximate result of Defendants' conduct, Mr. Osbaldo

experienced injuries, including pain, physical injuries, suffering, and emotional

distress.

## COUNT VII
## Assault
## Defendants Berry and Qualls

81.     Plaintiff incorporates each paragraph of this Amended Complaint as if

fully restated here.

82.     As described more fully above, Defendants Berry and Qualls intended

to harm and/or frighten Mr. Osbaldo without valid cause.  Their actions did in fact

cause Mr. Osbaldo fear and apprehension.

83.     As a direct and proximate result of Defendants' conduct, Mr. Osbaldo experienced injuries, including pain, physical injuries, suffering, and emotional distress.

## COUNT VIII
### Intentional Infliction of Emotional Distress
### Defendants Berry and Qualls

84.     Plaintiff incorporates each paragraph of this Amended Complaint as if fully restated here.

85.     As described more fully above, by beating and abusing Mr. Osbaldo, Defendants Berry and Qualls engaged in extreme and outrageous conduct.  That conduct was rooted in an abuse of power or authority.

86.     The actions of Defendants Berry and Qualls were undertaken with intent or knowledge that there was a high probability that the conduct would inflict severe emotional distress, and with reckless disregard of that probability.

87.     As a direct and proximate result of Defendants' conduct, Mr. Osbaldo experienced injuries, including severe emotional distress and suffering.

## COUNT IX
### Negligent or Willful and Wanton Conduct
### All Defendants

88.     Plaintiff incorporates each paragraph of this Amended Complaint as if fully restated here.

89.     In the manner described more fully above, Defendants breached the duty of care that they owed to Mr. Osbaldo and other prisoners at Menard in their care.

90.     Alternatively, the actions of Defendants were willful and wanton in that they demonstrated an utter indifference to the safety of others.  Defendants were aware that their misconduct posed a serious risk of harm or safety to Mr. Osbaldo and other prisoners in their care, and recklessly disregarded the consequences of those actions.

91.     Defendants' actions were undertaken willfully and wantonly, and/or with reckless indifference or conscious disregard for Mr. Osbaldo's health and safety.

92.     As a direct and proximate result of Defendants' negligence and/or willful and wanton conduct, Mr. Osbaldo experienced injuries, including pain, physical injuries, suffering, and emotional distress.

**COUNT X**
**Respondeat Superior**
**Wexford Health Sources, Inc.**

93.     Plaintiff incorporates each paragraph of this Amended Complaint as if fully restated here.

94.     In committing the acts alleged in the preceding paragraphs, Defendant Unknown Menard Physician was an employee, member, and agent of Wexford, acting at all relevant times within the scope of his employment.

95.     Consequently, Defendant Wexford is liable for the actions of Defendant Unknown Menard Physician.

96.     Additionally, Defendant Wexford, as a private corporation acting under color of state law, should be held liable under 42 U.S.C. § 1983 for the conduct of its

employees acting within the scope of their employment.  *See Shields v. Ill. Dep't of Corr.*, 746 F.3d 782, 793–95 (7th Cir. 2014).

## COUNT XI
### Indemnification

97.   Plaintiff incorporates each paragraph of this Amended Complaint as if fully restated here.

98.   Illinois law provides that public entities are direct to pay any tort judgment for compensatory damages for which employees are liable within the scope of their employment activities.

99.   Defendants Berry, Qualls, Snell, Purdom, Hughes, Hart, Harrington, Butler, and Lang are or were employees of the IDOC and acted within the scope of their employment in committing the misconduct described above.

100.   The State of Illinois is obligated to pay any judgment entered against individual Defendants within the scope of their employment for the IDOC.

Wherefore, Plaintiff Jose-Nicolas Osbaldo respectfully requests that this Court enter a judgment in his favor and against Defendants Nathan Berry, William Qualls, Justin Snell, Matthew Purdom, Robert Hughes, Jason Hart, Richard Harrington, Kimberly Butler, Aimee Lang, Unknown Menard Physician, and Wexford Health Sources, Inc., awarding compensatory damages, punitive damages, injunctive relief, attorneys' fees and costs, and any other relief this Court deems just and appropriate.

**JURY DEMAND**

Plaintiff Jose-Nicolas Osbaldo hereby demands a trial by jury pursuant to

Rule 38(b) of the Federal Rules of Civil Procedure on all issues so triable.

Dated: November 20, 2015

Respectfully submitted,

/s/ Sarah Grady
Sarah Grady
Attorney for Plaintiff

Sarah Grady
Arthur Loevy
LOEVY & LOEVY
312 North May St., Suite 100
Chicago, IL 60607
(312) 243-5900