# Deposition of:
# **Osbaldo Jose-Nicolas**

**Date:** May 26, 2017

**Case:** Osbaldo Jose-Nicolas, #R-72183 v. Nathan Berry, et al.

**Reporter:** Sarah Mecklenburg, CSR

**Keefe Reporting Company**
618-277-0190
reporter@keefereporting.com

Exhibit 1

Osbaldo Jose-Nicolas, #R-72183 v. Nathan Berry, et al.
Osbaldo Jose-Nicolas 5/26/2017

UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF ILLINOIS

EAST ST. LOUIS DIVISION

OSBALDO JOSE-NICOLAS, #R-72183

vs.

NATHAN BERRY, et al

Cause No. 15-964-NJR-DGW

DEPOSITION OF OSBALDO JOSE-NICOLAS

TAKEN ON BEHALF OF THE DEFENDANTS

May 26, 2017

REPORTER: SARAH MECKLENBURG, CSR 084.004858

Page 1

Exhibit 1

Osbaldo Jose-Nicolas, #R-72183 v. Nathan Berry, et al.
Osbaldo Jose-Nicolas 5/26/2017

```
 1                          INDEX
                                             PAGE
 2
         Osbaldo Jose-Nicolas                 5
 3       Examination By Ms. Jennings          5

 4

 5                         EXHIBITS

 6    EXHIBIT NUMBER     DESCRIPTION        PAGE MKD.
         Defendant's       Ticket             47
 7       Exhibit A
         Defendant's       Ticket             48
 8       Exhibit B
         Defendant's       Final summary report 49
 9       Exhibit C
         Defendant's       Grievance          56
10       Exhibit D

11

12    (Original exhibits were retained by the court
      reporter.)
13

14

15

16

17

18

19

20

21

22

23

24
```

Case 3:15-cv-00964-NJR-GCS   Document 101-1   Filed 09/25/17   Page 4 of 73   Page ID #756

Osbaldo Jose-Nicolas, #R-72183 v. Nathan Berry, et al.
Osbaldo Jose-Nicolas 5/26/2017

```
 1                   UNITED STATES DISTRICT COURT
                  FOR THE SOUTHERN DISTRICT OF ILLINOIS
 2                      EAST ST. LOUIS DIVISION

 3
       OSBALDO JOSE-NICOLAS,      )
 4     #R-72183,                  )
                                  )
 5                    PLAINTIFF,  )
                                  )
 6     vs.                        ) Case No. 15-964-NJR-DGW
                                  )
 7     NATHAN BERRY, et al,       )
                                  )
 8                    DEFENDANTS. )
                                  )
 9

10                   A P P E A R A N C E S

11
          For the PLAINTIFF:
12
                      LOEVY & LOEVY
13                    By:  JULIE GOODWIN
                      311 NORTH ABERDEEN STREET
14                    3RD FLOOR
                      CHICAGO, ILLINOIS 60607
15                    (312) 243-5900
                      Julie@loevy.com
16

17        For the DEFENDANTS:

18                    ATTORNEY GENERAL'S OFFICE
                      By:  MELISSA JENNINGS
19                    500 SOUTH SECOND STREET
                      SPRINGFIELD, ILLINOIS 62701
20                    (217) 785-4555
                      Mjennings@atg.state.il.us
21

22
          Also present:  THE INTERPRETER
23

24
```

Page 3

Exhibit 1

Osbaldo Jose-Nicolas, #R-72183 v. Nathan Berry, et al.
Osbaldo Jose-Nicolas 5/26/2017

1          IT IS HEREBY STIPULATED AND AGREED, by and

2    between counsel for the PLAINTIFF and counsel for the

3    DEFENDANTS that this deposition may be taken in

4    shorthand by Sarah Mecklenburg, a Certified Shorthand

5    Reporter, and afterwards transcribed into typewriting;

6    and the signature of the witness is expressly WAIVED.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Keefe Reporting Company

Exhibit 1

Osbaldo Jose-Nicolas, #R-72183 v. Nathan Berry, et al.
Osbaldo Jose-Nicolas 5/26/2017

```
 1                    MEIBY HUDDLESTON,

 2     having been first duly sworn testified as follows:

 3                 OSBALDO JOSE-NICOLAS,

 4     having been first duly sworn testified as follows:

 5                EXAMINATION BY MS. JENNINGS:

 6          Q.   Can you state your name for us?

 7          A.   Osbaldo Jose-Nicolas.

 8          Q.   We are currently at Menard Correctional

 9     Center, right?

10          A.   Yes.

11          Q.   You understand that you're under oath?

12          A.   Yes.

13          Q.   And that means that you have to tell the

14     truth today?

15          A.   Yes.

16          Q.   Have you ever had a deposition taken

17     before?

18          A.   No.

19          Q.   Well, a deposition is a time for me to ask

20     you questions about your case, and then you respond to

21     my questions to the best of your ability.

22               If I ask you a question and you don't

23     understand it, let me know, and I can rephrase it.

24          A.   Okay.
```

Keefe Reporting Company

Exhibit 1

Osbaldo Jose-Nicolas, #R-72183 v. Nathan Berry, et al.
Osbaldo Jose-Nicolas 5/26/2017

1          Q.   You can interrupt me and go back and add to

2     a previous answer.  You can ask me to repeat.  As long

3     as you answer, I'm going to assume that you understood

4     the question.  Is that fair?

5          A.   Okay.

6          Q.   Now, for the court reporter to take

7     everything down that we're all saying, it's important

8     that you answer out loud so that our translator can

9     hear you and understand you.  Okay?

10         A.   Yes, that's fine.

11         Q.   It's going to be very important today that

12    we try not to talk over each other.  Okay?

13         A.   Okay.

14         Q.   Do you have any general questions about how

15    a deposition works?

16         A.   Do I have a question?  No.

17         Q.   If your attorney objects to a question,

18    just wait to answer until she instructs you either to

19    answer or not to answer.

20         A.   Okay.

21         Q.   If you need a break at any point, let me

22    know.  Okay?

23         A.   That's fine.

24         Q.   Are you on any medications today that would

Osbaldo Jose-Nicolas, #R-72183 v. Nathan Berry, et al.
Osbaldo Jose-Nicolas 5/26/2017

```
 1    impact your ability to understand my questions or
 2    answer them truthfully?
 3         A.    I'm taking medicine, but I don't believe
 4    that that will be any problem at all.
 5         Q.    Do you have any other issues going on that
 6    would prevent you from understanding my questions or
 7    answering them truthfully?
 8         A.    No.
 9         Q.    Is there any other reason why you feel like
10    you couldn't give truthful and accurate testimony
11    today?
12         A.    No.
13         Q.    Obviously, we have a translator here for
14    you.  How fluent are you in English?
15         A.    Not much.
16         Q.    Okay.  How many lawsuits have you filed as
17    a plaintiff?
18         A.    I don't believe I understood that question.
19         Q.    Other than the lawsuit that we're here for
20    today, how many other lawsuits have you filed?
21         A.    Two more.
22         Q.    Okay.  Are those federal civil rights
23    lawsuits like this one?
24         A.    Yes.
```

Keefe Reporting Company

Exhibit 1

Osbaldo Jose-Nicolas, #R-72183 v. Nathan Berry, et al.
Osbaldo Jose-Nicolas 5/26/2017

```
 1            Q.    Do you know the names or the case numbers?

 2            A.    No.

 3            Q.    Is one of those other two the one that was

 4    initially connected with this case?

 5            A.    I believe so.

 6            Q.    Do you know what the other two are about?

 7            A.    Yes.

 8            Q.    And what -- just generally, what are those

 9    about?

10            A.    Condition of confinement, and the other one

11    is about medical treatment.

12            Q.    Okay.  Do you have attorneys in those other

13    cases?

14            A.    Yes.

15            Q.    In both of them?

16            A.    Yes.

17            Q.    Are you a U.S. citizen?

18            A.    No.

19                  MS. GOODWIN:  Objection to relevance.

20            Q.    (By Ms. Jennings) What country are you a

21    citizen of?

22                  MS. GOODWIN:  Same objection.

23                  MS. JENNINGS:  Do you want him to answer?

24                  MS. GOODWIN:  Oh, you can answer.  Unless I
```

Page 8

Exhibit 1

Osbaldo Jose-Nicolas, #R-72183 v. Nathan Berry, et al.
Osbaldo Jose-Nicolas 5/26/2017

```
 1    instruct you otherwise, you can go ahead and answer

 2    the question.

 3              THE INTERPRETER:  The United States from

 4    Mexico.

 5         Q.   (By Ms. Jennings) What's the highest level

 6    of education that you've completed?

 7         A.   Ninth.

 8         Q.   Do you have any special licenses or

 9    degrees?

10         A.   No.

11         Q.   Do you have any medical training?

12         A.   No.

13         Q.   You've been at Menard since 2008; is that

14    correct?

15         A.   Yes.

16         Q.   Do you have a job here at Menard?

17         A.   No.

18         Q.   Have you ever had a job here at Menard?

19         A.   No.

20         Q.   Prior to your incarceration, have you had a

21    job?

22         A.   Yes.

23         Q.   Just what kinds of jobs, generally, have

24    you had?
```

Page 9

Exhibit 1

Osbaldo Jose-Nicolas, #R-72183 v. Nathan Berry, et al.
Osbaldo Jose-Nicolas 5/26/2017

```
 1          A.   I don't know.

 2          Q.   I mean, have you worked in, you know, fast

 3   food or construction?

 4          A.   I used to work at a factory.

 5          Q.   Anything else you can think of?

 6          A.   No.

 7          Q.   You were first incarcerated in the

 8   Department of Corrections in 2008; is that correct?

 9          A.   Yes.

10          Q.   Your crimes, first would be murder,

11   correct?

12          A.   Yes.

13          Q.   And you have a 40-year sentence for that?

14          A.   Yes.

15          Q.   And then you also have a conviction for

16   concealing a homicidal death, correct?

17               THE INTERPRETER:  Can you repeat that

18   question for the interpreter?

19               MS. JENNINGS:  Yes.

20          Q.   (By Ms. Jennings) You also have a

21   conviction for concealing a homicidal death, correct?

22          A.   Yes.

23          Q.   And you have a five-year sentence for that,

24   correct?
```

