```
 1            IN THE UNITED STATES DISTRICT COURT
          FOR THE SOUTHERN DISTRICT OF ILLINOIS
 2                  EAST ST. LOUIS DIVISION

 3   OSBALDO J. NICOLAS,                     )
                                             )
 4                  Plaintiff,               )
                                             )
 5       vs.                                 ) No. 15 CV 0964
                                             )
 6   NATHAN BERRY; WILLIAM QUALLS;           )
     JUSTIN SNELL; MATHEW PURDOM;            )
 7   ROBERT HUGHES; JASON HART;              )
     RICHARD HARRINGTON; KIMBERLY            )
 8   BUTLER; and AMY LANG,                   )
                                             )
 9                  Defendants.              )

10

11

12           The videoconference deposition of WILLIAM

13   DAVID QUALLS, taken pursuant to the Federal Rules

14   of Civil Procedure, before Suzanne Thalji,

15   Certified Shorthand Reporter No. 084-002337, at

16   20 North Clark Street, Suite 1260, Chicago,

17   Illinois, on Monday, July 31, 2017, commencing at

18   12:21 o'clock p.m. pursuant to notice.

19

20

21

22

23

24
```

Exhibit 2

WILLIAM QUALLS, 07/31/2017

Page 6

```
 1  year ago.
 2      Q.    And was that through the process that
 3  you just described of having your Legal Department
 4  contact you?
 5      A.    Yes, ma'am.
 6      Q.    Okay.  Do you recall what information
 7  you learned about Osbaldo Nicolas's allegations
 8  against you at the time you received that packet of
 9  information?
10      A.    At the time I received it, I can't read
11  it.  I just sign for it, and then you kind of read
12  it -- you get a chance to read it later on.  I was
13  kind of surprised to hear some of the accusations
14  that were being made.
15      Q.    What is your recollection of the
16  accusations that were made?
17      A.    Well, the one that I can actually
18  remember was that I supposably had someone else
19  hold him up while I punched him in the face.
20      Q.    And you deny doing that?
21      A.    Absolutely, absolutely.
22      Q.    Have you ever been accused by any other
23  inmate at Menard Correctional Center for using
24  excessive force against them?
```

WILLIAM QUALLS, 07/31/2017

```
                                                       Page 34
 1      A.    Yes, ma'am.
 2      Q.    Okay.  And do you recall taking Osbaldo
 3 Nicolas to segregation?
 4      A.    I do not particularly recall it, no.
 5      Q.    Do you recall him slipping on ice
 6 outside when he was en route to segregation?
 7      A.    If my recollection is correct, I do
 8 believe there was a 434 written because he slipped
 9 on the ice, took my feet out from underneath me,
10 and we both went down.
11      Q.    If he was walking over to segregation
12 with you, just in the typical course, would he have
13 been handcuffed?
14      A.    Yes, ma'am, he would have.
15      Q.    Would his legs have been shackled?
16      A.    No, he would not have.
17      Q.    Okay.  So aside from the handcuffs,
18 would he have been restrained in any other way?
19      A.    I would be walking with my hand on his
20 arm or forearm, but that would have been it.  He
21 would have his handcuffs on and no other
22 restraints.
23      Q.    Okay.  Now, had you noticed injuries on
24 Mr. Nicolas when he was in the west house, would
```

WILLIAM QUALLS, 07/31/2017

Page 37

```
 1      A.    Mr. Nicolas slipped and came into my
 2 feet which took me out from under -- took me off of
 3 my feet, and I actually landed on top of
 4 Mr. Nicolas.
 5      Q.    So did he land on his back or on his
 6 front?
 7      A.    He would have landed on his front.
 8      Q.    Okay.  And what part of his body did
 9 you then land on?
10      A.    It would be his left side of his back
11 and hip.
12      Q.    Okay.  And you said Mr. Nicolas landed
13 on his front, the front side of his body?
14      A.    Yes.  He would have landed on his
15 stomach and chest area more than likely.
16      Q.    Did his head hit the pavement?
17      A.    Not that I'm aware of, no.
18      Q.    And his hands were handcuffed behind
19 his back?
20      A.    Yes, ma'am.
21      Q.    What did he say when he fell, or what
22 did you say to him?
23      A.    I do not recall him saying anything.
24      Q.    Did you say anything?
```

WILLIAM QUALLS, 07/31/2017

Page 38

```
 1      A.   I do not recall anything specific being
 2 said, ma'am.  I would have helped him get back up,
 3 but that would have been about it.
 4      Q.   When you were outside after having
 5 witnessed him fall, did you notice any injuries on
 6 him?
 7      A.   I did not see any injuries, no.
 8      Q.   Did he appear to be in pain when he was
 9 walking after the fall?
10      A.   Mr. Nichols didn't walk any different
11 and didn't say anything, so I wouldn't have -- and
12 I didn't notice anything.  So nothing was brought
13 to my attention.
14      Q.   Now, did you fill out a -- I think you
15 testified you filled out a 434 about that?
16      A.   Yes, ma'am.
17      Q.   If neither of you were injured, why did
18 you fill out a 434?
19      A.   Just a common practice, anything
20 happens in or out, to or from seg, such as a fall,
21 that you need to report it just in case and that
22 lets -- it would also notify a nurse to take a look
23 at him.
24      Q.   Did you have a nurse take a look at
```