```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                      EASTERN DIVISION

 3   OSBALDO J. NICOLAS,         )
                                 )
 4              Plaintiff,       )
                                 )
 5        vs.                    )   No. 15 C 964
                                 )
 6   NATHAN BERRY, WILLIAM       )
     QUALLS, JUSTIN SNELL,       )
 7   MATTHEW PURDOM, ROBERT      )
     HUGHES, JASON HART,         )
 8   RICHARD HARRINGTON, AIMEE   )
     LANG,                       )
 9                               )
                Defendants.      )
10

11         The video conference deposition of AIMEE

12   JO LANG, taken pursuant to the Federal Rules of

13   Civil Procedure, before Barbara A. Finn-Figliulo,

14   Certified Shorthand Reporter No. 084-002463, at

15   20 North Clark Street, Suite 1260, Chicago,

16   Illinois, on Wednesday, June 28, 2017, commencing

17   at 9:18 a.m., pursuant to notice.

18
          APPEARANCES:
19
             LOEVY & LOEVY, by
20           MS. JULIE M. GOODWIN
             (311 North Aberdeen Street, 3rd Floor
21            Chicago, Illinois  60607
              312.243.5900
22            julie@loevy.com)
                appeared on behalf of the plaintiff;
23


24
```

Exhibit 6

AIMEE JO LANG, 06/28/2017

Page 6

```
 1  the doctor when they have been, or saying that they
 2  didn't -- I did not perform or do the things that
 3  they wanted me to.
 4       Q.   Okay.  You are currently employed for
 5  Menard, correct?
 6       A.   Yes.
 7       Q.   And in what capacity?  What is your job
 8  title?
 9       A.   Correctional medical technician.
10       Q.   How long have you been in that position?
11       A.   Ten and a half years.
12       Q.   Prior to working at Menard as a
13  correctional medical technician, did you work
14  in any other IDOC facility?
15       A.   No.
16       Q.   Okay.  You're a college graduate?
17       A.   I have a license, a yearlong program
18  for LPN, licensed practical nurse.
19       Q.   Okay.  Tell me about your education
20  background.  Did you graduate from high school?
21       A.   Yes.  I would have had to have done
22  that in order to go to LPN school.
23       Q.   Okay.  What year?
24       A.   I'm sorry, what year what?
```

Urlaub Bowen & Associates, Inc.   312-781-9586

Exhibit 6

AIMEE JO LANG, 06/28/2017

Page 18

```
 1  portion of your assessment?
 2              So starting at the very top, the
 3  date and time is 2/5/14, and can you read the time
 4  there?
 5       A.   11:55.
 6       Q.   Okay.  And then next to that, I believe
 7  there might be an indication there, and then it
 8  says, "My head hurts"?
 9       A.   Yes.  "S" meaning -- stands for
10  subjective part of the note.
11       Q.   Okay.  And then what is -- can you read
12  for me what comes after that?
13       A.   In quotations, meaning this is what he
14  told me, "My head hurts.  Left wrist."
15              I think it says "right jaw."  I'm
16  not certain because I can't read it on this copy.
17       Q.   Okay.  And then what comes in the next
18  line?
19       A.   It's an "O" for objective.
20       Q.   Oh, I think before that, it looks like
21  the "and" symbol, and maybe ESP or so?
22       A.   I see an "and" symbol, but I can't make
23  out that word, either.
24       Q.   Okay.  All right.  And then the next
```

AIMEE JO LANG, 06/28/2017

Page 20

```
 1      A.    "A" stands for Assessment, Post Fall.
 2  And then on the right-hand side, where there's a
 3  "P" --
 4      Q.    Mm-hmm.
 5      A.    -- that's for Plan.  Follow up PRN,
 6  as needed.  Injury Report filed, and then my
 7  signature.
 8      Q.    What does it mean when you write
 9  "Unable to assess vital signs due to location
10  of evaluation"?
11      A.    Wherever we were at the time, I was
12  not able to get to them, and because he was
13  uncooperative.
14      Q.    Well, focusing first just on the
15  location of the evaluation, does that mean like
16  physically what room you were in, you could not
17  assess the vital signs?  Or what does that mean?
18      A.    Generally when someone is being brought
19  to seg, they're held in an area where they have to
20  get switched out security-wise.  Whatever they need
21  to do is in a certain area, and in that area, I
22  would not be able to really assess his vitals
23  because he would be behind a caged door or a gate.
24  And he would be cuffed behind the back, so I
```

AIMEE JO LANG, 06/28/2017

Page 21

1  wouldn't be able to get to him.
2      Q.   Okay.  So you believe, then, that when
3  you saw Mr. Nicolas, he was behind a gate and you
4  were on the other side of the gate?
5      A.   Generally, like I said, when we assess,
6  that's generally the location.  I cannot specify
7  if that's exactly where I was at that time, but
8  generally where you do an evaluation, when it's a
9  seg move, when they're being moved from a different
10 cell house, that's where they would go.
11     Q.   Where would the officer, McMillan, have
12 been?  Would he have been with the offender behind
13 the gate or on your side of the gate?
14     A.   On my side.
15     Q.   And --
16     A.   It's a very small area.
17     Q.   How big, if you can estimate?
18     A.   I don't know.  I'm trying to -- I mean,
19 is it big enough for two people to probably fit in,
20 yes, but not a safe situation for that type of
21 movement.
22     Q.   You mean if the offender was on your
23 side of the gate?
24     A.   No, I meant for the officer, because

