```
 1           IN THE UNITED STATES DISTRICT COURT
          FOR THE SOUTHERN DISTRICT OF ILLINOIS
 2                 EAST ST. LOUIS DIVISION

 3   OSBALDO J. NICOLAS,                    )
                                            )
 4              Plaintiff,                  )
                                            )
 5       vs.                                ) No. 15 CV 0964
                                            )
 6   NATHAN BERRY; WILLIAM QUALLS;          )
     JUSTIN SNELL; MATHEW PURDOM;           )
 7   ROBERT HUGHES; JASON HART;             )
     RICHARD HARRINGTON; KIMBERLY           )
 8   BUTLER; and AMY LANG,                  )
                                            )
 9              Defendants.                 )

10

11        The videoconference deposition of NATHAN

12   BERRY, taken pursuant to the Federal Rules of Civil

13   Procedure, before Suzanne Thalji, Certified

14   Shorthand Reporter No. 084-002337, at

15   20 North Clark Street, Suite 1260, Chicago,

16   Illinois, on Monday, July 31, 2017, commencing at

17   9:01 o'clock a.m. pursuant to notice.

18

19

20

21

22

23

24
```

Exhibit 8

NATHAN BERRY, 07/31/2017

Page 21

```
 1  that are not supposed to be found.  It's daily we
 2  basically find that stuff that they are not
 3  supposed to have, you know.
 4       Q.   Okay.  Sitting here today, aside from
 5  the hooch, do you remember finding anything else in
 6  Mr. Nicolas's cell?
 7       A.   I don't recall.
 8       Q.   Okay.  Now, his cellmate at the time
 9  was an inmate named Edgar Diaz.  Are you familiar
10  with who he is?
11       A.   As like every day?  Can you give me an
12  example?
13       Q.   Do you know who --
14       A.   Do I know of him?  Have I seen him?
15       Q.   Yes.  Do you know who Edgar Diaz is?
16       A.   Other than paperwork, I couldn't point
17  him out in a crowd.
18       Q.   Okay.  Now, as a correctional officer,
19  how did it come about that you searched
20  Mr. Nicolas's and Mr. Diaz's cell?  Do you recall?
21       A.   Any cell usually is random.  We don't
22  have any sort of reason why we shake down that cell
23  or this cell.  They just -- I'm going to shake this
24  one down, you know, just -- we have to do so many
```

Urlaub Bowen & Associates, Inc.   312-781-9586

Exhibit 8

NATHAN BERRY, 07/31/2017

Page 22

```
 1  cell shakedowns, you know, per month for security
 2  and safety of the institution.  It could be -- you
 3  know, somebody might have hit his -- you know,
 4  shook his cell down the day before.  I wouldn't
 5  have known.  Now I'm shaking it down today.
 6  There's no rhyme or reason why we do it, just part
 7  of the job.
 8       Q.    Okay.  Now, when you found the hooch in
 9  the cell, you wrote up a ticket against both
10  inmates, both cellmates, correct?
11       A.    I don't have the ticket in front of me.
12  If both names are on it, yes.
13       Q.    Well, I mean if you find it in the
14  cell, do you do any sort of investigation to
15  determine which inmate created or, you know, was
16  using the alcohol?
17       A.    I do not investigate the situation like
18  that.  That's not -- no.
19       Q.    Okay.  You write up the ticket against
20  both cellmates, right, and then send it off to be
21  determined by other people?
22       A.    That is what we do for any -- yes, any
23  offender will -- that's just -- yeah.  They both
24  get tickets and all that, yes.
```

Urlaub Bowen & Associates, Inc.   312-781-9586

Exhibit 8

NATHAN BERRY, 07/31/2017

Page 37

```
 1      A.   No.
 2      Q.   Did you ever kick Mr. Nicolas back in
 3 February of 2014?
 4      A.   No, I did not.
 5      Q.   Did you ever punch Mr. Nicolas back in
 6 February of 2014?
 7      A.   No, I did not.
 8      Q.   Okay.  And you can refer back to page
 9 406 if you need to, but what you reported in the
10 internal affairs investigation is that you told
11 Mr. Nicolas and Mr. Diaz to stop talking to the
12 inmates in the chow line, and they complied, and
13 then you and Officer Snell took them out to
14 segregation.  Is that a fair summary?
15      A.   Sorry.  I can't read my writing.  I
16 don't see -- I don't see where it said Snell.
17      Q.   Well, you have in front of you the
18 internal affairs investigation file, right?  And
19 you can refer back to it.  So if you look at Bates
20 407 and 408, that's Officer Snell's report as well,
21 correct?
22      A.   I read what he put.
23      Q.   Okay.  So going back to my question
24 then, is that a fair summary of what occurred?
```

Urlaub Bowen & Associates, Inc.   312-781-9586

Exhibit 8