IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| **OSBALDO JOSE-NICOLAS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 3:15-cv-964-NJR-DGW** |
| | ) | |
| **NATHAN BERRY,** | ) | |
| **ROBERT HUGHES,** | ) | |
| **JASON HART,** | ) | |
| **RICHARD HARRINGTON,** | ) | |
| **WILLIAM QUALLS,** | ) | |
| **JUSTIN SNELL,** | ) | |
| **MATTHEW PURDOM, and** | ) | |
| **AIMEE LANG,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM AND ORDER

**ROSENSTENGEL, District Judge:**

Currently pending before the Court is the motion for partial summary judgment filed by all Defendants on August 21, 2017 (Doc. 96). For the reasons set forth below, the motion is granted in part and denied in part.

### INTRODUCTION

Plaintiff Osbaldo Jose-Nicolas, an inmate currently incarcerated at the Menard Correctional Center, is proceeding on a Second Amended Complaint filed on May 2, 2016 (Doc. 50). The claims presented by Jose-Nicolas, who is represented by counsel, arise out of an incident that occurred on February 5, 2014. In short, Jose-Nicolas alleges that he was attacked and beaten on that day by correctional officers, Nathan Berry and William Qualls; that correctional officers, Justin Snell and Matthew Purdom, witnessed

the attack but did nothing; that Defendant Aimee Lang, a correctional medical technician, failed to provide medical care following the attack; that he was deprived of due process at a subsequent disciplinary hearing by correctional officers, Robert Hughes and Jason Hart, and former warden Richard Harrington; and that he endured unconstitutional conditions of confinement—conditions known by former warden Richard Harrington and former assistant warden Kimberly Butler—during the six months of segregation that was imposed as a result of the disciplinary hearing (Doc. 50, pp. 1-2). Based on these allegations, Jose-Nicolas asserted the following claims that remain pending in this action:[1]

| Count 1: | an excessive force claim against Berry and Qualls; |
|---|---|
| Count 2: | a failure to intervene claim against Berry, Qualls, Snell, and Purdom; |
| Count 3: | a deliberate indifference claim against Berry, Qualls, Snell, Purdom, and Lang;[2] |
| Count 4: | a due process claim against Hughes, Hart, and Harrington;[3] |
| Counts 6, 7: | state law claims of assault and battery against Berry and Qualls; |
| Count 8: | a state law claim of intentional infliction of emotional distress claim against Berry and Qualls; |

---

[1] Jose-Nicolas asserted a conditions of confinement claim in Count 5 (Doc. 50), however, that claim was dismissed with prejudice because it had previously been severed into a new case (Doc. 17; Doc. 80). Jose-Nicolas asserted a claim for "Respondeat Superior" against Wexford in Count 10 (Doc. 50), but Wexford has since been voluntarily dismissed without prejudice from this action (Doc. 64). Consequently, the Court deems Court 10 to be dismissed without prejudice.

[2] Jose-Nicolas also named Dr. John Trost in Count 3, however, Dr. Trost has since been voluntarily dismissed without prejudice from this action (Doc. 64).

**Count 9:**   a state law claim of negligence against all Defendants; and

**Count 11:**   a claim for "Indemnification" against all Defendants.

Defendants now seek summary judgment on Count 2 as to Defendants Snell and Purdom, Count 3, Count 4, and the state law claims in Counts 8 and 9 (Doc. 96). Defendants filed a memorandum in support of their motion (Doc. 97) and a statement of undisputed material facts (Doc. 97-3). Jose-Nicolas filed a memorandum in opposition to the motion (Doc. 98), a response to Defendants' statement of undisputed facts (Doc. 100), and a statement of additional facts (Doc. 99). Defendants then filed a response to Jose-Nicolas's statement of additional facts (Doc. 103).

<u>BACKGROUND</u>

The undisputed evidence reveals that on February 5, 2014, Jose-Nicolas was housed with inmate Edgar Diaz (Doc. 100, p. 1). On that day, their cell was searched during a routine and random shakedown by Defendants Berry and Qualls (Doc. 101-8, pp. 2–3; *see* Doc. 101-9). Defendants claimed to have found homemade intoxicants and a needle inside property box number 008851, and an "altered" television within the cell (Doc. 101-9). Jose-Nicolas and Diaz were directed to a holding cell (Doc. 100, p. 2). While in the holding cell, Jose-Nicolas made an innocuous comment (to wit "yes, I'm good, are you good?") to another inmate who walked past the holding cell (*Id.*). Defendant Qualls told Jose-Nicolas to "shut the fuck up and face the wall" and sit down (*Id.*). Jose-Nicolas turned and faced the wall, but he did not sit down (*Id.*). He was then handcuffed and removed from the holding cell (*Id.* at p. 3).

What happened next is in dispute. According to Jose-Nicolas, Qualls punched him in the face and, along with Defendant Berry, "smashed" his head against a concrete wall (Doc. 100, p. 3; Doc. 103, p. 2). Jose-Nicolas was then placed in a shower area where Qualls and Berry continued to hit, punch, and kick him, and he lost consciousness (Doc. 100, p. 2; Doc. 103, pp. 2-3). Qualls and Berry then took Jose-Nicolas out of the shower area, banging his head on the wall on the way out (Doc. 103, p. 3).

Jose-Nicolas says that Defendant Snell, a correctional officer, was present when he was initially punched, but Snell was not present in the shower area (Doc. 100, p. 3). Jose-Nicolas says Defendant Purdom, also a correctional officer, was near the holding cell and the shower area, and Purdom observed the assault but did nothing (Doc. 100, p. 3, Doc. 103, p. 3). The attack was audible to Jose-Nicolas's cellmate Diaz and another inmate, who were both located outside the shower area (Doc. 103, p. 2). Diaz testified that he could hear "stomping," and the other inmate stated that he could hear "blows landing" and Jose-Nicolas "crying in pain" (Doc. 101-4, p. 2; Doc. 102).

Jose-Nicolas, who lost consciousness during the attack, was then taken to segregation and placed in another shower area (Doc. 100, p. 4, Doc. 103, p. 3). On the way, he fell on the sidewalk—he says from exhaustion and pain; Defendants claim he slipped on the ice, and another officer assisted Qualls in moving Jose-Nicolas (Doc. 103, p. 4).[4] Jose-Nicolas did not request medical care from any of Defendants but did request care from another officer (Doc. 100, p. 4).

