1            **IN THE UNITED STATES DISTRICT COURT**
          **FOR THE SOUTHERN DISTRICT OF ILLINOIS**
2

OSBALDO JOSE-NICOLAS,      )
3                      )
           Plaintiff,    )
4                      )
     vs.             ) No. 15-cv-00964-NJR
5                      )
NATHAN BERRY, et al.,      )
6                      ) August 16, 2018
          Defendants.  )
7

8         **TRANSCRIPT OF JURY TRIAL DAY #3**
      **BEFORE THE HONORABLE NANCY J. ROSENSTENGEL**
9        **UNITED STATES DISTRICT COURT JUDGE**

10                  **APPEARANCES**

11 **FOR PLAINTIFF:**        Sarah C. Grady, Esq.
                      Julie Goodwin, Esq.
12                   Adair Crosley, Esq.
                      Loevy & Loevy
13                   311 N. Aberdeen St.
                      Chicago, IL  60607
14                   (312) 243-5900

15 **FOR DEFENDANT:**       Jeremy C. Tyrrell, Esq.
                      Joseph D. Bracey, Jr., Esq.
16                   Illinois A.G.'s Office
                      500 S. Second St.
17                   Springfield, IL 62701
                      (217) 785-4555
18

 **INTERPRETERS:**        Laura Angel
19                   Rafael Saloma-Gonzalez

20 **REPORTED BY:**         Laura A. Esposito, RPR, CRR, CRC
                      Official Court Reporter
21                   U.S. District Court
                      750 Missouri Avenue
22                   East St. Louis, IL  62201
                      (618) 482-9481
23                   Laura_Esposito@ilsd.uscourts.gov

24

     Proceedings recorded by mechanical stenography;
25 transcript produced by computer-aided transcription.

1                    MISCELLANEOUS INDEX

2                                                    PAGE

3    Court's Preliminary Jury Instructions        4
     Plaintiff's Closing Argument                 22
4    Defendants' Closing Argument                 57
     Plaintiff's Rebuttal Closing Argument        75
5    Court's Final Jury Instructions              79

6                        *   *   *   *

7        (Proceedings convened in open court at 8:30 a.m.)

8            COURTROOM DEPUTY:  Osbaldo Nicolas vs.

9    Nathan Berry, et al., Case No. 15-cv-964, is called for Day

10   3 of jury trial.  Will the parties please identify

11   themselves for the record.

12           MS. CROSLEY:  Your Honor, Adair Crosley on behalf

13   plaintiff, Jose Osbaldo.  Co-counsel Julie Goodwin and

14   Sarah Grady are entering.

15           THE COURT:  Good morning, Counsel.

16           MR. TYRRELL:  Good morning, Your Honor.

17   Jeremy Tyrrell and Joseph Bracey, Assistant Attorneys

18   General, on behalf of the defendants.

19           THE COURT:  Good morning, Counsel, and the

20   defendant, Mr. Nicolas.

21           Before we go any further, let's swear the

22   interpreter, if you would, please, Deana.  Ms. Angel is with

23   us again today.

24       (Interpreter Angel is sworn)

25           THE COURT:  Okay.  So, all of our jurors are here.

```
 1    We've finalized the jury instructions.  Counsel, you have a
 2    clean copy to use?
 3            MS. GRADY:  Yes, Your Honor.
 4            THE COURT:  Okay.  Mr. Tyrrell, do you have a clean
 5    copy?
 6            MR. TYRRELL:  Yes, Your Honor.
 7            THE COURT:  Okay.  And who will be giving the
 8    closing argument on behalf of plaintiff?
 9            MS. GRADY:  I will, Your Honor.
10            THE COURT:  Okay.  And, Mr. Tyrrell, you will be
11    for defendants?
12            MR. TYRRELL:  Yes, Your Honor.
13            THE COURT:  So I'm going to have -- when the jury
14    comes in I'll have the defendants formally rest on the
15    record and then I'll read all but the last couple of
16    instructions, and do closing arguments, and then I'll read
17    the last few.
18            Ms. Grady, how long do you think your closing
19    argument will be?
20            MS. GRADY:  About 45 minutes, Your Honor.
21            THE COURT:  Mr. Tyrrell, any estimate?
22            MR. TYRRELL:  I'd say about 15.
23            THE COURT:  Okay.  All right.  Are we ready for the
24    jury then?
25            MR. TYRRELL:  Yes, Your Honor.
```

```
 1                COURT'S PRELIMINARY JURY INSTRUCTIONS

 2         (Jury in)

 3              THE COURT:  Good morning, ladies and gentlemen.

 4    Welcome back.  I hope you had a nice evening.

 5              After you left yesterday we finalized your jury

 6    instructions.  Plaintiff rested yesterday.

 7              Mr. Tyrrell, will the defendants call any

 8    witnesses?

 9              MR. TYRRELL:  No, Your Honor.  Defendants rest.

10         THE COURT:  Okay.  So, the evidence having

11    concluded, then we are ready for final instructions that I

12    promised you during jury selection.  So, again, you should

13    each have a hard copy.  We will put them up on the screen.

14    If you want the read along on your copy or read along on the

15    screen or just listen to me, whatever is best for you, feel

16    free to do.  I'm going to read all but just the last few and

17    then we'll have closing arguments.

18              Members of the jury, you have seen and heard all

19    the evidence and will soon hear the arguments of the

20    attorneys.  Now I will instruct you on the law.

21              You have two duties as a jury:  Your first duty is

22    to decide the facts from the evidence in the case.  This is

23    your job and yours alone.

24              Your second duty is to apply the law that I give

25    you to the facts.  You must follow these instructions even
```

1   if you disagree with them.

2          Each of the instructions is important and you must

3   follow all of them.  Perform these duties fairly and

4   impartially.  Do not allow sympathy, prejudice, or public

5   opinion to influence you.  You should not be influenced by

6   any person's race, color, religion, national ancestry, or

7   sex.

8          Nothing I say now and nothing I said or did during

9   the trial is meant to indicate any opinion on my part about

10  what the facts are or about what your verdict should be.

11         In this case, the plaintiff, Osbaldo Jose-Nicolas,

12  is a prisoner.  All parties are equal before the law and

13  entitled to the same fair consideration.

14         The evidence consists of the testimony of the

15  witnesses and the exhibits admitted into evidence.

16         During the trial, the testimony of Lieutenant

17  Kevin Reichert was presented to you by the reading of a

18  deposition, and the testimony of Clayborn Smith was

19  presented to you by video conference.  You should give this

20  testimony the same consideration you would give it had the

21  witness appeared and testified here in court.

22         Certain things are not to be considered as

23  evidence.  I will list them for you:

24            First, if I told you to disregard any

25            testimony or exhibits or struck any testimony

1        or exhibits from the record, such testimony or

2        exhibits are not evidence and must not be

3        considered.

4          Second, anything that you may have seen or

5        heard outside the courtroom is not evidence

6        and must be entirely disregarded.  This

7        includes any press, radio, internet, or

8        television reports you may have seen or heard.

9        Such reports are not evidence and your verdict

10       must not be influenced in any way by such

11       publicity.

12         Third, questions and objections or comments

13       by the lawyers are not evidence.  Lawyers have

14       a duty to object when they believe a question

15       is improper.  You should not be influenced by

16       any objection and you should not infer from my

17       rulings that I have any view as to how you

18       should decide the case.

19         Fourth, the lawyers' opening statements and

20       closing arguments to you are not evidence.

21       Their purpose is to discuss the issues and the

22       evidence.  If the evidence as you remember it

23       differs from what the lawyers said, your

24       memory is what counts.

25         Any notes you have taken during this trial are only

1    aids to your memory.  The notes are not evidence.  If you

2    have not taken notes, you should rely on your independent

3    recollection of the evidence and not be unduly influenced by

4    the notes of other jurors.  Notes are not entitled to any

5    greater weight than the recollections or impressions of each

6    juror about the testimony.

7            You should use common sense in weighing the

8    evidence and consider the evidence in light of your own

9    observations in life.  In our lives we often look at one

10   fact and conclude from it that another fact exists.  In law

11   we call this an "inference".  The jury's allowed to make

12   reasonable inferences.  Any inference you make must be

13   reasonable and must be based on the evidence in the case.

14           You may have heard the terms "direct evidence" and

15   "circumstantial evidence".  Direct evidence is proof that

16   does not require an inference, such as the testimony of

17   someone who claims to have personal knowledge of a fact.

18   Circumstantial evidence is proof of a fact or series of

19   facts that tends to show some other fact is true.

20           As an example, direct evidence that it is raining

21   is testimony from a witness who says, "I was outside a

22   minute ago and I saw it raining."  Circumstantial evidence

23   that it is raining is the observation of someone entering a

24   room carrying a wet umbrella.

25           The law makes no distinction between the weight to

Nicolas vs. Berry, #15-964
Court's Preliminary Jury Instructions 8/16/18 - Vol. 3/Pg. 7

be given to either direct or circumstantial evidence.  You
should decide how much weight to give to any evidence.  In
reaching your verdict, you should consider all the evidence
in the case, including the circumstantial evidence.

You must decide whether the testimony of each of
the witnesses is truthful and accurate in part, in whole, or
not at all.  You also must decide what weight, if any, you
give to the testimony of each witness.

In evaluating the the testimony of any witness,
including any party to the case, you may consider, among
other things:  The ability and opportunity the witness had
to see, hear, or know the things that the witness testified
about; the witness's memory; any interest, bias, or
prejudice the witness may have; the witness's intelligence;
the manner of the witness while testifying; and the
reasonableness of the witness's testimony in light of all
the evidence in the case.

You may find the testimony of one witness or a few
witnesses more persuasive than the testimony of a larger
number.  You need not accept the testimony of the larger
number of witnesses.

You may consider statements given by a party before
trial as evidence of the truth of what that person said in
the earlier statements as well as in deciding what weight to
give his or her testimony.

1          With respect to other witnesses, the law's

2     different.  If you decide that before the trial the witness

3     made a statement that is inconsistent with his or her

4     testimony here in court, you may consider the earlier

5     statement only in deciding whether his or her testimony here

6     in court was true and what weight to give to the testimony

7     here in court.

8          In considering a prior inconsistent statement, you

9     should consider whether it was simply an innocent error or

10    an intentional falsehood and whether it concerns an

11    important fact or an unimportant detail.

12         You have heard evidence that a witness and a party

13    has a felony conviction.  You may consider this evidence

14    only in deciding whether the testimony's truthful in whole,

15    in part, or not at all.  You may not consider this evidence

16    for any other purpose.

17         It is proper for a lawyer to meet with any witness

18    in preparation for trial.

19         The defendants are being sued as individuals.

20    Neither the State of Illinois nor the Illinois Department of

21    Corrections is a party to this lawsuit.

22         You have heard evidence about whether the

23    defendant's conduct complied with the internal policies and

24    procedures of the Illinois Department of Corrections.  You

25    may consider this evidence in your deliberations, but

1    remember that the issue is whether the defendants violated

2    Mr. Nicolas's constitutional rights, not whether a policy or

3    procedure might have been violated or complied with.

4         In determining whether any fact has been proved,

5    you should consider all of the evidence bearing on the

6    question, regardless of who introduced it.

7         The law does not require any party to call as a

8    witness every person who might have knowledge of the facts

9    related to this trial.  Similarly, the law does not require

10   any party to present as exhibits all papers and things

11   mentioned during this trial.

12        You should consider only the evidence provided

13   through the official interpreter.  Although some of you may

14   know Spanish, it is important that all jurors consider the

15   same evidence.  Therefore, you must base your decision on

16   the evidence presented in the English translation.

17        Certain charts and diagrams have been shown to you.

18   Those charts and diagrams are used for convenience and to

19   help explain the facts of the case.  They are not themselves

20   evidence or proof of any facts.

21        You must give separate consideration to each claim

22   and each party in this case.  Although there are five

23   defendants, it does not follow that if one is liable any of

24   the others is also liable.

25        When I say that Mr. Nicolas must prove something by

1   "a preponderance of the evidence" or when I use the

2   expression "if you find" or "if you decide," this is what I

3   mean:  When you have considered all the evidence in the case

4   you must be persuaded that it is more probably true than not

5   true.

6          Plaintiff Osbaldo Jose-Nicolas brings the following

7   claims:

8          (1) That Defendants Nathan Berry and

9          William Qualls used excessive force against

10         Mr. Nicolas on February 5th, 2014;

11         (2) That Defendants Nathan Berry, William

12         Qualls, Justin Snell, and Matthew Purdom

13         failed to intervene in order to prevent the

14         use of excessive force against Mr. Nicolas on

15         February 5th, 2014;

16         (3) That Defendants Nathan Berry, William

17         Qualls, Justin Snell, Matthew Purdom, and

18         Aimee Lang failed to provide constitutionally

19         adequate medical care or access to adequate

20         medical care to Mr. Nicolas;

21         (4) That Defendants Nathan Berry, William

22         Qualls, Justin Snell, Matthew Purdom, and

23         Aimee Lang engaged in wilful and wanton

24         conduct that posed a serious risk of harm to

25         Mr. Nicolas.

1          The defendants deny each of the claims against

2     them.

3          To succeed on his claim of excessive use of force

4     against Defendants Nathan Berry and William Qualls,

5     Mr. Nicolas must prove each of the following three things by

6     a preponderance of the evidence, *as to each defendant*:

7               (1) The defendant intentionally used force

8               on Mr. Nicolas;

9               (2) The defendant did so for the purpose of

10              harming Mr. Nicolas and not in a good faith

11              effort to maintain security; and

12              (3) The defendant's conduct harmed

13              Mr. Nicolas.  Mr. Nicolas does not need to

14              prove that he suffered a serious injury.  If

15              the defendant's use of force caused pain to

16              Mr. Nicolas, that is sufficient harm, even if

17              Mr. Nicolas did not require medical attention

18              or did not have long-lasting injuries.

19         In deciding whether Mr. Nicolas has proved that a

20    defendant used force for the purpose of harming Mr. Nicolas,

21    you should consider all of the circumstances.  When

22    considering all of the circumstances, among the factors you

23    may consider are the need to use force, the relationship

24    between the need to use force and the amount of force used,

25    the extent of Mr. Nicolas's injury, whether the defendant

1   reasonably believed there was a threat to the safety of

2   staff or prisoners, and any efforts made by the defendant to

3   limit the amount of force used, and whether the defendant

4   was acting pursuant to a policy or practice of the prison

5   that, in the reasonable judgment of prison officials, was

6   needed to preserve security or order.

