```
 1                  IN THE UNITED STATES DISTRICT COURT
                      SOUTHERN DISTRICT OF ILLINOIS
 2

 3   OSBALDO JOSE-NICOLAS,              )
                                       )
 4             Plaintiff,              )
                                       )
 5   v.                                )  No. 15-cv-964-NJR-DGW
                                       )  East St. Louis, Illinois
 6   NATHAN BERRY, et al.,             )
                                       )
 7             Defendant.              )

 8
                     TRANSCRIPT OF JURY TRIAL PROCEEDINGS
 9                        DAY #1 - TESTIMONY
                   BEFORE THE HONORABLE NANCY J. ROSENSTENGEL
10                    UNITED STATES DISTRICT COURT

11                        AUGUST 14, 2018

12   APPEARANCES:

13   FOR THE PLAINTIFF:     Sarah C. Grady, Esq.
                            Julie M. Goodwin, Esq.
14                          Adair Crosley, Esq.
                            Loevy & Loevy
15                          311 N. Aberdeen, 3rd Floor
                            Chicago, IL  60607
16                          312-243-5900

17   FOR THE DEFENDANTS:    Jeremy Tyrrell, Esq.
                            Joseph D. Bracey, Jr., Esq.
18                          Illinois Attorney General's Office
                            500 S. Second Street
19                          Springfield, IL  62701

20   INTERPRETER:           Rafael Saloma-Gonzalez

21
                     Stephanie Rennegarbe, RDR, CRR, CBC
22                        IL CSR #084-003232
                          301 West Main Street
23                        Benton, IL  62812
                            618-439-7735
24              Stephanie_Rennegarbe@ilsd.uscourts.gov

25
```

1                          I N D E X

2

**WITNESSES CALLED ON BEHALF OF THE PLAINTIFF:**

3
                              <u>DX</u>      <u>CX</u>       <u>RDX</u>        <u>RCX</u>
4
   Osbaldo Jose-Nicolas        4       28        33
5  Richard Harrington         36
   Kevin Reichert             47
6    (Deposition)
   Clayborn Smith             52       77        90
7

8
                         E X H I B I T S
9

10  <u>EXHIBIT NO.</u>        <u>DESCRIPTION</u>              <u>ID'D</u>        <u>ADMT'D</u>

11  Plf's 8 (pp 1-5)  Letter w/Request         42           45
    Plf's 29          Drawing                  55
12  Plf's 3           2/9/14 Letter            75

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    ************************

 2              (Proceedings reconvened at 1:08 p.m. following jury

 3    selection and opening statements; jury not present.)

 4              THE COURT:  Be seated, everyone.  We are ready to

 5    proceed with the Plaintiff's testimony.  We have a new

 6    interpreter this afternoon, Mr. Rafael Saloma-Gonzalez.

 7              Deana, if you would please administer the oath to Mr.

 8    Gonzalez.

 9              (Interpreter, Rafael Saloma-Gonzalez, sworn).

10              THE COURT:  Okay.  So, Mr. Gonzalez is going to

11    interpret the question and then the answer, so we need to go

12    kind of slowly here.  If at any point you need to take a

13    break, stop me and let me know.

14              Are we ready?

15              MS. GOODWIN:  Yes.

16              THE COURT:  Gary, bring in the jury.

17              (Jury in).

18              THE COURT:  All right.  Be seated, everyone.  Welcome

19    back, ladies and gentlemen.  I apologize, it took us a little

20    longer to be ready to go.

21              We have a different interpreter here now, Mr. Rafael

22    Saloma-Gonzalez.  So, he's going to be interpreting the

23    question that's asked and then Mr. Nicolas's response.

24              As you see, Mr. Nicolas is the Plaintiff's first

25    witness.  He's in the stand and ready to go.
```

```
 1              So, you may proceed with your questions.

 2

 3                        DIRECT EXAMINATION

 4    BY MS. GOODWIN:

 5    Q.  Osbaldo, could you please state your full name for the

 6    record?

 7    A.  My name is Osbaldo Jose-Nicolas.

 8    Q.  All right.  And you are currently incarcerated at Menard

 9    Correctional Center, correct?

10    A.  Correct.

11    Q.  You are at Menard because you have been convicted of a

12    felony, correct?

13    A.  Yes.

14    Q.  Now, is Menard -- Is that located very far from your

15    family?

16    A.  Yes.

17    Q.  Are you able to stay in touch with your family?

18            MR. TYRRELL:  Objection, Your Honor; relevance.

19            THE COURT:  That's overruled.  This is just

20    background information.

21    A.  Yes.  Yes, I can.

22    Q.  And how so?

23    A.  Via telephone, letters.

24    Q.  Are you currently working in a job at the prison?

25    A.  Yes.
```

```
 1   Q.  What are your responsibilities?

 2   A.  Right now I am working in the kitchen.

 3   Q.  What do you do in the kitchen?

 4   A.  I started on the line serving food.

 5   Q.  Okay.

 6   A.  And now recently I am with dishes.

 7   Q.  You wash dishes?

 8   A.  Yes.

 9   Q.  How many hours a day do you work?

10   A.  From 1:00 in the afternoon until 6:00 in the evening.

11   Q.  Is that every day?

12   A.  Yes, but Thursdays.

13   Q.  Okay.  Now, we are here today to talk, of course, about

14   the events that occurred on February 5th of 2014.  You were at

15   Menard then, too, correct?

16   A.  Yes.

17   Q.  Okay.  So, tell us where within the prison you were being

18   housed on or just before February 5th of 2014.

19   A.  I was in the West house.

20   Q.  The West house?

21   A.  Yes.

22   Q.  Okay.  And were you on the -- Which side of the West house

23   were you typically housed on?

24   A.  Odd side.

25   Q.  The odd side?
```

```
 1   A.   O-D-D, odd side.

 2   Q.   Okay.  So, backing up even to the basics, West house is a

 3   building, correct?

 4   A.   Yes.

 5   Q.   That's where inmates are housed?

 6   A.   Yes.

 7   Q.   So, you were typically housed on the odd side of that

 8   building, right?

 9   A.   Yes.

10   Q.   And other inmates are typically, then, housed on the even

11   side?

12   A.   Correct.

13   Q.   Okay.  So, since you were housed on the odd side does that

14   mean you would ever see anybody on the even side?

15   A.   No, you can't.

16   Q.   Okay.  Of course, the guards at Menard would control where

17   you walk and where you go?

18   A.   Correct.

19   Q.   Would you, being housed on the odd side of the building,

20   ever have reason, then, to walk down the even side of the

21   building?

22   A.   No, you couldn't.

23   Q.   Would you, on the odd side of the building, eat at the

24   same time as the even-side prisoners of the building?

25   A.   No.
```

1    Q.  Would you go to yard at the same time as prisoners held on

2    the even side?

3    A.  No.

4    Q.  Now, during the morning of February 5th of 2014, am I

5    correct that you were brought to an even side holding cell?

6    A.  Correct.

7    Q.  Were you with anyone in the cell?

8    A.  I'm sorry, I didn't understand the question.

9    Q.  When you were in the holding cell on February 5th of 2014,

10   was anyone else in the cell with you?

11   A.  Yes, there was -- Yeah, there was somebody else.

12   Q.  And who was that?

13   A.  Edgar Diaz.

14   Q.  I'm sorry.  Is that *Elgard* Diaz?

15   A.  No, an inmate.

16        THE COURT:  Diaz.

17   Q.  All right.  I'm sorry, I misunderstood.

18        All right.  Can you -- So, in the holding cell, then,

19   so that we are clear, it was you and Edgar Diaz?

20   A.  Correct.

21   Q.  Okay.  All right.  Can you describe the holding cell that

22   you were in?

23   A.  It's a cell like two meters wide and about three and a

24   half meters long and about three and a half meters high and

25   it's covered with bars.  Two and a half meters, and it's

1    covered with bars.

2    Q.  Can you describe the bars for us?

3    A.  It's better if I draw it.

4    Q.  Well, that's okay.  Backing up a bit, could you see out of

5    the holding cell?

6    A.  Yes.

7    Q.  Okay.  So, the bars were spaced far enough apart that you

8    could see out?

9    A.  Correct.

10   Q.  And that holding cell was located -- Well, strike that.

11        When you looked out could you see other housing

12   cells?

13   A.  Yes; yes, I could see.

14   Q.  Okay.  Generally what was going on when you were in the

15   holding cell?

16   A.  They were running lines, for example, to the store, to the

17   gymnasium, to get food.

18   Q.  What do you mean by *running lines*?

19   A.  The inmates would depart and enter into the building.

20   Q.  Okay.  So, there were inmates moving back and forth before

21   where you were standing in the holding cell?

22   A.  Correct.

23   Q.  Could you see any guards while you were in the holding

24   cell?

25   A.  Yes, but at times it was like if they started from up top,

1  then I could see them up top.  Or, if they started below, I

2  could see them below.

3  Q.  Okay.  So, there's different tiers in the holding cell?

4  A.  I'm not -- I didn't understand the question.

5  Q.  Okay.  What guards could you see directly outside your

6  holding cell?

7  A.  When they were below?

8  Q.  Yes.

9  A.  I could see two of the officers that are right there in

10  front.  There was a Major, I believe a Lieutenant, and then

11  there were a couple of other officers aside from that.

12  Q.  Okay.  Osbaldo, on that day you were taken out of the

13  holding cell and beaten, is that correct?

14  A.  Correct.

15  Q.  Right before that beating occurred what officers or guards

16  did you see right in that area?

17  A.  It was Officer Purdom; it was Sergeant Quartz; there was

18  an Officer Snell; Berry, Officer Berry; and there was another

19  officer -- or other officers, but I don't recall their names.

20  Q.  Okay.  And just so we are clear, it was Officer or

21  Sergeant Qualls, correct?

22  A.  Correct.

23  Q.  Okay.  Were some of those officers coming and going?

24  A.  No.

25  Q.  All right.  Did Sergeant Qualls speak to you right before

```
 1   the beating occurred?

 2   A.  Yes.

 3   Q.  What did he say to you, what did you say to him?

 4   A.  At that time, to be honest, when somebody would speak to

 5   me in English sometimes I understood a word, sometimes I

 6   couldn't.  But, from what I understood, I mean, first he said

 7   some words that I didn't understand, but the ones that I did

 8   were after, and he said, "Face to the wall."

 9   Q.  And did you face the wall?

10   A.  Yes.

11   Q.  What did Sergeant Qualls then say to you next?

12   A.  Afterward he said, "Sit down."

13   Q.  Okay.  So, you were facing the wall?

14   A.  Yes.

15   Q.  And that's when he said to sit down?

16   A.  Yes.

17   Q.  And did you do that?

18   A.  No.

19   Q.  Did Qualls appear angry at that time?

20   A.  Yes.

21   Q.  What did he say to you then?

22   A.  He raised his voice and then he said to me, "Sit the fuck

23   down."

24   Q.  And what did you do or say in response?

25   A.  The first instruction he gave, I told them, "The floor is
```

1    cold."

2    Q.  Go ahead.

3    A.  And when he said again angrily, "Sit the fuck down," I

4    said, you know, once again, "The floor is cold."

5    Q.  What happened next?

6    A.  Afterward --

7            MS. GOODWIN:  Your Honor, may I approach the witness?

8            THE COURT:  You may.

9    Q.  (By Ms. Goodwin) Osbaldo?

10   A.  What's up?

11           MR. TYRRELL:  I'm sorry, Your Honor.  Perhaps we

12   could have the jury take a brief recess unless Mr. Nicolas can

13   compose himself.

14           THE COURT:  Mr. Nicolas, do you need to take a short

15   break?

16   A.  Yes, please, Your Honor.

17           THE COURT:  All right.  Ladies and gentlemen, we will

18   take a short break, we will use the restroom, about five

19   minutes.

20           All rise for the jury.

21           (Jury out.)

22           THE COURT:  Mr. Nicolas, I know this is hard for you,

23   but we are going to have to get through it.  We will give you

24   a short break so you can get your composure, but we are going

25   to have to get the witnesses on that we need to today.

```
 1              Take a break, get some water, and we will be back in
 2    about five minutes.
 3              Anything you want to say?
 4              MS. GOODWIN:  Your Honor, can I talk to the witness?
 5              (Following a recess, proceedings continue in open
 6    court; jury present).
 7              MS. GOODWIN:  Your Honor, I apologize.  Before we
 8    begin, I don't believe that the witness was sworn in for
 9    testimony.  I think that we swore in --
10              THE CLERK:  You're right.
11              THE COURT:  Good point, good catch.
12              MS. GOODWIN:  And we may want to have him swear that
13    the testimony that he's given thus far is --
14              THE COURT:  That's right.  So, yeah, we swore in the
15    interpreter.  That's my bad.
16              So, Deana, if you would please administer the oath.
17              (Plaintiff, Osbaldo Jose-Nicolas, sworn).
18              THE COURT:  Okay.  Mr. Nicolas, you are swearing that
19    what you have given so far and what you will be giving is the
20    truth?
21              MR. NICOLAS:  Yes.
22              THE COURT:  Okay.  You may proceed.
23    Q.  (By Ms. Goodwin)  Osbaldo, since the incident of February
24    5, 2014, have you ever been in the same room as Defendants
25    Qualls, Berry, Purdom, and Snell?
```

1    A.  If you would repeat the names of the people you listed,

2    please.

3    Q.  Qualls, Berry, Purdom, and Snell.

4    A.  I'm sorry.  I didn't understand what the question was you

5    asked.  Sorry.

6    Q.  I'll withdraw that question.

7           Is it hard to be in the same room with the officers

8    that beat you and describe what happened to you?

9    A.  Yes.

10   Q.  Go ahead.

11   A.  Right now when I saw Officer Qualls and Officer Berry, but

12   in particular Qualls, I started feeling afraid, and my heart

13   started beating really fast.

14   Q.  So, let's go back, then, to when you were in the holding

15   cell on February 5th of 2014.  Did Sergeant Qualls have you

16   cuff up?

17   A.  I'm sorry, I didn't understand what you were asking.

18   Q.  Were you handcuffed at some point when you were in the

19   holding cell?

20   A.  Yes.

21   Q.  What happened to you after the handcuffs were placed on

22   you?

23   A.  They took me out of the cell where they had me.

24   Q.  Who's they?

25   A.  Officer Qualls and Officer Berry, I think.