Keefe Reporting Company

Exhibit 1

Osbaldo Jose-Nicolas, #R-72183 v. Nathan Berry, et al.
Osbaldo Jose-Nicolas 5/26/2017

```
 1          A.   Yes.

 2          Q.   Are those sentences running together or

 3     back to back?

 4          A.   Concurrent.

 5          Q.   Do you have any other convictions in other

 6     states or countries?

 7          A.   No.

 8          Q.   Other than when you leave for court, you've

 9     been here at Menard since you were processed, correct?

10          A.   Yes.

11          Q.   And your claims in this case all relate to

12     your time at Menard, right?

13          A.   Yes.

14          Q.   The claims in this case began on

15     February 5, 2014, right?

16          A.   Yes.

17          Q.   And that was in the West Cell House?

18          A.   Yes.

19          Q.   That's where you were housed at the time?

20          A.   Yes.

21          Q.   And you were housed with Inmate Edgar Diaz,

22     correct?

23          A.   Yes.

24          Q.   On February 5, 2014, your cell was shaken
```

Keefe Reporting Company

Exhibit 1

Osbaldo Jose-Nicolas, #R-72183 v. Nathan Berry, et al.
Osbaldo Jose-Nicolas 5/26/2017

```
 1   down, correct?
 2        A.   How shaken down?
 3        Q.   They searched your cell, right?
 4        A.   I don't know.
 5        Q.   Okay.  You were removed from your cell on
 6   that day?
 7        A.   No.
 8        Q.   Weren't you housed in the holding cell in
 9   the West Cell House?
10        A.   I don't think I understood that question.
11        Q.   Okay.  Are you familiar with what your
12   claims are in this case?
13             MS. GOODWIN:  Objection to form.
14             THE INTERPRETER:  I don't understand your
15   question.
16        Q.   (By Ms. Jennings) You filed a lawsuit in
17   this case regarding events on February 5, 2014, right?
18        A.   Yes.
19        Q.   What happened on that day?
20        A.   We were in the Gallery Number 7 and we went
21   to eat, and when we were coming back, the police
22   officers asked me if I was Garcia, and I replied,
23   "No," and they let me pass through.
24        Q.   Before you move on, do you know who it was
```

Keefe Reporting Company

Exhibit 1

Osbaldo Jose-Nicolas, #R-72183 v. Nathan Berry, et al.
Osbaldo Jose-Nicolas 5/26/2017

```
 1      that asked you if you were Garcia?

 2           A.   No.

 3           Q.   What happened next?

 4           A.   So he let me go.  He let me go through.  So

 5      when I stopped by my cell, the doors were open, but my

 6      cell was not unlocked.  My cell was not open, and so

 7      the officers that were checking every single cell,

 8      they noticed that it was closed.  When they finally

 9      arrived to our cell, they mentioned to me and the

10      other inmate that we have to go right in front.

11           Q.   Did you ever enter your cell?

12           A.   No.

13           Q.   Who were the officers that told you you had

14      to go in front?

15           A.   I can't remember.

16           Q.   Do you know if they were the defendants in

17      this case?

18           A.   I can't remember.

19           Q.   The other inmate that was with you was

20      Diaz?

21           A.   Yes.

22           Q.   What happened next?

23           A.   When we arrived right in front of the

24      officers, they searched us.
```

Exhibit 1

Osbaldo Jose-Nicolas, #R-72183 v. Nathan Berry, et al.
Osbaldo Jose-Nicolas 5/26/2017

```
 1          Q.    Where were you located at that point?

 2          A.    How is that?  I don't know.

 3          Q.    When they searched you, where were you

 4    standing?

 5          A.    Right in front of where the galleries

 6    start.

 7          Q.    You weren't in front of your cell?

 8          A.    No.

 9          Q.    Were you on your gallery?

10          A.    Yes.

11          Q.    At the end of your gallery?

12          A.    Yes.

13          Q.    Were you inside of any sort of holding

14    cell?

15          A.    What do you mean?  When they searched us?

16          Q.    Yes.

17          A.    No.

18          Q.    Okay.  After you were searched, what

19    happened?

20          A.    They said to go downstairs, down to the

21    holding cell.

22                THE INTERPRETER:  I need the volume up

23    because there is a lot of noise going around, and it

24    is distracting me.
```

Exhibit 1

Osbaldo Jose-Nicolas, #R-72183 v. Nathan Berry, et al.
Osbaldo Jose-Nicolas 5/26/2017

```
 1            Q.    (By Ms. Jennings) Who told you to go
 2    downstairs?
 3            A.    I can't remember.
 4            Q.    Did both inmates, both you and Diaz, go
 5    downstairs?
 6            A.    Yes.
 7            Q.    Were you escorted down there?
 8            A.    We went in first, the two of us, and then
 9    the officers were right behind us.
10            Q.    Were you handcuffed?
11            A.    No.
12            Q.    You went into the holding cell?
13            A.    Not on the odd side because there was
14    helium, and we were told to go to the even -- to the
15    holding cell, even side.
16            Q.    So you couldn't go into your holding cell,
17    so you went to the other side?
18            A.    Yes.
19            Q.    Were the officers walking behind you to the
20    other cell?
21            A.    Yes.
22            Q.    You went to the holding cell on the even
23    side?
24            A.    Yes.
```

Page 15

Exhibit 1

Osbaldo Jose-Nicolas, #R-72183 v. Nathan Berry, et al.
Osbaldo Jose-Nicolas 5/26/2017

```
 1          Q.    What happened when you got there?

 2          A.    So we were told to wait because they were

 3    finishing chow.  Odd side, they were running the chow.

 4          Q.    So you had to wait because the lines were

 5    walking by?

 6          A.    Yes.

 7          Q.    Did you wait in the holding cell?

 8          A.    Me and Diaz.

 9          Q.    Were you locked in the holding cell?

10          A.    Yes.

11          Q.    And were you handcuffed?

12          A.    No.

13          Q.    What happened next?

14          A.    We were there approximately 30 minutes, but

15    during that time, Diaz said that he needed to use the

16    bathroom, and I told him that we don't have any

17    officers there, but then an officer arrived, and he

18    said, "I'm going to lock you down in the bathroom."

19                THE WITNESS:  No, not in the bathroom.  In

20    the showers.

21                THE INTERPRETER:  In the showers.  Not in

22    the bathrooms, in the showers.

23          Q.    (By Ms. Jennings) Who was that officer?

24          A.    I can't remember.  So that took about 10
```

Page 16

Exhibit 1

Osbaldo Jose-Nicolas, #R-72183 v. Nathan Berry, et al.
Osbaldo Jose-Nicolas 5/26/2017

```
 1   minutes, and Diaz came back with me at the holding

 2   cell.

 3          Q.    So the officer allowed Diaz to go to the

 4   bathroom?

 5          A.    I don't know.

 6          Q.    Diaz left the cell?

 7          A.    He went to the showers.  They took him to

 8   the showers, but I don't believe that he mentioned to

 9   the police officer that he needed to go to the

10   bathroom.  I think that they were just taking us apart

11   from each other so that we would not be able to

12   communicate.

13          Q.    Do you know which officer took Diaz to the

14   showers?

15          A.    No.

16          Q.    While you were in the holding cell, were

17   inmates walking by?

18          A.    When we were there, just waiting?

19          Q.    Yes.

20          A.    The counselor was there.

21          Q.    Your counselor?

22          A.    I think so.  I'm not so sure if it was mine

23   or not.

24          Q.    Was it a man or a woman?
```

Keefe Reporting Company

Exhibit 1

Osbaldo Jose-Nicolas, #R-72183 v. Nathan Berry, et al.
Osbaldo Jose-Nicolas 5/26/2017

```
 1          A.   Man.

 2          Q.   What was his name?

 3          A.   I don't remember.

 4          Q.   What was the counselor doing?

 5               MS. GOODWIN:  Objection to foundation.

 6               You can answer.

 7               THE INTERPRETER:  He was just doing his

 8     routine, but I asked him about some items that they

 9     had taken from me.  I have a grievance, but they told

10     me to contact property so that I can pick it up, and

11     that's what I was -- I was trying to let him know

12     about that.

13          Q.   (By Ms. Jennings) So you were asking about

14     a grievance regarding property?

15          A.   Yes.

16          Q.   When did you write that grievance?

17          A.   I can't remember.

18          Q.   Were inmates also walking by?

19          A.   No.

20          Q.   After Diaz returned to the holding cell,

21     what happened?

22          A.   We were there just waiting.

23          Q.   For how long?

24          A.   I can't remember.
```

Page 18

Exhibit 1

Osbaldo Jose-Nicolas, #R-72183 v. Nathan Berry, et al.
Osbaldo Jose-Nicolas 5/26/2017

```
 1          Q.   What happened next?

 2          A.   I'm not so sure.  They were running the

 3    line from the store and from the gym.  So they were

 4    running that line in and out, coming back, in and out,

 5    but I'm not so sure about that.

 6          Q.   When you say they were running a line, you

 7    mean inmates were being escorted?

 8          A.   No, the officers were upstairs because I

 9    think it was Gallery 8 or 10 that was coming back from

10    the store.

11          Q.   So the inmates were walking by the holding

12    cell to come back?

13          A.   Yes.

14          Q.   Were you talking to any of the inmates

15    walking by?

16          A.   No.

17          Q.   Were you talking with Inmate Diaz?

18          A.   Yes.

19          Q.   What happened next?

20          A.   So then all the officers went downstairs

21    and they were right in front of us, and I noticed that

22    Major Thomas was there and Sergeant Qualls and some

23    other officers.

24          Q.   Do you know who any of those officers were?
```

Keefe Reporting Company

Exhibit 1

Osbaldo Jose-Nicolas, #R-72183 v. Nathan Berry, et al.
Osbaldo Jose-Nicolas 5/26/2017

1          A.    Purdom; Berry.  I don't know.  I think it's

2     another -- I can't remember the exact names.