AIMEE JO LANG, 06/28/2017

Page 22

```
 1  you asked if the officer was behind the gate with
 2  the inmate.
 3       Q.   Oh, okay.  Okay.
 4       A.   I'm saying that there -- there's a --
 5  would be enough space, necessarily, for two people
 6  to be in there, but you don't put two people in
 7  there.
 8       Q.   Okay.
 9       A.   They're put in there for the change of
10  being moved from general population to a seg cell.
11       Q.   Now, describe the bars on the gate for
12  me.
13       A.   It is like just vertical and horizontal
14  bars that are probably only spaced with maybe a
15  square of approximately a 3 by 3 or a 2 by 2 inch
16  opening.
17       Q.   Okay.  So you observed Mr. Nicolas
18  through those bars?
19       A.   Yes.
20       Q.   Okay.  As part of your assessment of
21  Mr. Nicolas, did you -- you know, did you touch him
22  in any way?
23            Did you touch his forehead or feel
24  for any broken bones or anything like that?
```

Urlaub Bowen & Associates, Inc.   312-781-9586

Exhibit 6

AIMEE JO LANG, 06/28/2017

Page 24

```
 1      Q.    Okay.  Did you examine Mr. Nicolas's
 2  left wrist?
 3      A.    According to my note, I would have.
 4      Q.    Okay.
 5      A.    I listed anything that I saw or did not
 6  see.
 7      Q.    Okay.  So where in your notes does it
 8  indicate that you examined his left wrist?  Just
 9  point me to that.
10      A.    Well, it's saying no deformities,
11  bleeding, or bruising noted to the areas of
12  complaint.
13      Q.    Okay.
14      A.    And that would have been an area of
15  complaint.
16      Q.    Okay.  Do you recall if you had any
17  tools with you, you know, any medical tools at the
18  time that you examined Mr. Nicolas?
19      A.    I would have normally taken a blood
20  pressure cuff, a stethoscope, and a thermometer.
21      Q.    Do you recall if you used those, even
22  if he was behind the bars?
23      A.    If I would have used them, there would
24  have been notation saying what I got for each
```

AIMEE JO LANG, 06/28/2017

```
                                                         Page 36
 1                 And can you go ahead and read for me
 2   what's written in that section?
 3       A.   Right above that is saying "Unable to
 4   assess due to location/uncooperative."
 5       Q.   Okay.  And then underneath that, go
 6   ahead and read that for us.
 7       A.   As stated on the other notes,
 8   "Superficial abrasions noted to left side forehead/
 9   hairline, no bleeding noted."
10                 Next line, "No swelling, bruising,
11   bleeding, deformities noted to jaw (right), left
12   wrist, or bilateral thighs."
13                 Next line, "No apparent distress
14   noted.  No other injuries noted.  Alert and
15   oriented times 3."
16       Q.   Okay.  Okay.  How is it that you
17   checked for swelling, bruising, bleeding, or
18   deformities to his -- to the thighs, to
19   Mr. Nicolas's thighs?
20       A.   The jumpsuit that he may have already
21   been wearing could have been undone, or his -- the
22   area would have been exposed.
23       Q.   Any other way that you could have
24   checked?
```

Urlaub Bowen & Associates, Inc.   312-781-9586

Exhibit 6

AIMEE JO LANG, 06/28/2017

Page 37

```
 1        A.    Without him showing me?
 2        Q.    Correct.
 3        A.    No.
 4        Q.    And his wrists were, again, handcuffed
 5   behind his back?
 6        A.    Yes.
 7        Q.    Okay.
 8        A.    I would assume, yes.
 9        Q.    And he was behind the gate?
10        A.    Yes.
11        Q.    Okay.  So in terms of assessing for
12   swelling, bruising, bleeding, and deformities to
13   his jaw, you viewed Mr. Nicolas's jaw through the
14   gate, correct?
15        A.    Yes.
16        Q.    And in terms of assessing his swelling,
17   bruising, bleeding, or any deformities on his left
18   wrist, you would have viewed that through the gate
19   as well, correct?
20        A.    Yes.
21        Q.    And that would have been with handcuffs
22   over him, correct?
23        A.    Yes.
24        Q.    And are the inmates' uniforms in
```

Urlaub Bowen & Associates, Inc.   312-781-9586

Exhibit 6

AIMEE JO LANG, 06/28/2017

Page 40

```
 1      Q.    Go ahead.
 2      A.    You meant sent through the legal
 3 department and issued to me?  Is that what you're --
 4      Q.    Well, if you don't recall, it's okay.
 5 It's fine.
 6      A.    Oh, okay.
 7      Q.    Do you understand what Mr. Nicolas is
 8 alleging occurred in this lawsuit?
 9      A.    No.  Not without reading the paperwork.
10      MS. GOODWIN:  Okay.  I don't have any other
11 questions for you.
12                    EXAMINATION
13 BY MS. JENNINGS:
14      Q.    I just have two really quick followups.
15            We talked about how an inmate, when
16 they're taken to North 2, can be placed in a cell
17 or behind a gate.
18            If the inmate reported to you or you
19 viewed injuries on that inmate that were serious
20 that you felt needed to be assessed, you know,
21 without the gate, can you ask to have that inmate
22 taken elsewhere?
23      A.    Yes.
24      Q.    Okay.  And then, if an inmate reports
```

Urlaub Bowen & Associates, Inc.   312-781-9586

Exhibit 6