---

[4] The other officer who assisted Qualls is not named as a defendant in this action.

It is undisputed that Jose-Nicolas was visually examined by medical technician Lang before he was placed in a segregation cell, which is a routine procedure in the prison (Doc. 103, p. 4). Jose-Nicolas testified that he told Lang the guards had just beaten him and that he had pain in his stomach, jaw, and forehead, which he said was bleeding, but not dripping blood. (Doc. 103, p. 5; Doc. 97-1, pp. 42, 44). Jose-Nicolas claims Lang told him that he looked fine and then left (Doc. 97-1, p. 43). Lang has no recollection of treating Jose-Nicolas (Doc. 97-1, Doc. 103). An "Inmate Injury Report" filled out by Lang notes that Jose-Nicolas had "superficial abrasions" to the left side of his forehead/hairline, but there was no bleeding, and there was no swelling, bruising bleeding, or deformities to his jaw, wrist, or thighs (Doc. 97-2, p. 4).

The next day, Jose-Nicolas was served with two disciplinary tickets (*see* Doc. 101-9). The first was for insolence and disobeying a direct order for allegedly saying "fuck that" after Qualls told him to sit down (*Id.*). The second one was for "Drugs and Drug Paraphernalia" and "Damage or Misuse of Property" for the contraband found in the cell (*Id.*; Doc. 100, p. 6). Jose-Nicolas claims that the officer "threw the tickets" into his cell and did not give him the opportunity to sign the ticket or write the name of the witnesses he wanted to call at the disciplinary hearing (Doc. 103, p. 6). But even if he had been given an opportunity, he claims he did not have a pen or pencil (*Id.*). At some point before the hearing on the ticket on February 10, 2014, Jose-Nicolas secured a pen and paper, and he wrote a note to the Adjustment Committee (*Id.* at p. 7). Jose-Nicolas testified that the note indicated that he needed a translator, that he disputed the factual

basis of the tickets, and that he wanted to call two witnesses:  the officer who wrote the ticket and inmate Diaz (*Id.*; Doc. 97-1, p. 53-54, 56).

It is undisputed that when Jose-Nicolas appeared before the Adjustment Committee, which was comprised of Defendants Hart and Hughes, on February 10, 2014, his note was reviewed (Doc. 103, p. 7). Jose-Nicolas claims he was told that it was too late to call a witness (Doc. 97-1, pp. 53, 57), and no interpreter was provided (Doc. 103, p. 7). Jose-Nicolas was adjudicated guilty and punished with a demotion to C-grade for six months, six months in segregation, and six months of restricted commissary privileges and contact visits (Doc. 97-3, p. 1).

## DISCUSSION

Summary judgment is proper if there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). "Factual disputes are genuine only if there is sufficient evidence for a reasonable jury to return a verdict in favor of the non-moving party on the evidence presented, and they are material only if their resolution might change the suit's outcome under the governing law." *Maniscalco v. Simon*, 712 F.3d 1139, 1143 (7th Cir. 2013) (citation and internal quotation marks omitted). In deciding a motion for summary judgment, "[a] court may not . . . choose between competing inferences or balance the relative weight of conflicting evidence; it must view all the evidence in the record in the light most favorable to the non-moving party and resolve all factual disputes in favor of the non-moving party." *Hansen v. Fincantieri Marine Grp., LLC*, 763 F.3d 832, 836 (7th Cir. 2014) (citations omitted).

## A. Defendant Richard Harrington

In a footnote in his response brief, Jose-Nicolas stated that he "dismisses Defendant Harrington from this, and all, claims" (Doc. 98, p. 9 n.1). The Court construes this footnote as a request by Jose-Nicolas to voluntarily dismiss Defendant Harrington.

Such requests were long handled in this district under Federal Rule of Civil Procedure 41(a). But the Seventh Circuit no longer permits this approach because it does not square with a plain reading of Rule 41(a)(2). *Taylor v. Brown*, 787 F.3d 851, 857 (7th Cir. 2015). "Rule 41(a)(2) allows the plaintiff to dismiss 'an action' on 'terms that the court considers proper.' . . . Rule 41(a) does not speak of dismissing one claim in a suit; it speaks of dismissing 'an action'—which is to say, the whole case." *Id.* (citing FED. R. CIV. P. 41(a)) (other citations omitted). *But see* 9 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure Civil § 2362 (3d ed.) (arguing that interpreting Rule 41(a) to only allow for the dismissal of an entire case places "an artificial limit on Rule 41(a) that is reached only by an overly literal reading of that rule" and "the sounder view and the weight of judicial authority are to the contrary.") The Seventh Circuit further instructed that dropping an individual party or claim should be accomplished through amending the complaint under Rule 15(a). *Taylor*, 787 F.3d 851.

Using Rule 15 to whittle down the defendants or the claims in a case, however, can be inefficient and lead to unnecessary delays and expenses. There are obvious instances—such as when the plaintiff settles with one of multiple defendants or the parties stipulate to the dismissal of a particular defendant or a particular claim—that it would serve no purpose to require the plaintiff to move to amend his complaint, for

which leave would be freely granted, and then require the defendant to answer the new complaint. The additional filings would amount to nothing more than busy work that clutters the docket. In this case, the additional filings also would require the Court to delay ruling on the motion for summary judgment and cancel the trial, which is scheduled to begin later this month. Therefore, there must be, as a practical matter, some mechanism by which courts can allow a plaintiff to drop an individual defendant or an individual claim without the cumbersome procedure and additional filings required by Rule 15.

The undersigned concludes that mechanism is the Court's "inherent powers that are 'governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases.'" *Dietz v. Bouldin*, 136 S.Ct. 1885, 1891 (2016) (quoting *Link v. Wabash R. Co.*, 370 U.S. 626, 630–31 (1962)). *See also* 9 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure Civil § 2362 (3d ed.) ("The power to drop some plaintiffs or some defendants from the suit plainly exists, either in the Civil Rules or in the inherent power of the district court.")