7          If you find that Mr. Nicolas has proved each of

8   these things by a preponderance of the evidence as to a

9   defendant, then you must decide for Mr. Nicolas and go on to

10  consider the question of damages as to that defendant.

11         If, on the other hand, you find that Mr. Nicolas

12  has failed to prove any one of these things by a

13  preponderance of the evidence as to a defendant, then you

14  must decide for that defendant and you will not consider the

15  question of damages.

16         To succeed on his claim for failure to intervene

17  against Defendants Nathan Berry, William Qualls,

18  Justin Snell, and Matthew Purdom, Mr. Nicolas must prove

19  each of the following five things by a preponderance of the

20  evidence, *as to each defendant*:

21             (1) Excessive force was used on Mr. Nicolas

22             on February 5th, 2014;

23             (2) The defendant knew that excessive force

24             was being used or about to be used on

25             Mr. Nicolas;

```
 1              (3)  The defendant had a realistic
 2          opportunity to do something to prevent harm
 3          from occurring;
 4              (4)  The defendant failed to take reasonable
 5          steps to prevent harm from occurring;
 6              (5)  The defendant's failure to act caused
 7          Mr. Nicolas to suffer harm.
 8          If you find that Mr. Nicolas has proved each of
 9   these things by a preponderance of the evidence as to a
10   defendant, then you must decide for Mr. Nicolas and go on to
11   consider the question of damages as to that defendant.
12          If, on the other hand, you find that Mr. Nicolas
13   has failed to prove any one of these things by a
14   preponderance of the evidence as to a defendant, then you
15   must decide for that defendant and you will not consider the
16   question of damages.
17           To succeed on his claim for failure to provide
18   medical care against the Defendants Nathan Berry,
19   William Qualls, Justin Snell, Matthew Purdom, and
20   Aimee Lang, Mr. Nicolas must prove each of the following
21   four things by a preponderance of the evidence, *as to each*
22   *defendant*:
23              (1)  Mr. Nicolas had a serious medical need.
24          A serious medical need is a condition that a
25          doctor says requires treatment or something so
```

1              obvious that even someone who is not a doctor

2              would recognize that it requires treatment.

3                  (2) The defendant was aware that Mr. Nicolas

4              had a serious medical need or strongly

5              suspected facts showing a strong likelihood

6              that Mr. Nicolas had a serious medical need

7              but refused to confirm whether these facts

8              were true.  You may infer this from the fact

9              that the need was obvious.

10                 (3) The defendant consciously failed to take

11             reasonable measures to provide treatment for

12             the serious medical need.  Mr. Nicolas does

13             not have to show that the defendant ignored

14             him or provided no care.  If the defendant

15             provided some care, Mr. Nicolas must show that

16             the defendant knew his actions likely would be

17             ineffective or that the defendant's actions

18             were clearly inappropriate.

19                 (4) As a result of the defendant's actions,

20             Mr. Nicolas was harmed.  Mr. Nicolas may prove

21             that the defendant harmed him with evidence

22             that he suffered prolonged unnecessary pain.

23                 If you find that Mr. Nicolas has proved each of

24      these things by a preponderance of the evidence as to any

25      defendant, then you should find for Mr. Nicolas and go on to

1    consider the question of damages as to that defendant.

2          If, on the other hand, you find that Mr. Nicolas

3    has failed to prove any one of these things by a

4    preponderance of the evidence, then you should find for that

5    defendant on his claim, and you will not consider the

6    question of damages on his claim.

7          Mr. Nicolas's next claim is that he was injured

8    and sustained both physical and mental and emotional damage

9    and that the conduct of one or more defendants was wilful

10   and wanton in one or more of the following respects:

11         That the Defendants Nathan Berry and/or

12         William Qualls used force against Mr. Nicolas;

13         That the Defendants Nathan Berry,

14         William Qualls, Justin Snell, and/or

15         Matthew Purdom failed to intervene when force

16         was being used against Mr. Nicolas;

17         That the Defendants Nathan Berry,

18         William Qualls, Justin Snell, Matthew Purdom,

19         and/or Lang failed to provide appropriate

20         medical care or access to medical care for

21         Mr. Nicolas's injuries; and

22         Mr. Nicolas further claims that one or more of the

23   foregoing was a proximate cause of his injuries.

24         The defendants deny that they did any of the things

25   claimed by Mr. Nicolas, deny that they were wilful and

 1   wanton in doing any of the things claims by Mr. Nicolas, and

 2   deny that any claimed act or omission on their part was a

 3   proximate cause of Mr. Nicolas's claimed injuries.

 4        To succeed on his claim for wilful and wanton

 5   conduct, Mr. Nicolas must prove the following three things

 6   by a preponderance of the evidence, *as to each defendant*:

 7             (1) That the defendant acted or failed to

 8             act in one of the ways claimed by Mr. Nicolas

 9             as stated to you in the prior instruction, and

10             that in so acting or failing to act, the

11             defendant was wilful and wanton.

12             (2) That Mr. Nicolas was injured.

13             (3) That the wilful and wanton conduct of

14             the defendant was a proximate cause of the

15             injury to Mr. Nicolas.

16        If you find that Mr. Nicolas has proved each of

17   these things by a preponderance of the evidence as to any

18   defendant, then you should find for Mr. Nicolas, and go on

19   to consider the question of damages as to that defendant.

20        If, on the other hand, you find that Mr. Nicolas

21   has failed to prove any one of these things by a

22   preponderance of the evidence as to any defendant, then you

23   should find for that defendant on this claim, and you will

24   not consider the question of damages on this claim.

25        It was the duty of the defendants, before and at

1    the time of the occurrence, to refrain from wilful and

2    wanton conduct which would endanger the safety of

3    Mr. Nicolas.

4          When I use the expression "wilful and wanton

5    conduct," I mean a course of action which shows actual or

6    deliberate intention to harm or, which, if not intentional,

7    shows an utter indifference to or conscious disregard for

8    the safety of others.

9          When I use the expression "proximate cause," I

10   mean a cause that, in the natural or ordinary course of

11   events, produced Mr. Nicolas's injury.  It need not be the

12   only cause nor the last or nearest cause.  It is sufficient

13   if it combines with another cause resulting in the injury.

14         If you decide for the defendants on the question

15   of liability, then you should not consider the question of

16   damages.

17         If you find in favor of Mr. Nicolas on one or more

18   of his claims, then you must determine the amount of money

19   that will fairly compensate Mr. Nicolas for any injury that

20   you find he sustained as a direct result of a defendant's

21   unconstitutional actions.  These are called "compensatory

22   damages".

23         Mr. Nicolas must prove his damages by a

24   preponderance of the evidence.  Your award must be based on

25   evidence and not speculation.  This does not mean, however,

1    that compensatory damages are restricted to the actual loss

2    of money.  They include both the physical and mental aspects

3    of injury, even if they are not easy to measure.

4          You should consider the following types of

5    compensatory damages and no others:  The physical and

6    mental/emotional pain and suffering that Mr. Nicolas has

7    experienced and is reasonably certain to experience in the

8    future.  No evidence of the dollar value of physical or

9    mental/emotional pain and suffering has been or needs to be

10   introduced.  There is no exact standard for setting the

11   damages to be awarded on account of these factors.  You are

12   to determine an amount that will fairly compensate

13   Mr. Nicolas for the injury he has sustained.

14         If you find for Mr. Nicolas, you may, but are not

15   required to, assess punitive damages against any one or more

16   of the defendants.  The purposes of punitive damages are to

17   punish a defendant for his or her conduct and to serve as an

18   example or warning to the defendant and others not to engage

19   in similar conduct in the future.

20         Mr. Nicolas must prove, by a preponderance of the

21   evidence, that punitive damages should be assessed against

22   the particular defendant you are considering.  You may

23   assess punitive damages only if you find that the

24   defendant's conduct was malicious or in reckless disregard

25   of Mr. Nicolas's rights.  Conduct is malicious if it was

```
 1   accompanied by ill will or spite or was done for the purpose
 2   of injuring Mr. Nicolas.  Conduct is in reckless disregard
 3   of Mr. Nicolas's rights, if, under the circumstances, the
 4   defendant simply did not care about Mr. Nicolas's safety or
 5   his rights.
 6            If you find that punitive damages are appropriate
 7   for one or more of the defendants, then you must use sound
 8   reason in setting the amount of those damages.  Punitive
 9   damages, if any, should be in an amount sufficient to
10   fulfill the purposes that I have described to you but should
11   not reflect bias, prejudice, or sympathy toward any party.
12            In determining the amount of any punitive damages
13   against one of the defendants, you should consider the
14   following factors:
15            The reprehensibility of the defendant's
16            conduct;
17            The impact of the defendant's conduct on
18            Mr. Nicolas;
19            The relationship between Mr. Nicolas and the
20            defendant;
21            The likelihood that the defendant would
22            repeat the conduct if an award of punitive
23            damages is not made; and
24            The relationship of any award of punitive
25            damages to the amount of actual harm that
```

1          Mr. Nicolas suffered.

2          Okay.  So, I'm going to stop there and allow the

3     counsel to present their closing arguments, and then I will

4     finish up with the final instructions and explain the

5     verdict form.

6          So, Ms. Grady, you may now present your closing

7     argument.

8                    **PLAINTIFF'S CLOSING ARGUMENT**

9          *MS. GRADY:*  Thank you, Your Honor, Counsel.

10          Ladies and gentlemen of the jury, on February 5th,

11     2014, Osbaldo Nicolas was beaten.

12          *THE COURT:*  Sorry to interrupt.  I don't think the

13     jury can hear you.  Do you have a microphone?

14          *MS. GRADY:*  I can put a microphone on.

15          *THE COURT:*  Sorry to interrupt.  You can start

16     over.

17          *MS. GRADY:*  Okay.  Can you hear me okay?  Great.

18          Ladies and gentlemen of the jury, on February 5th,

19     2014, Osbaldo Nicolas was beaten for talking back.  Sergeant

20     Qualls and the other defendants decided to teach Mr. Nicolas

21     a lesson, and that lesson was:  Inmates who don't obey, who

22     aren't compliant, get hurt.  And how do we know that's true?

23     We know that's true because Osbaldo Nicolas told you that it

24     was true, we know it's true because Edgar Diaz told you it

25     was true, and we know it's true because Clayborn Smith told

1    you it was true.  He didn't just tell you it was true.

2         On Tuesday he told the Internal Affairs unit it was

3    true four days after the beating.  On February 9th, 2014, in

4    a letter that he wrote to Internal Affairs in Springfield,

5    at a time when Osbaldo Nicolas was in the segregation unit,

6    kept away from Mr. Smith, he wrote and reported the abuse

7    that he had seen.  And it will be your job as ladies and

8    gentlemen of the jury to hold these officers accountable for

9    that abuse.

10         My colleague, Julie Goodwin, on Tuesday morning

11   thanked you for coming and setting time out of your busy

12   schedules and taking this case seriously.  We've seen over

13   the past two-and-a-half days now how seriously you've taken

14   this case.  We see how closely you've paid attention to

15   every witness, both defendants' and plaintiff's, who have

16   come in the courtroom and testified.  We saw how closely you

17   paid attention even when Mr. Smith had to be presented by

18   videoconference.  And we saw how closely you paid attention

19   to every piece of evidence that was admitted.

20         And I want to thank you, on behalf of my

21   colleagues, Julie Goodwin, Adair Crosley, Valeria Brahas

22   [phonetic], and, most importantly, on behalf of my client,

23   Nicolas Osbaldo -- Osbaldo Nicolas, for paying such close

24   attention to the claims in this case because this is an

25   important case, ladies and gentlemen.  This is a case about

1   one of the most basic rights that the constitution provides:

2   It's the right to be free from cruel and unusual punishment,

3   the right to be free from being beaten up because officers

4   want to teach you a lesson, the right to be free from

5   excessive force.

6          And, Osbaldo Nicolas told you about the excessive

7   force that he suffered on February 5th, 2014.  He told you

8   about how he was being held in a holding cell while his cell

9   was being searched.  This was an unannounced, routine search

10  that Officer Berry explained was something that happens at

11  Menard on a regular basis as part of their routine

12  procedure.  They search these cells sort of on a random

13  basis without announcing it first.