```
 1    Q.  And what happened next?
 2    A.  When I was handcuffed already they took me -- they took me
 3    -- they took me out, and Officer Qualls, they had me on the
 4    right -- Officer Qualls was on my right and Officer Berry was
 5    on my left side behind me.
 6    Q.  And what happened next?
 7    A.  They took me out roughly, quickly.  When I turned around
 8    Officer Qualls hit me in the jaw, and I fell.
 9    Q.  Did you know that punch was coming?
10    A.  No.
11    Q.  Was it closed-fisted?
12    A.  Yes.
13    Q.  And did it hurt?
14    A.  Yes, and I fell.
15    Q.  What guards were you aware of who were nearby when that
16    punch occurred?
17    A.  It was Officer Snell and also Purdom, something like that.
18    Q.  Did Officer Snell or Officer Purdom say anything to you
19    after that punch occurred?
20    A.  No.
21    Q.  Did Officer Snell or Purdom or Berry, did they try and
22    help you up off the floor?
23    A.  No.
24    Q.  So, after that first punch occurred what happened to you
25    next?
```

1    A.  I fell.  Officer Berry had me -- was holding me from the

2    arm, from the hand, and between Officer Berry and Officer

3    Qualls, they lifted me up in a rough manner when they --

4    Officer Berry took me, I believe he kind of led me, he kind of

5    -- Officer Berry, when he lifted me, he kind of like guided my

6    head toward like where the bathrooms were on the concrete.

7    Q.  Osbaldo, did he slam your head against the concrete wall?

8    A.  Yeah, he chucked my face into the concrete wall.

9    Q.  All right.  Now, that was around the corner, am I correct,

10   from where you were in the holding cell?

11   A.  The corner -- The concrete, from the bathrooms.

12   Q.  Near the bathrooms?

13   A.  Yeah, by the bathing area.

14   Q.  The showering area?

15   A.  Correct.

16   Q.  So, when Officer Berry slammed your head into the concrete

17   wall, what is the next thing that you remember happening?

18   A.  Officer Qualls came up close to me and, once again, struck

19   my jaw, and he was punching me then on the back side on the --

20   on the stomach, and Officer Berry was hitting me on the back

21   of the head and on the back, also.

22   Q.  Did anyone come over and try and help you?

23   A.  No.

24   Q.  Did anyone try and stop the beating?

25   A.  No.

```
 1    Q.  Did you fight back?

 2    A.  No, I was handcuffed.

 3    Q.  So, what was going through your mind?

 4    A.  Well, the first I was asking is why are you hitting me.  I

 5    was asking myself the question.  I was asking myself the

 6    question.  I said why would they be hitting me?

 7    Q.  Now, what happened next, Osbaldo?

 8    A.  Well, they kept on hitting me on the back of the head, my

 9    back, the stomach, my private parts, and my legs until I fell.

10    Q.  You fell down onto the floor?

11    A.  Yes.

12    Q.  And what happened next?

13    A.  While that was going on I was wondering why that was

14    happening, and I don't know if -- I don't know if I yelled.  I

15    was wanting to.  But, I know that when I was being hit, like,

16    you know, they knocked the air out of my stomach.  And I

17    didn't know -- I didn't know -- I didn't know -- I was just in

18    a daze just from being -- getting hit.  And I started to think

19    that they wouldn't stop and that I wouldn't -- there wouldn't

20    be another day for me.  I just closed my eyes and I said, you

21    know, "My God, help me," and then I would just be -- was

22    feeling how the blows were being -- how the officers were

23    going about hitting me.

24    Q.  Did the beating eventually stop?

25    A.  Yes.
```

```
 1   Q.  And you were taken out of the cell house?
 2   A.  I want to say something else, because it stopped, but then
 3   something else happened.
 4   Q.  Okay.  And what else happened?
 5   A.  They -- When it stopped they lifted me up, you know, in a
 6   rough manner again, and I started to say -- I don't know if it
 7   came out.  I was wanting to say, "Stop," but I don't know -- I
 8   don't know if that's what came out exactly, because I was
 9   trying to gasp for air.
10   Q.  How is it that you were taken outside?
11   A.  I'm sorry, I was going to say more.  May I continue?
12   Q.  I'm sorry, Osbaldo.  Go ahead.
13   A.  And he lifted me up roughly, and when I was trying to say,
14   "Stop," Officer Qualls -- I don't know if he said, "Stop," but
15   I could hear, he was like imitating, you know, the noises that
16   I was making, the flinching, and he would go, "Mm-hmm, shut
17   the fuck up," and then he hit me once again.
18   Q.  Were you able to walk after this occurred?
19   A.  I was shaking, trying to walk.
20   Q.  Did you need help walking?
21   A.  Yes.
22   Q.  So, describe for us, then, how it was that you got from
23   the West house holding cell area to the next building that you
24   went to?
25   A.  Sergeant Qualls took me by the left arm, but since I was
```

1    on -- when he snagged me roughly, he -- you know, I fell, but

2    then he lifted me up.

3    Q.  You never slipped on ice during that walk, correct?

4    A.  No.

5    Q.  And you were handcuffed the whole time?

6    A.  Yes.

7    Q.  Where did Sergeant Qualls take you after this beating

8    occurred?

9    A.  To segregation, which is the North house 2.

10   Q.  Okay.  And is that where you saw Defendant Lang, the

11   medical technician?

12   A.  Yes.

13   Q.  And at the time that you saw Defendant Lang were you being

14   held in a shower area?

15   A.  Yes, they threw me down on the floor.

16   Q.  Okay.  That was in the floor of a cell that's in the

17   shower area, correct?

18   A.  Correct.

19   Q.  So, can you describe that cell where you were being held?

20   A.  It's a cell like -- more or less like 80 -- like 80 wide,

21   two and a half long, two and a half high, more or less.  More

22   or less like halfway there's a wall, which is about a meter

23   tall to cover up, you know, those people who are taking a bath

24   there.

25   Q.  Are there benches in the cell or the shower where you were

1    held?

2    A.   No, there's just like a stand that stuck to the bars.

3    Q.   Like a shelf?

4    A.   Yes.

5    Q.   Okay.  Were you able to stand up, then, in the cell?

6    A.   No.

7    Q.   No.  So, you were lying on the floor of the cell?

8    A.   Yes.

9    Q.   And were you in pain?

10   A.   Extreme amount of pain, yes.

11   Q.   What was going through your mind at that time?

12   A.   I wasn't understanding -- I couldn't understand why the

13   officers had assaulted me, and I just -- I just couldn't

14   understand anything and I felt, like, worthless.

15   Q.   Am I correct, then, that Defendant Lang, the medical

16   technician, eventually came to see you in that cell?

17   A.   Correct.

18   Q.   And what is the first thing that Defendant Lang asked you?

19   A.   She -- I don't know if she asked me for my name, but she

20   asked, you know, "What are your injuries?"

21   Q.   And what did you tell her?

22   A.   That the officers from the West house had hit me, I had

23   pain on my jaw, on my forehead, my stomach -- my stomach, my

24   private parts, my legs, and my wrists.

25   Q.   What was her response when you told her that it was guards

1    in the West house that had assaulted you?

2    A.   She didn't make any comment to that effect.   When I was

3    telling her about my injuries she wasn't -- she wasn't taking

4    notes, so I asked her, you know, "Why aren't you taking down

5    notes?"   And then she went and took from her desk -- She got

6    from the desk some papers, but she was laughing, looking the

7    whole time at the officer, and she was telling me -- she was

8    saying, "Ah-hah, he wants a lawsuit."   And from there on,

9    that's when she started writing down notes.   But, I don't know

10   what else she wrote.   I told her that I wanted the -- that my

11   jaw was hurting very much so, and my forehead was swelled.

12   But, I was asking her about my jaw, if she wouldn't be able to

13   get some x-rays, because I was uncertain whether there might

14   have been a fracture or some sort of dislocation.   I told her

15   also that it was hurting me quite a bit down here in my

16   private parts and nearby on my leg, and she said, "Let me

17   see."   Since I wasn't feeling at ease showing myself to a

18   nurse like that, but then she said, you know, "Let me see."

19   So, then when I tried to go ahead and show her, then she said,

20   "No, no, you know, I -- No, I don't want to see."   And she

21   didn't look me over, and then she left.

22   Q.   When you say that Defendant Lang looked you over, you were

23   still in the holding cell, correct?

24   A.   Correct.

25   Q.   And where was Defendant Lang standing?

```
 1   A.  She was right there outside the cell no more than a

 2   meter's distance away.

 3   Q.  So, she did not look at your legs, correct?

 4   A.  No.

 5   Q.  Did she look at your stomach area?

 6   A.  No.

 7   Q.  Did she look at your arms or your wrist?

 8   A.  No.

 9   Q.  Did she look at your back area, the back of your head?

10   A.  No.

11   Q.  Did she give you an ice pack?

12   A.  No.

13   Q.  Pain medication?

14   A.  No, nothing at all.

15   Q.  Did you want to see a doctor?

16   A.  Yes.

17   Q.  Now, afterwards you were taken to a segregation unit, is

18   that correct?

19   A.  Correct.

20   Q.  While you were in segregation was it easy for you to get

21   doctors' appointments?

22   A.  No.

23   Q.  In the first days when you were put into segregation, were

24   you still in pain?

25   A.  Yes, I was in an extreme amount of pain.
```

1   Q.   Did you try and see a doctor or a nurse?

2   A.   Yes.

3   Q.   How did you try to do that?

4   A.   When I heard -- Well, like I was close to the door, so

5   when I heard that the keys were making noise, you know, like

6   they were coming in, so when I heard the keys I turned like

7   they would go by, but they wouldn't stop.  You know, but when

8   I heard them come by, you know, I would say, "I need some help

9   here."

10          THE INTERPRETER:  Oh, pardon me.  The interpreter

11  made a mistake.

12  A.   (By the Interpreter) "Needed healthcare."

13  Q.   Did any of the guards that walked by take you to

14  Healthcare?

15  A.   No.

16  Q.   Did you eventually get to see a nurse?

17  A.   Yes.

18  Q.   How did you get the attention of the guards or the medical

19  staff so that you could go see that nurse?

20  A.   Since I was in extreme pain, and I noticed that the guards

21  weren't stopping by to let me know that, you know, "Well, I'm

22  going to get you -- get you some medical attention, I'm going

23  to get a nurse to look you over," I tried to look for a way in

24  which I could place a request for healthcare.  So, I was

25  looking like on the bed, beneath the bed, and I found some

1    papers down there, and I found like the tip of a pen.  And I

2    tried to write with it, but it wouldn't make a mark.  You

3    know, I think it was dried.  There wasn't any ink left.  So,

4    the -- you know, the transparent cylinder that's on it, you

5    know, I took the -- I took the tip, the metal tip out, and I

6    cut out a piece of paper maybe about a square centimeter, so I

7    started -- so I started twisting that little piece of paper in

8    such a way that it would be able to penetrate the tip of that

9    pen cap, the pen -- tip of the pen cap to be able to draw some

10   of the ink out of there so as to be able to write.  And that's

11   how I was able to place a request for healthcare.  It took me

12   a long time, but I had to do it because I was in such an

13   extreme amount of pain.

14   Q.  Osbaldo, you would agree it's not easy to get healthcare

15   when you are in segregation?

16   A.  No.  No, no, it's not easy, particularly so while in

17   segregation.

18   Q.  And aside from Medical, when you were in segregation were

19   you able to communicate with anyone else who was back in the

20   West house?

21   A.  No.

22   Q.  Now, two days after the incident were you able to see a

23   nurse regarding the beating that had occurred?

24   A.  Yes; yes.

25   Q.  What did you tell that nurse about what happened to you?

1   A.  I told them that the officers at the West house had struck

2   me, that my jaw was hurting very much so, that I wanted to get

3   it x-rayed so as to verify whether it had been fractured or

4   dislocated, and it was hurting here on my private parts and my

5   stomach and that I had two purple spheres, that just looking

6   at them just frightened me.

7   Q.  So, you have experienced anxiety about what occurred?

8   A.  Yes.

9   Q.  And you had nightmares?

10  A.  Yes.

11  Q.  Have you talked to mental health doctors at the prison

12  about what occurred?

13  A.  Yes.

14  Q.  Now, after you reported to Defendant Lang, so going back

15  to the day of the incident -- after you reported to her that

16  it was officers in the West house that had beat you up, did

17  anybody come talk to you about the beating?

18  A.  No.

19  Q.  After you told the nurse on February 7th that you had been

20  assaulted by guards, did anybody from the prison come and talk

21  to you about what had occurred?

22  A.  No.

23  Q.  And after you told any mental health professional at the

24  prison that guards had assaulted you, did anybody from the

25  prison come talk to you about the assault?