3          Q.    **The major you mentioned, Major Thomas, is**

4     **that his first name or last name?**

5          A.    I don't know if that's his name or last

6     name.

7          Q.    **So they were standing in front of the**

8     **holding cell?**

9          A.    Yes.

10         Q.    **What happened next?**

11         A.    I noticed that the major, Major Thomas, he

12    got close to the sergeant and they were speaking, but

13    they were, like, playing.  But the major hit the

14    sergeant on his knee.

15              THE WITNESS:  No, no, no.

16              THE INTERPRETER.  No.  On the upper leg.

17              And I noticed that his expression changed.

18    The sergeant's expressions had changed after that,

19    like that bothered him.

20         Q.    **(By Ms. Jennings) Do you know what the**

21    **major said to the sergeant?**

22         A.    I know who that sergeant was.

23         Q.    **Do you know what the major said to the**

24    **sergeant?**

Exhibit 1

Osbaldo Jose-Nicolas, #R-72183 v. Nathan Berry, et al.
Osbaldo Jose-Nicolas 5/26/2017

```
 1          A.   I don't believe I can hear her.

 2               THE INTERPRETER:  I have to repeat

 3     everything he's saying.  He thought that I was talking

 4     to him.

 5          Q.   (By Ms. Jennings) Did you hear what the

 6     major said?

 7          A.   No.

 8          Q.   Okay.  You and Diaz were still in the

 9     holding cell?

10          A.   Yes.

11          Q.   What happened next?

12          A.   Then, after the major hit the sergeant's

13     knee, I think he went outside, and all the officers

14     were right in front of the holding cell and right in

15     front of us, and that's when they ran the chow line,

16     and they were -- when they were running out, someone

17     that I knew was going by, and he asked me, "Are you

18     good?"  And I said, "Yes, I'm good."

19          Q.   Who was that inmate?

20          A.   I can't remember.

21          Q.   And what happened next?

22          A.   When I replied to that, the sergeant saw

23     me.  He noticed me, and he told me, "Shut the fuck up

24     and face the wall."
```

Exhibit 1

Osbaldo Jose-Nicolas, #R-72183 v. Nathan Berry, et al.
Osbaldo Jose-Nicolas 5/26/2017

```
 1          Q.    And what did you do?

 2          A.    I did what he told me, but he said, "Sit

 3    down."

 4          Q.    So you were told to sit down?

 5          A.    Yes.

 6          Q.    And did you do that?

 7          A.    And I said, "The floor is cold," and then

 8    he told me again, "Shut the fuck up."

 9                THE WITNESS:  No, no.  "Sit the fuck down."

10                THE INTERPRETER:  "Sit the fuck down."

11                He said, "No, no, no.  Sit the fuck down."

12          Q.    (By Ms. Jennings) And what did you say in

13    response?

14          A.    That the floor was cold.

15          Q.    And what did he say after that?

16          A.    Then they told what happened to Diaz, too,

17    to face the wall.

18          Q.    He told Diaz to face the wall?

19          A.    Yes, they told Diaz that, too, but then

20    from that point on, they said, "No, no.  Cuff up."

21          Q.    And it was the sergeant telling you this

22    the whole time?

23          A.    I don't know if that was the sergeant

24    because I was facing the wall.
```

Keefe Reporting Company

Exhibit 1

Osbaldo Jose-Nicolas, #R-72183 v. Nathan Berry, et al.
Osbaldo Jose-Nicolas 5/26/2017

```
 1          Q.   Did you ever sit down?

 2          A.   No.

 3          Q.   Did you cuff up?

 4          A.   After Diaz was told that he had to cuff it

 5     up, they got him out of the holding center.  Then they

 6     told me to cuff up, too, and I walked backwards and

 7     they cuffed me up.  They handcuffed me.

 8          Q.   Do you know who handcuffed you?

 9          A.   I couldn't see.  They handcuffed me from my

10     back.

11          Q.   Did you resist the cuffing?

12          A.   No.

13          Q.   Did they then let you out of the holding

14     cell?

15          A.   They -- Officer Berry got me out of the

16     holding cell.  He was from the left side.  He was on

17     my left side, and the sergeant was on my right side.

18               So when I was getting out of there, the

19     sergeant, he hit me on my jaw and I fell on the

20     ground, but Officer Berry got me up, and then he took

21     me to the corner of the shower -- and there's a door

22     right there, like in the angle of that shower -- and

23     that's when he smashed my head against the concrete

24     wall.  And he was hitting me on my head.  The sergeant
```

Exhibit 1

Osbaldo Jose-Nicolas, #R-72183 v. Nathan Berry, et al.
Osbaldo Jose-Nicolas 5/26/2017

1    was punching my back and kicking me on my leg, and

2    when I fell, they were kicking me on my back and in my

3    stomach, like right here.  How would you say right

4    here?  I guess my lower stomach.

5              They were wanting to kick me on my stomach.

6    They wanted to kick my groins, but they hit me here on

7    my lower stomach.  So then I told them to stop, but I

8    was trying to breathe and they -- I was gasping.  And

9    then the sergeant, he was mimicking everything that I

10   was saying.  I was like, "(descriptive sound)," and he

11   kept saying, "Shut the fuck up," and he kept punching

12   me.

13        Q.   **What next?**

14        A.   So then he said, "I'm going to take him."

15   The sergeant said, "I'm going to take him," and that's

16   when he grabbed me by my arm, my left arm, and he

17   grabbed me so hard that I fell, and then he got me up

18   again, and the door was in between -- it was hardly

19   open.  When we went through that door, he hit my head.

20   The door -- to open the door, he hit my head.  And I

21   was hardly walking by myself by then.

22        Q.   **Okay.  I'm going to go back a little bit.**

23        A.   Okay.

24        Q.   **So Berry and Qualls escorted you to the**

Exhibit 1

Osbaldo Jose-Nicolas, #R-72183 v. Nathan Berry, et al.
Osbaldo Jose-Nicolas 5/26/2017

```
 1    shower?

 2         A.   No.

 3              THE INTERPRETER:  You said the shower,

 4    right?

 5              MS. JENNINGS:  Yes.

 6              THE INTERPRETER:  No.

 7         Q.   (By Ms. Jennings) Who took you out of the

 8    holding cell?

 9         A.   I didn't hear that question.

10         Q.   Who took you out of the holding cell?

11         A.   I don't remember.

12         Q.   You said that Defendant Berry took you from

13    the left, and then the sergeant was on your right?

14         A.   Yes.

15         Q.   And that was from the holding cell to the

16    shower?

17         A.   Not inside the shower.

18         Q.   On the way to there?

19         A.   Yes.

20         Q.   Okay.  You said that the sergeant hit you

21    on the jaw?

22         A.   On the right side, yes.

23         Q.   Was this before you were in the shower?

24         A.   Before.
```

Keefe Reporting Company

Exhibit 1

Osbaldo Jose-Nicolas, #R-72183 v. Nathan Berry, et al.
Osbaldo Jose-Nicolas 5/26/2017

```
 1          Q.   Was it on the way or right in front of the
 2   holding cell?
 3          A.   When they -- basically instantly right
 4   after they got me out.
 5          Q.   What did he hit you with?
 6          A.   With his fist.
 7          Q.   With a closed fist?
 8          A.   Closed fist.
 9          Q.   How many times did he hit you in the jaw?
10          A.   I can't remember, but it was -- that was
11   the first one, but then when they took me close to the
12   showers, about two, three more times.
13          Q.   When you were initially removed from the
14   cell, it was just one hit?
15          A.   Yes.
16          Q.   And then you fell to the ground?
17          A.   Yes.
18          Q.   And Defendant Berry lifted you up?
19          A.   Yes.
20          Q.   And then you were taken to the shower?
21          A.   Yes.
22          Q.   Were you hit, kicked, or punched any other
23   way between the cell and the shower?
24          A.   No, just at the shower.
```

Keefe Reporting Company

Exhibit 1

Osbaldo Jose-Nicolas, #R-72183 v. Nathan Berry, et al.
Osbaldo Jose-Nicolas 5/26/2017

1          Q.    When you got to the shower, you said they
2    smashed your head into the wall?
3          A.    Yes.
4          Q.    Who did that?
5          A.    Berry.
6          Q.    Were you standing up?
7          A.    I don't understand that question.
8          Q.    Were you standing up or bent over or
9    sitting down?
10         A.    When he hit me against the wall, and they
11   were punching me in the back and my stomach and my
12   jaw, my head, behind my head, and like I said, they
13   got all my air completely out --
14         Q.    So --
15         A.    -- and then I fell.  They were kicking me,
16   also, and they were kicking me -- they were trying to
17   kick my groin areas, my private parts, and then -- but
18   they hurt me right under my stomach, like on my lower
19   stomach on the left side.
20         Q.    How many times did the sergeant
21   hit -- punch you?
22         A.    Many times.
23         Q.    Can you give me an estimate?
24         A.    Since I remember, about 15 times.