As the Supreme Court explained, "[t]he Federal Rules of Civil Procedure set out many of the specific powers of a federal district court. But they are not all encompassing." *Dietz*, 136 S.Ct. at 1891. And "[t]hey make no provision . . . [for] many . . . standard procedural devices trial courts around the country use every day in service of Rule 1's paramount command: the just, speedy, and inexpensive resolution of disputes." *Id.* A district court can invoke its inherent power so long as its "a reasonable

response to the problems and needs confronting the court's fair administration of justice," and it is not "contrary to any express grant of or limitation on the district court's power contained in a rule or statute." *Id.* at 1891-92.

The undersigned believes that using the Court's inherent powers to dismiss Defendant Harrington easily satisfies the first condition. It also satisfies the second condition because, although Rule 41(a) provides for the voluntary dismissal of an entire action, the undersigned is unaware of any reason why that Rule would preclude a federal court from resorting to its inherent power to dismiss something less than an entire action. *Cf. Chambers v. NASCO, Inc.*, 501 U.S. 32, 49 (1991) ("[I]t was recognized that a federal district court has the inherent power to dismiss a case *sua sponte* for failure to prosecute, even though the language of Federal Rule of Civil Procedure 41(b) appeared to require a motion from a party." (citing *Link*, 370 U.S. at 630–32)).

Accordingly, Richard Harrington is dismissed from this action pursuant to the Court's inherent authority. Jose-Nicolas did not indicate whether he was asking for dismissal with or without prejudice (*see* Doc. 98, p. 9 n.1). Dismissal without prejudice would be unfair to Defendant Harrington, however, given the late stage of this lawsuit and his pending motion for partial summary judgment. Consequently, the dismissal of Defendant Harrington is with prejudice.

**B.  Count 2: Failure to Intervene**

Defendants seek summary judgment on Count 2, a failure to intervene claim against Defendants Berry, Qualls, Snell, and Purdom (*see* Doc. 50), as to Defendants Snell and Purdom only (Doc. 97).

A prison official "can be held liable under § 1983 if [he] (1) had reason to know that a fellow officer was using excessive force . . . and (2) had a realistic opportunity to intervene to prevent the act from occurring." *Lewis v. Downey*, 581 F.3d 467, 472 (7th Cir. 2009) (citations omitted). Defendants argue that Purdom and Snell only witnessed one punch and therefore did not have a realistic opportunity to intervene in any constitutional violation (Doc. 97). They further argue that Purdom and Snell did not observe and were not involved in the beating in the shower area (Doc. 97). Jose-Nicolas has submitted evidence, however, from which a reasonable jury could conclude otherwise. Specifically, there is evidence that Purdom was in the shower area when Jose-Nicolas was being beaten by Berry and Qualls (Doc. 97-1, p. 34). And Snell, who had already witnessed one punch, was with inmate Diaz outside of the shower area (Doc. 97-1, p. 35), but within earshot of the stomps, punches, and Jose-Nicolas's cries of pain. Thus a jury could find that they were not only aware that Jose-Nicolas was being beaten but that they did nothing—even though they had the opportunity to do so. Consequently, the motion for summary judgment as it relates to Defendants Purdom and Snell on Count 2 is denied.

## C.  Count 3: Deliberate Indifference to a Serious Medical Need

Count 3 is a claim for deliberate indifference to a serious medical need against Defendants Berry, Qualls, Snell, Purdom, and Lang (Doc. 50). The Supreme Court has recognized that "deliberate indifference to serious medical needs of prisoners" may constitute cruel and unusual punishment under the Eighth Amendment. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). In order to prevail on a claim for deliberate indifference

to a serious medical need, there are "two high hurdles, which every inmate-plaintiff must clear." *Dunigan ex rel. Nyman v. Winnebago Cnty.*, 165 F.3d 587, 590 (7th Cir. 1999). First, a plaintiff must demonstrate that his medical condition was "objectively, sufficiently serious." *Greeno v. Daley*, 414 F.3d 645, 652-653 (7th Cir. 2005) (citations and quotation marks omitted). Second, a plaintiff must demonstrate that the "prison officials acted with a sufficiently culpable state of mind," namely deliberate indifference. *Greeno*, 414 F.3d at 653.

With respect to the first element, a serious medical need includes "[t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." *Hayes v. Snyder*, 546 F.3d 516, 522-23 (7th Cir. 2008) (quoting *Gutierrez v. Peters*, 111 F.3d 1364, 1373 (7th Cir. 1997)). *See also Greeno*, 414 F.3d at 653 ("A serious medical condition is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would perceive the need for a doctor's attention.")

Here, Defendants argue that Jose-Nicolas only had an abrasion. Jose-Nicolas testified, however, that he was brutally beaten until he lost consciousness and that he was actively bleeding from a cut on his forehead (Doc. 100; Doc. 97-1). He also recounted that he was in significant pain (Doc. 100; Doc. 97-1). A jury that credits Jose-Nicolas's story could reasonably conclude that it was obvious he needed a doctor's attention. Thus, Jose-Nicolas has established a genuine issue of fact as to whether he had a sufficiently serious medical condition.

As for the second element of a deliberate indifference claim, a plaintiff must put forth evidence that the prison officials knew that the prisoner's medical condition posed a serious health risk, but they consciously disregarded that risk. *Holloway v. Delaware Cnty. Sheriff*, 700 F.3d 1063, 1073 (7th Cir. 2012). "This subjective standard requires more than negligence and it approaches intentional wrongdoing." *Id.*; *accord Berry v. Peterman*, 604 F.3d 435, 440 (7th Cir. 2010) ("Deliberate indifference is intentional or reckless conduct, not mere negligence."); *McGowan v. Hulick*, 612 F.3d 636, 640 (7th Cir. 2010) ("[N]egligence, even gross negligence does not violate the Constitution."). A plaintiff does not have to prove that his complaints were "literally ignored," but only that "the defendants' responses were so plainly inappropriate as to permit the inference that the defendants intentionally or recklessly disregarded his needs." *Hayes v. Snyder*, 546 F.3d 516, 524 (7th Cir. 2008) (quoting *Sherrod v. Lingle*, 223 F.3d 605, 611 (7th Cir. 2000)). "Even if the defendant recognizes the substantial risk, he is free from liability if he 'responded reasonably to the risk, even if the harm ultimately was not averted.'" *Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010) (quoting *Farmer*, 511 U.S. at 843).