14         And they put Mr. Nicolas and his cellmate,

15  Edgar Diaz, in the holding cell on the even side of the

16  prison, which we heard from both prisoners and defendants

17  alike is held on the opposite side of where Mr. Nicolas and

18  Mr. Diaz were housed.  And Mr. Nicolas testified that while

19  he was in that holding cell there were prisoners coming from

20  the galleries on the even side and going out to lunch, and

21  he acknowledged to you that he was talking to some of those

22  guys.  And Edgar Diaz acknowledged that, and Clayborn Smith

23  acknowledged that, too.  They were talking.  Clayborn Smith

24  told you that's -- sometimes that's what happens.  Guys are

25  walking past, you're talking, that happens.

```
 1              And Mr. Nicolas told you about how, as he was

 2    talking to some of these inmates, he was ordered by Sergeant

 3    Qualls to do something that he couldn't quite understand.

 4    Mr. Diaz told you that that order was to "shut the fuck up."

 5     And I wanted to say, as an aside, that I know there's been

 6    some profanity used in this trial, and I want to say it's

 7    not lightly that I use that profanity or that Mr. Nicolas

 8    uses that profanity or that Mr. Diaz or Mr. Smith used that

 9    profanity.  We understand that this is a courtroom and it's

10    a place of respect, but it's important also to let you know

11    what happened and how the situation escalated from some

12    conversation that was happening in passing to a beating to

13    teach Mr. Nicolas a lesson.  So you'll hear me use a few

14    more obscenities today to tell you what happened on that

15    day.  I just want you to know that I'm doing that because

16    it's important to understand what happened and not because I

17    don't respect you or the Court.

18              So, Edgar Diaz told you that the officers -- he

19    told you that Officer Snell first said, "Hey, guys, be

20    cool."  And then seems like there might have been a few more

21    words exchanged between some guys walking by, and the

22    situation escalated.  And Clayborn Smith told you that he

23    heard someone -- he acknowledges he doesn't know exactly

24    who -- say something to the effect of, "Shut your pussy ass

25    up."  So the situation escalated.
```

```
 1              Mr. Nicolas told you that he heard Sergeant Qualls
 2    tell him to face the wall, and Mr. Diaz told you that was
 3    kind of a confusing order because it wasn't really in the
 4    routine, but they did it.  And then Mr. Nicolas told you
 5    that Sergeant Qualls told him to sit down, and Nicolas
 6    didn't sit down.  He acknowledged to you that, instead, he
 7    said to Sergeant Qualls, "The floor is cold."  Well, that
 8    made Sergeant Qualls mad, and so he said, "Sit the fuck
 9    down."  And Mr. Nicolas told you again, he didn't sit down.
10    He again repeated, "The floor is cold," and he apologized in
11    Court for doing that.  He acknowledged that was not
12    complying.
13              And Sergeant Qualls got really mad.  This was a
14    challenge to his authority.  He was the supervisor of the
15    cellhouse.  This was his turf.  And he got angry.  And you
16    heard from Mr. Nicolas about what happened and you heard
17    from Mr. Diaz about what happened and you heard from
18    Mr. Smith about what happened next.  Sergeant Qualls cuffed
19    Mr. Nicolas up, pulled him out of his cell -- pulled him out
20    of the holding cell and sucker punched him.  Mr. Nicolas
21    told you that he didn't see it coming.  And that was the
22    point:  The point was to teach Mr. Nicolas a lesson about
23    what happens when you don't listen to Sergeant Qualls, when
24    you don't listen to the supervisor of that cellhouse.
25              Now, you heard testimony from Clayborn Smith that
```

1   he saw the sucker punch as well, and he told you about how

2   it was that he was able to see that sucker punch, because he

3   was standing at the front of his line, at the front of his

4   cell when the line was going to chow with his mirror out

5   looking for someone who was coming by.  I don't think we

6   ever really heard who that was.  And he told you he was

7   standing right here and he had his mirror out.  And

8   Sergeant Qualls admitted, yeah, this is something the guys

9   do, they got a mirror.  And it makes sense.  If you're

10  staring at a wall and you have a mirror, yeah, you're going

11  to have a mirror and it will allow you to kind of see right

12  here.  You can kind of see what's going on.  I imagine it's

13  boring to stare at a wall and some bars all day.

14          So, Smith probably -- you know, it's reasonable,

15  and you can use your common sense to understand that this is

16  kind of something that he would do from time to time; to see

17  what's going on, he'd use his mirror.  He told you about

18  what he could see and how, if he's standing at the very

19  front of his cell, he, without his mirror, can see into this

20  cage.  And then once he has his mirror out, he can see all

21  the way to here.  And remember, ladies and gentlemen, these

22  are bars, not walls.  And so standing here, he can see here,

23  and with his mirror he can kind of see right about here, and

24  then his line of sight sort of stops.

25          Mr. Nicolas told you about the sucker punch.

1    Mr. Smith told you about the sucker punch.  Mr. Diaz told

2    you about the sucker punch.  They all told you what happened

3    next.  Sergeant Qualls dragged Mr. Nicolas, who was doubled

4    over, over to this area right around the showers and he

5    punched Mr. Nicolas and he slammed Mr. Nicolas's head into

6    the concrete, and he kicked Mr. Nicolas, and he punched him

7    again and he kicked him again and he punched him again until

8    Mr. Nicolas fell to the ground.  But the beating didn't stop

9    there, ladies and gentlemen.  Sergeant Qualls continued to

10   kick Mr. Nicolas in the stomach, in the back, in the legs.

11   He kicked him so hard that Mr. Nicolas told you his legs

12   were numb by the end.  And Mr. Nicolas told you about, as he

13   lay there curled up -- and remember, he's handcuffed this

14   whole time so he can't even use his hands to protect himself

15   from the blows, and he thinks to himself, *My God, why me?*

16         And you heard testimony that Officer Berry took

17   Mr. Nicolas, along with Sergeant Qualls, and participated in

18   that beating.  And I want to just acknowledge that there was

19   some different testimony by Mr. Diaz and Mr. Smith about

20   exactly what Officer Berry was doing, and it will be your

21   job at the end of the day to decide.  Mr. Nicolas got on the

22   stand and he told you, "It's my memory that Officer Berry

23   was the other officer who was involved in that beating."

24   But he also acknowledged that he was terrified and that he

25   couldn't be a hundred percent sure.  And that testimony was

1    honest, and it will be up to you to decide.  But there's one
2    point that everybody agrees on with respect to Sergeant
3    Berry:  He was right there and he was right where he could
4    see and he could intervene, and he did not.  On that point
5    the testimony is clear.
6         Mr. Nicolas told you that eventually and,
7    thankfully, the beating did stop, and he was yanked up to
8    his feet and dragged out of the cellhouse, and at that point
9    he was taken to segregation.  Mr. Smith told you that the
10   very last time he ever laid eyes on Mr. Nicolas was to see
11   him being dragged out of this door after he came back into
12   view.
13        Mr. Nicolas told you that on that walk to
14   segregation he could barely move his legs and walk on his
15   own, and Sergeant Qualls walked with Mr. Nicolas and had to
16   keep Mr. Nicolas up.  But Mr. Nicolas was very clear:  There
17   was no ice on the walk to North 2 segregation, and neither
18   he nor Sergeant Qualls slipped on any such ice.  And
19   Edgar Diaz, who followed Mr. Nicolas to segregation, told
20   you the same thing.  And Officer Berry, who followed
21   Mr. Nicolas and Sergeant Qualls, told you the same thing:
22   No ice, no slip, no fall.
23        So, Mr. Nicolas told you about how he was brought
24   to the segregation unit after his beating at West cellhouse,
25   and he was thrown into a shower area there, and he was lying

1  on the ground and he couldn't get up, and he told you that

2  he felt worthless.  And then Aimee Lang arrived, an

3  opportunity to get help, to get medical care, an opportunity

4  to be taken to a place where he could be evaluated and have

5  his injuries treated.  And we went through what happened as

6  a result of Ms. Lang's encounter with Mr. Nicolas.  She took

7  one look at him from five feet away, she wrote down the

8  abrasion she could obviously see.  She took no steps to

9  evaluate the other complaints that she did note, and she

10  walked away.  She walked away and told Mr. Nicolas, "Follow

11  up PRN."  We heard testimony that "PRN" means follow up as

12  needed.  She saw that Mr. Nicolas was injured and she didn't

13  even bother to give him an ice pack.

14        Mr. Nicolas told you about the pain that he was

15  suffering at that time, about how he -- his abdomen was in

16  pain, his jaw was in pain, his wrist was in pain, his legs

17  were in pain, these places where Sergeant Qualls and the

18  other officer had beaten him for five to eight minutes.  He

19  testified about that pain that he felt.  And you'll see from

20  the medical records that his testimony is corroborated by

21  what he said to medical staff just two days later, and you

22  can see it there.  He told medical staff after -- as he told

23  you, after being thrown in the cell in segregation, using a

24  pen he found in the corner and a little scrap of paper to

25  draw out the ink so that he could write a note to

1    Healthcare.  And, thankfully, the note was found and

2    processed and he got to see a medical technician, another

3    medical technician, and he told that medical technician, "I

4    was hit in my cheek, face, and jaw.  It hurts bad."  And he

5    told the med tech about what happened and when it happened.

6           And, now, you heard some statement from defendants,

7    I believe on cross-examination, that, well, he said

8    altercation but he didn't say it was the officers who beat

9    him.  Ladies and gentlemen, Judge Rosenstengel told you that

10   you're entitled to use your common sense, and this is a

11   perfect example of when common sense will tell you that he

12   told this medical technician that officers beat him up and

13   she or he wrote that down and did what he or she was

14   supposed to do, sent him on to be evaluated and be

15   appropriately treated.

16          But, of course, common sense will tell you that

17   when he reports being beaten, maybe the Illinois Department

18   of Corrections medical technician isn't going to write down

19   it was the officers who did the beating.  I think using your

20   common sense you can see that he did report that he was

21   beaten by officers.  And you see here that Mr. Nicolas

22   reports that the pain is seven out of ten.  Now, that

23   strikes me as probably the most honest answer you could

24   give.  You see sometimes when people report ten out of ten,

25   and you know that -- you've heard when you go to the

1    doctor's office, ten out of ten means, I can't even walk, I

2    can't even talk, someone just cut off my leg.  That's ten

3    out of ten pain.  Mr. Nicolas is being honest and he's

4    telling you exactly how much pain he had.  He's telling this

5    nurse how much pain he had on February 7th.  Seven out of

6    ten, that's a lot of pain.

7         And this nurse notes that Mr. Nicolas has an

8    alteration in his range of movement.  That means something

9    about how Mr. Nicolas is walking or moving around is not

10   right, and she notes -- she or he notes that there's

11   swelling and she or he notes that there's numbness.  And

12   this all happened on February 7th, 2014, just two days after

13   Mr. Nicolas is beaten by Sergeant Qualls at West cellhouse.

14        And this medical technician, unlike Ms. Lang,

15   finally provides him a cold pack and Tylenol and refers him

16   to see medical care.  And, ladies and gentlemen, this nurse

17   did the right thing, but it didn't cure Mr. Nicolas's pain,

18   and so you'll see that in March of 2014, Mr. Nicolas

19   presents to a doctor still complaining of pain.  He tells

20   this doctor, "I was struck in the left groin and now I have

21   two bumps."  And the doctor agrees, two mildly tender nodes,

22   left groin, and he assesses him and determines that he does,

23   in fact, have a left groin injury.  That's a month, over a

24   month after this beating, ladies and gentlemen, and

25   throughout that time Mr. Nicolas has suffered the pain of

this beating that included punches and slams of his head into the wall and kicks to his body.

And Sergeant Qualls told you what he kicked Mr. Nicolas with.  He testified that he doesn't wear tennis shoes, doesn't wear flip flops; he wears big black boots. And Mr. Nicolas testified about the pain that those black boots inflicted on his abdomen and his legs on February 5th, 2014.

Now, I want to talk specifically about Mr. Smith because Mr. -- Clayborn Smith's testimony and Clayborn Smith's letter, which you will have back in the jury room with you as you're considering plaintiff's claims, is one of the key pieces of this story.  Clayborn Smith told you that he has never in his life met Osbaldo Nicolas, and Mr. Nicolas told you that, too, and I believe Mr. Diaz told you that as well.  This guy is a guy who's now in Cook County jail.  He was at Menard on the even side of the cellhouse; whereas, Mr. Nicolas and Mr. Diaz were housed over on the odd side.  He speaks English.  Mr. Nicolas, as you've seen here today and over the past few days, I think understands some English but requires the use of an interpreter for communication.

So, Clayborn Smith writes a letter to the internal -- or, rather, the investigative unit at Springfield, and Mr. Smith told you about why he wrote that

1     letter.  He knew that these officers beat up Mr. Nicolas on

2     February 5th, 2014, and he said that he just -- that wasn't

3     the right thing and it really disturbed him.  And if

4     officers could do that to Osbaldo Nicolas, they could do

5     that to someone like him.  And he told you that the reason

6     he wrote Springfield was, one, because had he written

7     Menard, he worried that nothing would be done about it; and,

8     two, he was scared of retaliation.

9          And, ladies and gentlemen, I'll invite you to look

10    at the last page of this letter, and I think it shows you

11    exactly Mr. Smith's concern.  He specifically asked the

12    investigative unit to remain anonymous.  "To all Menard

13    correctional employees."  When he testified that he was

14    worried about retaliation, you can tell from his letter that

15    he wrote on February 9th, 2014, that that was a true fear.

16    And we can also tell that when he testified about his

17    concern Menard's Internal Affairs wouldn't take this

18    complaint seriously, we also know that's true because, as we

19    heard from the testimony, when Internal Affairs received

20    this letter they sent it to the warden on February 19th,

21    2014.  And, ladies and gentlemen of the jury, that date is

22    important because it shows that by February 19th of 2014, a

23    time when Mr. Nicolas was still in segregation, the

24    Internal Affairs unit in Springfield had already received

25    Clayborn Smith's letter.  They had reviewed it and they had

1    determined that how it should be handled is to be sent back

2    to Menard to be handled by their Internal Affairs unit.  And

3    we saw what happened once Menard Internal Affairs unit got a

4    hold of that letter and took charge of that investigation.

5    They interviewed correctional staff, and they never

6    interviewed Clayborn Smith, they never interviewed

7    Edgar Diaz, and they never interviewed Osbaldo Nicolas, the

8    person who's at the heart of this letter.  They never

9    bothered to ask him what happened to him on February 5th.

10          And, ladies and gentlemen, you'll see the abuse

11   that Mr. Smith writes about in this letter.  You'll see

12   that, as he testified to you on Tuesday, he heard someone

13   use the phrase that you see written in that letter and that

14   I used and that I told you about earlier.  And he describes

15   the sucker punch that Sergeant Qualls landed on

16   Osbaldo Nicolas on February 5th, 2014, and he describes

17   exactly where he saw that happen.  And we talked about that.

18   It happened right by the orange water cooler, which

19   Mr. Smith told you is right here (indicating), right across

20   from the door of the holding cage.

21          Now, Edgar Diaz, from his perspective, from his

22   advantage point, says, "Actually, I think it was more right

23   when Qualls was pulling him out of the door."  And, ladies

24   and gentlemen, I expect that defendants will try and point

25   to that difference in memory, difference in perspective, and

1    suggest to you that that means it's fabricated.  But that's

2    exactly the sort of difference that you would expect from

3    two people who don't know each other who saw things from

4    different perspectives, one from a cellhouse just inside the

5    gallery, one from the holding cage, one who's removed from

6    the action, one who's right in the middle of it.  That's the

7    sort of difference four-and-a-half years later that you

8    would expect different people to say about an event that

9    they saw and are testifying about honestly.  That's the sort

10   of detail you would expect.  Might be just a little bit

11   different.

12          And, make no mistake about it, ladies and

13   gentlemen, there is the central fact that everybody agrees

14   on:  There was a sucker punch to Mr. Nicolas, it caused him

15   to double over, and he was then dragged to the area by the

16   showers where he was beaten for about five to eight more

17   minutes.  And Mr. Smith tells you about that further

18   beating, and he told you that -- he acknowledged to you that

19   he couldn't see the beating even with his mirror, right, and

20   you know, he puts his mirror out but they disappear from

21   view.  And he told you about how it was that he knew that

22   the beating continued.  And I'm not even going to try and

23   repeat what he -- the sounds he made in the demonstration he

24   gave to you, but you could hear how that echoed from where

25   he was and how it made that reverberating sound.  That's

1    actually exactly the same environment that Mr. Nicolas was

2    in when he was getting beaten, and those same echos you

3    would expect to hear, and Mr. Smith told you about how he

4    heard them and why he heard them, because the chow lines

5    were out and the place was a little bit quieter.