```
1   A.   No.
2   Q.   Now, did you file a grievance about this assault?
3   A.   Correct.
4   Q.   Can you just explain to the jury what a grievance is?
5   A.   Yes.
6   Q.   What is a grievance?
7   A.   A grievance is a complaint -- A grievance is a complaint
8   -- like if you want to place a complaint, like if you have --
9   if you have like health symptoms or if some officers had
10  beaten you or if you want a transfer, then you place a
11  grievance with a counselor, and then you wait.
12  Q.   So, a grievance is a form that you write out and it's your
13  way to communicate with the prison, correct?
14  A.   Yes.
15  Q.   After you filed a grievance about the beating that had
16  occurred, did anybody from the prison at Menard come and talk
17  to you about that?
18  A.   No.
19  Q.   Were you surprised that nobody from the prison had talked
20  to you or interviewed you about what had occurred?
21  A.   Yes.
22  Q.   And why is that?
23  A.   Yes, then because I -- you know, I was also able to write
24  a letter, I think it's what's called a *kite*, and I was able to
25  write this to a counselor.  I wrote down LT, and then I
```

```
 1   presented it not to the counselor, but to the Lieutenant I --
 2   Q.  I/A?
 3   A.  Yeah, I/A.
 4            THE COURT:  As in Internal Affairs?
 5   Q.  Yes.
 6   A.  Yes.
 7   Q.  So, you attempted to communicate with the Lieutenant of
 8   Internal Affairs about the beating that had occurred?
 9   A.  Yes.
10   Q.  Were you aware as to whether anyone else, such as Edgar
11   Diaz, had spoke to anybody at Internal Affairs about the
12   beating that had occurred?
13   A.  No.
14   Q.  Back in February 2014, were you even aware of who an
15   inmate named Clayborn Smith was?
16   A.  No.
17   Q.  No.  And you never spoke to Mr. Smith, to your knowledge,
18   ever, correct?
19   A.  Correct.
20   Q.  So, Osbaldo, was today the first time that you were
21   actually able to tell the story about what happened to you on
22   February 5, 2014?
23   A.  Yes.
24   Q.  Can you explain to the jury why you filed this lawsuit?
25   A.  Yes, I placed this lawsuit because the officers can't be
```

1    -- they just can't be beating up prisoners without having

2    their done anything.  I understand that I made a mistake in

3    not following the order that was given for me to sit down.

4    You know, I told them that the floor was cold, and for that,

5    you know, he could have given me a ticket for disobeying a

6    direct order.  But, they can't be beating me up for not

7    obeying that order.  And, because of that, that's why I went

8    forth with this lawsuit, so that in the future other prisoners

9    don't have to go through this for not following orders.

10            Each inmate is a different case, and I want to change

11   what will happen on the outside with me.  You know, what I did

12   was without thinking.  That's why I am here locked up.  But, I

13   want to forge ahead and that's why, you know, I want to -- I

14   want to be able to not do bad things; to do good things.

15   Q.  Thank you.  I don't have anything else.

16            THE COURT:  All right.  Mr. Interpreter, do you need

17   a break?

18            THE INTERPRETER:  The interpreter has not answered,

19   but your witness said, "Yes, please."

20            THE COURT:  Okay.  We will take a short break, about

21   ten minutes.  All rise for the jury.

22            (Jury out).

23            THE COURT:  All right.  Let Mr. Nicolas have a break,

24   and then bring him back to the stand.

25            (Following a recess, proceedings continue in open

```
 1    court).
 2              THE COURT:  Okay.  Are we ready for
 3    cross-examination?
 4              MR. TYRRELL:  Yes, Your Honor.
 5              THE COURT:  We are ready.
 6              (Jury in).
 7              THE COURT:  Be seated, everyone.  We will now have
 8    cross-examination, Mr. Tyrrell.
 9              MR. TYRRELL:  Thank you, Your Honor.
10
11                        CROSS EXAMINATION
12    BY MR. TYRRELL:
13    Q.  Good afternoon, Mr. Nicolas.  My name is Jeremy Tyrrell.
14    A.  Good afternoon.
15    Q.  I just have some hopefully brief and short questions for
16    you, sir.
17    A.  Okay.
18    Q.  To clarify, is it -- So, thinking back to when you were on
19    the odd side of West cell house, is it your testimony that you
20    were unable to communicate with inmates on the even side of
21    West cell house?
22    A.  Correct.
23    Q.  And you have been placed on both the even and odd sides of
24    the West cell house at Menard, correct?
25    A.  In all the houses that I have been to, yes.
```

1    Q.   And so West cell house, you were both on the even and the

2    odd side?

3    A.   That takes place in every house.

4    Q.   Okay.  And it's your testimony you don't know Clayborn

5    Smith, correct?

6    A.   No, I don't know him.

7    Q.   Okay.  Do you recall being on the even side of West cell

8    house in April 2013 through October 2013?

9         THE INTERPRETER:  Excuse me.  Could you repeat the

10   question for the interpreter?

11   Q.   Absolutely.  Do you recall being placed on the West cell

12   house of Menard between April 2013 and October 2013?

13   A.   Would you specify maybe better like what gallery, exactly,

14   so maybe I could recollect?

15   Q.   Sure.  Do you recall being in the West cell house on 8

16   Gallery from April 12th, 2013, through October 2, 2013?

17        THE INTERPRETER:  April 2 through October 2?

18   Q.   April 12, 2013 through October 2, 2013.

19   A.   Yes.

20   Q.   It's your testimony that Lieutenant Qualls was the first

21   person to hit you, and he punched you in, I think, the face,

22   you said?

23   A.   On the jaw.

24   Q.   Okay.  Was that inside the holding cell or was that

25   outside the holding cell?

```
 1   A.  The door was open, so I don't know if it was on the inside
 2   or outside, but it was as they were taking me out.
 3   Q.  Did Lieutenant Qualls enter the holding cell to hit you in
 4   the jaw?
 5   A.  No, I didn't -- It was right after -- after the door was
 6   open.
 7   Q.  Where was Officer Purdom when Lieutenant Qualls hit you in
 8   the jaw?
 9   A.  He was in the -- He was in the right corner looking at
10   him.
11   Q.  How far away?
12   A.  No more than four meters.
13   Q.  How about Officer Snell?  Where was Officer Snell when
14   Lieutenant Qualls hit you in the jaw?
15   A.  He was on the left side outside of the holding cell.
16   Q.  How far away was Officer Snell?
17   A.  No more than three meters away.
18   Q.  I believe you said after Lieutenant Qualls hit you in the
19   jaw you fell to the ground, is that correct?
20   A.  Correct.
21   Q.  And then Officer Berry helped pick you up off the ground?
22   A.  Correct.
23   Q.  And then is it your testimony the next attack happened in
24   the shower area of the West cell house?
25            THE INTERPRETER:  Your interpreter blanked, sorry.
```

```
1    Q.  In the shower area.

2              THE INTERPRETER:  In the shower area.

3    Q.  West cell house.

4    A.  Yes.

5    Q.  Did Officer Purdom follow you to the shower?

6    A.  I wasn't able to see him.

7    Q.  Did Officer Snell follow you to the shower?

8    A.  No.

9    Q.  While you and Mr. Diaz were the holding cell were there

10   different line movements going by the holding cell?

11   A.  Yes.

12   Q.  Did you or Mr. Diaz talk to any of the offenders going by

13   the holding cell?

14   A.  No.

15   Q.  Okay.  So, it's your testimony you didn't talk to anyone

16   -- any of the offenders passing by the holding cell of the

17   line movements?

18   A.  I apologize if I had started a conversation.  That is, I'm

19   sorry, your question, whether I started a conversation?

20   Q.  My question, Mr. Nicolas, is whether or not you talked to

21   any of the inmates on the line movement when you were in the

22   holding cell.

23   A.  Yes.

24   Q.  Yes, you did talk to some of the inmates?

25   A.  Yes.
```

```
1    Q.   Okay.  I believe you testified that you saw Nurse Lang in
2    the North 2 shower, is that correct?
3    A.   Correct.
4    Q.   Were you wearing a jumpsuit when you saw Ms. Lang?
5    A.   Correct.
6    Q.   Did you have handcuffs on when you saw Nurse Lang?
7    A.   I don't recall.
8    Q.   Okay.  Did Ms. Lang communicate to you in English?
9    A.   Yes.
10   Q.   And were you able to communicate with Ms. Lang in English?
11   A.   Yes.
12   Q.   And you're able to show her parts of your body that were
13   hurting?
14   A.   No.
15   Q.   What parts of the body were you not able to show Ms. Lang?
16   A.   Right here in my private area.
17   Q.   Okay.  I believe you said today that you sent a letter to
18   the Internal Affairs lieutenant, is that correct?
19   A.   Correct.
20   Q.   Do you have a copy of this letter?
21   A.   No.
22   Q.   Okay.  Thank you, Mr. Nicolas.  I don't have any further
23   questions.
24            THE COURT:  Thank you, Mr. Tyrrell.  Any Redirect?
25            MS. GOODWIN:  We do, Your Honor.
```

```
 1
 2                        REDIRECT EXAMINATION
 3  BY MS. GOODWIN:
 4  Q.  Osbaldo, you were asked questions about talking to inmates
 5  in the line movement while you were in the holding cell.
 6  A.  Yes.
 7  Q.  Just to clarify, did somebody speak to you?
 8  A.  Yes.
 9  Q.  And then you responded to them?
10  A.  Correct.
11  Q.  And what did that person say to you and what did you say
12  to them?
13  A.  He said the lines that were formed with me -- and I was
14  standing there -- a person, one of the inmates who I didn't
15  know, said to me, "Are you doing good?"  And I said, "I'm
16  good."
17  Q.  Okay.  And then when you were being examined by Defendant
18  Lang were you in long sleeves and long pants?
19  A.  I recall that I had on a sweatshirt with long sleeves.
20  Q.  Okay.  And long pants, as well?
21  A.  Yes.
22  Q.  All right.  Now, you were also asked questions that
23  involved your housing history at Menard.
24  A.  Yes.
25  Q.  And I believe it was in 2013 that you were on the even
```

1   side of the West cell house?

2   A.  In Gallery 8, yes.

3   Q.  Okay.  So, I just want to be clear, though, that in the

4   weeks or months leading up to February 5th of 2014, you were

5   housed on the odd side of the building?

6         THE INTERPRETER:  He was housed on the what?  I'm

7   sorry.

8   Q.  Odd side.

9   A.  Yes.

10  Q.  And then am I correct that on February 5th of 2014,

11  immediately after the beating occurred you were taken to

12  segregation?

13  A.  Correct.

14  Q.  And in the days after that the beating occurred, you

15  remained in segregation, is that correct?

16  A.  Correct.

17  Q.  Okay.  All right.  Thank you.

18        THE COURT:  All right.

19        MR. TYRRELL:  I have nothing additional, Your Honor.

20        THE COURT:  All right.  Thank you.  Ladies and

21  gentlemen, we are going to take a short break.  I believe our

22  next witness will be by video.  We are going to get that set

23  up and everything.  So, you can just take a break, get a

24  drink, use the restroom, whatever you need to do.

25        Ray is filling in now for Gary, so he will take you

```
1    back, take care of you.  So, all rise for the jury.
2              (Jury out).
3              THE COURT:  Be seated, everyone.  Is Mr. Smith our
4    next witness?
5              MS. GRADY:  No, we just have two brief witnesses to
6    put in front.  We have Mr. Harrington, who's here.  He will be
7    five to ten minutes.  Then we have five lines of deposition
8    testimony to read.
9              THE COURT:  Perfect.  So, I knew we needed to break,
10   so that's why I said something about the video.
11             THE CLERK:  Do you want Brian to go ahead and come
12   in?
13             THE COURT:  Why don't we have Brian come in, and we
14   will get the witnesses set up briefly.
15             (Following a recess, proceedings continue in open
16   court; jury in.)
17             THE COURT:  Plaintiff may call your next witness.
18             MS. GRADY:  Thank you, Your Honor.  Plaintiff calls
19   Mr. Harrington to the stand.
20             THE COURT:  All right.  Mr. Harrington.  You can come
21   up here and have a seat.  Good afternoon, sir.
22             Deana, if you would administer the oath.
23             (Defendant, Richard Harrington, sworn).
24             THE CLERK:  Thank you.  Please be seated.
25             Please state your name and spell your last name for
```

```
 1    the record.
 2          MR. HARRINGTON:  Richard Harrington,
 3    H-A-R-R-I-N-G-T-O-N.
 4
 5                     DIRECT EXAMINATION
 6    BY MS. GRADY:
 7    Q.  Good afternoon, sir.
 8    A.  Good afternoon.
 9    Q.  Can you please tell the jury where you are currently
10    working?
11    A.  I'm retired.
12    Q.  And where are you retired from?
13    A.  Menard Correctional Center.
14    Q.  What is your job -- What was your job title there when you
15    retired?
16    A.  Warden.
17    Q.  When did you retire?
18    A.  April of 2014.
19    Q.  We are here to talk about an incident that happened back
20    in February of 2014.  So, at that time you were the warden of
21    the facility, is that correct?
22    A.  Yes.
23    Q.  As Warden it was your job to make sure that employees new
24    about certain policies and procedures that the Illinois
25    Department of Corrections had in place, right?
```