Keefe Reporting Company

Exhibit 1

Osbaldo Jose-Nicolas, #R-72183 v. Nathan Berry, et al.
Osbaldo Jose-Nicolas 5/26/2017

```
 1          Q.    So the sergeant punched you about 15 times?

 2          A.    Yes.

 3          Q.    How many times did the sergeant kick you?

 4          A.    That I remember, about nine times.

 5          Q.    How many times was your head hit into the

 6    wall?

 7          A.    Only one time.

 8          Q.    Did the sergeant do anything else to you

 9    other than punch and kick?

10          A.    Can you repeat that question?

11                No, he used to repeat everything --

12                THE WITNESS:  Mimicking.

13                THE INTERPRETER:  He was mimicking me.

14    And, again, he was just punching me.

15          Q.    (By Ms. Jennings) What about physically?

16    Was he doing anything other than punching and kicking?

17          A.    No.

18          Q.    Defendant Berry, how many times did he

19    punch you?

20          A.    About -- since I remember, six times.

21          Q.    And how many times did he kick you?

22          A.    About three times.

23          Q.    And it was Berry who hit your head into the

24    wall?
```

Exhibit 1

Osbaldo Jose-Nicolas, #R-72183 v. Nathan Berry, et al.
Osbaldo Jose-Nicolas 5/26/2017

```
 1        A.   Yes.

 2             Q.   Did Berry do anything else physically?

 3        A.   No.

 4             Q.   Of the 15 punches that the sergeant did,

 5   where were those at?

 6             MS. GOODWIN:  Objection to form;

 7   foundation.

 8             Q.   (By Ms. Jennings) Let me rephrase that

 9   question.

10             You said the sergeant punched you about 15

11   times, right?

12        A.   Yes.

13             Q.   Where on your body did he punch you?

14        A.   On my back, on my head, here on my lower

15   stomach, and on my jaw.

16             Q.   Where on your body did the sergeant kick

17   you?

18        A.   Right here on my ribs, on my lower stomach

19   on the left side.

20             Q.   Anywhere else?

21        A.   In my legs.

22             Q.   Is that it?

23        A.   Kicking me, yes.

24             Q.   Sergeant -- or Defendant Berry, where did
```

Keefe Reporting Company

Exhibit 1

Osbaldo Jose-Nicolas, #R-72183 v. Nathan Berry, et al.
Osbaldo Jose-Nicolas 5/26/2017

```
 1    he punch you at on your body?

 2          A.   My stomach, my back, behind my head, and in

 3    my jaw.

 4          Q.   And where did Defendant Berry kick you?

 5          A.   My legs.

 6          Q.   Then you fell to the ground?

 7          A.   Yes.

 8          Q.   And they were continuing to kick you?

 9          A.   Yes.

10          Q.   The kicks that you received when you were

11    on the ground, did you include those in the numbers

12    you gave me -- include those kicks in the numbers you

13    gave me?

14          A.   I'm not so sure.

15          Q.   So when you said that Sergeant Berry -- or

16    Sergeant -- when you said that the sergeant punched

17    you 15 times, was that all before you hit the ground?

18          A.   Yes.

19          Q.   Okay.  So when you hit the ground, who

20    kicked you?

21          A.   The sergeant.

22          Q.   How many times?

23          A.   About four times.

24          Q.   Where did he kick you on your body?
```

Keefe Reporting Company

Exhibit 1

Osbaldo Jose-Nicolas, #R-72183 v. Nathan Berry, et al.
Osbaldo Jose-Nicolas 5/26/2017

```
 1          A.    Right here in my stomach, on the side, in

 2    my legs.

 3          Q.    Did he punch you while you were on the

 4    ground?

 5          A.    No.  I don't remember that.

 6          Q.    Defendant Berry, did he kick you while you

 7    were on the ground?

 8          A.    I don't remember.

 9          Q.    You asked them to stop?

10          A.    Yes, but I could hardly breathe when I was

11    asking that.

12          Q.    You were gasping for air?

13          A.    Yes.

14          Q.    And that's when the sergeant was mimicking

15    you?

16          A.    Yes.

17          Q.    And they told you to shut up?

18          A.    Yes.

19          Q.    And then they punched you more?

20          A.    Yes.

21          Q.    Were you still on the ground?

22          A.    No.

23          Q.    Who lifted you up?

24          A.    Berry and the sergeant.
```

Keefe Reporting Company

Exhibit 1

Osbaldo Jose-Nicolas, #R-72183 v. Nathan Berry, et al.
Osbaldo Jose-Nicolas 5/26/2017

```
 1            Q.    Who punched you at that point?

 2            A.    The sergeant.

 3            Q.    How many times?

 4            A.    About five times, and then about six times,

 5      he kicked me on my legs.

 6            Q.    When he punched you, where did he punch

 7      you?

 8            A.    My back.

 9            Q.    Anywhere else?

10            A.    In my legs, he kicked me.

11            Q.    Did Defendant Berry kick you or punch you

12      at that point?

13            A.    No, he didn't do any more.  He was only

14      holding me, pushing my head against the wall so that I

15      wouldn't move or fall.

16            Q.    Did you fall again?

17            A.    No.

18            Q.    Is this when they escorted you to the door?

19            A.    When the sergeant grabbed me by my arm,

20      that's when I fell again.

21            Q.    They lifted you up?

22            A.    Yes.

23            Q.    And that's when you were escorted to the

24      door?
```

Keefe Reporting Company

Exhibit 1

Osbaldo Jose-Nicolas, #R-72183 v. Nathan Berry, et al.
Osbaldo Jose-Nicolas 5/26/2017

```
 1        A.   Yes.

 2        Q.   Your head was hit on the door?

 3        A.   Yes.

 4        Q.   Who hit your head on the door?

 5        A.   The sergeant.

 6        Q.   One time or more than once?

 7        A.   One time.

 8        Q.   Did you leave the shower after that?

 9        A.   No.

10        Q.   You stayed in the shower?

11        A.   No, right after the sergeant grabbed me, he

12   took me out, and we came here to North 2.

13        Q.   Okay.  When you were in the shower, did you

14   receive any other hits or punches or kicks other than

15   what you've told me?

16        A.   No.

17        Q.   Was anyone else present?

18        A.   Yes.

19        Q.   Who else was there?

20        A.   Officer Purdom and some other officers, but

21   I can't remember their names.

22        Q.   Can you describe them?

23        A.   No.

24        Q.   Were there any inmates in the shower?
```

Keefe Reporting Company

Exhibit 1

Osbaldo Jose-Nicolas, #R-72183 v. Nathan Berry, et al.
Osbaldo Jose-Nicolas 5/26/2017

```
 1          A.   I don't remember.

 2          Q.   Do you remember anyone else being present?

 3          A.   No.

 4          Q.   Was Officer Snell there?

 5          A.   Yes, I think that that officer was the one

 6   who took Diaz.  Snell had Diaz detained.

 7          Q.   So Snell and Diaz were not in the shower

 8   with you?

 9          A.   No.

10          Q.   At the time you left the shower, what

11   injuries were you aware of?

12          A.   My jaw hurt a lot.  I had -- on my left

13   side, my forehead had an abrasion and here on my lower

14   stomach and on my legs, and my hands hurt, too,

15   especially on this side, the wrist.

16          Q.   While you were in the shower, were you

17   handcuffed?

18          A.   Yes.

19          Q.   Were you cuffed in the front or back?

20          A.   Back.

21          Q.   Other than the cut on your forehead, did

22   you have any other cuts that you knew about?

23          A.   No.

24          Q.   Were you conscious?
```

Keefe Reporting Company

Exhibit 1

Osbaldo Jose-Nicolas, #R-72183 v. Nathan Berry, et al.
Osbaldo Jose-Nicolas 5/26/2017

```
 1        A.   No.

 2        Q.   When did you lose consciousness?

 3        A.   When my head was hurt in the bathroom, in

 4   the showers.

 5        Q.   So you lost consciousness in the shower?

 6        A.   Yes.

 7        Q.   Is this when they hit your head into the

 8   wall?

 9        A.   Yes.

10        Q.   How long were you out for?

11        A.   I can't remember.

12        Q.   Were you conscious when they were punching

13   and kicking you?

14        A.   That's when I lost my conscious.

15        Q.   When you first arrived in the shower?

16             Did you lose your consciousness when you

17   first arrived in the shower?

18        A.   No.

19        Q.   It was during the punches and kicks?

20        A.   Yes.

21        Q.   And you don't know how long you were out

22   for?

23        A.   No.

24        Q.   Were you aware of what was happening to
```

Page 35

Exhibit 1

Osbaldo Jose-Nicolas, #R-72183 v. Nathan Berry, et al.
Osbaldo Jose-Nicolas 5/26/2017

```
 1    you?

 2         A.    No.

 3         Q.    Everything you've testified to, do you

 4    personally recall all of that?

 5              THE INTERPRETER:  Repeat the question for

 6    the interpreter, please.

 7         Q.    (By Ms. Jennings) Everything that you've

 8    been talking about, the punches and kicks, do you

 9    remember all those?

10         A.    Yes.

11         Q.    When you left the shower, were you

12    conscious?

13         A.    Yes.

14         Q.    Who escorted you over to North 2?

15         A.    Sergeant Qualls.

16         Q.    Was anyone else there?

17              MS. GOODWIN:  Objection to form.

18         Q.    (By Ms. Jennings) Did anyone else escort

19    you?

20         A.    No.

21         Q.    Did he punch or kick you at all during the

22    escorting?

23         A.    No, he was just dragging me.

24         Q.    Were your feet touching the floor?
```

Keefe Reporting Company

Exhibit 1

Osbaldo Jose-Nicolas, #R-72183 v. Nathan Berry, et al.
Osbaldo Jose-Nicolas 5/26/2017

```
 1        A.   Yes.

 2        Q.   Were you walking forward?

 3        A.   Yes.

 4        Q.   And you were still handcuffed behind you?

 5        A.   Yes.

 6        Q.   Did the sergeant have ahold of your

 7   handcuffs?

 8        A.   He was holding me from my arm.  I had my

 9   head down, and he was holding me from my arm and

10   walking.

11        Q.   Were you walking?

12        A.   I was forcing myself.

13        Q.   Did you fall during the escort?

14        A.   No.

15        Q.   Where were you placed when you got to

16   North 2?

17        A.   I'm sorry.  When we were walking in the

18   tower that is right in front of North 1, the one that

19   was in that tower told the sergeant, "Take him to the

20   hospital," but the sergeant, he didn't listen to him,

21   or he just decided to act like he didn't hear him

22   because he had his face like he was upset.

23             But the tower told me, "Take him to the

24   hospital," and the sergeant said, "He will get some
```