Defendants Berry, Qualls, Snell, and Purdom argue that they could not have been deliberately indifferent because Jose-Nicolas "did not complain to them about injuries or request medical attention" (Doc. 97, p. 6). This argument is disingenuous. There is evidence in this case from which a reasonable jury could conclude that Defendants Berry and Qualls beat Jose-Nicolas to the point of unconsciousness while Defendants Purdom and Snell stood by. After beating Jose-Nicolas to the point where he could not verbalize a need for help, Berry and Qualls cannot now state that they

didn't know he needed help. Similarly, if Defendants Purdom and Snell heard the beating and Jose-Nicolas's cries, they cannot now state that they didn't know he needed help.

Defendants Berry, Qualls, Snell, and Purdom also argue that they cannot be held liable for deliberate indifference because Jose-Nicolas was escorted to segregation and was seen by a medical professional within five to ten minutes after arriving in segregation (Doc. 97, p. 6). This argument might have some merit if there was evidence that Defendants decided not to seek help for Jose-Nicolas because they knew he would be seen by a medical professional shortly after arriving in segregation. *See*, e.g., *Arnett v. Webster*, 658 F.3d 742, 755 (7th Cir. 2011) ("We have previously stated that if a prisoner is under the care of medical experts, a non-medical prison official will generally be justified in believing that the prisoner is in capable hands."). Defendants did not, however, point to any evidence indicating that they knew as much or made such a decision (*see* Doc. 97).

As for Defendant Lang, she argues that she was not deliberately indifferent because she saw Jose-Nicolas within five to ten minutes after he arrived in segregation, she "heard his complaints, gave him an examination, noted no injuries other than the superficial abrasion, and directed him to follow up with medical staff as needed" (Doc. 97, p. 6). But Jose-Nicolas submitted evidence that Lang conducted nothing more than a cursory examination and ignored his complaints of pain and his need for additional medical care. For example, Lang indicated that she examined Jose-Nicolas's wrist, but he claims that during the examination he was in handcuffs, behind bars, and

wearing a sweater (*see* Doc. 97-2, p. 4; Doc. 101-1; Doc. 101-6). Lang also indicated that she examined Jose-Nicolas's thighs, but there is no evidence that his jumpsuit had been taken off (*see* Doc. 97-2, p. 4; Doc. 101-1; Doc. 101-6). Thus, Jose-Nicolas has established a genuine issue of fact as to whether Defendant Lang was deliberately indifferent to his serious medical need.

Consequently, Defendants' motion for summary judgment as it relates to Count 3 is denied.

**D.  Count 4: Due Process**

Count 4 is a due process claim against Defendants Hughes, Hart, and Harrington related to the disciplinary hearing. Specifically, Jose-Nicolas alleges that his due process rights were violated when he was not allowed to present witnesses at the hearing and when the disciplinary tickets were not translated into Spanish for him and he was not provided an interpreter.

A prisoner challenging the process he was afforded in a prison disciplinary proceeding must meet two requirements:  (1) he has a liberty or property interest that the state has interfered with; and (2) the procedures he was afforded upon that deprivation were constitutionally deficient. *Scruggs v. Jordan*, 485 F.3d 934, 939 (7th Cir. 2007).

Here, Defendants do not argue that Jose-Nicolas's term in segregation did not implicate a liberty interest (*see* Doc. 97). *Sandin v. Conner*, 515 U.S. 472, 484 (1995) (holding that a term of segregation can implicate a liberty interest only if it "impose[d] [an] atypical and significant hardship on the inmate in relation to the ordinary incidents

of prison life.") Consequently, for the purpose of summary judgment, the Court assumes that Jose-Nicolas's confinement in segregation was atypical or imposed a significant hardship. The following discussion will analyze the procedures that Jose-Nicolas was afforded.

### 1. *Spanish-English Translation & Interpreter*

The Court turns first to the issue of whether Jose-Nicolas's due process rights were violated when the disciplinary tickets were not translated into Spanish for him and he was not provided an interpreter at the hearing. The Seventh Circuit has held that "[a] criminal defendant is denied due process when he is unable to understand the proceedings due to a language difficulty." *Mendoza v. United States,* 755 F.3d 821, 827 (7th Cir. 2014) (citing *United States v. Johnson,* 248 F.3d 655, 663 (7th Cir. 2001).[5] The Seventh Circuit has never applied this standard to prison disciplinary hearings, but several district courts have. *See, e.g., Holmes v. Godinez*, 311 F.R.D. 177, 238 (N.D. Ill. 2015) ("[H]earing impaired inmates who are not fluent in English may have a due process right to a qualified interpreter at prison disciplinary hearings."); *Sandoval v. Holinka*, No. 09-CV-033-BBC, 2009 WL 1773148, at *2 (W.D. Wis. June 23, 2009) ("[D]ue process is violated when a non-English speaking prisoner must proceed before a disciplinary hearing officer when he cannot understand the proceeding or comprehend

---

[5] Specifically, the Seventh Circuit said that "a defendant in a criminal proceeding is denied due process when: (1) what is told to him is incomprehensible; (2) the accuracy and scope of a translation at a hearing or trial is subject to grave doubt; (3) the nature of the proceeding is not explained to [the defendant] in a manner designed to insure his full comprehension; or (4) a credible claim of incapacity to understand due to language difficulty is made and the district court fails to review the evidence and make appropriate findings of fact." *United States v. Johnson*, 248 F.3d 655, 663 (7th Cir. 2001) (quoting *United States v. Cirrincione*, 780 F.2d 620, 634 (7th Cir. 1985)).

his rights."); *Peralta v. Vasquez*, No. 01CIV.3171(BSJHBP), 2009 WL 750218, at *2 (S.D.N.Y. Mar. 20, 2009) ("[A]n inmate who is not fluent in English is entitled to an interpreter to permit him to understand the charge and the evidence against him.")