6          Then he told you about Officer Snell and

7    Officer Berry ordering him to put his mirror in his cell.

8    And he told you about how they had Diaz up against the side,

9    and he demonstrated that for you, and they were looking -- I

10   think he said they were looking this way, so facing his cell

11   and looking back, and so they would have had the opportunity

12   to see him in his cell with his mirror sticking out.  And he

13   told you that he put his mirror in his cell, and that's

14   honest.  Mr. Smith doesn't want to get beaten up.  And he

15   told you about the cries that he heard as Sergeant Qualls

16   was back in the shower area with Mr. Nicolas, and he told

17   you about -- he told you about some other officers who he

18   saw, and you'll see that those people are mentioned in this

19   letter.

20         But, ladies and gentlemen of the jury, the judge

21   has instructed you that what you are to focus on is the

22   claims against the defendants, and the fact that other

23   officers were present and either were or were not also

24   responsible for failing to intervene in this assault, that

25   is not something that you should be considering.  What you

1    should consider is whether these officers who sit before you

2    today were involved in the beating or failing to intervene

3    to stop the beating.

4           And, finally, Mr. Smith tells the Internal Affairs

5    unit in this letter about how he saw Mr. Nicolas one last

6    time bent over with his face down and rushed out the West

7    exit door.  Mr. Smith told you about it took him four days

8    to write this letter, and he told you about how he contacted

9    an inmate worker to get the names of the inmates who were

10   involved because he didn't know.  I think he called them two

11   Latino guys.  So he got their names, and he got their names

12   because he wanted an investigation to be started, and he

13   knew that the names were important to start that

14   investigation and to get it rolling.  And, unfortunately for

15   Mr. Nicolas, the fact that he got those names didn't make a

16   difference.

17          Mr. Diaz also testified to you about what happened,

18   and at the very end of his testimony he brought up something

19   that I think is the really important.  He was asked about

20   why Sergeant Qualls did what he did, and what he said to

21   you, ladies and gentlemen, was, "I don't know, he just

22   snapped."  And, ladies and gentlemen, I think that's exactly

23   what happened.  Sergeant Qualls ordered Nicolas to sit down

24   and Nicolas didn't sit down, and Sergeant Qualls got mad and

25   he got madder and then he snapped.

```
 1              In their opening statement defendants told you, why
 2     would these defendants risk their career to beat up an
 3     inmate?  Now, that suggests that what we are required to
 4     prove is that Sergeant Qualls woke up on the morning of
 5     February 5th, 2014 and said, "You know what I'm going to do
 6     today?  I'm going to beat Mr. Nicolas up or maybe I'm just
 7     going to beat someone up."  But we are not required to prove
 8     that, ladies and gentlemen.  We are not required to prove
 9     that Sergeant Qualls had any intention in advance to use
10     force against Mr. Nicolas.  Instead, what we are required to
11     prove is that Sergeant Qualls did use force and that it
12     wasn't an accident, he didn't slip and fall, but that he
13     intentionally landed blows on Mr. Nicolas on February 5th,
14     2014, and that he did so with -- not to keep order in the
15     prison but to cause him harm.  And, ladies and gentlemen, I
16     think that's exactly what happened.  Sergeant Qualls decided
17     to teach Mr. Nicolas a lesson, and he -- and that lesson was
18     that inmates who talk back get hurt.
19              I think the better question than, "Why would the
20     defendants risk their careers," is, "Why would two prisoners
21     who stand nothing to gain by this lawsuit" -- if you find
22     for plaintiff on every single one of his claims and you
23     award him damages, they get nothing, they gain nothing.  And
24     Mr. Smith testified that -- Mr. Smith told you that when he
25     wrote that letter he would have had nothing to gain.  Why
```

1    would they risk their lives, their safety?  Keep in mind, at

2    the time both of these inmates came forward they were under

3    control by the same defendants they were complaining about

4    and other guards who worked at the prison.  Those are guards

5    who control their movement, their ability to go to lunch,

6    their ability to get commissary, their ability to make phone

7    calls to their loved ones, their ability to sleep, to go to

8    programming school, all of these things.  Those are the

9    officers who are in charge of their every movement.  Why

10   would they come forward and tell something about what

11   happened to another prisoner unless it was anything except

12   the truth?  And, ladies and gentlemen of the jury, it was

13   the truth.

14          Now, the officers also testified, and I want to go

15   through what I think are a couple of important points about

16   that testimony.  First, Lieutenant Qualls testified, and I

17   think we all saw on the stand that he was very defensive.

18   In fact, shortly after he got on the stand I made a mistake

19   and I called him Sergeant Qualls, and he stopped the whole

20   proceeding and he said, "Excuse me, ma'am.  I am a

21   lieutenant now."  It's not hard to imagine how someone who

22   gets that upset about a mistaken honorific would get really

23   mad when an inmate in his cellhouse doesn't take an order,

24   isn't compliant.

25          And he remained defensive, I think, throughout our

1    questioning, my questioning of him.  When we talked about

2    what happened on February 5th, 2014, he said, "Oh, yeah, it

3    was a fall.  The ice on Front Street was 100 yards long."  A

4    hundred yards long.  Ladies and gentlemen, a hundred yards

5    is the length of a football field.  According to Lieutenant

6    Qualls, Front Street was a football field of ice.  According

7    to his testimony -- and keep in mind he admitted that when

8    he took Mr. Nicolas to segregation on February 5th, 2014, it

9    was just shortly after a large group of prisoners, maybe

10   like 20 to 50, had been moving lines, and there were

11   multiple lines moving.  And Front Street, as we learned, is

12   the main place that not only prisoners, but nurses use that

13   Front Street, officers use Front Street.  I'm sure the --

14   it's the main source of movement between places in the

15   cellhouse.  And it was Sergeant Qualls's testimony in court

16   that he recalled 100 yards of ice.  But he admitted to you

17   that, despite that, he didn't make a single call to anybody

18   after falling.  He didn't tell anyone that he had fallen.

19   He didn't ask anyone to come salt Front Street, even though

20   he knew there was going to be movement back and forth as

21   soon as Mr. Nicolas and Mr. Diaz went to segregation.  He

22   didn't even tell Officer Berry, his guy, the guy he's

23   responsible for supervising, his -- one of the people that

24   was under him in the chain of command.  He didn't even

25   bother to tell him, "Hey, man, watch out.  It's slippery."

1    That's because, ladies and gentlemen, that was a lie.
2    Mr. Nicolas told you that that was not the truth.  Mr. Diaz
3    told you that that was not the truth.  Officer Berry told
4    you that was not the truth.  They all agreed, Sergeant --
5    Lieutenant Qualls is the only person who testified in this
6    courtroom that there was ice on Front Street on
7    February 5th, 2014.
8            And I want to show you Lieutenant Qualls's incident
9    report because I think it shows how inconsistent
10   Sergeant Qualls' story is -- Lieutenant Qualls's story is
11   even with himself.  You can see there that in his incident
12   report he claims it was a patch of ice.  Now he's saying it
13   was a hundred yards sheet of ice, Front Street's covered.
14   And keep in mind, ladies and gentlemen, that in his
15   interview a month later with Lt. Reichert, he doesn't
16   mention ice at all.  No ice in this story.  Ladies and
17   gentlemen, that's because there was no ice.  And that's
18   because February 5th, Mr. Nicolas didn't slip and fall on
19   any ice.  He got injured because he was punched and beaten
20   by Sergeant Qualls and another officer in West cellhouse.
21           Now, you'll have these investigative interviews,
22   and it's no surprise, as we've gone through, that each one
23   of them denies that they did anything inappropriate.  But as
24   you'll see, there are some eerily consistent things, things
25   that defendants admitted were not factually true according

```
 1    to their own statement.  You see that every single one of
 2    these officers uses the word "compliant".  Every single one
 3    of them says Nicolas and Diaz were compliant.  But as you
 4    heard testimony, Lieutenant Qualls said, "Actually, Diaz
 5    refused all orders given.  Actually, Nicolas was so
 6    noncompliant that I had to write him a ticket for not
 7    complying."  But a month later Berry gets interviewed by
 8    Lt. Reichert about what happened, and he says "compliant".
 9    And then the officers fall into line, and you see Snell the
10    next day say "compliant," and you see Qualls the next day
11    say "compliant".  Now they all have to be wed to this story
12    and they all fall in line, just like they did yesterday
13    during their testimony.
14           You heard Lieutenant Qualls tell me that he didn't
15    bring up the ice because he wasn't asked, and then you heard
16    the next defendant talk about, "I wasn't asked."  Then you
17    heard the next defendant say, "I wasn't asked."  Ladies and
18    gentlemen, I think the evidence shows and I think your
19    common sense should tell you that these officers had the
20    opportunity a month after this beating to get together and
21    get their story straight, and they did get their story
22    straight; unlike Clayborn Smith who wrote a letter at a time
23    when Mr. Nicolas was housed in segregation.  And the
24    testimony you heard, unrebutted, was that at the time
25    Mr. Smith wrote his letter, Nicolas is in segregation and
```

1    there's no opportunity for them to come together and talk

2    about what had happened.  Let's be clear, the segregation

3    unit, the whole point is to segregate.  They didn't see each

4    other.  There was no opportunity for them to talk.  So

5    unlike Clayborn Smith and Osbaldo Nicolas, these officers

6    had the opportunity to get together and get their story

7    straight.

8            There's one other point I want to bring up in the

9    Internal Affairs investigation.  You see that Berry simply

10   talks about -- Berry simply talks about the inmates being

11   compliant, and then Snell and Qualls add this little tidbit

12   that doesn't come up anywhere else.  They say, "Oh, well,

13   the lines were in the shower at that time, so couldn't have

14   been, couldn't have been."  We don't see it anywhere else

15   and kind of struck me as a weird fact.

16           But as I was thinking about it this morning, you

17   know, how are these officers going to know exactly what time

18   we're talking about?  How do they know?  "Oh, that time

19   you're talking about when I was alleged to be using

20   excessive force?  Couldn't have been.  Couldn't have been.

21   There's a school line there."  How would they know when

22   we're talking about?

23           Clayborn Smith's letter puts it sometime around

24   10 a.m.  From what we know from the testimony about the

25   lines is that they move.  That's the whole point of lines.

 1    You put them in the shower until the chow line goes out and
 2    then they go in the cellhouse.  That's the point of lines.
 3    they're moving.  How are these officers supposed to know
 4    exactly when this beating occurred and claim that, "Well,
 5    for those few minutes it couldn't have been because there's
 6    a school line," unless they know exactly what time we're
 7    talking about?  They know exactly what time we're talking
 8    about, ladies and gentlemen, because they know exactly what
 9    the incident was that they were getting called for.  It was
10    about that time that Qualls pulled Nicolas out of the
11    holding cage and beat him and sucker punched him and kicked
12    him to the floor.
13             There's one other piece about the defendants'
14    testimony that I think is important to this interaction, and
15    that is something that I actually almost missed.  When Lang
16    got up on the stand, she told you she doesn't remember
17    anything; she just remembers she got a call about an inmate
18    coming to segregation that needed to be seen.  That story is
19    totally inconsistent with Qualls's story.  Qualls says, "The
20    injury doesn't happen until we're already on our way to
21    seg."  So how can that be?
22             Lang, who's in segregation -- she's assigned to the
23    segregation unit -- gets a call there's someone coming and
24    he needs to be seen.  Well, ladies and gentlemen, that's
25    because Qualls knew, when Osbaldo left segregation, that he

1    was injured and he needed to be seen, and he knew because he

2    was the one who had injured him.  Now, Defendant Lang told

3    you that she didn't remember, she didn't remember about what

4    had happened, and Osbaldo told you about what happened, and

5    Osbaldo told you about how she didn't do any exam of the

6    injuries he was talking about, but she did document a few

7    things that are important.  The injuries that she documents

8    are just inconsistent, plain and simple, with the story

9    Qualls tells:  "My left wrist hurts, my right jaw hurts."

10   And as we see, Lang notes an abrasion to the left side of

11   the forehead.  So, Qualls explains the abrasion this way:

12   "He's walking, Nicolas is walking with his handcuffs, and he

13   must have fallen.  I didn't see him hit his head, but he

14   must have hit his head like this."  Maybe that explains the

15   abrasion, but then how do you get right jaw pain?  Okay.

16   Maybe, instead, he hit his head like this, but how does he

17   get this abrasion?  These injuries are inconsistent with

18   Qualls's story slipping and falling on ice.  The evidence

19   and common sense will tell you that Mr. Osbaldo didn't slip

20   and fall on ice, he was beaten.

21          Now, when you're considering these jury

22   instructions that Judge Rosenstengel read to you, I want you

23   to remember what the burden of proof is here.  The burden of

24   proof is not beyond a reasonable doubt, Judge Rosenstengel

25   made that clear.  The burden of proof is a preponderance of

1   the evidence, and what that means is that you put all of

2   plaintiff's evidence on one hand, put all of the defendants'

3   evidence on the other hand, and you see which way it tilts.

4   If it tilts toward plaintiff, that's enough.  And I think

5   the evidence tilts pretty heavily, but even tilting a little

6   bit means that on the claims we win.

7        So let's go through each of the claims.  The first

8   is an excessive force claim.  The evidence showed that if

9   there was a sucker punch, that itself is excessive force

10  because every single defendant admitted to you, and Warden

11  Harrington admitted to you, too, that anything else that

12  happened on February 5th, 2014 was no reason to use force.

13       So one of the things -- sorry.  This is the wrong

14  one.  One of the things you're going to be asked to

15  determine is whether the use of force was for the purpose of

16  harming Mr. Nicolas, and then you've got a big paragraph

17  that talks about how you consider whether the purpose was

18  harming, but that's not in dispute here.  If the sucker

19  punch happened, everybody agrees that the purpose was harm.

20  If the kicks happened, everyone agrees that the purpose was

21  harm.  And that conduct did harm Mr. Nicolas.