```
 1   A.  Part of the job, yes.
 2   Q.  And I'm sure you had a lot of duties as Warden, right, --
 3   A.  Yes.
 4   Q.  -- day-to-day, lots of stuff going on?
 5   A.  Yes.
 6   Q.  But, that was one of your jobs, right?
 7   A.  Yes.
 8   Q.  And, another one of your jobs was to actually approve
 9   policies that were specific to the prison, right?
10   A.  I'm not sure how to answer that.
11   Q.  Okay.  Are you familiar with institutional directives?
12   A.  Yes.
13   Q.  Can you tell the jury what those are?
14   A.  Those are directives that -- rules and regulations that
15   pertain directly to Menard Correctional Center.
16   Q.  Okay.  And as Warden it was your job to sign off on those
17   institutional directives, right?
18   A.  Yes.
19   Q.  You worked with a team to make sure that those
20   institutional directives were good policies that were in place
21   at Menard, right?
22   A.  Yes.
23   Q.  And you wanted those policies to protect your officers,
24   correct?
25   A.  Correct.
```

1   Q.  And you wanted those policies to protect the prisoners

2   that you were responsible for protecting, correct?

3   A.  Correct.

4   Q.  You told your officers that they should take those

5   institutional directives that are specific to Menard, they

6   should take those seriously, right?

7   A.  I didn't specifically tell them, but they knew that, yes.

8   Q.  And they knew that, because it was the expectation of you

9   and the other administrative staff at the prison to -- that

10  they follow those policies, right?

11  A.  Yes.

12  Q.  And it was your expectation similarly that the officers

13  under your watch -- the officers under your watch followed the

14  policies set in place at all of the Illinois Department of

15  Corrections facilities, right?

16  A.  Yes.

17  Q.  And there are policies that apply to all sorts of prisons

18  all over the state, right?

19  A.  Yes.

20  Q.  Let's talk today about use-of-force policies.

21        Now, the Illinois Department of Corrections has

22  policies that limit when an officer can use force, right?

23  A.  Yes.

24  Q.  And they tell officers about times that it's okay to use

25  some amount of force, correct?

1    A.  Yes.

2    Q.  And times when it's not okay to use any force at all,

3    right?

4    A.  Correct.

5    Q.  And it was your job to make sure that those follows were

6    polled at Menard, right?

7    A.  Part of my job, yes.

8    Q.  And making sure those policies were followed, that was to

9    protect your -- the prisoners that you were charged with

10   protecting from abuse by staff, correct?

11   A.  It was designed to protect both inmates and staff.

12   Q.  Right; to keep a safe institution for everybody who's

13   there, --

14   A.  Yes.

15   Q.  -- prisoners and staff alike?

16   A.  Yes.

17   Q.  And you made sure officers were told about the importance

18   of following those use-of-force policies, right?

19   A.  Yes.

20   Q.  The Department's policy statewide is that force should

21   only be used as a last resort, correct?

22   A.  I don't remember specifically what the AED says.

23   Q.  Okay.  Can you tell me, generally speaking, would you

24   agree that the Department's policy discouraged use of force

25   except when necessary to achieve legitimate purposes?

```
 1   A.   Correct.
 2   Q.   And would you agree that the Department's policy, not
 3   verbatim, but in substance, told officers once you have
 4   achieved whatever goal you were allowed to use force for, once
 5   that goal has been achieved no more force, right?
 6   A.   Correct.
 7   Q.   In other words, the force should stop when the goal and
 8   the order has been restored, right?
 9   A.   Yes.
10   Q.   And corporal punishment was never allowed at Menard for
11   any reason, correct?
12   A.   Correct.
13   Q.   And can you tell the jury what corporal punishment is?
14   A.   That is physical abuse as a result of an inmate making you
15   mad for some reason or doing something you didn't like.
16   Q.   And corporal punishment, that's prohibited even when an
17   officer gets really upset, right?
18   A.   Yes.
19   Q.   Even when an inmate challenges an officer's authority,
20   right?
21   A.   Yes.
22   Q.   Even when an inmate fails to respond to a direct order in
23   the right way, correct?
24   A.   Correct.
25   Q.   And that prohibition on corporal punishment, that policy
```

1    was in place at Menard the whole time you served as warden

2    there, correct?

3    A.   Yes.

4    Q.   And that policy was in place as of February 5, 2014,

5    correct?

6    A.   Yes.

7    Q.   And that was an important policy, correct?

8    A.   They all are; but, yes.

9    Q.   Would it be okay under the Department's use of force

10   policy to punch a prisoner because he didn't follow an order

11   to sit down?

12   A.   I would have to have more information on the particular

13   incident.

14   Q.   Sure.  If you had a prisoner in a holding cage and you

15   told him to sit down and he did not comply immediately, would

16   that be a reason to punch him in the jaw?

17   A.   No.

18   Q.   That would be in violation of the use of force policy at

19   Menard, correct?

20   A.   Yes.

21   Q.   And would it be okay under that same scenario for an

22   officer to kick a prisoner anywhere on his body?

23   A.   No.

24   Q.   That would be in violation of the use of force policy at

25   Menard, right?

1    A.   Yes.

2    Q.   I want to talk to you about a letter you received.  Do you

3    recall receiving a letter from a man named Randy Plunk on

4    February 19, 2014?

5    A.   No.

6    Q.   Okay.

7         MS. GRADY:  Can I show just the witness?

8    Q.   (By Ms. Grady) All right.  You have on your screen right

9    in front of you what's been marked as Plaintiff's Exhibit 8.

10   And this is -- I have just zoomed in on the substance of the

11   letter.  Does that refresh any recollection for you about

12   receiving a letter on February 19, 2014?

13   A.   No, I don't remember the letter.

14   Q.   Do you know who Randy Plunk is?

15   A.   Yes.

16   Q.   Who is he?

17   A.   He was a commander of the Investigations Unit.

18   Q.   And was that Investigations Unit one that was in Menard in

19   particular, or was that one that was housed centrally to the

20   Department?

21   A.   Statewide.

22   Q.   Do you know where his office is located, or was back in

23   February 2014?

24   A.   I think in Springfield.

25   Q.   Do you have any reason to believe you didn't receive this

1    letter?

2    A.  No.

3    Q.  Is this the kind of communication that you might get on

4    Illinois Department of Corrections letterhead from someone in

5    the Investigations Unit?  Is that something that happened as

6    part of your job as warden at Menard from time to time?

7    A.  Yes.

8    Q.  And in those instances that you would receive those

9    letters, would they come to you for review?

10   A.  It would depend on the nature of the letter.

11   Q.  Okay.  I'm going to zoom in here again just in case you

12   are having difficulty seeing.

13         You received a letter on February 19, 2014, alerting

14   you that Mr. Plunk or someone in his office had received a

15   letter from Mr. Clayborn Smith that was being sent to you for

16   review and disposition, correct?

17   A.  Correct.

18   Q.  What did you understand it to mean, *disposition*?

19   A.  Again, I would have to see the letter that he sent to me

20   before I could tell you exactly what the disposition would

21   have been.

22   Q.  Okay.  Well, did -- And you see that in this letter here

23   there is a remark that there's an attachment?  Do you see

24   that?

25   A.  Yes.

1    Q.   Okay.  Do you know whether or not you received the letter?

2    A.   I don't remember.

3    Q.   Is it your expectation that you would have received the

4    letter with this -- with this letter to you from Mr. Plunk?

5    A.   Yes.

6    Q.   Okay.  And would you -- And, if that letter had come to

7    you would you have read that letter?

8    A.   Yes.

9    Q.   If you would, take a minute and read the first two

10   paragraphs of this letter.  Let me know whether that refreshes

11   your recollection to receiving a letter like this on or about

12   February 19, 2014.

13   A.   Again, I don't remember receiving this.

14   Q.   Is this the kind of letter you would receive from time to

15   time as part of your job of warden at Menard?

16   A.   It could be, yes.

17   Q.   Can you tell me -- Well, this is a letter that alleges

18   there was excessive force used by officers at Menard, right?

19   A.   Correct.

20   Q.   So, if you had read this letter back on February 19, 2014,

21   and received this letter from Randy Plunk attached to it, can

22   you tell me what as part of your general practice you would

23   have done with this letter and with Mr. Plunk's request to

24   review and decide about the letter?

25   A.   I would have forwarded it to Menard Internal Affairs.

1    Q.   What would be the reason you would have forwarded it to

2    Menard Internal Affairs?

3    A.   Because they do investigations on allegations of staff

4    misconduct.

5    Q.   Okay.

6         MS. GRADY:   Your Honor, at this time we would move

7    that Plaintiff's Exhibit 8 be admitted into evidence, pages 1

8    through 5.

9         THE COURT:   Are there other pages, or is that 1

10   through 5 the whole exhibit?

11        MS. GRADY:   No, there are additional pages, and we

12   wouldn't be moving for those pages at that time.

13        THE COURT:   So, pages 1 through 5, Exhibit 8.   Any

14   objection?

15        MR. TYRRELL:   No objection, Your Honor.

16        THE COURT:   Okay.   8 will be admitted.

17        MS. GRADY:   Can we publish to the jury?

18        THE COURT:   You may.

19   Q.   (By Ms. Grady) So, I just want to understand how the mail

20   process works here.   You say you don't recall receiving this

21   letter on February 19, 2014, but if this was sent to you

22   around then how would it typically come to you or your office?

23   Would it be mailed snail mail, e-mail?

24   A.   It could be faxed, e-mail, snail mail.

25   Q.   Okay.   Something you would expect to receive in a few

1   days?

2   A.  Yes.

3   Q.  And you would have -- As you said, you would have reviewed

4   the letter that came attached to it?

5   A.  Yes.

6   Q.  And any instance of excessive force, it's your testimony

7   you would refer that to Internal Affairs for investigation?

8   A.  Correct.

9   Q.  Was it your expectation when you referred this to Internal

10  Affairs that they would review all of the relevant people

11  involved, --

12  A.  Yes.

13  Q.  -- including the prisoners alleging that the force was

14  used upon them?

15  A.  Yes.

16  Q.  I don't have anything further.

17          THE COURT:  All right.  Do you have any questions of

18  Mr. Harrington, Mr. Tyrrell or Mr. Bracey?

19          MR. TYRRELL:  I have no questions.  Thank you, Your

20  Honor.

21          THE COURT:  All right.  You may step down.

22          MR. HARRINGTON:  Thank you.

23          THE COURT:  Now, did you say you have some --

24          MS. GRADY:  Yes, Plaintiff's next witness, which will

25  be very brief, will be presented by deposition testimony.  It

1    will be presented by Lieutenant Kevin Reichert.

2           THE COURT:  Have you all agreed on these?

3           MS. GRADY:  Yes, we conferred this morning.  We don't

4    have any disagreement on the designation.

5           THE COURT:  Okay.  Are you going to put someone in to

6    read the lines?

7           Okay.  So, ladies and gentlemen, a deposition is

8    testimony someone gave under oath just like here, but at a

9    different time previously, and so that can be read into the

10   record.

11          So, what we will do to make it easier for you is we

12   will -- I will have her read questions, just like they were

13   asking questions, and the paralegal is going to fill in as if

14   she was the witness.

15          What's the witness's name again?

16          MS. CROSLEY:  Kevin Reichert, R-E-I-C-H-E-R-T.

17          THE COURT:  Okay.  You may proceed.

18          (Deposition testimony of Kevin Reichert read to the

19   jury).

20          THE COURT:  So, now we have our witness by video.

21          Deana, do you need Brian?

22          THE CLERK:  It will take him just a few minutes.

23          THE COURT:  Ladies and gentlemen, if you want to

24   stand up and stretch or something, it will take a few minutes

25   to get the call connected.

1          Again, I will remind you that this witness is being
2     presented by video, but you give it the same consideration
3     that you would as if he was sitting right here.  And just let
4     me know if you have any problems hearing or seeing or
5     anything, but normally it works very well.
6              (Brief interruption in proceedings).
7              THE CLERK:  Good afternoon, Mr. Smith.
8              MR. SMITH:  Yes.
9              THE CLERK:  Can you hear me on your end?
10             MR. SMITH:  Yes, I can.
11         I can't testify with the handcuffs on.  Do I need the
12    handcuffs?
13             MS. GRADY:  Mr. Smith -- I think he will need the
14    handcuffs off.  Part of our exam is asking him to demonstrate
15    things.
16             THE COURT:  Okay.  I would ask that Mr. Smith's
17    handcuffs be taken off so that he can demonstrate -- use his
18    hands to demonstrate.
19             Is there someone there that can do that?
20             MR. SMITH:  He is talking to the Sergeant right now
21    in the other room.
22             THE COURT:  Can they hear me?
23             MR. SMITH:  Yes, they can hear you.
24             THE COURT:  Are they getting someone else?
25             MS. GRADY:  Your Honor, I'm not sure.  Maybe we can

1    take a short break.

2          THE COURT:  Yes, let's take a break, ladies and

3    gentlemen, and we can figure this out.  Just a short break,

4    and we will let you know when we are ready.

5          All rise for the jury.

6          (Jury out.)

7          THE COURT:  Be seated, everyone.

8          MS. GRADY:  Mr. Smith, I apologize.  I'm going to

9    have to talk to the Court for a minute and then I will be back

10   with you in a minute, okay?

11         THE CLERK:  We can mute it if you don't want him to

12   hear.

13         MS. GRADY:  I don't mind him hearing.  Your Honor, at

14   this point I think we have to file a motion -- since our

15   Motion for Continuance was denied, at this point we will have

16   to file a motion for a mistrial.  Mr. Smith appeared to the

17   jury shackled and, you know, not -- I think no one at the

18   facility was prepared for him to be appearing in front of a

19   jury.  There was a correctional officer directly in view

20   behind him.  He wasn't able to testify and, you know, a large

21   part of my exam is asking him to talk about what he saw.  And

22   he needs to use his hands, and I appreciate Your Honor's

23   direction he be able to use his hands to do that, but I think

24   given his appearance to the jury, at this time I have to ask

25   for a mistrial again given the central role that he plays in