Keefe Reporting Company

Exhibit 1

Osbaldo Jose-Nicolas, #R-72183 v. Nathan Berry, et al.
Osbaldo Jose-Nicolas 5/26/2017

```
 1   health care treatment at North 2."  But from that
 2   point on, since I was very tired and under a lot of
 3   pain, I was unable to walk and I fell, and the
 4   sergeant was trying to get me up to walk, but I
 5   couldn't walk because he was tired, too.
 6              So then another officer approached, and
 7   then he told the sergeant -- he asked the sergeant if
 8   he needed some help, and between the two of them, they
 9   lifted me up.  They got me up.  Each of them grabbed
10   me from my arm.  And I had a sweater, and they grabbed
11   me from the sweater, and I felt like they were choking
12   me.
13        Q.   Who was that other officer?
14        A.   I don't remember his name, but he was tall.
15        Q.   Do you know if he was one of the
16   defendants?
17        A.   No.
18        Q.   You don't know, or he wasn't?
19        A.   No, he's not.
20        Q.   After they lifted you up, what happened?
21        A.   They left me at the bathroom from Gallery
22   Number 2, and they threw me down to the ground.
23        Q.   So they threw you into the shower in
24   North 2?
```

Keefe Reporting Company

Exhibit 1

Osbaldo Jose-Nicolas, #R-72183 v. Nathan Berry, et al.
Osbaldo Jose-Nicolas 5/26/2017

```
 1          A.   Yes.

 2          Q.   I want to go back to the West Cell House

 3    for a second.

 4          A.   Okay.

 5          Q.   Where is the shower in relation to the

 6    holding cell?

 7          A.   I'm sorry.  Can you repeat that question?

 8          Q.   How far away from the holding cell is the

 9    shower?

10          A.   About five meters.

11          Q.   Did you have to go up or down the stairs?

12          A.   No.

13          Q.   It's on the same level?

14          A.   Yes, it's on the same level.  It's

15    downstairs.

16          Q.   Did the sergeant say anything to you during

17    your escort?

18          A.   No.

19          Q.   Do they put you in the shower in North 2?

20    What happened?  What happened then?

21          A.   They threw me there in the bathroom, in the

22    tub.  I asked for a nurse.  The officer that was there

23    told me, "In a moment, they're going to be here."

24          Q.   Before that, had you asked for a nurse?
```

Keefe Reporting Company

Exhibit 1

Osbaldo Jose-Nicolas, #R-72183 v. Nathan Berry, et al.
Osbaldo Jose-Nicolas 5/26/2017

```
 1          A.   No.  I couldn't.  I wasn't thinking well

 2   enough.

 3          Q.   Do you know who that officer was?

 4          A.   No.

 5          Q.   Do you know what time it was when you got

 6   to North 2?

 7          A.   No.

 8          Q.   How long were you in the shower before you

 9   were seen by medical?

10          A.   About five minutes or more.

11          Q.   Less than ten minutes?

12          A.   I think so.

13          Q.   When you asked for the nurse, had the

14   sergeant already left?

15          A.   Yes.

16          Q.   So after he threw you in the shower, he

17   left?

18          A.   Correct.

19          Q.   Who came to see you?

20          A.   The nurse came, Aimee Lang, and then she

21   asked me, "What happened?"

22          Q.   Did she speak to you in English or Spanish?

23          A.   In English.

24          Q.   Did you understand what she said?
```

Page 40

Exhibit 1

Osbaldo Jose-Nicolas, #R-72183 v. Nathan Berry, et al.
Osbaldo Jose-Nicolas 5/26/2017

```
 1        A.   Yes.

 2        Q.   What did you tell her?

 3        A.   That the officers from the West House, they

 4   have beaten me.

 5        Q.   Did you tell her what injuries you had?

 6        A.   Yes.

 7        Q.   What did you say your injuries were?

 8        A.   I told her that I was in pain.  My jaw was

 9   hurting.  I had a lot of pain in my jaw, right here in

10   my forehead, on the left side of my forehead, and on

11   the left side on my stomach, lower stomach.

12        Q.   Were you able to describe those injuries to

13   her in English?

14        A.   Yes, because I was also pointing.

15        Q.   Did you say anything else to her?

16        A.   Yes, because I noticed that she wasn't

17   writing anything down, and so I said to her, "Why are

18   you not writing anything down about what I'm telling

19   you?"  She said, "Okay," and then she took a piece of

20   paper, but then during that time, she was laughing,

21   and then she told the other police officer -- she

22   said, "Ha ha ha.  He want a lawsuit," and that's when

23   she started writing.

24        Q.   Did you say anything else to her?
```

Keefe Reporting Company

Exhibit 1

Osbaldo Jose-Nicolas, #R-72183 v. Nathan Berry, et al.
Osbaldo Jose-Nicolas 5/26/2017

```
 1          A.   Yes.

 2          Q.   What did you say?

 3          A.   That I needed for her to do an X-ray for my

 4     jaw because I had no idea if it was broken or

 5     dislocated.

 6          Q.   What did she say to that?

 7          A.   She said she can see that it was fine and

 8     that I have nothing, and then she left me.

 9          Q.   Did she say anything else to you before she

10     left?

11          A.   No.

12          Q.   Did you ask her for anything other than an

13     X-ray?

14          A.   I don't remember.

15          Q.   At this time back in 2014, did you take

16     medication daily?

17          A.   No.

18          Q.   Did you ask anyone else for medical

19     attention after she left?

20          A.   On that day, no.  I can't remember.

21          Q.   So on that day, the only person you asked

22     for medical attention was the officer and the nurse?

23          A.   That's correct.

24          Q.   And the officer was the one in North 2?
```

Keefe Reporting Company

Exhibit 1

Osbaldo Jose-Nicolas, #R-72183 v. Nathan Berry, et al.
Osbaldo Jose-Nicolas 5/26/2017

```
 1        A.   Yes.
 2        Q.   Can you describe the cut in your forehead?
 3        A.   No, because I couldn't see.  I couldn't
 4   just see it.
 5        Q.   Was it bleeding?
 6        A.   Yes.
 7        Q.   Was the blood dripping down your face?
 8        A.   It was painful, most of all.  At first, it
 9   was, but then I cleaned it up.  I noticed that I had
10   blood when I put my hand on it.
11        Q.   So you noticed blood when you touched it?
12        A.   Yes.
13        Q.   Was it a lot of blood?
14        A.   At that moment, yes.
15        Q.   Did it stop bleeding?
16        A.   Yes.
17        Q.   When did it stop bleeding?
18        A.   I don't know.  I can't remember.  But it
19   wasn't dripping.  The blood wasn't dripping.
20        Q.   Did it stop that day?
21        A.   Yes.
22        Q.   When you noticed it when you touched it,
23   was that before Nurse Lang came to see you?
24        A.   After.
```

Keefe Reporting Company

Exhibit 1

Osbaldo Jose-Nicolas, #R-72183 v. Nathan Berry, et al.
Osbaldo Jose-Nicolas 5/26/2017

```
 1          Q.    How long did you stay in the showers?

 2          A.    I can't remember.

 3          Q.    Did you see anyone else in the showers in

 4   North 2?

 5          A.    No, just the police.

 6          Q.    Did they come to check on you?

 7          A.    No.

 8          Q.    Did they come to escort you to a cell?

 9          A.    Yes.

10          Q.    Were any of the defendants there at that

11   point?

12          A.    No.

13          Q.    So officers in North 2 escorted you to your

14   cell?

15          A.    Can you repeat that question?  I'm sorry.

16          Q.    Officers in North 2 escorted you to a

17   segregation cell?

18          A.    No.

19          Q.    How were you removed from the showers in

20   North 2?

21          A.    The officer that works at North 2, he took

22   the handcuff off, and he told me to change my clothes

23   and he gave me some -- from North 2, that's where he

24   gave me some clothes, from there, and then when I
```

Keefe Reporting Company

Exhibit 1

Osbaldo Jose-Nicolas, #R-72183 v. Nathan Berry, et al.
Osbaldo Jose-Nicolas 5/26/2017

```
 1   changed, that's when he took me to Gallery Number 4.

 2   I can't remember which cell.

 3          Q.    When Aimee Lang was there, were you

 4   handcuffed?

 5          A.    I can't remember.

 6          Q.    Who removed the cuffs from you when you

 7   were in the segregation shower?

 8          A.    The officer that works at North 2.

 9          Q.    Once you got to 4 Gallery, when's the next

10   time you saw a medical professional?

11          A.    Since I was under pain, I found a way to

12   make an appointment, and I did.  I requested to see

13   someone so that they could check my jaw and my left

14   side of my stomach -- on my lower stomach on the left

15   side, and also my forehead.  And I wanted to know if

16   they could do an X-ray because I wanted to find out

17   why was that hurting so much.  I wanted to know if it

18   was something dislocated or broken.

19          Q.    On 4 Gallery, did you ask for medical

20   attention?

21          A.    I was trying to.

22          Q.    Who were you trying to ask?

23          A.    The officers that worked there.

24          Q.    And a couple of days later, you saw a
```