Here, the parties agree that "[i]f an inmate cannot comprehend English, then he cannot be said to have a meaningful opportunity to defend himself. Therefore, due process is violated when a non-English-speaking prisoner must proceed before a disciplinary hearing officer when he cannot understand the proceeding or comprehend his rights" (Docs. 97, 98) (citing *Sandoval v. Holinka*, No. 09-CV-033-BBC, 2009 WL 1773148, at *2 (W.D. Wis. June 23, 2009)). But the parties dispute whether Jose-Nicolas was able to understand the charges against him and his rights at the disciplinary hearing, to comprehend the proceedings, or to fully defend himself (*see* Docs. 97, 98). The undisputed evidence shows that Jose-Nicolas requested a translator for the disciplinary hearing in a note he wrote to the Adjustment Committee, but no translator was provided (Doc. 103, ¶ 24). Jose-Nicolas admitted, however, that he wrote the note in English without any assistance (Doc. 100, ¶¶ 40, 45). He also admitted that, after the hearing, he wrote a grievance in English without any assistance (Doc. 100, ¶¶ 44, 45).

Jose-Nicolas nevertheless maintains that English is not his first language and he is not fluent in English (Doc. 99, ¶ 26). When asked whether Jose-Nicolas was "proficient" in the English language, neither Defendants Hughes nor Hart could recall (Doc. 101-12, Doc. 101-13). The Court further notes that Jose-Nicolas was provided counsel at the outset of this case because "he cannot speak or write English to a degree that would allow him to prosecute this case *pro se*" (Doc. 9). Additionally, a translator

was present at Jose-Nicolas's deposition (*see* Doc. 97-1, p. 8). When asked "how fluent are you in English," Jose-Nicolas responded "not much" (*Id.*). When asked if he understood "what the two tickets were charging you with," Jose-Nicolas answered "no." (*Id.* at p. 55). But four questions later, he was asked "did you understand what the charges were," and he answered "yes" (*Id.*)

Based on the record currently before the Court, there is a material issue of fact as to whether Jose-Nicolas was proficient enough in English to not have his tickets translated to Spanish and to go through the disciplinary hearing without an interpreter. Consequently, Defendants are not entitled to judgment as a matter of law on the issue of whether the lack of an interpreter violated Jose-Nicolas's due process rights.

**2.** *Presentation of Witnesses*

The Court next turns to the issue of whether Jose-Nicolas's due process rights were violated when he was not permitted to call witnesses at his disciplinary hearing. "Inmates have a due process right to call witnesses at their disciplinary hearings when doing so would be consistent with institutional safety and correctional goals, but there is no right to call witnesses whose testimony would be irrelevant, repetitive, or unnecessary." *Piggie v. Cotton*, 344 F.3d 674, 677 (7th Cir. 2003) (citations omitted).

Jose Nicolas stated in his amended complaint that he wanted to call two witnesses:  Officer Berry (one of the officers who wrote the ticket and who allegedly used excessive force against Jose-Nicolas) and his cellmate, Edgar Diaz (Doc. 50). In their motion for summary judgment, Defendants argue that Jose-Nicolas's inability to call either of those two witnesses did not violate his due process rights (Doc. 97, pp. 7–

9). In responding to the motion for summary judgment, Jose-Nicolas's argument pertains only to Diaz (*see* Doc. 98, pp. 10–12). He did not make any argument regarding Officer Berry, and thus Jose-Nicolas seemingly concedes that his inability to call Officer Berry as a witness did not violate his due process rights (*see id.*). *See also Oliver v. Pfister*, 655 F. App'x 497, 500 (7th Cir. 2016), *reh'g denied* (Aug. 30, 2016) (explaining it would be repetitive to call the reporting officer as a witness at a disciplinary hearing in order to have that officer confirm the information already contained in the report). Therefore, the Court's analysis will address only Jose-Nicolas's inability to call inmate Diaz as a witness.

Defendants argue that calling Diaz as a witness would not have aided Jose-Nicolas's defense because "it can be assumed [Diaz] would have testified consistently with his deposition testimony in this case—that he and the Jose-Nicolas were in possession of the hooch in their cell and that Jose-Nicolas altered Inmate Diaz's television" (Doc. 97, p. 8). For his part, Jose-Nicolas argues that Diaz would have testified "that the alcohol found in the cell belonged to [Diaz], the altered TV also belonged to [Diaz] and had his name on it . . . ." (Doc. 98, p. 11). In other words, the parties read Diaz's testimony to say exact opposite things.

The Court has reviewed Edgar Diaz's testimony, and it appears that each party is half-right. When asked if he and Jose-Nicolas had "hooch" in their cell, Diaz responded "I mean, yeah . . . *It was mine*" (Doc. 97-3, p. 16) (emphasis added). When asked about the television, Diaz stated "That was my TV . . . my headphone jack was messed up, so I had [Jose-Nicolas] fix it. I paid [Jose-Nicolas] to fix my TV" (*Id.*). Thus, assuming Diaz's

testimony at the disciplinary hearing would have been consistent with his deposition testimony, calling him as a witness would have benefited Jose-Nicolas on the Drug and Drug Paraphernalia charge and seemingly exonerated him on the Drug and Drug Paraphernalia charge. But Diaz's testimony would not have exonerated Jose-Nicolas on the Damage or Misuse of Property charge.

Defendants suggest that refusing to allow Jose-Nicolas to call Diaz as a witness was harmless because, even if Diaz had testified, the end-result of the disciplinary hearing would have been the same because "at least three of the four charges Plaintiff faced are punishable by six months of segregation, C-grade, commissary restriction, and contact visits restriction" (Doc. 97, p. 8) (citing 20 ILL. ADMIN. CODE § 504, Table A). While it is true that the maximum possible penalty for Damage or Misuse of Property was six months of segregation, 20 ILL. ADMIN. CODE § 504, Table A (2014),[6] there is simply no evidence (or even any argument) that this is the punishment that would have still been recommended or imposed on Jose-Nicolas, even if he had been exonerated on the Drug and Drug Paraphernalia charge (*see* Doc. 97). Accordingly, there remains an issue of fact as to whether the refusal to allow Jose-Nicolas to call Diaz as a witness was harmless. Defendants are therefore not entitled to judgment on this issue either.

In sum, Defendants' motion for summary judgment as it pertains to Count 4 must be denied.