22       Mr. Nicolas testified about his injuries and

23  there's been absolutely no evidence to rebut that.  In fact,

24  the medical records which you have in evidence show that he

25  was injured.  And, of course, the excessive force claim

1    doesn't require us to prove some serious, long-lasting

2    permanent injury, although Mr. Nicolas told you and you saw

3    on the stand how difficult it was, and the mental and

4    emotional injuries he continues to suffer as a result of

5    this beating.  But that's not required for us.  The evidence

6    already in the medical records is sufficient proof for this

7    part of the claim.

8         The only question is whether there was an

9    intentional use of force.  Defendants are not going to argue

10   that Lieutenant Qualls accidentally sucker punched

11   Osbaldo Nicolas, and we think the evidence is clear that

12   there was a sucker punch for all of the reasons I've already

13   told you about.  And so as to this claim, and as against

14   Lieutenant Qualls, the evidence is for plaintiff, and you

15   should find for plaintiff on the excessive force claim

16   against Qualls.

17        Let's talk about Berry.  As I said before, there

18   was testimony by Mr. Nicolas that he honestly believes that

19   it was Berry who beat him, and there was testimony from

20   Edgar Diaz and Clayborn Smith that was a little different

21   than that, so, ladies and gentlemen of the jury, it will be

22   up to you to determine whether Mr. Berry used excessive

23   force and was part of the beating against Mr. Nicolas or

24   simply failed to intervene to stop it.  That will be

25   something that you will have to determine and it's something

1    that I know you will take seriously.

2         I want to talk about the next claim, and that is a

3    failure to intervene claim.  That is the reason that Officer

4    Purdom and Officer Snell are in the courtroom, because they

5    saw the beating, they were involved in the beating.  They

6    told you that they were right there on February 5th when the

7    lines were moving and Mr. Nicolas was in the holding cage,

8    and they all testified that they would have seen the beating

9    occur.  Defendants are in furious agreement with plaintiff

10   on that point, so what you'll have to find is, first, that

11   excessive force was used, and we've gone through that.  Then

12   you'll have to find that the defendant knew that excessive

13   force was being used or about to be used.  What this

14   requires you to think about is whether they knew that there

15   was going to be punches thrown.  You know, honestly,

16   probably no one knew about the first sucker punch.  I don't

17   think even Mr. Nicolas knew about it.  He didn't see it

18   coming.  So maybe you find, you know, these defendants, they

19   didn't know about that first sucker punch.  But that wasn't

20   the end of the beating, ladies and gentlemen.  The beating

21   continued for five to eight minutes afterward, and certainly

22   defendants knew at that point that the beating was ensuing.

23   They knew what was happening when Qualls drug Mr. Nicolas

24   over to the shower area.  They knew what was happening when

25   Sergeant Qualls ordered Diaz to face the wall.

1              The next prong will require you to consider whether

2       they had a realistic opportunity to do something.  Again,

3       there's five to eight minutes there.  There's clearly an

4       opportunity.

5              Next, you'll be asked whether to determine that

6       they failed to take reasonable steps.  And this, I think,

7       comes down to the chain of command.  They knew that they had

8       a responsibility, and they failed to take reasonable steps

9       because they were following chain of command.  But, ladies

10      and gentlemen, under the law that is not an excuse.  You

11      cannot say that your supervisor beat someone up so you don't

12      have to act.  That is not an excuse under the law, and you

13      should find that they failed to take reasonable steps as

14      they watched the beating occur.

15             And then as to the fifth prong, there can just be

16      no doubt, the defendants' failure to act caused harm, and

17      Mr. Nicolas again told you about that harm.  And so in our

18      mind, it's clear that the beating that occurred on

19      February 5th, 2014, each of these defendants is responsible

20      for failing to intervene to stop it.

21             The next claim that you're going to be asked to

22      consider is a denial of medical care claim.  And I just want

23      to run quickly through this because I know you all are

24      anxious to get to the next part of this.  So the first part

25      is about whether he had a serious medical need, and he told

1    you about the pain he suffered, and that's enough.

2           The next question is about whether or not the

3    defendant was aware.  Let me just break down very quickly

4    what our claims are against each of these defendants.

5    Purdom and Snell and Berry each admitted that when Osbaldo

6    left the cellhouse they didn't know whether or not he was

7    going to receive any medical care, and yet, knowing that he

8    had been beaten, knowing that he was injured, they failed to

9    take any steps whatsoever to provide him medical care.  That

10   is -- that is enough to prove our failure to provide access

11   to care as to Defendants Purdom and Snell and Berry.

12          And, lastly, with respect to Qualls, he actually

13   did call medical care, so you might think, okay, but what he

14   told Aimee Lang was not what happened.  He told Aimee Lang

15   there's a slip and fall on ice, and so for that reason he

16   failed to provide adequate access to -- access to adequate

17   medical care by failing to inform Ms. Lang exactly the

18   severity of his injuries.

19          And, lastly, on this claim we have a claim against

20   Aimee Lang herself for failing to provide medical care.

21   Now, again, serious medical need.  Osbaldo told you about

22   that.  Defendant was aware that Mr. Nicolas had a serious

23   medical need, you can see that from her note.  She documents

24   what he told her, and she takes no steps, according to her

25   note, according to -- and there's no note to suggest

1   otherwise that she took any steps to evaluate the injuries

2   he described.  She doesn't take any notes about evaluating

3   his head injury or his wrist injury.  In fact, she admitted

4   that he was handcuffed and she at no point asked anyone to

5   take those handcuffs off to evaluate him.  And the leg

6   injury, she admitted, "Well, I looked at what I could see."

7   And we're not even asking you to find a failure to provide

8   medical care against Lang for failing to treat Osbaldo, to

9   even provide him a cold pack.  If she had just referred him

10  to a doctor, fine, but she did not.  She denied him medical

11  care.  She walked away.  And we know now that he was able to

12  see a nurse two days later, but Lang didn't know that as she

13  walked away.  To the contrary, she knew.  She was the one

14  who walked those galleries and knew that there wasn't an

15  opportunity for Mr. Nicolas to get medical care in

16  segregation.

17        The last claim -- and so for those reasons we think

18  that there should be a verdict in plaintiff's favor on the

19  denial of medical care claim to Defendant Lang and to

20  Defendants Purdom and Snell and Berry and to Defendant

21  Qualls.

22        And, lastly, we have a wilful and wanton claim.

23  I'm not going to go through each of those claims because I

24  think, as you'll see when you get back there, that claim is

25  for the same sort of conduct that we've already been talking

1    about.  That claim is for beating Osbaldo, for failing to

2    intervene in the beating of Osbaldo, and for denying him

3    medical care.  And you'll see in the judge's instruction

4    that, if you find for plaintiff on his constitutional

5    claims, you should also find for plaintiff on his wilful and

6    wanton claim.

7         I just want to remind you again that what we need

8    to prove is not beyond a reasonable doubt, it's not even

9    clear and convincing evidence.  You put the things on one

10   hand, you put the things in favor of plaintiff on one hand,

11   put the things in favor of defendants on the other hand.

12   Remember, ladies and gentlemen, that you are entitled to use

13   your common sense and you are entitled to make inferences in

14   either party's favor.  And when you weigh those things out,

15   which way does it tilt?  It tilts in plaintiff's favor.  And

16   when you find for plaintiff, you will go on to consider

17   compensatory damages.

18         And, ladies and gentlemen, this is one of the most

19   difficult parts of the argument for any lawyer because this

20   is a difficult thing to ask you to do.  The constitution and

21   our statutes don't allow you to ask the officers to be fired

22   or disciplined.  They don't allow you to try and address the

23   harm that Mr. Osbaldo suffered in any way -- Mr. Nicolas

24   suffered in any way, other than to award him money damages.

25   And it will be your responsibility, and I know that you will

```
 1   take it seriously, to determine what sort of money will
 2   compensate him for the harm that he suffered on
 3   February 5th, 2014.  And it will be a difficult decision for
 4   you, and you will have to think about what would compensate
 5   him for the sucker punch he suffered and the slamming of his
 6   head into the wall and the blows to his body and the kicks
 7   to his groin and the kicks to his legs and the kicks to his
 8   abdomen -- and each one of those is a compensable injury --
 9   and the emotional and mental pain that he felt following
10   this, the fear that he testified he felt following the
11   beating that he suffered and being thrown in segregation.
12   It will be your job to determine the dollar figure that that
13   violation of his constitutional rights is worth.
14          And lastly, ladies and gentlemen, you will be asked
15   to consider punitive damages.  It will be your job to
16   determine whether in this case punitive damages should be
17   awarded against the defendants for their conduct, and in a
18   case like this, punitive damages are appropriate.
19          You have heard how defendants, over the past
20   four-and-a-half years, have lied.  They've lied about what
21   happened, they've lied about what they did to
22   Osbaldo Nicolas on February 5th, 2014, and yesterday they
23   came into the courtroom and they lied to you and they lied
24   to Osbaldo about what they did.  And it is those lies that
25   tell you a very important fact, and it's a fact that you
```

 1  should consider in determining whether to award punitive

 2  damages:  The likelihood that the defendant would repeat the

 3  conduct if an award of punitive damages is not made.

 4          Ladies and gentlemen of the jury, I think the

 5  defendants' misconduct is exactly the kind of misconduct

 6  that will repeat if you don't award punitive damages.  I

 7  think that it is your responsibility and you should today

 8  award punitive damages to tell defendants that this kind of

 9  behavior is not okay.  We do not sanction, we do not

10  sanction correctional officers beating up a prisoner to

11  teach him a lesson.  Prisoners are sent to prison and they

12  must serve their entire sentence, and we don't expect

13  correctional officers to be perfect, and we do not expect

14  them to do every single thing right, but there's something

15  that we expect them not to do as members of the community,

16  and that is to beat prisoners for the purpose of punishing

17  them, of harming them, of teaching them a lesson.  And,

18  ladies and gentlemen of the jury, I think that you should

19  award a punitive damages amount that is high enough that it

20  sends a message, that it makes it in the papers to tell

21  correctional officers that if they beat prisoners up to

22  punish them that that will not be tolerated in this

23  community.

24          And you'll see on the verdict form the place where

25  you will be permitted to award punitive damages, and you'll

Nicolas vs. Berry, #15-964
Plaintiff's Closing Argument      8/16/18 - Vol. 3/Pg. 54

1    have to consider them against each of the individuals

2    individually, and you should.  Sergeant Qualls, as we've

3    told you, sucker punched Osbaldo.  He was in charge.  He ran

4    the show.  And the other officers are just as culpable.

5    They stood by while this beating occurred and they did

6    nothing, they didn't even say "stop."  Instead, they got up

7    here, they followed the line, and they lied to you, and

8    that's worth punitive damages.

9          Ladies and gentlemen, I'm going to sit down now.

10   Thank you very much for your time.  I want to leave you with

11   one final thought, and that is the jury instruction that

12   Judge Rosenstengel read to you early on:  All parties are

13   equal before the law and entitled to the same fair

14   consideration.  I expect, at the end of this case, what you

15   will be asked by the defendants is to believe them because

16   they wear a badge on their uniform.  That is not what we do,

17   that is not how we do things in a court of law, ladies and

18   gentlemen.

19         Everybody is entitled to the same fair

20   consideration, and Mr. Nicolas thanks you for taking that

21   responsibility seriously.  Thank you.

22         **THE COURT:**  All right.  Thank you, Ms. Grady.

23         Ladies and gentlemen, let's take about a 15-minute

24   break.  I'm sure you could probably use it and I know the

25   interpreter and court reporter can.  Fifteen minutes and we

```
 1    will resume with the defendants' closing argument.
 2         (Jury out)
 3            THE COURT:  Ms. Grady, I didn't ask you before, but
 4    do you want to give a brief rebuttal?
 5            MS. GRADY:  Yes, but it will be very brief.
 6            THE COURT:  We'll plan to resume at 10:00.
 7         (Court recessed from 9:51 a.m. to 10:07 a.m.)
 8         (Jury in)
 9            THE COURT:  Mr. Tyrrell, you may now give the
10    defendants' closing argument.
11                    DEFENDANTS' CLOSING ARGUMENT
12            MR. TYRRELL:  Thank you, Your Honor.  May it please
13    the Court, Counsel, ladies and gentlemen of the jury.
14            Officer Young, Officer Griffin, Officer Furlough,
15    multiple medical professionals, multiple different
16    correctional officers in the West cellhouse, in the North 2
17    cellhouse, Sergeant Berry, Sergeant Snell, Officer Purdom,
18    Lieutenant Qualls, and Nurse Lang.  Are you to believe
19    plaintiff's story, these are all people you must believe
20    were out to get plaintiff?  Plaintiff wants you to believe
21    there's a conspiracy among all these different people, among
22    multiple different shifts, among multiple different areas of
23    the prison, in security and nonsecurity positions:  They're
24    out to get the plaintiff.  And he wants you to believe this
25    story and he wants you to award him money.  I ask that you
```

1    carefully consider the evidence.  By doing so, I believe

2    you'll find in favor of the defendants.

3           Good morning.  As I've told you throughout the

4    trial, my name is Jeremy Tyrrell, and I, along with

5    co-counsel Joseph Bracey, represented these correctional

6    staff and Nurse Lang during this trial this week.

7           As plaintiff's counsel indicated, we also thank you

8    for your time today.  We understand it's an inconvenience.

9    We can't do our jobs as attorneys or judges or as plaintiffs

10   or defendants without you here because, as the judge told

11   you on the first day, this case comes down to, who do you

12   believe?  And it's only your decision to make.

13          I want to talk to you for a moment about the

14   plaintiff's story.  You just heard from his attorney in

15   great detail.  I don't want to say and repeat everything

16   that she said but I want to point out some confusing details

17   that at least I noticed during this trial.

18          So, plaintiff first wants you to believe that

19   Lieutenant Qualls, who was then a sergeant at the time,

20   sucker punched him.  I asked him repeatedly, "Where did this

21   take place?"  He wasn't able to say if it was inside a

22   holding cage, outside the holding cage, or somewhere in

23   between.  He doesn't recall.

24          He wants you to believe that Officer Berry slammed

25   his head into the shower door, into concrete, and that

Nicolas vs. Berry, #15-964
Defendants' Closing Argument        8/16/18 - Vol. 3/Pg. 57

1    Sergeant Berry, who's an officer at the time, Lieutenant

2    Qualls, then proceeded to beat him senselessly in the

3    shower.  And plaintiff wants you to believe that Officer

4    Purdom, Officer Snell were present for this altercation

5    between Lieutenant Qualls and Sergeant Berry and the

6    plaintiff, and they did nothing.