```
 1   the story as the Court has already seen through our openings
 2   and through Mr. Nicolas's testimony.
 3           THE COURT:  Okay; all right.  That motion will be
 4   denied.  They weren't quite ready for us when we called in.
 5           But, Mr. Smith, are your hands free now?  I think I
 6   saw them take the handcuffs off.
 7           MR. SMITH:  Yes.
 8           THE COURT:  Okay.  So, we can see him.  Is there any
 9   way that we can move in a little closer with a camera or
10   center him more on that end?
11           COURTROOM IT:  They would have to use their remote.
12   One of their -- And I don't know if they are capable of doing
13   that.
14           THE COURT:  He got up and moved.
15           Now we can't see you as well, Mr. Smith.
16           MS. GRADY:  Mr. Smith, is it possible just for you to
17   move a little to your left?  Where you are standing right now
18   is right in the middle of the camera.
19           That chair doesn't move, is that right?
20           MR. SMITH:  That's right.
21           MS. GRADY:  All right.  There's an officer right
22   behind you.  Does the camera move?  Maybe the officer could
23   sort of direct the camera a bit.
24           MR. SMITH:  I'm going to find out.  I will ask him.
25           THE COURT: At the end of the day they are going to
```

1    know that he's incarcerated, and so I don't think there's any

2    harm.  Now he's going to be able to use his hands and

3    demonstrate what he needs to demonstrate.  I just want to make

4    sure that we can see him a little better, if that's possible.

5         MS. CROSLEY:  Or we can pull up a chair.  I know they

6    have them.

7         THE COURT:  Yeah, maybe they can pull in another

8    chair, Mr. Smith.

9         MR. SMITH:  That's exactly what they are going to do.

10   They are going to see about one right now.

11        THE COURT:  Okay.  So, again, as I was saying, I

12   don't think there's any harm here.  They are going to know

13   that Mr. Smith is incarcerated and he is going to now -- We

14   have a new chair.  He's going to be able to testify.  And,

15   again, we tried, there was just many practical difficulties

16   with getting him all the way here for trial, and we tried up

17   until all day yesterday and this morning, and this is the best

18   way for us to proceed with the trial.

19        So, that's great now.  We can see you well, Mr.

20   Smith.  If at any point you have any difficulty hearing us,

21   just raise your hand and let me know, okay?

22        MR. SMITH:  Yes.

23        MS. GRADY:  Mr. Smith, if I could just ask before the

24   jury gets brought in, we arranged for you to have some

25   documents.  Is there any way you have those documents?

```
 1              Oh, okay.  Great.
 2              THE COURT:  Okay.  Well, have those ready to go, and
 3    we are ready to go get the jury.
 4              (Jury in).
 5              THE COURT:  Be seated, everyone.  We have got
 6    everything taken care of here now.
 7              Mr. Smith, please raise your right hand and take an
 8    oath to tell the truth.
 9              (Plaintiff witness, Clayborn Smith, sworn).
10              THE CLERK:  Please state your name for the record,
11    please.
12              MR. SMITH:  Clayborn Smith.
13
14                        DIRECT EXAMINATION
15    BY MS. GRADY:
16    Q.  Good afternoon, Mr. Smith.  Can you tell the jury where
17    you are from?
18    A.  Chicago, Illinois.
19    Q.  And can you tell us where you are at right now as you are
20    testifying here remotely in this courtroom?
21    A.  Cook County, Chicago.
22    Q.  We are here to talk about what happened on February 5,
23    2014.
24              Can you tell me where you were at that time?
25    A.  Menard Correctional Center.
```

1   Q.  And you were at Menard because you had been convicted of a

2   felony, right?

3   A.  Yes.

4   Q.  How long have you been at Cook County jail?

5   A.  Since October of last year, 2017.

6   Q.  Let's turn back, if we can, to February 2014.  Can you

7   tell me how long -- Strike that.

8           Can you tell me where you were housed in that time,

9   the winter of 2014, at Menard?

10  A.  I was housed in the West house on 2 Gallery.

11  Q.  Can you explain for the jury -- I apologize if you can't

12  see, but they are just to my left.

13          Can you explain to them what is West house and how is

14  Menard set up, if you know?

15  A.  The cell house has got like maybe five galleries stacked

16  on top of each other, maybe 25 cells per gallery.  It's a

17  building.  I don't know how else to describe it.

18  Q.  Okay.  Well, let's just focus on West house.  Is West

19  house divided into two different sides?

20  A.  Oh, yes, it's odd/even side.

21  Q.  And you said that you were on 2 Gallery.  Can I tell from

22  that whether you were on the even side or the odd side?

23  A.  That would be the even side.

24  Q.  Okay.  Where on the stack on top of each other is 2

25  Gallery?

1    A.  2 Gallery is on the floor level.  I was in like 3 cell,

2    so -- and I already got on top of 2 Gallery.

3    Q.  So, you're first floor on the even side, is that right?

4    A.  Yes.

5    Q.  And is that where you were housed in February 2014?

6    A.  Yes.

7    Q.  Can you tell me, do the prisoners who are housed on the

8    even side have yard with the prisoners who are housed on the

9    odd side?

10   A.  No.

11   Q.  And just so we are clear, can you explain to the jury what

12   it means to have yard?

13   A.  Yeah, you get out -- I think at that time we was getting

14   out like an hour or so, like two days a week; a couple of

15   hours, two days a week.  I can't remember, because the hours

16   had changed while I was there.  But, you get out, you go out

17   the west side of the building, across from the West house, so

18   to speak, and it would be like on the yard.  Basically the

19   West house, you all was in the back of the prison, I would

20   say, so it wasn't nowhere where you could see anybody or any

21   other cell house or anything like that while I was there

22   unit-wise.

23   Q.  And what about lunch?  Did the guys on even side eat lunch

24   with the guys on the odd side?  Did they have lunch at the

25   same time?

1    A.  No.

2    Q.  All right.  You just recently drew a layout of the

3    entrance to the even side of West house at Menard, correct?

4    A.  Yes.

5    Q.  And I'm going to ask you to open those papers that have

6    been sent to you.

7    A.  Okay.

8    Q.  One of them is marked as Plaintiff's Exhibit 29.  Do you

9    see that?

10   A.  Yes.

11   Q.  That's a drawing that you did?

12   A.  Yes.

13   Q.  Is this a fair and accurate depiction of how the entrance

14   to the even side at West house looked in February of 2014?

15   A.  Yes.

16   Q.  Okay.

17           MS. GRADY:  And, Your Honor, for the record, I will

18   just state that the paper copy that Mr. Smith has in front of

19   him is the same as what I would like to ask permission to show

20   the jury, I believe without objection.

21           THE COURT:  Okay.  Does that have an exhibit number?

22           MS. GRADY:  It has an exhibit number, but not on the

23   demonstrative form.

24           THE COURT:  Okay.

25           MS. GRADY:  It is Plaintiff's Exhibit 29.