Keefe Reporting Company

Exhibit 1

Osbaldo Jose-Nicolas, #R-72183 v. Nathan Berry, et al.
Osbaldo Jose-Nicolas 5/26/2017

```
 1    nurse?

 2        A.   Yes.

 3        Q.   Do you recall who that nurse was?

 4        A.   Ms. Missy.

 5        Q.   And she referred you to the dentist?

 6        A.   When I arrived there to see her, I told her

 7    what I had.  I told her that I had pain in my

 8    forehead.  I had pain here under my stomach on the

 9    left side on the lower side, and my jaw hurt and that

10    I couldn't open it up a lot.  I couldn't even eat.

11    And when I was trying to open it up and close it, it

12    was making a sound.  So that's when she referred me to

13    X-ray.

14        Q.   And she referred you to the dentist?

15        A.   Yes.

16        Q.   Were you ever diagnosed with a hernia?

17        A.   No.

18        Q.   Did you ever receive treatment other than

19    Tylenol?

20        A.   I can't remember.

21        Q.   Were you ever sent outside of the prison

22    for a medical appointment?

23        A.   Yes, but that was about September 2014.

24        Q.   Was that related to your injuries from this
```

Keefe Reporting Company

Exhibit 1

Osbaldo Jose-Nicolas, #R-72183 v. Nathan Berry, et al.
Osbaldo Jose-Nicolas 5/26/2017

```
 1    incident?

 2         A.   No.

 3         Q.   The next day, you received two disciplinary

 4    tickets, right?

 5         A.   Yes.

 6         Q.   The first one was regarding items found in

 7    your cell?

 8              THE INTERPRETER:  Can you repeat the

 9    question for the interpreter, please?

10         Q.   (By Ms. Jennings) The first one was

11    regarding items found in your cell?

12         A.   That's what the ticket stated.

13              MS. JENNINGS:  I'm going to mark something.

14              I'm going to mark this as Defendant's

15    Exhibit A.

16              (Defendant's Exhibit A, Ticket, was

17    marked.)

18         Q.   (By Ms. Jennings) Is this one of the

19    tickets you received?

20         A.   Yes.

21         Q.   And this ticket says that homemade

22    intoxicants were found in your cell?

23         A.   That's what it says here.

24         Q.   Were you present when your cell was
```

Keefe Reporting Company

Exhibit 1

Osbaldo Jose-Nicolas, #R-72183 v. Nathan Berry, et al.
Osbaldo Jose-Nicolas 5/26/2017

```
 1   searched?

 2         A.   No, I was not.  I was in the kitchen

 3   eating.

 4         Q.   You were served with a copy of this ticket?

 5         A.   Yes.

 6              MS. JENNINGS:  I'm going to mark another

 7   Exhibit B.

 8              (Defendant's Exhibit B, Ticket, was

 9   marked.)

10         Q.   (By Ms. Jennings) I'm showing you what's

11   marked as Exhibit B.

12              Is this the other ticket you got that day?

13         A.   Yes.

14         Q.   And this ticket says that you were told to

15   stop interfering with line movement and to have a

16   seat?

17         A.   That's what it says in here.

18         Q.   You were served a copy of this ticket?

19         A.   Yes.

20         Q.   Both of these exhibits indicate that you

21   were served on February 6, 2014; is that correct?

22         A.   I'm sorry.  I don't believe -- can you

23   repeat that question again?

24         Q.   The disciplinary tickets in front of you,
```

Page 48

Exhibit 1

Osbaldo Jose-Nicolas, #R-72183 v. Nathan Berry, et al.
Osbaldo Jose-Nicolas 5/26/2017

```
 1    they both say that you were served on
 2    February 6, 2014?
 3         A.   Yes.
 4         Q.   And is that when you were served?
 5         A.   I'm sorry.  Repeat the question again.
 6         Q.   Is that when you actually were served?
 7         A.   Yes.
 8         Q.   You went before the Adjustment Committee on
 9    February 10, 2014; is that correct?
10         A.   Yes.
11         Q.   Okay.
12         A.   So I have something to say.  Can I say
13    something?
14         Q.   Sure.
15         A.   When I received those tickets, I wanted to
16    cite some witness, but I didn't have any time because
17    the officer only threw them through my door.  I didn't
18    have the chance to sign them and to write down the
19    name of the witness.
20              MS. JENNINGS:  C.
21              (Defendant's Exhibit C, Final summary
22    report, was marked.)
23         Q.   Did you receive a copy of the tickets?
24         A.   Yes.
```

Keefe Reporting Company

Exhibit 1

Osbaldo Jose-Nicolas, #R-72183 v. Nathan Berry, et al.
Osbaldo Jose-Nicolas 5/26/2017

```
 1          Q.   After you got your copy, did you attempt to

 2   write down any requests for a witness?

 3          A.   I couldn't do it because I didn't have a

 4   pen or something to write it down.

 5          Q.   I'm going to show you what we've marked as

 6   Exhibit C.

 7               MS. GOODWIN:  For the record, what is the

 8   Bates number?  Is that the 44?

 9               MS. JENNINGS:  44 and 45.

10          Q.   (By Ms. Jennings) Have you seen this

11   before?

12          A.   Yes.

13          Q.   And this is the final summary report from

14   the Adjustment Committee; is that right?

15          A.   Yes.

16          Q.   It says towards the top that the hearing

17   date was February 10th?

18          A.   Yes.

19          Q.   And this is for both of the tickets that I

20   showed you?

21          A.   Okay.

22          Q.   Do you agree with that?

23          A.   With the date, yes.

24          Q.   Did the Adjustment Committee come to your
```

Exhibit 1

Osbaldo Jose-Nicolas, #R-72183 v. Nathan Berry, et al.
Osbaldo Jose-Nicolas 5/26/2017

1   cell?

2        A.   No.

3        Q.   **You left your cell?**

4        A.   Yes.

5        Q.   **Where did you go?**

6        A.   An officer got me out of my cell, and he

7   took me to the Adjustment Committee.

8        Q.   **Where was that at?**

9        A.   The North 2.  I think on the second floor.

10       Q.   **Was it on the same gallery?**

11       A.   I think so.

12       Q.   **Did you have to go up or downstairs?**

13       A.   I can't -- I don't remember.

14       Q.   **Was it an office?**

15       A.   No.  No, I don't remember.

16       Q.   **Was it a little room?**

17       A.   Yes.

18       Q.   **Who was there?**

19       A.   Someone with a white shirt and some other

20   officers.

21       Q.   **How many?**

22       A.   Three or four.  I'm not so sure.

23       Q.   **Were any other inmates there?**

24       A.   No.

Exhibit 1

Osbaldo Jose-Nicolas, #R-72183 v. Nathan Berry, et al.
Osbaldo Jose-Nicolas 5/26/2017

```
 1          Q.    What happened when you arrived?

 2          A.    The one with the white shirt, he started

 3   reading the citations, and I told him that I wanted to

 4   have my witness there, and he said that, "You lost the

 5   chance because you didn't sign it," but I found a way

 6   so that I could write something down, and I presented

 7   that to him and he read that, and then he handed it

 8   back to me.  And I told him -- well, he asked me how I

 9   pled, guilty or not guilty, and I said not guilty.

10          Q.    Who was the witness you wanted?

11          A.    The officer that wrote the ticket,

12   the -- 203 and 202, and from 304 to 303, I wanted

13   Inmate Diaz.

14          Q.    Did you tell the Adjustment Committee who

15   you wanted as your witness?

16          A.    I don't remember.  I only wrote it down.

17          Q.    When you wrote something down, what did

18   that say?

19          A.    That in this ticket --

20          Q.    And that's Exhibit A?

21          A.    Yes.  Exhibit A, that it didn't have the

22   cell number and it didn't say which cell was found the

23   contraband, the possession, and, also, it said here

24   something intoxicant was there, a needle in
```

Keefe Reporting Company

Exhibit 1

Osbaldo Jose-Nicolas, #R-72183 v. Nathan Berry, et al.
Osbaldo Jose-Nicolas 5/26/2017

```
 1    box 008851, and a TV, that that wasn't mine.
 2         Q.    That's what you wrote and gave to the
 3    Adjustment Committee?
 4         A.    Yes.
 5         Q.    Did you write anything about the other
 6    ticket?
 7         A.    Yes.  I said -- I never said this.  That's
 8    what the officer said, that I was interrupting with
 9    the line and that he said to stop and have a seat, but
10    the holding cell in the even side, there are not
11    chairs to sit down, so he couldn't just say, "Have a
12    seat," because what happened is what I said, but he
13    said, "Sit the fuck down."  That's what he said.  He
14    didn't say, like he says here, "Have a seat," and that
15    I responded.  I don't know what it says in here.
16    Something like that.  He wrote down that I said, "Fuck
17    that," and I didn't say that, either.
18         Q.    You put all of that in your writing?
19         A.    Yes.  And that I told him to take this into
20    consideration and to give me the less -- minimum time
21    that they could, but this one here had nothing to do
22    with it.
23         Q.    When you wanted Inmate Diaz to be your
24    witness, did you want him to support that you didn't
```

Keefe Reporting Company

Exhibit 1

Osbaldo Jose-Nicolas, #R-72183 v. Nathan Berry, et al.
Osbaldo Jose-Nicolas 5/26/2017

1    say, "Fuck that"?

2          A.    That's correct.

3          Q.    **Anything else you wanted him to say as your**

4    **witness?**

5          A.    I couldn't force him about this one, but

6    here, that's the exhibit.