---

[6] Defendants did not provide the Court with a copy of the Table they cited to, however, the Court was able to use Westlaw to access a Table from the 2014 Illinois Administrative Code, which is the version that would have been in effect at the time of the disciplinary hearing at issue. The Table indicates the maximum possible penalty for Insolence is one month, and the maximum possible penalty for Disobeying a Direct Order is three months. 20 ILL. ADMIN. CODE § 504, Table A (2014).

*Qualified Immunity*

In light of the Court's conclusion that Defendants are not entitled to summary judgment on Counts 2, 3, or 4, the Court must address their argument that they are protected from liability by qualified immunity (Doc. 97, pp. 14–16).

"Generally, qualified immunity protects government agents from liability when their actions do not violate 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Hernandez v. Cook Cnty. Sheriff's Office*, 634 F.3d 906, 914 (7th Cir. 2011) (citing *Purvis v. Oest*, 614 F.3d 713, 720 (7th Cir. 2010)). "It protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Burritt v. Ditlefsen*, 807 F.3d 239, 249 (7th Cir. 2015) (quoting *Malley v. Briggs,* 475 U.S. 335, 341 (1986)). In determining whether Defendants are entitled to qualified immunity, the Court must ask two questions:   (1) whether the facts, taken in the light most favorable to Jose-Nicolas, show that Defendants violated a constitutional right; and (2) whether that constitutional right was clearly established at the time of the alleged violation. *Hernandez*, 634 F.3d at 914 (citing *Saucier v. Katz*, 533 U.S. 194, 201, 202 (2001)).

Defendants argue that they are entitled to qualified immunity because "the facts alleged here do not give rise to a Constitutional violation" and therefore holding them liable would "establish a new standard" under which Defendants would not have been aware their conduct was unlawful (Doc. 97, pp. 15–16). This argument is fundamentally flawed, however, because it is based on Defendants' own version of the facts. As set forth above, Jose-Nicolas put forth a different set of facts that establish a genuine issue of fact as to whether his constitutional rights were violated. As for whether Jose-

Nicolas's rights were clearly established at the time of the alleged violation, Defendants did not make any credible argument on this point, nor could they, because those rights were certainly well-established by 2014. *See supra* Parts B, C, and D. Accordingly, Defendants are not entitled to qualified immunity.

### E.  Count 8: Intentional Infliction of Emotional Distress

Count 8 is a claim under Illinois state law for intentional infliction of emotional distress against Defendants Berry and Qualls. To survive summary judgment on this claim, Jose-Nicolas "must present evidence showing that (1) [Defendants'] conduct was truly extreme and outrageous, (2) [Defendants] either intended to inflict emotional distress or knew there was at least a high probability that [they] would cause severe emotional distress, and (3) the conduct in fact caused severe emotional distress. *Stokes v. Bd. of Educ. of the City of Chicago*, 599 F.3d 617, 626 (7th Cir. 2010) (citing *Feltmeier v. Feltmeier,* 798 N.E.2d 75, 80 (Ill. 2003)).

The Court elects to bypass the first two elements and address whether Defendants' conduct caused Jose-Nicolas severe emotional distress. "Severe emotional distress" is distress so severe that no reasonable person could be expected to endure it. *Lifton v. Bd. of Educ. of City of Chi.*, 416 F.3d 571, 579 (7th Cir. 2005). In his briefing, Jose-Nicolas does not identify the severe emotional distress that he allegedly suffered (*see* Doc. 98). In fact, he doesn't even make a bald assertion that he was humiliated, depressed, or something of the like following the attack (*see* Doc. 98). Jose-Nicolas also does not point to any evidence that describes his alleged emotional distress (*see* Doc. 98). Consequently, he has failed to satisfy his burden of setting forth specific facts

showing that there is genuine issue for trial, and Defendants are entitled to summary judgment on this claim. *See Springer v. Durflinger,* 518 F.3d 479, 484 (7th Cir. 2008) ("Summary judgment is the put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of the facts." (quoting *Steen v. Myers,* 486 F.3d 1017, 1022 (7th Cir. 2007))). In light of this conclusion, the Court need not address Defendants' arguments that they are entitled to various forms of immunity on this claim (*see* Doc. 97, pp. 12–16).

## F.   Count 9: Negligent or Willful and Wanton Conduct

Count 9—titled "Negligent or Willful and Wanton Conduct"—is brought against all Defendants (Doc. 50), but only Defendants Berry and Qualls move for summary judgment this claim (*see* Doc. 97, p. 12).

Before addressing Berry and Qualls's argument for summary judgment, the Court needs to address the nature of the claim in Count 9. The title given to Count 9 implies that Jose-Nicolas is asserting an aggravated negligence claim based on willful and wanton conduct against Defendants Berry and Qualls, and in the alternative, an ordinary negligence claim.[7] Unfortunately, however, the amended complaint does not delineate, and the Court cannot fathom, how Defendant Berry and Qualls acted negligently (*see* Doc. 50). The factual allegations in the amended complaint suggest only

---

[7] "There is no separate, independent tort of willful and wanton conduct. Rather, willful and wanton conduct is regarded as an aggravated form of negligence." *Jane Doe-3 v. McLean Cnty. Unit Dist. No. 5 Bd. of Directors*, 973 N.E.2d 880, 887 (Ill. 2012) (citing *Krywin v. Chi. Transit. Auth.*, 938 N.E.2d 440, 452 (Ill. 2010)). "In order to recover damages based on willful and wanton conduct, a plaintiff must plead and prove the basic elements of a negligence claim . . . [and] either a deliberate intention to harm or a conscious disregard for the plaintiff's welfare." *Jane Doe-3*, 973 N.E.2d at 887 (citing *Krywin*, 938 N.E.2d at 452).

that Berry and Qualls intentionally injured Jose-Nicolas by beating him while he was restrained until he lost consciousness (Doc. 50). In his response to the motion for summary judgment, Jose-Nicolas seemingly confirms that he is only asserting a claim against Berry and Qualls based on willful and wanton conduct, and not ordinary negligence, by stating that he "alleges willful and wanton conduct" against them and that he has evidence their actions were intentionally meant to cause harm (Doc. 98, p. 15). All that being said, neither party speaks to the nature of Count 9 in their briefing, and thus the Court assumes that Jose-Nicolas is pursuing both an ordinary negligence claim and a negligence claim based on willful and wanton conduct against Defendants Berry and Qualls.