7         And you heard from the other witnesses:  These

8    weren't the only two correctional officers out there.  There

9    was numerous other correctional officers.  I believe it was

10   Mr. Diaz who said somewhere around ten correctional officers

11   were in that area when this altercation apparently happened,

12   all people that apparently sat there, watched Mr. Nicolas be

13   repeatedly beat and did nothing.  You heard from the

14   defendants.  They wouldn't have done that.  It was the job

15   of each and every correctional officer there that day to

16   report it up the chain of command.  They had a duty, even if

17   it was a sergeant and they were officers, to tell someone at

18   the prison about what happened that day.  And you've heard

19   no evidence of anyone putting any reports about an incident

20   happening that day.  Why?  Because it simply did not happen.

21   February 5th, 2014 was just another day at Menard

22   Correctional Center.

23         I want to talk about Nurse Lang for a moment.  She

24   wasn't present for February 5th, 2014 in the West cellhouse,

25   and plaintiff doesn't dispute that.  She was in a different

1   part of the prison.  She was in the North 2 cellhouse.

2   She's a medical professional.  It's her job to treat inmates

3   at Menard Correctional Center.  To believe plaintiff, you

4   have to believe that this medical professional lied in her

5   medical reports and was in a conspiracy with everyone else.

6   Simply does not make sense.

7         To support his claims, you heard from Inmate Smith,

8   Inmate Diaz.  Now, Smith, he said, and I quote, "His view of

9   what happened was as clear as if it was on a TV."  He had a

10  mirror outside his cell.  He said he could see everything as

11  clear as it was on TV, as we saw him testify on video

12  yesterday.  He says he heard plaintiff got struck in the

13  midsection.  Hold on.  The plaintiff said he got sucker

14  punched in the jaw.  So if he could see as as clear as he

15  said he could, how is it that Mr. Nicolas claims he got hit

16  in the jaw and Mr. Smith says, you know, Mr. Nicolas got

17  punched in the midsection?  Mr. Smith also added a second

18  punch.  We never heard that from Mr. Nicolas.

19        You heard Mr. Smith say he couldn't see what

20  happened in the shower.  Rather, he just said he heard

21  everything.  Somehow Mr. Smith, in a cellhouse with

22  approximately 500 inmates, heard a beating in the shower

23  area.  And you saw the diagram.  It's fairly far down the

24  hall from where Mr. Smith is located.  How is he able to

25  hear in great detail it was Mr. Nicolas crying and repeated

1    beatings in that shower area?  I have no idea.

2            I have to apologize.  I made a mistake for a second

3    there.  I said that he heard Mr. Nicolas crying.  Mr. Smith

4    never said that.  Someone told Mr. Smith what happened that

5    day, and he refused to tell you who told him what happened

6    that day.  You heard Mr. Smith.  He claims he doesn't know

7    Mr. Nicolas, he claims he doesn't know Mr. Diaz, but somehow

8    he was able to get their names, their IDOC numbers, and

9    various other details of what happened on February 5th, 2014

10   without ever knowing them.  When he was asked who told him

11   this information, he flat out refused to tell you.  How can

12   you trust a word that Mr. Smith said when he won't tell you

13   how he got any of his information?

14           I do want to point out, too, just in case it was

15   lost:  Mr. Smith and Mr. Nicolas were in the same cellhouse.

16   Yes, they were at different sides on February 5th, 2014, but

17   you also heard evidence they were on the same side of the

18   cellhouse.  They could have went to the yard together, they

19   could have went to gym together, they could have even had

20   meals together.  They could have known each other and

21   Mr. Smith might have been lying to you yesterday.

22           I want to talk about Mr. Diaz.  You heard Mr. Diaz

23   say he was the cellmate of Mr. Nicolas.  Clearly, Mr. Diaz

24   and Mr. Nicolas knew each other.  And Diaz also testified

25   differently than what the plaintiff testified to two days

1    ago.  He also said he saw two punches.  And now Mr. Diaz

2    says Officer Berry, now Sergeant Berry, he had no

3    involvement whatsoever.  He was in the cage.  Didn't punch

4    the plaintiff, didn't kick the plaintiff, didn't take him to

5    the shower area.  Doesn't match up with plaintiff's story.

6         You also heard Mr. Diaz say he couldn't see into

7    the shower area.  He also had to rely upon hearing, hearing

8    punches from down the hall in a cellhouse full of about 500

9    inmates.  Now, Mr. Diaz did have one really important detail

10   that wasn't brought up a couple minutes ago by plaintiff's

11   counsel.  Mr. Diaz also witnessed Mr. Nicolas fall on the

12   way to segregation.  You heard him.  Now, he disputes

13   that -- Mr. Diaz disputes there was ice on the ground that

14   day but he readily admitted that he saw Mr. Nicolas fall to

15   the ground.  Exactly corresponds with Lieutenant Qualls's

16   incident report and actually what happened that day.

17        Now, plaintiff's counsel asked you a question of,

18   why do you think -- or why would Mr. Smith and Mr. Diaz help

19   Mr. Nicolas?  I offer this answer:  Either knew each

20   other -- in the case of Mr. Diaz and Mr. Nicolas, they're

21   both cellmates -- or they're just looking out for another

22   inmate at Menard Correctional Center.  They're working

23   together.  And, as I said, we don't know where Mr. Smith got

24   his information from.

25        I want to talk about a couple other things that

 1    plaintiff's counsel brought up just a moment ago.

 2    Plaintiff's counsel brought up that Lieutenant Qualls was a

 3    little defensive when he was testifying yesterday.  I agree,

 4    he was a little defensive.  Now, I've never been on that

 5    side of the witness stand but I'm used to being on this side

 6    and asking people questions.  It's a frustrating experience

 7    for someone to repeatedly ask you the same questions and

 8    accuse you of lying.  I understand why he got defensive that

 9    day.  It's hard to sit there and have someone say that

10    you're a liar when you're simply trying to do your job.

11         And, now, you also heard evidence from plaintiff's

12    counsel that because of these investigational interviews,

13    that clearly shows a conspiracy among the defendants because

14    they all use the word "compliant".  I want to show you some

15    other similarities in these investigational interviews.  So

16    here's three of them.

17         You'll notice that all these interviews talk about

18    the same person, Lt. Reichert.  You heard testimony by way

19    of his deposition that he was the lieutenant in

20    Internal Affairs.  It was his job to investigate allegations

21    of excessive force.  He wasn't there to investigate

22    accidents, he wasn't asked to investigate a simple case of

23    slipping and falling on the ice; he was there to investigate

24    and talk to these defendants and these correctional staff

25    members if they used excessive force as Mr. Smith alleged

1    that day.

2         I want to direct your attention to the second page

3    on each of these statements.  I want to zoom in at the very

4    top line at the top of these investigational interviews.  I

5    want to direct your attention to this line right here:

6    "Interviewee substantially stated."  This isn't meant to be

7    a dictation of what was said today.  Lt. Reichert's not a

8    court reporter.  It wasn't his job to take down exactly what

9    each of these defendants say.  You've heard no evidence that

10   these defendants, when interviewed, used the word

11   "compliant".  That could have been Lt. Reichert's word.

12   They may have said something along the lines of being

13   compliant.  They could have said they disobeyed one order

14   and followed the next order.  That means compliant to me.

15   You heard from one of the officers that that meant compliant

16   to them, too, that an offender can disobey one order but

17   then obey other orders.  There was the case where

18   Mr. Nicolas disobeyed the direct order by interfering the

19   line and refusing to sit down.  You heard Mr. Nicolas admit

20   that he accepted the order to turn around, cuff up, and be

21   walked to segregation.  That sounds compliant to me.

22         And, now, plaintiff's counsel also talked about

23   these inmates in the school line that are missing from

24   certain incident reports.  You saw the evidence.  You know

25   that disciplinary tickets were written.  That's how it works

1    in prison life.  An offender violates a prison rule, they

2    receive a disciplinary ticket.  And those disciplinary

3    tickets said line movements were occurring at that time.  It

4    matches up with these investigational interviews and these

5    summaries.  Line movements were happening.  This event

6    couldn't have happened in the shower because the line

7    movement was in there.  And you heard about the safety and

8    security concerns of having a restrained inmate --

9    Mr. Nicolas was restrained -- in the shower area with a

10   bunch of unrestrained inmates.  That's a safety and security

11   concern for Mr. Nicolas as well as for the officers that

12   were in the shower with him, if they were.

13          Before I summarize what the defendants have talked

14   about the past couple days and what actually happened on

15   February 5th, 2014, the days after, I want to turn to one

16   more thing plaintiff's counsel said to you.  And I want to

17   show you this jury instruction that the Court read to you:

18   "The defendants are being sued as individuals.  Neither the

19   State of Illinois nor the Illinois Department of Corrections

20   is a party to this lawsuit."

21          Plaintiff's counsel has repeatedly said throughout

22   this trial and today that they should have done more

23   interviews, the interviews are bad, they should have asked

24   more facts, there should have been more of an investigation

25   done.  Why didn't they talk to Mr. Nicolas or Mr. Diaz or

1  Mr. Smith?  None of these defendants were involved in the

2  investigation.  They were simply doing their job on

3  February 5th, 2014, and cooperated in the investigation.

4  Lt. Reichert's not a defendant.  Warden Harrington's not a

5  defendant.  Commander Plunk, person in Springfield who sent

6  the letter to Warden Harrington, is not a defendant.  You

7  can't hold these people sitting at this table liable for

8  anything those people might have done.  They're not being

9  sued.  You can only consider what these five men and women

10  did.

11       I know it's been a long couple days.  I promise to

12  be as brief as I can; that way you have time to consider

13  your decision.

14       I want to talk about what actually happened on

15  February 5th, 2014, and the days after.  You heard from the

16  defendants, it was a regular day at work.  A routine

17  shakedown of Mr. Diaz and Mr. Nicolas's cell happened on

18  February 5th, 2014.  Items were found that were against

19  prison rules, namely hooch, which is what we learned

20  throughout this trial is alcohol made inside -- or

21  intoxicant made inside the cell.  A disciplinary ticket was

22  issued for that.

23       Now, when their cell's being searched, the

24  offenders have to go someplace else, that way the officers

25  can accurately check the cell.  They were in the holding

1    cage that day.  You heard from the officers that because of

2    the line movement, more officers were on opposite sides of

3    the cellhouse than the other.  They put Mr. Diaz and

4    Mr. Nicolas in the holding area that officers keep an eye on

5    to make sure they don't harm themselves or others.

6          While these line movements were going on you heard

7    and saw the disciplinary reports showing that Mr. Nicolas

8    and Mr. Diaz were holding up these line movements by talking

9    to people.  They were slowing them down.  They weren't

10   following the prison rules.  Now, plaintiff's counsel wants

11   to suggest that because they interfered with line movement,

12   because Mr. Nicolas initially refused to sit down, that

13   Lieutenant Qualls and perhaps some of the other

14   defendants -- we're not exactly sure who -- became upset

15   enough that they started to assault Mr. Nicolas.  That idea

16   is absurd.  These correctional officers and sergeants and

17   lieutenants had a way to control an inmate who's not

18   following orders and not obeying prison rules:  They write a

19   disciplinary ticket.  It's part of prison life.  Then when

20   you violate a rule, you also go to segregation.

21         You heard, Mr. Diaz said he's been in segregation a

22   number of different times, I think he said over five, maybe

23   more.  That's just how it works in prison.  There's no need

24   to senselessly beat, kick, punch an inmate because they

25   broke a rule.  That wouldn't happened.  It doesn't make

1    sense.

2            Now, you also heard from Lieutenant Qualls.  They

3    were walking to segregation with Mr. Nicolas first week in

4    February.  It can be pretty cold in Illinois, in the

5    midwest, in the first week of February.  He claims there was

6    ice on the ground, and there was ice on the ground that day,

7    and they slipped on it.  And Lieutenant Qualls recognizes

8    that and remembers that because he also went down with

9    Mr. Nicolas.  That was something unusual for him to do.  It

10   has to be an unusual experience to be walking someone and

11   you slip and fall on the ice.  And if you slipped and fall

12   on the ice before, sometimes, you know, it hurts a little

13   bit, you might get bruising, and especially when your hands

14   are handcuffed behind your back.  You can't but put them out

15   to brace for yourself or you're going to fall face first.

16           Because of this fall, you heard that Nurse Lang was

17   contacted.  Now, plaintiff's counsel said, *Oh, I just*

18   *realized today, how could Lieutenant Qualls possibly have*

19   *called Nurse Lang?*  I don't think Lieutenant Qualls ever

20   said he personally called Nurse Lang.  Said Nurse Lang was

21   notified, Nurse Lang was called.  People have radios.  This

22   is prison.  There's walkie-talkies.  There's methods of

23   communicating to healthcare staff when people are coming

24   into an area to evaluate an offender.  Plaintiff's counsel

25   wants you to believe, no, that can't happen, this must have

1    been a pre-planned conspiracy, and somehow as part of this

2    conspiracy we're going to make sure he got medical attention

3    and saw the nurse.

4            I want to talk about Nurse Lang's interaction with

5    Mr. Nicolas.  She saw him.  You heard Nurse Lang.  She's an

6    LPN.  She's educated.  She knows how to treat someone simply

7    having an abrasion on the forehead.  That's all she saw that

8    day.  She notes no bleeding, no swelling, no bruising, no

9    bleeding, no deformities noted to right jaw, left wrist, or

10   thighs, no apparent signs of distress noted, no other

11   injuries noted.  That's what she saw that day, a slight

12   abrasion, a superficial abrasion.  That doesn't warrant --

13   that's not a serious medical need.  It's just that it's a

14   superficial, very small abrasion.

15           You also heard from Mr. Nicolas that he was

16   initially uncooperative.  He claims he had injuries around

17   his private parts and he initially refused to show

18   Nurse Lang.  This other report, also in evidence that you

19   can see, reflects that:  "Unable to assess certain locations

20   because uncooperative."  Nurse Lang also noticed this

21   witnessed by Officer McMillan -- I forgot his name from my

22   earlier statement -- another officer you have to believe was

23   in a conspiracy to violate Mr. Nicolas's rights.