```
 1              THE COURT:  Okay.
 2              MS. GRADY:  I can move it closer to the jury, if I
 3    may publish.
 4              THE COURT:  Yes, you may.
 5              No objection?
 6              MR. TYRRELL:  Correct, Your Honor.  No objection.
 7              THE COURT:  So, ladies and gentlemen, this is what we
 8    call a demonstrative aid.  It's just a diagram to help explain
 9    something to you, and I will instruct you on this later.
10    Q.  (By Ms. Grady) Okay.  Mr. Smith, can you hear me when I am
11    away from the microphone, or no?
12    A.  Yes, I can hear you.
13    Q.  Okay.  So, I understand it's going to be a little
14    difficult for us to talk if we are not looking at the exact
15    same physical thing, but I'm going to try and walk us through
16    so you can explain for the jury the drawing that you made
17    depicting the entrance to the even side of the West cell house
18    as it looked in February of 2014, okay?
19    A.  Yes.
20    Q.  So, it's going to be most helpful for you to have it right
21    in front of you, I think.
22              Okay.  So, here -- As you are oriented and you look
23    at the exit on the very bottom, so you turn it to this exit
24    that is at the bottom, can you do that for me?
25    A.  Yes.
```

1  Q.  And can you tell me where -- where that exit is coming

2  from?  What does that door lead to?

3  A.  That door leads to the outside of the building.

4  Q.  Okay.  And immediately to the left you have got about five

5  boxes encapsulated in a pretty large rectangle.  Can you tell

6  me what that depicts?

7  A.  Those are cell boxes that you put grievances in, sick

8  call --

9  Q.  Can you just repeat that answer, Mr. Smith, for us?

10  A.  It's like a mailboxes.

11  Q.  Okay.  Those are mailboxes where prisoners can place

12  different types of requests to different offices within the

13  prison?

14  A.  Yes.

15  Q.  Okay.  And over immediately to the right of the exit you

16  have got this thing with two stick figures in it, and it's got

17  the word written *door*.  Do you see what I am talking about?

18  A.  Yes.

19  Q.  Can you tell me what's depicted there?

20  A.  That's a cage area, a holding cage area.  There's a shelf

21  in there where officers stack your mail and organize the mail,

22  things of that nature.

23  Q.  Okay.  And what about that -- What about this larger area

24  here where these two stick figures are in?  Is that a holding

25  cell?

1    A.  Yes, it's more like a cage.  It's a holding cell.

2    Q.  Okay.  And you have got lines drawn here, but can you tell

3    me, are those actual walls or is that something else?

4    A.  That whole entire front from the exit until the -- into

5    around like where I write *cell*, they go toward this way,

6    that's all cages.  That's one solid bar.  You can see through

7    it, it's not a solid wall.

8    Q.  So, those are bars like you would have on your cell,

9    right?

10   A.  Yes.

11   Q.  Up and down, sort of vertical bars, correct?

12   A.  Yes.

13   Q.  Okay.  And then you have got this long rectangle here in

14   which you have written the word *sergeant*?

15   A.  Yes.

16   Q.  Can you tell me what's depicted there?

17   A.  That is a sergeant's cage.  That's where the sergeant, the

18   officers have property.  Whatever cells we have, the officers

19   can see inside, but I have never been inside to see everything

20   that's in there.  But, it sees from the even side to the odd

21   side.

22   Q.  Okay.  That's a place where correctional officers go.

23   That's not a place where prisoners go, is that right?

24   A.  That's correct.

25   Q.  All right.  And then you have got *stairwell* depicted here.

1    Do you see where I am talking about?

2    A.  Yes.

3    Q.  Okay.  Where does that stairwell go, if you know?

4    A.  That would go up to 4 Gallery, 6 Gallery, 8 Gallery, and

5    10 Gallery.

6    Q.  And is that why it's referred to as the even side, because

7    the galleries each have even numbers?

8    A.  Yes.

9    Q.  And you have some cells drawn here.  Do you see that cell

10   1, cell 2, Smith cell 3?  Do you see where you have written

11   that down?

12   A.  Yes.

13   Q.  I think -- I believe you testified earlier that there

14   are -- Are there more cells than just those three cells?

15   A.  Yes, the gallery, when you see in, like maybe 20, 20-some

16   cells.

17   Q.  Okay.  So, those aren't depicted here, right?

18   A.  No.

19   Q.  But you've drawn a space for your cell, is that true?

20   A.  Yes.

21   Q.  And can you tell me in the front of your cell, again, is

22   that walls or is that something else?

23   A.  That's bars.  Bars.

24   Q.  Okay.  And, again, down at the bottom here there's this --

25   Is this -- Can you tell me what you have written here?  I

1    think it's a shower door.

2    A.  Yes.

3    Q.  Can you tell me what that depicts?

4    A.  That's the entrance for the shower.

5    Q.  Okay.  So, as you were in your cell you can -- standing in

6    your cell you can see out in front of you, is that true?

7    A.  Yes.

8    Q.  Can you also tell me what you can see from your cell, the

9    cell that you had on February 5, 2014?

10   A.  I could see where six people are standing and I could see

11   to the exit door.

12   Q.  Okay.  So, you can see all the way to the exit here, and

13   can you see that just looking out of your cell?

14   A.  Yeah, I can look out my cell and see most of this.  I can

15   see to the corner of the cage, I can see to the wall on the

16   side of the door, the exit door.  If I stick my mirror out I

17   can see just a little bit past the point of the shower here,

18   just a little bit.

19   Q.  Okay.  You used a phrase I don't think that we are

20   familiar with, *if you stick your mirror out*.  So, can you tell

21   me what mirror you are referring to?

22   A.  Most of the time when you go and look from whatever angle

23   that you can see further down, left or right, you stand in

24   front of the bar, put your mirror out and you can look down.

25   Q.  Okay.  So, you stand at the front of the bars, and then

1    does your hand go through the bars or does it stay behind the

2    bars?

3    A.   No, it goes through the bars.

4    Q.   Okay.  Sorry, go ahead.

5    A.   You put it out, but you can extend it out where you put

6    your hand on the outside of the bars to use the mirror to see

7    down the gallery way.

8    Q.   And you're saying that using the mirror will give you a

9    different angle of sight, depending on how far you stick your

10   hands out, is that right?

11   A.   Yes.

12   Q.   Okay.  And can you tell me where -- How did you get that

13   mirror?

14   A.   I purchased it from the commissary.

15   Q.   And can you just explain to the jury what a commissary is?

16   A.   The commissary is where you go to buy necessities,

17   correspondence materials, underclothes, and I guess basically

18   whatever you are allowed to have in the prison that they allow

19   you to have.

20   Q.   Okay.  I want to draw one more thing to your attention

21   here on your drawing.  You have a line written here, *odd side*

22   and *even side*.  Is that bars or is that walls?

23   A.   No, that's, I would say, a ceiling or a metal wall that

24   has a door.

25   Q.   And do you know if that door is typically kept open or

1    closed?

2    A.  No, the door is -- Well, it's open at times, but during

3    this time it's always closed.

4    Q.  Okay.  I want to talk to you specifically about the events

5    that happened on February 5, 2014.

6           Do you remember seeing two prisoners in the holding

7    cell that morning?

8    A.  Yes.

9    Q.  Did you know who they were?

10   A.  Two Spanish guys.  I didn't know them.

11   Q.  When you say *Spanish guys*, do you mean people who were

12   Hispanic or appeared to be Hispanic to you?

13   A.  They appeared to be black Latin, Latino.

14   Q.  Had you ever seen them before February 5, 2014?

15   A.  No.

16   Q.  Did you know their names?

17   A.  No, I didn't.  If I had seen them before I wouldn't know,

18   because I didn't know their names.  I didn't know the guys.

19   Q.  Can you tell me what you remember happening on February 5,

20   2014?

21   A.  Say that again, please.

22   Q.  Sure.  Can you tell me what you remember?

23   A.  They are doing a lot of noise back behind me.

24   Q.  Okay.  And, please, do just let me know if there's an

25   issue with hearing me.

1              Can you tell me what you remember happening on

2      February 5, 2014?

3      A.   Yeah, the line was coming down the stairwell exiting the

4      door.  Guys were leaving lunch and guys was in the cage,

5      exchanging in small comments, and they was walking out the

6      door.  I was sitting in my cell, but I was trying to catch

7      somebody going out the cell to tell them something that was on

8      the high gallery.  They was exiting the door.  When they was

9      exiting the door at the end of the line I heard somebody say,

10     "Shut your pussy asses up," or something like that.  And then

11     I heard Qualls -- Qualls was standing -- coming this way.  I

12     heard him say, "Oh, he's about to get hurt."  And he walked

13     over to the cage and asked the guys to turn around and cuff

14     up, and then they opened the door and snatched one of them out

15     of there by the neck, basically, and had the guy almost like

16     towards this corner of the side cage and he punched him.  And

17     he told the other guy -- If my memory serves me correctly, he

18     said, "Face the God-damned wall, face the God-damned wall."

19     He kept repeating.  And he had these other two officers come

20     in, and they grabbed him through the main cage, walked him up

21     to the wall and standing there pushing his head into the wall.

22     As this was going on, the officers who were outside to watch

23     the line seen what happened, came in, and basically Qualls

24     took big guy on in -- took big guy into the shower.  That's

25     what I heard.  I heard the shower door open and I heard

1    yelling, I heard what sounded like punching.  I didn't see

2    anything.  I heard what sounded like punching, I heard the guy

3    yelling.  Like it was the last person like following, he got

4    out of my view, you know, and I was told to put my mirror in.

5    They pulled the guy out, jacked up.  His hands was already

6    behind his back.  They had him jacked up like this.  I can't

7    recall -- I can't remember exactly who was holding the man up,

8    running him out the door, like that.

9    Q.  Thank you, Mr. Smith.  We went through a lot, but I want

10   to break that down a little bit.

11        I think the first thing that you testified about was

12   seeing a line of guys going to lunch, is that correct?

13   A.  Yeah.

14   Q.  And in prison can you go to lunch when you want to?

15   A.  No.

16   Q.  Tell me how it works.

17   A.  Gallery to gallery.  Take one gallery in, take the gallery

18   out.  Depends on how many in the chow hall.  Sometimes you can

19   go into more than one chow hall; take a gallery in and take a

20   gallery out.  The officers come up, sometimes they announce

21   chow, you know, guys come out, close the door, and the line

22   proceeds down the stairwell off the gallery, out the cell

23   house.

24   Q.  Did you go to chow that day?

25   A.  No.

1    Q.  Why not?

2    A.  I normally don't go to chow.  You have to put up with too

3    much stuff to go to chow.  I didn't go.  I didn't go.

4    Q.  Sorry.  Was the chow line coming down the stairs or were

5    they coming from the first floor?

6    A.  The chow line was entering the door when he was coming

7    down the stairs.

8    Q.  What time do officers typically start taking the galleries

9    for lunch on the even side of the West cell house?

10   A.  They don't do it every day start at one place.  They start

11   on even or odd side, depending on what's going on.  9, 9:30,

12   something like that.

13   Q.  And I think you testified that you were paying attention

14   to the line movement.  Can you tell us where within your cell

15   you were located as the line was moving from the upper gallery

16   out to lunch?

17   A.  I was standing at the bars with my mirror out waiting on

18   somebody -- see if somebody was going to come down that I was

19   looking for.

20   Q.  Okay.  So, you were near -- you were near the front of the

21   bars?

22   A.  Yes.

23   Q.  And you had your mirror out as the line was moving

24   already, is that correct?

25   A.  Yes.

1    Q.  And, at the time your mirror was out where were you trying

2    to point your mirror?  What were you trying to see right at

3    the very beginning?

4    A.  I was looking for a guy entering the cell, coming through

5    the -- coming out the door, through the cell.  I was trying to

6    catch somebody.

7    Q.  Okay.  Now, you said that you heard some people talking.

8    Right at that point as you were looking for a particular

9    person as the line's moving to chow, did you hear exactly who

10   was saying what to whom?

11   A.  Everybody was talking.  Guys that was in the line was

12   talking to each other, and as they walked by guys in the cages

13   was talking to people.  It wasn't like a conversation, it was

14   more like a comedy, because the line was constantly moving.

15   Q.  And you said at some point a person said words to the

16   effect of, "Shut your pussy ass up," is that correct?

17   A.  That was at, like, the last couple of guys that was

18   walking out the door.

19   Q.  When you say the last couple of guys were walking out the

20   door, you mean the last couple of prisoners in that line going

21   to chow were on their way out, is that correct?

22   A.  Yeah, most of the line had exited already.

23   Q.  And do you know who said that line or words to that

24   effect?

25   A.  No.

1  Q.  Do you know whether it was an officer or a prisoner or

2  anybody else?

3  A.  I can only assume it was the officers.  I didn't see them

4  say it.

5  Q.  Okay.  Tell me what was the next thing that you did

6  actually see.

7  A.  I saw Qualls saying something to the effect, "Don't worry

8  about it."

9  Q.  Can you please repeat for us?

10  A.  I saw Sergeant Qualls walking towards the cage door.

11  Q.  Okay.  And can you describe what Sergeant Qualls looks

12  like for the jury, please?

13  A.  Yeah, about this tall, kind of -- I would say he got some

14  weight, kind of husky, chubby, wear like a crewcut hairstyle,

15  sort of like that, a mustache.  I didn't ever see him wear

16  glasses, you know.

17  Q.  And what's his race, if you know?

18  A.  He's a white male.

19  Q.  Okay.  So, you saw him approach the holding cell.  And

20  could you see that -- Did you require use of your mirror in

21  order to see Sergeant Qualls, or could you see it from your

22  cell without using your mirror?

23  A.  Well, I likely could have seen him without the mirror, but

24  I had the mirror out.

25  Q.  Okay.  And, as you sit here today do you recall whether

1    that prisoner that you saw get pulled out of his cell was

2    handcuffed or not handcuffed?

3    A.   Well, if my memory serves me correctly he was definitely

4    handcuffed.

5    Q.   So, tell me what happens next after Mr. Nicolas -- I'm

6    sorry -- after the prisoner is taken out of his cell.  And,

7    again, just to clarify you didn't know that prisoner's name at

8    the time he got pulled out of the cell, right?

9    A.   If they was standing right here in this room I wouldn't

10   know them.

11   Q.   Okay.  But, you do recall seeing the -- I believe you

12   described him as a Latino prisoner being pulled out of the

13   cell on that day, right?

14   A.   Yes.

15   Q.   Okay.  Can you tell me what's the next thing that you

16   remember?

17   A.   Qualls punched him.

18   Q.   Where was he standing when Qualls punched him?

19   A.   He was standing in front of Qualls.

20   Q.   Can you tell me where in relation --

21   A.   Towards like the corner -- Towards like the corner of the

22   sergeant cage.

23   Q.   Did you say the corner of the sergeant cage?

24   A.   Yes, around that area.  This is not a very -- It's not a

25   very large area, so it's maybe -- maybe seven -- maybe seven

```
 1   feet or five feet.  Maybe seven feet in length.  I don't know.
 2   It's not a very large area.
 3   Q.  It's your testimony it's about seven feet from the door of
 4   the holding cell or the holding cage to the corner of the
 5   sergeant's cage?
 6   A.  I'm saying that from the cell there's bars separating the
 7   sergeant's cage and the stairwell.  It's like that's the width
 8   of it, from the stairwell to that corner, maybe seven feet,
 9   probably.  Maybe seven feet.
10   Q.  Okay.  Is there anything -- I'm sorry, Mr. Smith.  That
11   was my mistake.  Can you please repeat the last thing you
12   said?
13   A.  Somebody is talking in here.  I can't hear you, because
14   somebody else is talking.
15   Q.  Mr. Smith, that's because we have --
16           THE COURT:  We have an interpreter, so we will just
17   have to deal with it.
18   Q.  Okay.  Well, we will do our best.  And if you need me to
19   repeat anything, please do let me know, okay?
20   A.  Yes.
21   Q.  Maybe this will be a little bit better, I'm sorry.  I had
22   the mic off.
23           Okay.  So, I'm not sure I quite understand what your
24   testimony was.  You were talking about seven feet.  Did you
25   tell me it's seven feet from the stairwell to the outside of
```

1   the sergeant's corner cage?

2   A.  Yeah, to the corner of the sergeant's cage, maybe seven

3   feet.  It's not that long.

4   Q.  Okay.  I'm going to write on here *seven feet* unless

5   there's an objection.

6           MR. TYRRELL:  No objection.

7   Q.  Okay.  And I believe you said that the punch that you saw

8   was on the corner of the sergeant's cage closest to the exit,

9   is that right?

10  A.  The inmate was standing like close to the sergeant's cage,

11  maybe a half a foot, where I could see him.

12  Q.  And at that point could you see with the use of your

13  mirror both Sergeant Qualls and the inmate?

14  A.  Yes.

15  Q.  And is there anything in the corner of this sergeant's

16  cage that is right on the corner?

17  A.  It had big orange water container.

18  Q.  Is that like a circular Gatorade water-cooler-type thing?

19  A.  Exactly.

20  Q.  Okay.  And, so, when you saw that punch can you tell me

21  what you saw the inmate do in response?

22  A.  I saw his reaction.  I saw his reaction hunched like this.

23  Q.  He doubled over?

24  A.  Yes.  He didn't kneel all the way down.  I saw the

25  reaction from him.

1  Q.  And at that point did you see any officers -- any other

2  officers get involved in any way?

3  A.  Messing with this guy that Qualls had?

4  Q.  Correct.  After you saw that first punch, did you see any

5  officers get involved with either Sergeant Qualls or with the

6  inmate?

7  A.  Well, as this whole thing was happening, officers were

8  coming into the building.  Every time a line goes out, they

9  get to a certain point, they've got to come get them, remind

10  them it was still cold outside.  Because we have got the

11  officers that are coming in and the officers going out.  So, I

12  didn't see no other officers.  I saw this guy that Qualls had.

13  Q.  What did you see Qualls do with the inmate?

14  A.  He took him around to the shower.

15  Q.  And you couldn't -- even with your mirror you couldn't see

16  into the shower area, right?

17  A.  Well, I can't see it, but whenever you open the shower

18  door it makes a lot of noise.

19  Q.  So, you could hear it, but even with your mirror you

20  couldn't see it?

21  A.  No, I couldn't see it, no.

22  Q.  And could you see back into the corner closer where you

23  have written even-side line and odd-side line?  Could you see

24  back there with your mirror?

25  A.  I couldn't see nowhere in that area.

1   Q.  Okay.  But you testified that you heard something after

2   Qualls and this inmate disappeared from view?

3   A.  Yeah, I heard the shower door open, but then it got real

4   squeaky and squeaky sounds.  I heard the door open, and then I

5   heard punches and I heard him holler.

6   Q.  Okay.  Let's take each of those.  You described what the

7   shower door sounded like.  Can you tell me what you heard that

8   led you to believe that there were punches?

9   A.  Stuff like (indicating).  Those are the type of sounds

10  that I heard.

11        MS. GRADY:  And, Your Honor, for the record, I will

12  just note that the witness imitated the sound of a hit on his

13  body.

14        THE COURT:  Yes.

15  Q.  (By Ms. Grady)  And can you tell me what you heard that

16  led you to the conclusion that there was yelling going on, or

17  what exactly you heard being yelled, what type of sounds?

18  A.  "Ahh, ahh, ahh."  It was a lot of keys jingling, you know.

19  I was seeing a lot of keys.  I could hear the same thing.  But

20  I didn't hear no words.  I didn't hear nobody say nothing in

21  addition to that, like words, stuff like that.  It was a lot

22  of noise because the keys was jiggling.

23  Q.  At this point when you were hearing these things did you

24  see Qualls anywhere within your view separate from the inmate?

25  A.  I want a second question.