7          Q.    **Number A or Letter A?**

8          A.    Yes, the A.

9          Q.    **Okay.  Did you understand what the two**

10   **tickets were charging you with?**

11         A.    No.

12         Q.    **You had them in your cell with you for a**

13   **few days?**

14         A.    Yes.

15         Q.    **Did you have a cellmate?**

16         A.    No.

17         Q.    **Did you have other inmates near you who**

18   **spoke Spanish?**

19         A.    No.

20         Q.    **You understood what -- did you understand**

21   **what the charges were?**

22         A.    Yes.

23         Q.    **And you understood enough to tell them you**

24   **didn't do it?**

Keefe Reporting Company

Exhibit 1

Osbaldo Jose-Nicolas, #R-72183 v. Nathan Berry, et al.
Osbaldo Jose-Nicolas 5/26/2017

```
 1          A.   Yes.

 2          Q.   Defendants Hughes and Hart, were they the

 3     Adjustment Committee chairpeople?

 4          A.   I think that Hughes was the chairman.

 5          Q.   And was Hart also present?

 6          A.   Yes.

 7          Q.   Did you ever request to have a translator?

 8          A.   On the note, I asked for a translator.

 9          Q.   Did you write the note in Spanish or

10     English?

11          A.   In English.

12          Q.   Did someone help you write it?

13          A.   No.

14          Q.   You knew enough English to be able to write

15     it down?

16          A.   I believe he could understand what I was

17     trying to write down because it wasn't too hard to ask

18     for an interpreter, and I'm familiarized a little bit

19     with the letters, but I have a lot of problems to

20     pronounce it.

21          Q.   It's easier for you to write it down?

22          A.   What I wrote down, yes.

23          Q.   You wrote a grievance after this, right?

24          A.   Yes, but when we were at the
```

Keefe Reporting Company

Exhibit 1

Osbaldo Jose-Nicolas, #R-72183 v. Nathan Berry, et al.
Osbaldo Jose-Nicolas 5/26/2017

```
 1    Adjustment Committee, I told the chairman to provide

 2    me with the rights to appeal to -- I mean I told him

 3    in English.  I told him, "Could you please motion me

 4    my rights to appeal?"  And then he said, "You have the

 5    right."  He told the officer, "Take him out.  Take him

 6    out," and that's when they took me out, and then he

 7    gave me back that paper that I gave him.

 8         Q.   Do you still have that paper?

 9         A.   No.

10         Q.   What did you do with it?

11         A.   I threw it away.

12              MS. JENNINGS:  Can we mark this as

13    Exhibit D?

14              (Defendant's Exhibit D, Grievance, was

15    marked.)

16              MS. JENNINGS:  And this is Pages 42 and 43.

17         Q.   (By Ms. Jennings) Is that a grievance you

18    filed?

19         A.   Yes.

20         Q.   Is that your handwriting?

21         A.   Yes.

22         Q.   You can take a minute to read it.  And let

23    me know when you've had a chance to review it.

24         A.   Okay.  I read it.
```

Keefe Reporting Company

Exhibit 1

Osbaldo Jose-Nicolas, #R-72183 v. Nathan Berry, et al.
Osbaldo Jose-Nicolas 5/26/2017

```
 1          Q.    Did anyone help you write this grievance?

 2          A.    No.

 3          Q.    Is this your handwriting?

 4          A.    Yes.

 5          Q.    Is this grievance true and accurate?

 6          A.    Yes.

 7          Q.    Is there anything in this grievance that's

 8   not accurate?

 9          A.    No, everything is correct.

10          Q.    I'm going to go through each of the

11   defendants really quickly.  Okay?

12          A.    Okay.

13          Q.    So I'm going to start with Defendant Berry.

14   Your claim against him is excessive force, failure to

15   intervene, deliberate indifference, battery, assault,

16   intentional infliction of emotional distress, and

17   negligence.  Does that sound right to you?

18               MS. GOODWIN:  Objection to form.

19               THE INTERPRETER:  Yes.

20          Q.    (By Ms. Jennings) We've talked about the

21   facts and what happened in February of 2014.  Is there

22   anything that Defendant Berry did or did not do that's

23   relevant to the claims against him that you haven't

24   mentioned?
```

Exhibit 1

Osbaldo Jose-Nicolas, #R-72183 v. Nathan Berry, et al.
Osbaldo Jose-Nicolas 5/26/2017

```
 1          A.   I'm sorry.  Can you repeat that question?
 2          Q.   Is there anything that Defendant Berry did
 3     or did not do that's relevant to the claims against
 4     him that you haven't mentioned already?
 5               MS. GOODWIN:  Objection to form.
 6               THE INTERPRETER:  I don't think so.  I
 7     think everything that I wrote down is fine.
 8          Q.   (By Ms. Jennings) Have we talked about
 9     everything today that Defendant Berry did?
10               MS. GOODWIN:  Same objection to form.
11               THE INTERPRETER:  I'm sorry.  Repeat the
12     question again.  I couldn't hear it.
13          Q.   (By Ms. Jennings) Let me try to rephrase
14     it.
15               For Defendant Berry, we've talked about him
16     punching and kicking you and being present in the
17     shower.  Is there anything else that he did or did not
18     do regarding this complaint?
19               MS. GOODWIN:  Objection to form.
20               THE INTERPRETER:  No.
21          Q.   (By Ms. Jennings) Before this incident, had
22     you interacted with Defendant Berry?
23          A.   I don't remember.
24          Q.   What about after this incident?
```

Keefe Reporting Company

Exhibit 1

Osbaldo Jose-Nicolas, #R-72183 v. Nathan Berry, et al.
Osbaldo Jose-Nicolas 5/26/2017

```
 1          A.   No.

 2          Q.   For Defendant Qualls, the sergeant, what is

 3     your claim against him?

 4               MS. GOODWIN:  Objection to form; calls for

 5     a legal conclusion.  It's all laid out in the

 6     complaints.

 7               You can answer, if you know.

 8               THE INTERPRETER:  Excessive force,

 9     deliberate indifference, emotional distress.  That's

10     the only thing I can think of.

11          Q.   (By Ms. Jennings) Did Sergeant Qualls do

12     anything to you other than what we've talked about

13     today?

14               MS. GOODWIN:  Objection to form.

15               THE INTERPRETER:  No.

16          Q.   (By Ms. Jennings) Had you interacted with

17     the sergeant before this incident?

18          A.   No.

19          Q.   Have you interacted with him since then?

20          A.   No.

21          Q.   Officer Snell, he wrote you the

22     disciplinary ticket?  No, he didn't.  Never mind.

23               Officer Snell was the one you said escorted

24     Diaz, correct?
```

Osbaldo Jose-Nicolas, #R-72183 v. Nathan Berry, et al.
Osbaldo Jose-Nicolas 5/26/2017

```
 1            A.   I wasn't so sure if he was the one who
 2     escorted Diaz, but I'm sure that he's the one that got
 3     him out of the holding cell.
 4            Q.   Was Officer Snell present when you were in
 5     the shower in the West House?
 6            A.   Yes.
 7            Q.   He was in the shower with you?
 8            A.   No.
 9            Q.   Was he there when you were removed from the
10     holding cell?
11            A.   Yes.
12            Q.   Was he there when you say you were punched
13     by the sergeant?
14            A.   Yes.
15            Q.   Was Officer Snell there for any of the
16     other hits or punches or kicks?
17            A.   Can you repeat that question, please?
18            Q.   Was Officer Snell there for any of the
19     other punches or kicks?
20            A.   No, I don't remember.
21            Q.   Did you ever ask him, Officer Snell, for
22     medical care?
23            A.   No, I couldn't ask him due to the
24     conditions that I had at that time.
```

Exhibit 1

Osbaldo Jose-Nicolas, #R-72183 v. Nathan Berry, et al.
Osbaldo Jose-Nicolas 5/26/2017

```
 1            Q.   Did you have any interactions with him
 2    before this, Officer Snell?
 3            A.   No.
 4            Q.   Have you interacted with him after this?
 5            A.   No.
 6            Q.   Officer Purdom, was he present when you
 7    were removed from the holding cell?
 8            A.   Yes.
 9            Q.   Was he present in the shower in the
10    West House?
11            A.   Yes.
12            Q.   He was present the whole time you were in
13    the shower?
14            A.   I'm sorry.  Repeat the question again.
15            Q.   Was Officer Purdom present the entire time
16    you were in the West House shower?
17            A.   Yes.
18            Q.   Did he come into contact with you
19    physically in any way?
20            A.   No.
21            Q.   Did you ask him for medical care?
22            A.   No, I couldn't because of the conditions
23    that I was in.
24            Q.   Did you interact with Officer Purdom before
```

Exhibit 1

Osbaldo Jose-Nicolas, #R-72183 v. Nathan Berry, et al.
Osbaldo Jose-Nicolas 5/26/2017

```
 1   this incident?

 2        A.   I spoke with Officer Purdom, but way too

 3   long before that incident happened.

 4        Q.   Did you have any problems with him?

 5        A.   No.

 6        Q.   Have you spoken to him since?

 7        A.   No.

 8        Q.   Aimee Lang, the issue you have with her is

 9   that she didn't provide you with enough treatment that

10   day, right?

11             MS. GOODWIN:  Objection to form.

12        Q.   (By Ms. Jennings) Are you unhappy with the

13   treatment she provided you?

14             MS. GOODWIN:  Objection to form.

15             THE INTERPRETER:  Correct.

16        Q.   (By Ms. Jennings) Was Aimee Lang present in

17   the West Cell House?

18        A.   Yes.

19             THE WITNESS:  No, no, no.  No.

20             THE INTERPRETER:  No.

21        Q.   (By Ms. Jennings) Did you interact with her

22   after the interaction on February 5, 2014?

23        A.   Yes.

24        Q.   Did she treat you for the injuries you got
```

Exhibit 1

Osbaldo Jose-Nicolas, #R-72183 v. Nathan Berry, et al.
Osbaldo Jose-Nicolas 5/26/2017

1    this day?

2         A.    No.

3         Q.    Do you have any problems with her?

4              MS. GOODWIN:  Objection to form.

5              THE INTERPRETER:  No.

6         Q.    (By Ms. Jennings) Defendant Hughes, is your

7    claim against him based on his serving on the

8    Adjustment Committee?

9         A.    Yes.

10        Q.    What is it that you say Defendant Hughes

11   did or didn't do?

12             MS. GOODWIN:  Objection to form; calls for

13   a legal conclusion.