In support of their request for summary judgment on Count 9, Berry and Qualls advance a four-sentence argument, which is reproduced below in its entirety:

> The law distinguishes between intentional acts and negligence; intentional negligence is not an appropriate cause of action. *See, e.g., Staub v. Proctor Hosp.*, 562 U.S. 411, 417 (2011). Intentional torts require that the actor intended the consequences, not just the act itself. Illinois law views willful and wanton allegations as aggravated negligence. *Walfer v. Evanston Northwestern Healthcare*, 52 N.E. 3d 319, 327 (Ill. S. Ct. 2016). [Jose-Nicolas] only alleges intentional acts against Defendants and has no evidence of the Defendants intentions. (UMF 47). Defendants are, therefore, entitled to summary judgment on [Jose-Nicolas's] negligence and willful and wanton misconduct claims.

(Doc. 97, p. 12).

The Court is unable to discern what exactly Defendants Berry and Qualls are arguing. This argument is simply too undeveloped for the Court to properly analyze it,

and therefore, Defendants request for summary judgment on Count 9 is summarily denied.

In light of the conclusion that Berry and Qualls are not entitled to summary judgment on Count 9, the Court must consider whether they are entitled to state sovereign immunity or public official immunity (Doc. 97, pp. 12–16). The Court notes that it seems as though the immunity arguments were intended to apply to all Defendants, not just Berry and Qualls. It is not entirely clear, however, because the motion simply refers to "Defendants" and speaks very generally about immunity (*see* Doc. 97, pp. 12–16); it does not name any of the Defendants or explain how their specific conduct is shielded by immunity (*see id.*). It is obvious from his response brief that Jose-Nicolas assumed the immunity arguments applied only to Defendants Berry and Qualls as those are the only two Defendants that he addressed (Doc. 98, pp. 16–20). Despite the vagaries of the allegations in Count 9 and the absence of any briefing regarding the conduct of Defendants Hughes, Hart, Snell, Purdom, and Lang, the Court believes that it is relatively easily to determine that none of the remaining Defendants are entitled to any kind of immunity on Count 9. Consequently, the following discussion on immunity will not be limited to Defendants Berry and Qualls and will address all Defendants.

### 1. *State Sovereign Immunity*

The Illinois State Lawsuit Immunity Act provides that the State shall not be made a defendant in any Court except as provided in either the Public Labor Relations Act (not at issue here) or the Court of Claims Act. 745 ILL. COMP. STAT. 5/1. The Court of Claims Act vests exclusive jurisdiction in the Court of Claims for "all claims against the

State for damages in cases sounding in tort." 705 ILL. COMP. STAT. 505/8. In other words, the State is immune from claims for tort damages in any court other than the Illinois Court of Claims. *Richman v. Sheahan*, 270 F.3d 430, 441 (7th Cir. 2001); *Healy v. Vaupel*, 549 N.E.2d 1240, 1246 (Ill. 1990).

Here, Jose-Nicolas did not sue the State of Illinois for state law torts; instead, he sued employees of the State as individuals. But "the formal identification of the parties as they appear in the record is not dispositive" in determining whether the action is, in fact, one against the State and thus one that must be brought in the Court of Claims. *Leetaru v. Bd. of Trustees of Univ. of Illinois*, 32 N.E.3d 583, 595 (Ill. 2015). "[S]ubstance takes precedence over form." *Id.* The court must look at "the issues involved and the relief sought" to determine whether the immunity statute applies to claims against state employees. *Id.* An action against an individual state employee will be characterized as an action against the State if (1) the officers were acting beyond the scope of their authority through wrongful acts; (2) the duty alleged to have been breached was imposed on the officers solely by virtue of their employment and was not a duty owed by all citizens, and (3) the complained-of actions involved matters ordinarily within the officers' normal and official functions. *Richman*, 270 F.3d at 441 (quoting *Healy*, 549 N.E.2d at 1247); *Turpin v. Koropchak*, 567 F.3d 880, 883 (7th Cir. 2009).

"The doctrine of sovereign immunity affords no protection, however, when it is alleged that the State's agent acted in violation of statutory or constitutional law or in excess of his authority." *Leetaru*, 32 N.E.3d at 595; *accord Murphy v. Smith*, 844 F.3d 653, 658–59 (7th Cir. 2016). "This exception is premised on the principle that while legal

official acts of state officers are regarded as acts of the State itself . . . when a state officer performs illegally or purports to act under an unconstitutional act or under authority which he does not have, the officer's conduct is not regarded as the conduct of the State." *Leetaru*, 32 N.E.3d at 596; *accord Murphy*, 844 F.3d at 659. The Seventh Circuit recently explained that, in 2015, the Illinois Supreme Court "reaffirmed the exception in broad terms, over a dissent that would have narrowed [its scope]." *Murphy*, 844 F.3d at 659 (citing *Leetaru*, 32 N.E.3d at 611–12). The role of the federal courts "is to take the *Leetaru* majority opinion at its word" and "the exception applies whenever 'agents of the State have acted in violation of statutory or constitutional law.'" *Murphy*, 844 F.3d at 659 (quoting *Leetaru*, 32 N.E.3d at 597).

Here, Jose-Nicolas alleged that Defendants Berry, Qualls, Purdom, and Snells not only committed the tort of negligence or willful and wanton conduct, but also that they violated the Eighth Amendment. There is evidence that Defendants Berry and Qualls beat Jose-Nicolas while he was restrained in handcuffs until he lost consciousness, and that Purdom and Snells stood by and did nothing to stop the beating. No correctional officers have the authority to use force "maliciously and sadistically to cause harm" or to ignore a fellow officer's use of such force. *See, e.g., Wilkins v. Gaddy*, 559 U.S. 34, 37 (2010) (prison officials violate the Eighth Amendment when they use force "maliciously and sadistically to cause harm" as opposed to "in a good-faith effort to maintain or restore discipline."); *Harper v. Albert*, 400 F.3d 1052, 1064 (7th Cir. 2005) (prison officials "who have a realistic opportunity to step forward and prevent a fellow officer from violating a [prisoner's] right through the use of excessive force but fail to do so" violate

the Eighth Amendment). Thus, Jose-Nicolas has established a genuine issue of material fact as to whether these four Defendants acted in excess of their authority and violated the Eighth Amendment to the Constitution. Consequently, state sovereign immunity does not bar his state-law claims for negligence or willful and wanton conduct against them. *See Murphy*, 844 F.3d at 660 (concluding Illinois state sovereign immunity did not bar inmate's tort claims for battery because inmate also alleged and proved that the defendants' actions violated the Eighth Amendment of the Constitution). *Bentz v. Ghosh*, No. 16-1697, 2017 WL 5564679, at *5 (7th Cir. Nov. 20, 2017) (reversing the dismissal of state-law negligence claims based on state sovereign immunity because inmate alleged the defendants were negligent as well as deliberately indifferent to his serious medical needs in violation of the Eighth Amendment).