24           Plaintiff's counsel showed you more medical

25   records.  She showed you this one from February 7th, 2014,

1    where a different nurse evaluates the plaintiff and notes

2    that there was some swelling, some alteration, some numb --

3    some reported numbness and some alteration of range of

4    motion.  As I pointed out though, doesn't say "staff

5    assault".  Plaintiff's counsel wants you to believe there's

6    another nurse who's in a conspiracy to get Mr. Nicolas.  She

7    wants you to believe that this trained medical professional

8    lied on this medical document.  What incentive would this

9    medical professional have to lie on a medical document of

10   one of her patients?  She wouldn't.

11          I also noticed this two days later.  Who knows how

12   he got these injuries?  Two days passed from when Nurse Lang

13   saw the plaintiff until this nurse saw the plaintiff.  You

14   heard from Nurse Lang, people walk through the cellhouse all

15   the time.  You had a nurse or medical professional each

16   shift walk down each of those galleries three times a day.

17   How many nurses had to have walked past Mr. Nicolas's cell

18   and ignore his plight for you to believe plaintiff's story?

19          I want to show you the -- this was the February 28,

20   2014.  This is where Mr. Nicolas complains to the nurse, "I

21   have two hernias in my left groin, hurts bad."  This

22   document says, "Has he had this pain before, and how was it

23   treated?"  No.  No, he hadn't had this pain before.  Now, we

24   don't know exactly what he meant by that but at least from

25   here looks like he reported that he didn't have this pain

1    before.

2          Plaintiff's counsel did show you this March 7th,

3    2014 medical doctor note, M.D. report.  This was a month

4    later.  You've heard no medical professional or no one else

5    tell you that somehow an altercation on February 25th, 2014,

6    or slipping and falling on the ice on February 25th, 2014

7    caused this injury that the plaintiff reported first on

8    February 28, 2014 to this nurse.  You've heard absolutely no

9    evidence tying that together, but plaintiff wants you to

10   believe that somehow nearly a month later this altercation

11   caused this hernia.  You've heard absolutely no evidence of

12   that.

13         Now, plaintiff's counsel showed you the jury

14   instructions.  I apologize in advance because I know it's

15   now the third time you've had to see these instructions.

16   I'm sure you'll have to look at them when you go back to

17   deliberate as well, and I'm going to have to show them to

18   you one more time, I promise.  I'm only going to show them

19   to you once, and I'll be brief, I promise.

20         In addition to what I told you earlier about not

21   holding these five individuals liable for what someone else

22   may or may not have done, I want to show you this

23   instruction:  "You have heard evidence about whether

24   defendant's conduct complied with the internal policies and

25   procedures of the Department of Corrections."  You can

1    consider this, but this isn't the central issue:  The

2    central issue here is whether or not you believe plaintiff's

3    story or the defendants telling you what happened on these

4    days.  To the extent Lieutenant Qualls wrote the wrong date

5    and time on his incident report, and that may have violated

6    IDOC policy and procedures, you can't hold him liable for

7    making a mistake in his incident report.

8         I want to briefly show you the other jury instructions

9    and show you exactly why you should find in favor of the

10   defendants.  This is the excessive force allegation against

11   Berry and Qualls.  Now, it seems that plaintiff's counsel --

12   and plaintiff doesn't really have an issue with Berry any

13   more.  I'm not exactly sure since it's an excessive force

14   claim, probably because the witnesses somehow didn't match

15   up with the plaintiff's story, but, "To find for the

16   plaintiff, you need to show that Berry or Lieutenant Qualls

17   used intentional force on Mr. Nicolas."  You haven't heard

18   any credible evidence to support that.

19        The failure to intervene claim against all the

20   correctional staff members, first element:  "Excessive force

21   was used on Mr. Nicolas on February 5th, 2014."  As I just

22   said, no credible evidence of that.  You can't find in favor

23   of plaintiff on -- I ask that you not find in favor of

24   plaintiff on his failure to intervene claim, medical claim.

25        Now, the second element is that the defendant has to

1    be aware that Mr. Nicolas, the plaintiff, had a serious

2    medical need.  There was no use of force.  There was no

3    reason why any of these correctional officers, specifically

4    Sergeant Berry, Sergeant Snell, or Officer Purdom, were

5    aware of any serious medical need.  Defendant's story

6    though, Lieutenant Qualls and what actually happened that

7    day, is that plaintiff went down to the ground and fell on

8    the ice.  That could have been a serious medical need.  So

9    what did he do?  He took the reasonable measure of making

10   sure Mr. Nicolas was seen by Nurse Lang.  You heard from

11   Lieutenant Qualls, he's not a medical professional, he's not

12   a nurse, he's not a doctor, so he took the reasonable step

13   of making sure the trained LPN med tech saw Mr. Nicolas

14   after a slip and fall on the ice.  He did his job that day.

15        And you heard from Nurse Lang, she also did her job

16   that day.  The sentence, "If the defendant provided some

17   care, Mr. Nicolas must show that the defendant knew his or

18   her actions likely would be ineffective, the defendant's

19   actions were clearly inappropriate."  Nurse Lang is a

20   trained medical professional.  She looked at the plaintiff

21   on February 5th, 2014.  She noted a slight superficial

22   abrasion on his left forehead near his hairline.  She

23   examined him for bleeding, swelling, other deformities.  She

24   didn't observe anything.  A slight superficial abrasion, in

25   her medical opinion, did not warrant Mr. Nicolas seeing the

1   doctor that day.  I find that you also find in favor of the

2   defendants in the adequate medical care claim.

3       Now, the last claim, plaintiff's counsel also said,

4   "To find in favor of plaintiff on one of these claims you

5   must have found against the defendants on one of the other

6   claims."  As I just told you, the evidence shows that you

7   should find in favor of defendants on all the claims.  I ask

8   that you also find in favor of defendants in this claim

9   because plaintiff can't show any of his rights were violated

10  by the defendants.

11      Lastly, plaintiff's counsel showed you the verdict

12  form.  I just want to make it clear.  If you carefully

13  examine the evidence and you find that plaintiff has failed

14  to meet his burden to prove his claims against each and

15  every one of these defendants here, then you, as the jury,

16  can find in favor of defendants.  And you do so, as the

17  instruction will tell you, by placing an "X" in the line of

18  the person you find for, just as I'm doing right now.

19  Instruction will tell you, since you found in favor of the

20  defendants on all counts, you are to skip the compensatory

21  damages line, punitive damages lines, and to proceed to sign

22  and date the verdict form.

23      And I ask that you, ladies and gentlemen of the jury,

24  carefully consider the evidence, as I know you will.  I ask

25  that you find in favor of the defendants on all counts and

 1   not award plaintiff any money damages for his story.

 2        Again, I appreciate your time and consideration.

 3   Thank you.

 4        **THE COURT:**  All right.  Thank you, Mr. Tyrrell.

 5        Now, ladies and gentlemen, as I told you early on

 6   in the case, the plaintiff has the burden of proof, so that

 7   means he has the right to open and close the closing

 8   argument.  So, Ms. Grady will now give a brief rebuttal.

 9              **PLAINTIFF'S REBUTTAL CLOSING ARGUMENT**

10        **MS. GRADY:**  I will be very brief.  I just want to

11   address a few of the points that were raised by Mr. Tyrrell

12   in his closing argument.

13        The first is that Mr. Tyrrell accused Mr. Nicolas

14   of conspiring with Mr. Smith, and then said that in order

15   for our claims to be true, the defendants would have had

16   themselves to conspire.  Let me be clear.  The only person

17   in this trial who has used the word "conspiracy" is

18   Mr. Tyrrell, and I think the evidence is clear that -- just

19   one minute.

20        You'll see from the evidence -- we're not talking

21   about a conspiracy, ladies and gentlemen.  There's

22   absolutely no way, based on the evidence, for

23   Osbaldo Nicolas and Clayborn Smith to have conspired unless

24   what defense counsel is asking you to believe is that months

25   and months and months in advance of this event

1    Clayborn Smith and Osbaldo Nicolas, who both testified very
2    truthfully that they didn't know each other, were actually
3    both lying to you and came up with this story in advance
4    that, some day my cell might be searched; some day when my
5    cell is searched I am going to blame defendants for this,
6    something that I'm going to make up out of whole cloth.
7    There's zero evidence to support that argument.  And there
8    is zero evidence to support the argument that then they
9    even -- had they come together with this plan, been able to
10   communicate with each other after the event to say, okay,
11   it's time to set that plan in motion, let's accuse these
12   officers of that stuff.
13          I think that what's further evidence that they're
14   telling the honest truth is that they got details a little
15   bit different.  It's like if you go to a baseball game and
16   you're sitting in right field and you see this great play.
17   You go out for beers or tea or coffee afterwards with your
18   friends and you're like, *Man, look at this great play that*
19   *we saw.*  And your friends who were sitting in left field
20   say, "No, no, no, that's not how it happened.  It happened
21   this other way and it was that guy that ran and made the
22   great save."  It doesn't mean that it didn't happen.  It
23   means that your different perspectives and you're different
24   people and so you have a different take on what happened.
25   And that's what the testimony shows.  There are small and

```
 1    sensible details that are a little different between

 2    witnesses testifying about a beating that happened

 3    four-and-a-half years ago.

 4           Ladies and gentlemen of the jury, as I said earlier

 5    this morning, when it comes down to it, defendants are

 6    asking you to believe them because they wear a badge and

 7    people who wear a badge wouldn't do this.  You are entitled

 8    to use your common sense, and the common sense shows that

 9    Osbaldo Nicolas was telling the truth about what happened to

10    him on February 5th, 2014, and Clayborn Smith told the truth

11    about what happened on February 5th, 2014, and he told you

12    about how it was that he wrote the letter and he told you

13    truthfully about how he got those prisoners' names.

14           Now, Mr. Tyrrell accused Mr. Smith of withholding

15    evidence, and he actually pretty honestly told you why he

16    was withholding that evidence.  He was afraid that the

17    prisoner who had given him names would be retaliated

18    against, so he did refuse to give the names in open court in

19    front of these defendants, the name of the prisoner that he

20    had asked and who had agreed to give him the names of the

21    prisoners.

22           Again, we are not alleging and we do not have to

23    prove that this is a conspiracy.  What we have to prove is

24    that when Sergeant Qualls decided to teach Mr. Nicolas a

25    lesson, the other officers followed chain of command.  They
```

1    testified about chain of command and you heard them testify

2    about what they would do if the beating had happened.  And,

3    ladies and gentlemen, that "would do" did not include

4    stopping the beating.  That was a telling admission, I

5    think.

6          Mr. Tyrrell mentioned the Internal Affairs

7    interviews as being Lt. Reichert's product, but as every

8    defendant admitted, they reviewed them carefully and they

9    signed them and they took that responsibility seriously.

10          Mr. Tyrrell also said that there's no evidence that

11    Sergeant Qualls was the one who contacted Ms. Lang on

12    April 5th, 2014, but as you'll see in Exhibit 7, which

13    you'll have back with you, she's the one who writes down

14    Qualls is the person reporting this injury.  And Qualls

15    admitted on the stand, and you'll recall, based on your own

16    memory and your perception of the testimony, that he at

17    first said, "I don't know if I told them."  And then we went

18    and talked about his deposition testimony and he admitted

19    that he testified in his deposition that it was him who told

20    Ms. Lang.

21          I want to talk about Ms. Lang's note about the

22    "uncooperative".  Ms. Lang admitted to you that she couldn't

23    tell you why, what the circumstances were that led her to

24    make that note, and she has no memory of it today.  She

25    doesn't know whether Mr. Nicolas was uncooperative because

1   he didn't answer questions, because she couldn't communicate

2   with him because of the language barrier or because he was

3   lying on the ground unable to get up.

4          You also heard some argument about the medical

5   records.  And just to be clear, you'll remember the

6   testimony -- and I know you all have taken really good notes

7   about the testimony as well.  You'll remember that

8   Mr. Nicolas testified that after the beating he had two

9   purple spheres on his body; that's what the translation was

10  anyway, that there were two purple spheres.  That's entirely

11  consistent with what a month later the staff notes are lumps

12  on his groin.  It makes sense because Sergeant Qualls,

13  wearing big black boots, is kicking him in the groin and the

14  abdomen and the legs.

15         I want to conclude with just one final thought.

16  When you get sent to prison getting beat up is not part of

17  your sentence.  We talked about Menard's policies, and it's

18  true that breaking or complying with a policy at Menard,

19  that's not what we're here to decide today.  You won't have

20  to decide whether the officers -- the officer defendants

21  followed the policies or didn't the follow the policies.

22  Let me be clear:  The policies at Menard say it's not okay

23  to beat up a prisoner for no reason, and that's what the

24  constitution says, too.

25         We ask that you find for plaintiff on his claims

1    and that you consider an amount that would be fair to

2    compensate him for his injuries and that you award punitive

3    damages to tell these officers that this community does not

4    stand for that abuse.  Thank you.

**COURT'S FINAL JURY INSTRUCTIONS**

6          *THE COURT:*  All right.  Thank you, Ms. Grady.

7          Now, ladies and gentlemen, I will read the final

8    instructions and go over the verdict form with you.

9          Upon retiring to the jury room you must first

10   select a presiding juror.  The presiding juror will preside

11   over your deliberations and be your representative here in

12   court.

13         Now, this says "forms of verdict".  We actually

14   have one form in this case, so, a form of verdict has been

15   prepared for you.  Take this form to the jury room, and when

16   you have reached unanimous agreement on the verdict, your

17   presiding juror will fill in and date the form and all of

18   you will sign it.

19         I do not anticipate that you will need to

20   communicate with me.  If you do need to communicate with me,

21   the only proper way is in writing.  The writing must be

22   signed by the presiding juror, or, if he or she is unwilling

23   to do so, by some other juror.  The writing should be given

24   to the court security officer, who will give it to me.  I

25   will respond either in writing or by having you return to

1   the courtroom so that I can respond orally.  If you do

2   communicate with me, you should not indicate in your note

3   what your numerical division is, if any.

4        The verdict must represent the considered judgment

5   of each juror.  Your verdict, whether for or against the

6   parties, must be unanimous.  You should make every

7   reasonable effort to reach a verdict.  In doing so, you

8   should consult with one another, express your own views, and

9   listen to the opinions of your fellow jurors.

10       Discuss your differences with an open mind.  Do not

11  hesitate to reexamine your own views and change your opinion

12  if you come to believe it is wrong.  You should not

13  surrender your honest beliefs about the weight or effect of

14  evidence solely because of the opinions of other jurors or

15  for the purpose of returning a unanimous verdict.