```
 1   Q.   Sure.  My question is you testified that Qualls took the
 2   inmate and then you heard these noises.  Did Qualls come back
 3   into your view when you heard these noises going on?
 4   A.   I don't remember.
 5   Q.   Okay.  Did anyone ever tell you to put your mirror away?
 6   A.   Yes.
 7   Q.   Who told you that?
 8   A.   Snell.
 9   Q.   And what did you do when he told you that?
10   A.   I believe I -- I had my -- I had my hand extended out.  I
11   brought it in.  I brought my arm in a little bit.
12   Q.   And where was Snell when he told you to put your mirror
13   away?
14   A.   He was in the cage area right here.  He had the other guy
15   up against the wall, holding his head against the wall.  He
16   was looking at me, he told me to put the mirror in.  He was
17   also looking into the shower area, too.
18   Q.   So, he could see you from that shower area, right, --
19   A.   Yes.
20   Q.   -- because you can see straight into that holding cell --
21   I'm sorry.  I misspoke.
22        He could see you from the holding cell, right?
23   A.   Yes.
24   Q.   Because you can see straight into that holding cell
25   without the use of a mirror?
```

1   A.  Yes.

2   Q.  After the -- You testified that you saw Mr. Nicolas get

3   taken out of the cell.  Did you ever see him again?

4   A.  Only when they took him out the door.

5   Q.  You mean on that same day, February 5, 2014?

6   A.  Yeah.  I don't know.  I don't know the guy.

7   Q.  And did you see him around Menard at any day -- a date

8   after that?

9   A.  If I ever saw the dude again I wouldn't even know it was

10  him.  I never even knew the guy.

11  Q.  Is there a segregation unit at Menard that you are

12  familiar with?

13  A.  Yes.

14  Q.  Where --

15  A.  North 2.

16  Q.  And do prisoners from North 2 have lunch with prisoners

17  from the West cell house?

18  A.  They don't do anything with anybody in population.

19  Q.  By *population*, you mean people not in segregation, right?

20  A.  Yes.

21  Q.  They don't have yard with prisoners from the West cell

22  house, correct?

23  A.  Correct.

24  Q.  You say that you saw this beating happen on February 5,

25  2014.  Did you ever tell anybody about what you saw?

1    A.   Yes, I did.   I wrote people from the outside about it.

2    Q.   When you say you *wrote people on the outside about it*, can

3    you tell the jury what you mean by that?

4    A.   I wrote the Investigations Unit, I wrote John Howard, I

5    wrote another organization I usually write.

6    Q.   Another organization you usually write?   That's what you

7    said?

8    A.   Yes.

9    Q.   Okay.   And one of the people you wrote was the

10   Investigative Unit?

11   A.   In Springfield.

12   Q.   And when did you write that letter?

13   A.   I think that was the last that I wrote -- Can I look at

14   this paper?

15   Q.   Sure.   Would it refresh your recollection to look at that

16   -- a copy of that letter?

17   A.   Yes.

18   Q.   Okay.   Then you can go ahead and pick up Plaintiff's

19   Exhibit 3.

20   A.   I wrote this February 9, 2014.

21   Q.   You wrote that on February 9, 2014?

22   A.   Yes.

23   Q.   And can you tell me why you wrote this letter?

24   A.   I wrote the letter because I was disturbed by what I saw

25   and I didn't want them getting away with that.   It was so --

1    It was shocking to see that a person would be punched and

2    jumped on simply because he's talking, something that goes on

3    every day, just saying, "What's up man," talking to guys that

4    you would see every day.  I was really disturbed about what I

5    saw.  This is unnecessary.

6    Q.  And why did you, like, write the letter to Springfield

7    instead of somewhere at Menard?

8    A.  Because I wanted them to know my opinion, my experience.

9    Ain't nobody at Menard going to do nothing about this.  They

10   wasn't going to investigate.  I had no confidence that they

11   would investigate it, and I thought like a lot of things that

12   I have done, it would just get lost, it was never -- Actually,

13   I thought that's what happened to this, because nobody talked

14   to me about this.

15   Q.  Can you tell me why it was that you waited for four days

16   to write it?

17   A.  Well, I had to get their names and stuff.  I didn't know

18   the guys.  I had to get --

19   Q.  And you got their -- Sorry.  Go ahead, Mr. Smith.

20   A.  I had to get their names.  I didn't know them.  I had to

21   get somebody to find out who they were.

22   Q.  And you wanted their names so that an investigation could

23   be launched, right?

24   A.  Exactly.  That's why I wrote the Investigation Unit.

25   Q.  And did you eventually get those names?

1  A.  Yes, I did.

2  Q.  Can you tell me generally how you got the names?

3  A.  I had a guy, a buddy that worked there.

4  Q.  Did you have any conversation with either of the two

5  inmates that you saw involved in this altercation at any point

6  between February 5, 2014 and February 9th, when you wrote this

7  letter?

8  A.  No.

9  Q.  Did you have any conversation with those inmates at any

10 point between February 9th, when you sent your letter, and

11 today?

12 A.  No.

13 Q.  And did anybody from the Investigative Unit in Springfield

14 or Menard or anywhere else ever come to talk to you about the

15 beating that you described in your letter?

16 A.  No.

17        MS. GRADY:  Nothing further, Your Honor.

18        THE COURT:  All right.  Cross-examination?

19

20                    CROSS EXAMINATION

21 BY MR. BRACEY:

22 Q.  Good afternoon, Mr. Smith.

23 A.  How are you doing?

24 Q.  I have got some questions to follow up here just to clear

25 some things up, okay?

1              Before we start, how many pieces of paper do you have

2    in front of you right now?

3    A.   Four.

4    Q.   Okay.  And that's the entirety of Plaintiff's Exhibit 3

5    and your drawing, is that correct?

6    A.   Yes.

7    Q.   Okay.  Earlier it appeared that you were looking down when

8    answering some of your questions.  Were you looking at that

9    when you were looking down?

10   A.   I was looking at this diagram.

11   Q.   Okay.  I believe you just testified that you obtained the

12   names of Mr. Diaz and Jose-Nicolas, is that correct?

13   A.   Yes.

14   Q.   Okay.  How did you get those names?

15   A.   I had somebody at work get them for me.

16   Q.   When you say *someone at work*, are you referring to someone

17   that works for IDOC?

18   A.   Yes.

19   Q.   Who was that?

20   A.   It was -- I don't want to tell you who it was.  He was in

21   prison.

22   Q.   Are you saying that a prison correctional officer gave you

23   those the names?

24   A.   No, I am telling you that the inmate got the names for me.

25   Q.   Okay.  Which inmate was that?

1           MS. GRADY:  Objection, Your Honor.  Relevance.

2  A.  I'm not going to tell you that.  I don't believe that

3  there's any relevance to the name of the prisoner.

4           THE COURT:  Well, that will be sustained.  And, for

5  obvious reasons, he's not likely to tell you.  So, go ahead.

6  Q.  Okay.  I believe during this time you said that you were

7  on the 2 Gallery, cell 3.

8  A.  I believe so, yes.

9  Q.  Okay.  Do you recall -- Is it correct that you were in

10  that same cell from, roughly, July 2013 to February 2015?

11  A.  Yes.

12  Q.  You testified earlier regarding Plaintiff's Exhibit 3, the

13  letter you wrote to I/A.  In the first paragraph there, you

14  have a sentence that says, "Greeting -- greeting and common

15  small talk was exchanged by Diaz, Nicolas with other inmates

16  exiting the door."

17           Was that true when you wrote that?

18  A.  I don't know which one was who, but they both were

19  talking.

20  Q.  You could hear them talking?

21  A.  Yeah, I could hear them talking.  Everybody was talking.

22  I could see them talking.  A lot of people was talking, so I

23  would assume that they were talking.  But I could see them

24  talking to people.  I couldn't hear the exact words what was

25  being said, but there was a lot of talking going on.

1   Q.  So, I believe you just said you could not hear them

2   because there was a lot of talking going on, is that correct?

3   A.  I could see them talking, but I couldn't -- I wasn't

4   really paying attention to them.  I was looking for somebody

5   that was coming down the stairs.

6   Q.  Okay.  I believe earlier you testified that on each

7   gallery, like the 2 Gallery that your cell was on, I believe

8   you said there's approximately 20 or so cells on that gallery,

9   is that correct?

10  A.  Yes.

11  Q.  How many galleries are stacked on top of each other, so

12  above your 2 Gallery?

13  A.  Above mine, maybe four.

14  Q.  So, that would be roughly 80 cells or so?

15  A.  It's like 20, 25 cells on a gallery.

16  Q.  Okay.  So, is it noisy in the cell house?

17  A.  It's noisy in the cell house, but not when the cell house

18  is almost empty, each side.  It's chow time.  A lot of guys

19  was out their cell, out of the building.

20  Q.  Okay.  Still looking at your letter, Plaintiff's Exhibit

21  3, the letter you wrote to I/A.  You say another officer that

22  you couldn't tell yelled to Diaz and Nicolas to shut their

23  pussy asses up, is that correct?

24  A.  Yes.

25  Q.  Okay.  So, again, did you actually hear the statement?

1   A.  Yes, I heard him say that.

2   Q.  Okay.  So, you next say you heard Sergeant Qualls tell the

3   other officers or officer, "Don't worry about it, he's about

4   to get hurt."  Do you remember that?

5   A.  Yes, I remember that.

6   Q.  Was this in a raised voice, or just you and me speaking?

7   A.  It wasn't in a raised voice, because the line was

8   basically out the door at the time.  That was at the end of

9   the line.  Both comments was at the end of the line, whoever

10  it was that was telling them, "Shut your pussy ass's up," and

11  Qualls's response to that.

12  Q.  Okay.  So, earlier you testified regarding the physical

13  altercation allegations here, okay?  So, who first brought

14  Jose-Nicolas out of the holding cell?

15  A.  I seen Qualls bring one of the guys out.  I don't know

16  who, which one of them it was.

17  Q.  So, am I correct you just saw Qualls bring one of the two

18  guys out, but you don't know which one?

19  A.  Yeah, he would -- Qualls was the only one there.  There

20  were other officers coming in there at the time; however,

21  Qualls told him to turn around, get cuffed up, or somebody

22  cuffed him up, and Qualls was by the cage.

23  Q.  And I believe you said he then took them in the range of

24  five to seven feet to the corner by the edge of the sergeant's

25  cage, is that correct?

1    A.  Say that one more time, please.

2    Q.  Okay.  So, I believe you testified earlier that they then

3    carried Jose-Nicolas roughly five to seven feet and punched

4    him at the corner of the sergeant's cage, is that correct?

5    A.  No, that's not -- No.  Can I repeat this -- Can I grab

6    this?  It says right here he's in the door, directing him

7    almost -- across from the side of the cage.  He pulled him out

8    of -- He pulled him out of the cage here, right -- Right here

9    by the corner is where most everything happened.  It wasn't no

10   walking five or seven feet.  I was saying it was the width of

11   the side of the cage is like five or seven feet.  That's what

12   I was trying to explain.

13   Q.  Okay.  So, didn't you testify that you saw him -- that you

14   saw Qualls punch Jose-Nicolas at the corner of the sergeant's

15   cage?

16   A.  Yes.

17   Q.  Okay.  Where did -- Where did that punch land?

18   A.  His fingers landed in his mid section.

19   Q.  And you saw this through your mirror?

20   A.  Yes.

21   Q.  Okay.  I'm looking now at the second page of your letter

22   to I/A.  You say, "Qualls and others moved this inmate to the

23   shower and apparently continued to assault and batter this

24   inmate," okay?

25   A.  Yes.

1    Q.  So, am I correct that you said earlier that you could see

2    all the way to the shower door from your cell?

3    A.  No, sir.

4    Q.  Okay.  Well, then how would you know that Qualls and

5    others moved the inmate to the shower?

6    A.  Well, I saw Qualls being in the corner, past the

7    sergeant's cage, with the inmate and the other officers.  I

8    only heard from that point.  I couldn't see that far.

9    Q.  How far away is the shower door from your cell?

10   A.  That's maybe -- I have no idea, because you have to go

11   toward the exit door maybe 20 -- maybe almost 20 feet, and

12   then before exiting the door you have to make a right and it

13   would be like maybe five feet from the exit door, maybe ten,

14   five feet from the exit door.  It's not that long.  It's not a

15   very large area.  It's a small area.

16   Q.  Okay.  So, I believe you just said somewhere in the range

17   of 25 to 30 feet, is that accurate?

18   A.  Maybe 20 feet from my cell to almost the exit door and you

19   make a right here.  Maybe 25 feet.  I am only estimating.  I

20   have no idea.

21   Q.  Well, you do this demonstrative showing the layout and you

22   testified earlier about the five to seven feet, so that's the

23   only reason why I am asking.

24          So, you believe that you could clearly hear people

25   kicking in the shower, is that correct?

1   A.  I don't know what kind of strikes, kicks, punches, what

2   they were.  I heard the contact of it and I heard the man yell

3   and I heard the key chain.  I don't know what kind of -- I

4   couldn't see.  I don't know if it was a kick, a punch, you

5   know, or what was going on.

6   Q.  Well, how many contact sounds did you hear?

7   A.  It's difficult to say, because I heard like maybe four or

8   five punches before I heard him scream, and then keys and all

9   of that stuff, so maybe three, four, five punches.  I heard

10  that for sure.  I don't know those punches -- all of them were

11  punches, rather.  I don't know.

12  Q.  Do you know who Officer Berry is?

13  A.  I believe I do.  Heavy-set individual.

14  Q.  Was Officer Berry present during this interchange we are

15  describing?

16  A.  Which interchange?

17  Q.  This event that we are discussing on February 5, 2014.

18  A.  Okay.  But you asked me did he go towards the shower, or

19  what are you asking me?

20  Q.  I am asking was he there?  Was he at the holding cage

21  during any of this portion?

22  A.  Yes.

23  Q.  Okay.  Did he go to the shower area?

24  A.  I don't recall him going to the shower area.

25  Q.  Okay.  Well, can you look at the second page of your