14             You can answer.

15             THE INTERPRETER:  The Officer Hughes, he

16   didn't do the investigation to receive this citation,

17   the Exhibit A.

18        Q.    (By Ms. Jennings) Anything else?

19        A.    He didn't mention to me -- he didn't

20   admonish me the appellate rights to this citation.

21        Q.    Did you know you had rights to appeal?

22        A.    Yes.

23        Q.    What was your understanding of what you

24   have to do to appeal your ticket?

Keefe Reporting Company

Exhibit 1

Osbaldo Jose-Nicolas, #R-72183 v. Nathan Berry, et al.
Osbaldo Jose-Nicolas 5/26/2017

```
 1          A.    That he had to mention what was the next
 2   step to appeal to that citation.
 3          Q.    Did you know what the next step was?
 4          A.    No.
 5          Q.    Did you write a grievance about it?
 6          A.    About what?
 7          Q.    About the Adjustment Committee hearing?
 8          A.    Yes.
 9          Q.    And Defendant Hart, he was also on the
10   Adjustment Committee, right?
11          A.    Yes.
12          Q.    So is your complaint regarding him the same
13   as with Hughes?
14                MS. GOODWIN:  Objection to form.
15                THE INTERPRETER:  And Officer Hart, I
16   stated that he didn't have any -- an adequate
17   investigation to decide what was the best time that
18   they were going to give me for the citation in
19   Exhibit A.
20          Q.    (By Ms. Jennings) So you had an issue with
21   how Hughes and Hart handled the hearing?
22          A.    Yes.
23          Q.    And Defendant Harrington, who was he?
24                MS. GOODWIN:  Objection to form.
```

Osbaldo Jose-Nicolas, #R-72183 v. Nathan Berry, et al.
Osbaldo Jose-Nicolas 5/26/2017

```
 1          Q.   (By Ms. Jennings) Who was he at the time of
 2    the -- in February of 2014?
 3          A.   Guardian.
 4          Q.   The warden?
 5          A.   Yes.
 6          Q.   Did you interact with him?
 7          A.   No.
 8          Q.   In your complaint, you allege that he
 9    signed off on the disciplinary ticket?
10          A.   Yes.
11          Q.   Is that the basis of your complaint against
12    him?
13          A.   Yes.
14          Q.   Was he present at all for the events that
15    took place on February 5th?
16          A.   I don't remember.
17          Q.   Other than the physical injuries you've
18    already described, tell me any other injuries you had.
19          A.   No, that's it.  Right now, I still have the
20    problem with my jaw.  When I'm eating, like, something
21    hard, it makes that clicking sound and it hurts.
22          Q.   Any other physical injuries you haven't
23    already described?
24          A.   No.
```

Keefe Reporting Company

Exhibit 1

Osbaldo Jose-Nicolas, #R-72183 v. Nathan Berry, et al.
Osbaldo Jose-Nicolas 5/26/2017

```
 1          Q.    Any emotional injuries?

 2          A.    As of right now, no.

 3          Q.    In your complaint, you allege that the

 4     defendants breached their duty of care to you.  Do you

 5     know what that means?

 6                MS. GOODWIN:  Objection to form; calls for

 7     a legal conclusion.

 8                You can answer.

 9                THE INTERPRETER:  No.

10          Q.    (By Ms. Jennings) Did anyone ever tell you

11     why the defendants would have used excessive force

12     against you?

13          A.    No.

14          Q.    Have you spoken to anyone about this case

15     other than your attorney?

16          A.    No.

17          Q.    Have you spoken to Inmate Diaz since this

18     accident?

19          A.    He told me that he was going to give me an

20     affidavit to help me out.

21          Q.    Did he tell you what it would say?

22          A.    No.

23          Q.    Did he provide you with an affidavit?

24          A.    Yes.
```

Keefe Reporting Company

Exhibit 1

Osbaldo Jose-Nicolas, #R-72183 v. Nathan Berry, et al.
Osbaldo Jose-Nicolas 5/26/2017

```
1          Q.    When did that happen?

2          A.    I don't remember.

3          Q.    Was it before you filed the lawsuit?

4          A.    Before.  Before I did the lawsuit.

5          Q.    Did you say anything else to him?

6          A.    No, I just told him thank you.

7          Q.    Did he say anything else to you?

8          A.    No.

9          Q.    How did he get the affidavit to you?

10         A.    When we -- I'm not so sure.  I think it was

11    when we got out of the segregation.

12         Q.    When you spoke to him, was that when you

13    were in segregation?

14         A.    At the exit.  When we exit segregation

15    population -- to go to population.

16         Q.    That's when you spoke to him?

17         A.    Yes.

18         Q.    Where were you at?  Were you at the end of

19    the gallery?

20         A.    My location?  I really don't understand the

21    question.

22         Q.    Your location, your physical location.

23         A.    When I spoke with Diaz or when?

24         Q.    Yes.
```

Keefe Reporting Company

Exhibit 1

Osbaldo Jose-Nicolas, #R-72183 v. Nathan Berry, et al.
Osbaldo Jose-Nicolas 5/26/2017

```
 1          A.    In the holding cell, from the one here in

 2    North 2.

 3          Q.    You were both in there at the same time?

 4          A.    Yes.

 5          Q.    You were both going back to general

 6    population at the same time?

 7          A.    Yes.

 8          Q.    Have you spoken to anyone else about this

 9    case?

10          A.    No.

11          Q.    Other than the people we've already talked

12    about, do you have any other witnesses that saw this

13    happen on February 5th?

14          A.    Another person approached me and he said,

15    "What happened?" and then I asked, "What are you

16    talking about?"  And he's like, "I saw what happened

17    to you," and then he told me what he was doing, and he

18    said, "Are you going to -- are you going to have a

19    lawsuit about that?"  And I told him -- basically, I

20    didn't want to tell him anything because I didn't want

21    for him to know what I was planning to do, and then he

22    told me he was going to provide me an affidavit

23    because he saw everything that happened, and he did.

24    He gave me the affidavit.
```

Keefe Reporting Company

Exhibit 1

Osbaldo Jose-Nicolas, #R-72183 v. Nathan Berry, et al.
Osbaldo Jose-Nicolas 5/26/2017

```
 1          Q.    What's his name?

 2          A.    I can't remember.

 3          Q.    Do you know of any other witnesses?

 4          A.    No.

 5          Q.    The other inmate who provided you the

 6     affidavit, do you know if he's still here at Menard?

 7          A.    Yes.

 8          Q.    He is here?

 9          A.    At Menard?  Yes.

10          Q.    What relief are you seeking?

11                MS. GOODWIN:  Objection to form; calls for

12     a legal conclusion.

13                You can answer, if you know.

14                THE INTERPRETER:  I ask what it says in

15     here, in Exhibit D.

16          Q.    (By Ms. Jennings) You want money damages?

17                MS. GOODWIN:  Objection to form.

18                THE INTERPRETER:  Yes.

19          Q.    (By Ms. Jennings) Do you have a specific

20     amount you are seeking?

21                MS. GOODWIN:  Objection to form, and it

22     calls for a legal conclusion.  I think this is a

23     question that -- if you want to talk settlement, we

24     can go ahead and do so, but any specific amount that
```

Keefe Reporting Company

Exhibit 1

Osbaldo Jose-Nicolas, #R-72183 v. Nathan Berry, et al.
Osbaldo Jose-Nicolas 5/26/2017

1   he's seeking in the lawsuit, I don't think he needs to

2   provide today.

3            MS. JENNINGS:  Well, I think if he is

4   seeking a specific amount, he does need to provide it,

5   but if he doesn't have a number, then that could be

6   his answer.

7            MS. GOODWIN:  I think that that's something

8   he should talk to me about before answering.

9            MS. JENNINGS:  So are you instructing him

10  not to answer?

11           MS. GOODWIN:  Yeah, I'm going to instruct

12  him not to answer.

13       **Q.   (By Ms. Jennings) Are you seeking anything**

14  **other than money?**

15       A.   Yes.

16       **Q.   What would that be?**

17       A.   I'm asking to be transferred to another

18  prison with a minimum security and give me access to

19  classes.

20       **Q.   Anything else?**

21       A.   Punitive damages and compensatory damages.

22       **Q.   Other than the times where you told me you**

23  **didn't understand a question and I rephrased it or**

24  **repeated it, have you understood my questions today?**

Osbaldo Jose-Nicolas, #R-72183 v. Nathan Berry, et al.
Osbaldo Jose-Nicolas 5/26/2017

```
 1          A.   Yes.

 2          Q.   And have you answered all questions

 3   truthfully?

 4          A.   Yes.

 5          Q.   I don't have anything else.

 6               MS. GOODWIN:  I don't have any questions,

 7   and we will waive signature.

 8               (WHEREIN, the deposition was concluded at

 9   12:44 p.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

Keefe Reporting Company

Exhibit 1

Osbaldo Jose-Nicolas, #R-72183 v. Nathan Berry, et al.
Osbaldo Jose-Nicolas 5/26/2017

```
 1              CERTIFICATE OF REPORTER
 2       I, SARAH MECKLENBURG, a Certified Shorthand
 3   Reporter (IL), do hereby certify that the witness
 4   whose testimony appears in the foregoing deposition
 5   was duly sworn by me; that the testimony of said
 6   witness was taken by me to the best of my ability and
 7   thereafter reduced to typewriting under my direction;
 8   that I am neither counsel for, related to, nor
 9   employed by any of the parties to the action in which
10   this deposition was taken, and further, that I am not
11   a relative or employee of any attorney or counsel
12   employed by the parties thereto, nor financially or
13   otherwise interested in the outcome of the action.
14
15
16                   SARAH MECKLENBURG
17                   IL CSR 084-004858
18
19
20
21
22
23
24
```

Keefe Reporting Company

Exhibit 1