State sovereign immunity also does not bar Jose-Nicolas's state-law claims for negligence or willful and wanton conduct against Defendants Lang, Hughes, and Hart. In addition to alleging these Defendants committed the tort of negligence or willful and wanton conduct, Jose-Nicolas also alleged that Lang violated the Eighth Amendment and that Hughes and Hart violated his due process rights. There is evidence that Lang conducted nothing more than a cursory examination and ignored Jose-Nicolas's complaints of pain and his need for additional medical care. There is also evidence that Hughes and Hart refused to allow Jose-Nicolas to call witnesses or to provide an interpreter at the Adjustment Committee hearing. As previously explained in this Order, no prison official has the authority to ignore a prisoner's serious medical needs or deprive a prisoner of a liberty interest without due process. *See* Parts C and D above.

Thus, the evidence in this case establishes a genuine issue of material fact as to whether Lang was deliberately indifferent to Jose-Nicolas's serious medical needs in violation of the Eighth Amendment and whether Hughes and Hart violated his due process rights. Consequently, Jose-Nicolas's state law claims against these Defendants can proceed in this Court without offending the Illinois doctrine of sovereign immunity.

In sum, Defendants' request to dismiss Jose-Nicolas's state law claim for negligence or willful and wanton conduct on the basis of state sovereign immunity is denied.

### 2. *Public Official Immunity*

Public official immunity is a common law doctrine that dictates public officials are immune from individual liability for "the performance of discretionary duties performed in good faith" and "unique to the particular public office." *Currie v. Lao*, 592 N.E.2d 977, 984 (Ill. 1992); *Kinzer v. City of Chi.*, 539 N.E.2d 1216, 1220 (Ill. 1989).[8] Defendants argue that they are entitled to public official immunity on the state-law claim for negligence or willful and wanton conduct because Jose-Nicolas alleges they breached a duty "which is unique to their positions as correctional employees" and which "they owed to [him] by nature of their position over him at a correctional facility" (Doc. 97, p. 14).

---

[8] The common law doctrine known as public official immunity was codified in Section 2-201 of the Illinois Local Governmental and Governmental Employees Tort Immunity Act. 745 ILL. COMP. STAT. 10/2-201. *Reese v. May*, 955 F. Supp. 869, 874 (N.D. Ill. 1996); *Horton v. City of Ottawa*, 352 N.E.2d 23, 24 (Ill. App. Ct. 1976). Notwithstanding the Tort Immunity Act, Illinois still recognizes the common-law public official immunity doctrine that gives immunity to individuals. *Kinzer*, 539 N.E.2d at 1220.

Defendants' stunted, two-sentence argument, which is devoid of any citations to supporting authority, can be summarily denied. It also can be readily denied on the merits. Defendant Lang is not entitled to public official immunity because the duty she allegedly breached is owed by every health care professional to his or her patients, rather than an obligation incurred solely by virtue of being a public employee. *Michigan Ave. Nat. Bank*, 191 Ill. 2d at 521 (listing cases where public official immunity was denied to doctors and nurses because their duties arose from their professional relationship with the plaintiffs and thus they were not engaged in actions of a government character). As for the other Defendants, the evidence before the Court establishes an issue of fact as to whether they performed their duties in good faith. Consistent with the conclusions reached previously in this Order, a reasonable jury could find that Berry and Qualls were not acting in good faith when they beat Jose-Nicolas to the point of unconsciousness while he was restrained; that Purdom and Snells were not acting in good faith when they did not intervene as their fellow officers were beating a restrained inmate; and that Hughes and Hart were not acting in good faith when they ignored Jose-Nicolas's request for a translator and to call an exculpatory witness at the Adjustment Committee Hearing.

Consequently, Defendants' request to dismiss Jose-Nicolas's state law claim for negligence or willful and wanton conduct on the basis of public official immunity is denied.

<u>CONCLUSION</u>

Defendant Harrington is **DISMISSED with prejudice** at Plaintiff Jose-Nicolas's request.

For the reasons explained above, Defendants' motion for partial summary judgment (Doc. 96) is **GRANTED in part and DENIED in part**. The motion is **GRANTED** as to Count 8 (intentional infliction of emotional distress), and judgment will be entered in favor of Defendants Berry and Qualls as to that Count at the conclusion of this matter. The motion is **DENIED** as to Count 2 (failure to intervene); Count 3 (deliberate indifference); Count 4 (due process); and Count 9 (negligent or willful and wanton conduct). Additionally, the motion is **DENIED** as to Defendants' respective requests for qualified immunity, state sovereign immunity, and/or public official immunity.

This matter shall proceed to trial on the following Counts:

**Count 1:**     an excessive force claim against Berry and Qualls;

**Count 2:**     a failure to intervene claim against Berry, Qualls, Snell and Purdom;

**Count 3:**     a deliberate indifference claim against Berry, Qualls, Snell, Purdom, and Lang;

**Count 4:**     a due process claim against Hughes, Hart;

**Counts 6, 7:** state law claims of assault and battery against Berry and Qualls;

**Count 9:**     a state law claim of negligence or willful and wanton conduct against Berry, Qualls, Snell, Purdom, Lang, Hughes, and Hart; and

**Count 11:**     a claim for "Indemnification" against all Defendants.


**IT IS SO ORDERED.**

**DATED:   March 2, 2018**

_____
**NANCY J. ROSENSTENGEL**
**United States District Judge**