16       All of you should give fair and equal consideration

17  to all the evidence and deliberate with the goal of reaching

18  an agreement that is consistent with the individual judgment

19  of each juror.  You are impartial judges of the facts.

20       Now, I will send this verdict form back with you.

21  As I said, we have one form, but it's four pages, and

22  counsel went over this a little bit in closing arguments.

23  But we've indicated there's four claims, and if you look

24  back on page 22 of your instructions, that sets out what

25  those four claims are.  And then the instructions that

 1   follow page 22, go through each claim and what must be
 2   proven for each claim.
 3          So once you have decided on each claim -- and
 4   that's by using the instructions -- you will go in, and then
 5   there's a line 1.  The first claim is excessive force,
 6   there's a line for plaintiff, for defendant, and each
 7   defendant listed individually, and you just check a box.
 8          Same with the failure to intervene.  There's four
 9   defendants, so there's four lines there, either for
10   plaintiff or for the defendant, and the name.
11          Then the third claim denial of adequate medical
12   care, same thing.  There's five defendants in that claim so
13   there's a line for plaintiff and for each defendant.
14          Wanton and wilful conduct, same thing, five
15   defendants, and then it's pretty self-explanatory, either
16   for plaintiff or for defendant and each name.
17          Now, you will note on page 2 this form says,
18   "Please complete the following section only if any of the
19   above findings are in favor of Mr. Nicolas.  If all of the
20   above findings are in favor of all the defendants, go to
21   page 4 and sign and date this form."
22          So, then, if you have found for plaintiff on any of
23   the claims you will decide what compensatory damages to
24   award, and write that amount in this line.
25          Now, on the next page, page 3, it says, "Please

1   complete the following section only if you assess punitive

2   damages against one or more of the individual defendants."

3   So, if you found for the plaintiff and awarded the

4   compensatory damages here, you move on, and then there's a

5   line for each defendant if you find that punitive damages

6   are appropriate.

7          And, then, the last page just has eight lines.

8   That's where each of you will sign it and date it, and then

9   you'll let the court security officer know you've reached a

10  verdict, and we will return to the courtroom to read that

11  verdict.

12         So, Deana will be back with the -- show you how to

13  work the exhibits and with the verdict form, and we will

14  just await word that you have reached a verdict.

15         All rise for the jury.  I need to swear the court

16  security officer.  Deana, if you would do that at this time.

17      *(The court security officer is sworn)*

18      *(Jury out)*

19      **THE COURT:**  Thank you, everyone.  I appreciate the

20  professionalism of the lawyers and the parties, everyone in

21  the case, and that we were able to get this completed in the

22  time that we did.  Stay close by.  The jury's lunch will

23  probably be coming in the next half-hour or so but we'll let

24  them get started.

25         Deana, have you confirmed all the exhibits, we did

1    that at the end of the day, and that nothing changed?

2            **COURTROOM DEPUTY:**  Yes.

3            **THE COURT:**  So, you're going to go show them how to

4    use the system.

5            Okay.  Stay close.  Now, we're going to have a

6    change of interpreter at 12:30, so I've asked Ms. Angel to

7    stick around in case we get a verdict before 12:30, so if we

8    haven't gotten a verdict by 12:30, I'll come back out just

9    to confirm everything with the translation before we -- and

10   then to swear in the new interpreter.  Stay close by.  If

11   you're going to go very far, let Deana know where you are so

12   we can get in touch with you as soon as we hear that the

13   jury's reached a verdict.

14           All right.  Court's in recess.

15       *(Court recessed from 10:50 a.m. to 12:20 p.m.)*

16           **THE COURT:**  So, we are back on the record just for

17   the purpose of leaving one interpreter and swearing in the

18   other.

19           So, Ms. Angel was with us this morning and now

20   Mr. Rafael Saloma-Gonzalez is here for the afternoon.  So I

21   just want to confirm, Ms. Angel, have you accurately

22   translated these proceedings as you swore that you would do

23   when taking the oath earlier today?

24           **INTERPRETER ANGEL:**  Yes.

25           **THE COURT:**  And, Mr. Nicolas, have you understood

1  the translation provided and did you understand everything

2  that was translated to you?

3          *THE DEFENDANT:*  Yes, Your Honor.

4      *THE COURT:*  And, Deana, if you would please

5  administer the oath to Mr. Gonzalez.

6      *(Interpreter Gonzalez is sworn)*

7      *THE COURT:*  Okay.  So still remain close by and

8  we'll let you know when we hear something from the jury.

9      *(Court recessed from 12:24 p.m. to 3:55 p.m.)*

10     *(Court reconvened - jury not present)*

11     *THE COURT:*  It is 3:54.  Just a few moments ago,

12 the jury told the court security officer that they have

13 reached a verdict.  I will bring the jury back in here in a

14 minute.  I will look at the verdict to make sure it's in the

15 proper form.  I'll then give it to Deana, all but the

16 signature page, to publish one page at a time, and I will

17 read the verdict.

18         If either side wants me to poll the jury, make that

19 request immediately.  I expect everyone, as you have been

20 throughout the trial, to be professional and respectful of

21 the jury's verdict.

22         I will then go back and talk to the jury for a few

23 minutes.  We have forms to give them, etc.  Usually what I

24 do then, if the lawyers want to talk to the jury, is tell

25 the jury that they can go out the side door, the door that

1    goes over to the federal building next door -- that's the

2    employee entrance -- and the lawyers can meet them down

3    there.  If they don't want to talk, the CO will escort them

4    out the main entrance.  If they go out that door, that means

5    they don't want to talk.

6            Kristen, you can tell them we're ready.

7        *(Jury in)*

8        **THE COURT:**  Ladies and gentlemen, the court

9    security officer informed me a few moments ago that you have

10   reached a verdict.  Juror No. 2 is our foreperson.  Would

11   you please hand the verdict form to the court security

12   officer.

13       *(Court security officer hands document to the Court)*

14       **THE COURT:**  Okay.  I have reviewed the form.  It

15   appears to be in proper form and it is signed by all eight

16   jurors.  I will hang onto the signature page.

17           Deana, I will ask then that you publish the form

18   one page at a time, and I will read it as you publish it.

19           Now, the verdict form reads:  On the first claim

20   for excessive force, the jury finds in favor of Defendant

21   Berry; and in favor of plaintiff and against Defendant

22   Qualls.  So that's for Defendant Berry and against

23   plaintiff; and for plaintiff and against Qualls on the

24   excessive force claim.

25           On the second claim for failure to intervene, the

Nicolas vs. Berry, #15-964

1   jury finds for the plaintiff and against Defendant Berry;

2   for the plaintiff and against Defendant Qualls; for the

3   plaintiff and against Defendant Snell; and for Defendant

4   Purdom and against plaintiff.

5           Now, on the third claim of denial of adequate

6   medical care, the jury finds for the plaintiff and against

7   Defendant Berry; for the plaintiff and against Defendant

8   Qualls; for Defendant Snell and against plaintiff; for

9   Defendant Purdom and against plaintiff; and for plaintiff

10  and against Defendant Lang.

11          On the fourth claim for wanton and wilful conduct,

12  the jury finds for the plaintiff and against Defendant

13  Berry; for the plaintiff and against Defendant Qualls; for

14  the plaintiff and against Defendant Snell; for Defendant

15  Purdom and against plaintiff; for plaintiff and against

16  Defendant Lang.

17          Now, the jury awards compensatory damages in the

18  amount of $1,000.

19          The jury then further awards punitive damages for

20  the Plaintiff Jose-Nicolas and against Defendant Berry in

21  the amount of $1,000; for the plaintiff and against

22  Defendant Qualls in the amount of $200,000; for the

23  plaintiff and against Defendant Snell in the amount of $100;

24  for the plaintiff and against -- I'm sorry, no punitive

25  damages against Defendant Purdom.  And, with respect to

1   Defendant Aimee Lang, the jury awards punitive damages in

2   the amount of $50,000.

3        All right.  Well, ladies and gentlemen, thank you

4   for your time.  You clearly worked hard all this week and

5   paid close attention, took a lot of notes, and I know you

6   deliberated for a long time, and so I do greatly appreciate

7   your time.  I know that the lawyers and the parties do.

8        **MR. TYRRELL:**  Your Honor, defendants request the

9   jury be polled, please.

10       **THE COURT:**  All right.  I will do that.  Deana, can

11  I have that form?

12       So, ladies and gentlemen, I have just reviewed the

13  four-page verdict form, going through each of the four

14  claims and your award on each claim and the award of

15  compensatory and punitive damages.  So I'm now just going to

16  poll the jury.  I'm just going to ask each and every one of

17  you to confirm that this is, in fact, your verdict.

18       So, first, Juror No. 1 -- don't want to say the

19  name, from Collinsville -- is this your verdict and did you

20  sign this form and return this yesterday?

21       **JUROR NO. 1:**  Yes, ma'am.

22       **THE COURT:**  All right.  And, Juror No. 2, our

23  foreperson, is this your verdict?  Did you return this

24  verdict and did you sign this form?

25       **JUROR NO. 2:**  Yes, ma'am.

 1          **THE COURT:**  Juror No. 3, is this also your verdict

 2    that you returned as part of this jury, and did you sign

 3    this form?

 4          **JUROR NO. 3:**  Yes, ma'am.

 5          **THE COURT:**  Juror No. 4, same question:  Is this

 6    your verdict?  Did you return this verdict and sign this

 7    form?

 8          **JUROR NO. 4:**  Yes, ma'am.

 9          **THE COURT:**  Juror No. 5, is this your verdict?  Did

10    you return this verdict and is this your signature?

11          **JUROR NO. 5:**  Yes, ma'am.

12          **THE COURT:**  Juror No. 6, is this your verdict?  Did

13    you return this verdict as part of the jury, and is this

14    your signature?

15          **JUROR NO. 6:**  Yes, ma'am.

16          **THE COURT:**  Juror No. 7, is this also your verdict?

17    Did you return the verdict as part of the jury, and is this

18    your signature on the form?

19          **JUROR NO. 7:**  Yes, ma'am.

20          **THE COURT:**  And, finally, Juror No. 8, is this your

21    verdict?  Did you return it as part of the jury, and is this

22    your signature on the form?

23          **JUROR NO. 8:**  Yes, ma'am.

24          **THE COURT:**  All right.  Anything else, Counsel?

25          **MS. GRADY:**  No, Your Honor.

1              *MR. TYRRELL:*  No, Your Honor.

2              *THE COURT:*  All right.  Thank you again, ladies and

3    gentlemen.  If you would go back to the jury room for just a

4    few minutes.  I will come back, and we have some forms for

5    you, and I think a token of our appreciation from the

6    District Court, and I can answer any questions.

7              And, then, what I -- if you would like to speak to

8    any of the lawyers, they will be waiting by the employee

9    entrance, which is the side door.  If you want to talk to

10   them, you may talk to them there.  If you don't want to talk

11   to them, the officer will escort you out the main door to

12   your cars.

13             Thank you again.  Have a nice evening.  Be careful

14   going home, and I'll be back in a few minutes.  All rise for

15   the jury.

16        *(Jury out)*

17             *THE COURT:*  Be seated, everyone.

18             So, Ms. Grady, Ms. Goodwin, Ms. Crosley, thank you

19   for your service as appointed counsel.  The Court greatly

20   appreciates it, as I know Mr. Nicolas does as well.

21             I will enter judgment on the jury's verdict.

22   There's a lot to digest here, but I can tell you, as long as

23   it took them, they worked hard.  I think they put a lot of

24   thought into the verdict.  So I'll enter judgment on the

25   jury's verdict and you will be relieved of -- I guess you

```
 1   weren't really appointed.
 2            MS. GRADY:  That's true.
 3            THE COURT:  You will be relieved of the
 4   appointment, and I remind you to file a motion for
 5   out-of-pocket costs.
 6            MS. GRADY:  Yes, Your Honor.  Will we be permitted
 7   to file the motion for costs and could we remain in the case
 8   to file motions afterwards even though we're relieved?
 9            THE COURT:  Sure.  In fact, I'll leave you in the
10   case for now knowing that, you know, your appointment
11   technically ends at the conclusion of the trial.
12            MS. GRADY:  Okay.  Thank you.
13            THE COURT:  Anything else on behalf of the
14   plaintiff?
15            MS. GRADY:  No, Your Honor.
16            THE COURT:  Anything else on behalf of the
17   defendants, Mr. Tyrrell?
18            MR. TYRRELL:  Your Honor, just to clarify, I think
19   my Rule 50 motion was still pending or reserved ruling.  Is
20   that by any chance denied then?
21            THE COURT:  Yeah, I will deny that in light of the
22   jury's verdict.  Like I said, we'll enter judgment.  You can
23   file the appropriate post-trial motion.
24            MR. TYRRELL:  Thank you, Your Honor.
25            THE COURT:  Okay.  So, finally,
```

1   Mr. Saloma-Gonzalez, let me ask you:  Have you accurately

2   translated these proceedings here today as you indicated you

3   would do when taking the oath?

4           *INTERPRETER GONZALEZ:*  I have, Your Honor.

5           *THE COURT:*  And, Mr. Nicolas, have you understood

6   the translation provided?  Did you understand everything

7   that was translated for you?

8           *THE DEFENDANT:*  Yes, Your Honor.

9           *THE COURT:*  Then nothing further is before the

10  court at this time.  The Court's in recess.  Have a nice

11  evening.

12      *(Proceedings adjourned at 4:00 p.m.)*

13                          *   *   *   *

14

15

16

17

18

19

20

21

22

23

24

25

1          **REPORTER'S CERTIFICATE**

2

3          I, Laura A. Esposito, RPR, CRR, CRC, Official Court
   Reporter for the U.S. District Court, Southern District of
   Illinois, do hereby certify that I reported in shorthand the
4  proceedings contained in the foregoing 91 pages, and that
   the same is a full, true, correct, and complete transcript
5  from the record of proceedings in the above-entitled matter.

6          Dated this 17th day of December, 2018.

7
                                    Digitally signed by Laura
8          *Laura A. Esposito*      Esposito
                                    Date: 2018.12.17 13:11:39
                                    -06'00'
9          _____
           LAURA A. ESPOSITO, RPR, CRR, CRC

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Nicolas vs. Berry, #15-964

                              8/16/18 - Vol. 3/Pg. 92