```
 1   letter to I/A?  At the beginning of the second paragraph you
 2   say, "C/O Snell and C/O Berry grabbed the other inmate in the
 3   cage and held him in the wall."
 4   A.  Yes.
 5   Q.  Then earlier on that same page you say Snell and Berry
 6   ordered you to put your mirror in the cell, is that correct?
 7   A.  Yes.
 8   Q.  Okay.  So, is it your testimony that Snell and Berry, you
 9   never saw them go -- walk to the shower?
10   A.  Yes, I don't remember Snell or Berry in the shower.  I
11   remember them doing what Qualls told them to do, and that's
12   it.
13   Q.  Do you remember?
14   A.  They put their -- They had the dude like this
15   (indicating).  Snell had his head against the wall holding
16   like this, and Berry had him like this, and both of them were
17   looking this way towards the shower.
18   Q.  And when you say -- That demonstration you just did, are
19   you referring to the other inmate who was remaining in the
20   holding cell?
21   A.  Yes.
22   Q.  Okay.  Not the Plaintiff, Jose-Nicolas, correct?
23   A.  Who?
24   Q.  I said, just to clarify, you were not describing the
25   Plaintiff, Mr. Jose-Nicolas, correct?
```

1   A.  I don't know which one is which, sir, but whoever was in

2   the shower, I'm not talking about him.  I am only talking

3   about the guy that was in the cage.

4   Q.  Okay, thank you.  That clarifies.

5         Do you recall the total number of officers that were

6   present during the first punch by the sergeant's cage?

7   A.  Total number would be difficult to say, because they was

8   coming through the door as the event was unfolding.  So, if

9   you are talking about maybe Berry and Qualls, yes, who came

10  through the door first and arranged, only thing I know their

11  names.  I didn't know how many people was in there at the

12  exact time of the punch, though, because there was all this

13  yelling.  I was watching what was going on.  I really wasn't

14  standing -- I didn't even expect that to happen, man.  I

15  wasn't, you know, paying attention to who exactly was coming

16  through the door at that time.

17  Q.  Well, I believe you said earlier that all the lines had

18  already left at this point, right?

19  A.  Yes.

20  Q.  So, who would have been coming and going that would have

21  confused you about who all was there?

22  A.  I wasn't confused about who all was there.  You asked me a

23  second question, and I'm telling you that I don't know the

24  exact number of officers because they were coming into the

25  door.  Berry and Snell and Qualls was already in the area,

1    okay?  When the incident was going on, when this guy was

2    getting punched, I was not -- First of all, I would have to be

3    seeing past him.  It's a very narrow area coming through the

4    door.  It's not like you walk straight out to the door.  It's

5    a small little tunnel, so to speak, like three feet in the

6    entrance of the door.  So, it's not like you just walk out the

7    door and you are outside.  You have to walk a couple more

8    steps.  But, I don't know the exact number of officers, no.  I

9    don't even know who all the officers were.  I only named the

10   officers that I knew were present.  I don't know all the

11   officers' names.

12   Q.  Okay.  I'm looking at the diagram you sketched for us.

13   Can you take a look at that for a second?

14        In the area where you drew the two stick figures, I

15   believe earlier you said that represents the holding cage,

16   correct?

17   A.  Yes.

18   Q.  Okay.  Then do you see where you've drawn the stairwell

19   and the sergeant's cage connect?

20   A.  Okay, yes.

21   Q.  Okay.  Is there a door that connects that corner to the

22   holding cage area?

23   A.  Say it one more time, because I didn't understand what you

24   asked.

25   Q.  Sure.  Is there a door that connects the corner of the

1    holding cage area to the area where the sergeant's cage and

2    the stairwell meet?

3    A.  This door -- This line right here represents the

4    stairwell.  It connects to this.  I didn't know that this was

5    going to be in court or nothing like this.  This is not a

6    perfect thing.  But, there is a door -- There's a door there

7    that divides from entering onto the gallery, yes.  That door

8    is connected to here and here.

9    Q.  Do you know if that door remains closed unless line

10   movement is going to or from?

11   A.  Yes.

12   Q.  Is that *yes*, the door does remain closed?

13   A.  If there's not any line movement during chow, even on 2

14   Gallery that is not a door, it's a cage.  It's closed --

15   Q.  Okay.

16   A.  -- and has bars.

17   Q.  And I believe you said earlier that by the time you said

18   you saw the punch thrown the lines were already done, correct?

19   A.  Yes.

20   Q.  Was there anyone else besides the guys that you described

21   as the two Latin guys?  Was there anyone else other than them

22   in the holding cell?

23   A.  No, not to my recollection.

24   Q.  When you used your mirror to see in that direction, did

25   you have it connected to a pole or anything, or was it just in

1    your hand?

2    A.   Just in my hand.

3    Q.   How long is that mirror?

4    A.   Maybe about the length of my hand and maybe about the

5    width of it.

6    Q.   Did you ever have an occasion to visit the Healthcare Unit

7    when you were on the West house 2 Gallery?

8    A.   Where?  Outside the building or inside?

9    Q.   Let me withdraw that question.

10           There were some questions earlier about whether the

11   odd and even sides of the West house ever had any occasion to

12   interact, okay?  And I believe you testified that they don't

13   have lunch or yard at the same time, is that correct?

14   A.   Okay.

15   Q.   Is that a correct statement of your testimony?

16   A.   Yes, it is.

17   Q.   Okay.  Are there any occasions where the odd and even

18   sides both go to Healthcare at the same time?

19   A.   Yes, they can go to Healthcare at the same time, yes.

20   Q.   Okay.  So, they do interact during those types of visits,

21   correct?

22   A.   Yeah, if you get a call pass to go to the Healthcare,

23   somebody else on the other side gets a call pass to go to

24   Healthcare.

25   Q.   Thank you, Mr. Smith.  I have no further questions.

```
 1              THE COURT:  All right.  Any brief redirect?

 2              MS. GRADY:  Brief; very brief.

 3

 4                    REDIRECT EXAMINATION

 5   BY MS. GRADY:

 6   Q.  Mr. Smith, you were just asked some questions about going

 7   to Healthcare, getting a healthcare pass.

 8              Just to clarify, did you ever go to Healthcare with

 9   either of the two inmates you saw in the holding cell on

10   February 5, 2014?

11   A.  I have no idea, because I don't know these guys.  I have

12   been telling you I don't know these brothers.

13   Q.  You were asked several questions about your hearing.  The

14   walls -- Are the walls concrete in the prison?

15   A.  What do you mean *are the walls concrete in prison*?  I

16   don't understand your question.

17   Q.  Can you tell me what makes up the walls?  What kind of

18   walls are they?

19   A.  It's all bars.  There are -- I guess you could call -- The

20   rearview wall's like this.  Everything inside is basically

21   cage.  Everything inside the cage is bars.

22   Q.  Do you hear a lot of echoes through the cell house?

23   A.  Everything.

24   Q.  And you were asked some questions about different

25   galleries.
```

```
 1           First of all, let's just be clear, 2 Gallery is on
 2    the first floor, right?
 3    A.   Yes.
 4    Q.   And immediately above 2 Gallery, do you know what gallery
 5    is up there?
 6    A.   4 Gallery.
 7    Q.   Okay.  So, does it go 2, 4, 6, 8?
 8    A.   Yes.
 9    Q.   Okay.  You were asked some about exact measurements and
10    whether things are five feet or seven feet.  The hallway is a
11    straight hallway, right?
12    A.   What do you mean *hallway*?
13    Q.   Well, does the hallway turn?  I know you testified that
14    there's an L and you wrote your -- you drew your demonstrative
15    where you can turn into the shower.  From your cell, if you
16    walk right outside your cell, it would be a straight line to
17    walk out the door, correct?
18    A.   Yes.
19    Q.   And, at the time that you saw Qualls punch this inmate,
20    was the door between your gallery and the entranceway, was
21    that open or shut?
22    A.   Exiting the building?  The door exiting the building?
23    Q.   No, you testified about a door to the gallery.
24    A.   Yes, it's bars.  It's -- Yeah, it was closed, but it's a
25    C-shape, too, the structure.
```

1    Q.  So, even when that door is closed you can see through it

2    to some degree with your eyes standing at the front of the

3    cell, right?

4    A.  I could see through this door sitting in front of my cell

5    with or without the mirror.

6    Q.  Okay.  And you can also see through it with your mirror?

7    A.  Yes, looking at the TVs.  Only thing is, it's like a cage

8    with bars.

9    Q.  When you wrote this letter, the letter that we have been

10   talking about today to Internal Affairs in Springfield, was it

11   your expectation that they would investigate and find out all

12   the information necessary to understand exactly who was

13   present and where?

14   A.  Yeah, when I wrote to Springfield I was hoping that they

15   investigate it.

16   Q.  And nobody ever came to talk to you, right?

17   A.  I didn't talk to anybody about this case other than you

18   asking me in a interview real quick about what I wrote, no.

19           MS. GRADY:  I have nothing else, Your Honor.

20           THE COURT:  Thank you.  Thank you, Mr. Smith.  That

21   will conclude your testimony.

22           MR. SMITH:  All right.  Thank you.  You all have a

23   nice day.

24           THE COURT:  All right.  You, too.

25           All right.  Ladies and gentlemen, thank you.  It's

```
 1    been a long day, and I promised to always get you out of here
 2    before 5:00.  My previous instruction about not talking about
 3    the case continues to apply, of course.  Be careful going
 4    home, don't be thinking about the case, pay attention to the
 5    traffic.  I would like you back here and ready to go at 8:30
 6    tomorrow morning.  I know Deana got your lunch orders.  We
 7    will get your lunch and we will work hard tomorrow and maybe
 8    you will get the case if not tomorrow, I think maybe early
 9    Thursday.
10              Okay.  All rise for the jury.
11              (Jury out).
12              THE COURT:  Be seated, everyone.  I know our
13    interpreter and our Court Reporter are about drained.  I want
14    to go over a few things.
15              We admitted Exhibit 8.  Exhibit 3, I believe, was the
16    only other one shown.  Do you intend to move to admit Exhibit
17    3?
18              MS. GRADY:  So, Exhibit 3 is actually identical to
19    what we have admitted through Exhibit 8.
20              THE COURT:  Okay.
21              MS. GRADY:  So, I think only one copy really needs to
22    go back to the jury.
23              THE COURT:  Absolutely.  I wanted to make sure that's
24    clear.
25              MS. GRADY:  For the record, Plaintiff 3 equals what's
```

```
 1   been admitted as Plaintiff's 8.
 2        THE COURT:  Okay.  And, 29 you referred to that one
 3   is the demonstrative?
 4        MS. GRADY:  Correct.
 5        THE COURT:  That will be there.  It's just a
 6   demonstrative.
 7        MS. GRADY:  Right.  We are not going to move that
 8   into evidence, but we do intend to use it at closing.
 9        THE COURT:  Okay.  So, all we have at this point is
10   8.  And that's five pages of Exhibit 8, correct?
11        MS. GRADY:  Pages 1 through 5 of Exhibit 8.
12        THE CLERK:  They're going to have to redact it.
13        THE COURT:  Okay.  So, you redact that and get the
14   redacted version to Deana later.  She will get you straight.
15        MS. GRADY:  Okay.
16        THE COURT:  I would like to have everyone here at
17   8:00 tomorrow.  I am going to ask for Mr. Nicolas to be here
18   at 8:00, Counsel be here at 8:00.  The Defendants, as long as
19   you are here and ready to go by 8:30, that will be fine.
20        What witnesses -- Do you still think we are on track
21   to get through your witnesses quickly tomorrow?
22        MS. GRADY:  I do anticipate finishing tomorrow.  So,
23   my only question is jury instructions, because I would like to
24   be able to show the jury some of the instructions, so I would
25   like to have a couple of exhibits.
```

1          THE COURT:  So, Kristen is going to get you a copy

2     before you leave today.  We have been working on them.  So,

3     what I do is this will be -- We've gone through them, I went

4     through them at lunch, and Kristen has been working on them of

5     what I prefer between the ones -- I looked at the different

6     ones that you offered.  I always prefer the pattern where

7     possible.  We've made some clarifications on things, we've

8     added a few.  So, this is our working copy, what she's going

9     to give to you.  So, look at that tonight, and then I would

10    like at 8:15 tomorrow to have an informal conference off the

11    record.  That's where you can just say, "Hey, I don't like

12    this wording, this has a typo," whatever, and then we will

13    finalize them, and then at some point tomorrow morning we can

14    have our final conference.  That's very straightforward where

15    you just say what your objections are to anything, and that

16    goes very quickly.  And, like I said, I instruct before

17    closings, so you can certainly use the instructions.  We will

18    have everything finalized.  We will have done the final

19    conference and you can use those during closings.

20          MS. GRADY:  And, Your Honor, in case they are being

21    worked on, for due process we should put on the record that we

22    have dropped our due process claims and dropped the case

23    against Hughes and Hart, so they should be --

24          THE COURT:  We took those out.  And any reference to

25    seven defendants, we have taken that out.  So, I think we are

```
 1    good.
 2              I will have Kristen e-mail.  Are you okay to get an
 3    e-mail copy?
 4              MR. TYRRELL:  Yes.
 5              THE COURT:  Okay.  Then if you want to we can search
 6    for something or whatever.
 7              Okay.  Anything else that we need to take up at this
 8    time?
 9              MR. TYRRELL:  Nothing further, no.
10              MS. GRADY:  No, Your Honor.
11              THE COURT:  Before we go, let me just quickly ask,
12    Mr. Gonzalez, have you accurately translated these proceedings
13    as you indicated you would do when taking the oath earlier
14    today?
15              THE INTERPRETER:  Yes, Your Honor, to the best of my
16    knowledge I have.
17              THE COURT:  All right.  And, Mr. Nicolas, have you
18    understood the translations provided and did you understand
19    everything that was translated to you?
20              MR. NICOLAS:  Yes, Your Honor.
21              THE COURT:  All right.  Everyone have a nice evening.
22    Be careful going home, and I will see you bright and early
23    tomorrow morning.
24              (Court is in recess.)
25
```

1

2                              *   *   *   *   *   *   *

3

4    I certify that the foregoing is a correct transcript from the
     record of proceedings in the above-entitled matter.

5

6    /S/ Stephanie K. Rennegarbe                    03/18/2019
     Certified Shorthand Reporter

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25