1

```
                    UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF ILLINOIS


OSBALDO JOSE-NICOLAS,        )      15-964
                             )
                             )
          Plaintiffs,        )
                             )
     Vs.                     )      East St. Louis, Illinois
                             )      August 15, 2018
NATHAN BERRY, et al.,        )
                             )
          Defendants,        )

              TRANSCRIPT OF TRIAL, VOLUME II
         BEFORE THE HONORABLE NANCY J. ROSENSTENGEL,
          UNITED STATES DISTRICT JUDGE, and a jury.


APPEARANCES:

For the Plaintiffs:       Loevy and Loevy
                          By:  Adair Crosley
                               Julie M. Goodwin
                               Sarah Copeland Grady
                          311 N. Aberdeen St.
                          Chicago, IL  60607

For the Defendants:       Office of the Attorney General
                          By:  Jeremy C. Tyrrell
                               Joseph D. Bracey, Jr.
                          500 South Second Street
                          Springfield, IL  62701

Court Reporter:           Barbara Kniepmann
                          750 Missouri Avenue
                          East St. Louis, IL  62202

Proceedings recorded by mechanical stenography, transcript
produced by computer.)
```

2

```
 1              (Whereupon the following proceedings were held in

 2    open Court, out of the presence of the jury.)

 3              THE COURT:  The matter of Jose-Nicolas versus Berry,

 4    et al., 15-964, is called for day two of jury trial.  Parties

 5    please identify themselves for the record.

 6              MS. GRADY:  Good morning.  Sarah Grady, Julie Goodwin

 7    and Adair Crosley on behalf of the plaintiff.

 8              MR. TYRRELL:  Good morning, Your Honor.  Jeremy

 9    Tyrrell and Joseph Bracey on behalf of the defendants.

10              THE COURT:  Good morning everyone.

11              After a little bit of a late start, people forget how

12    to drive when it rains, we do now have all of the jurors.

13    Mr. Diaz is here downstairs, but now I understand you wish to

14    call one of the defendants as the first witness, is that

15    correct?

16              MS. GRADY:  Yes, Your Honor, William Qualls as the

17    first witness.

18              THE COURT:  Mr. Diaz would be next?

19              MS. GRADY:  I think our next witness would be Aimee

20    Lang.

21              THE COURT:  Let me know when we have to take a break

22    before Mr. Diaz takes the stand.  Do you think that will be

23    after Miss Lang?

24              MS. GRADY:  I think it will probably be after lunch

25    at this point.
```

3

1          THE COURT:  All right.  Are we ready then for the

2     jury?  Deanna, if you would please swear the interpreter?

3     Miss Angel is back today as our interpreter.

4              (Whereupon the interpreter, Maria Laura Angel, is

5     sworn.)

6          THE COURT:  All right, Gary, if you would bring in

7     the jury?  Mr. Qualls, would you go ahead and come up and get

8     in the stand?

9          MS. GRADY:  Your Honor, I am sorry.  We do have one

10    issue that I think we need to take up outside of the jury

11    presence.  I am so sorry.

12             Your Honor, Sergeant Qualls testified at his

13    deposition that he had never been sued before and had never

14    been accused of excessive force before.  We have a number of,

15    small number of lawsuits, that we would like to introduce as

16    evidence that impeaches the witness.  The relevance of that is

17    it impeaches this witness' testimony, whose credibility is

18    essential to this case.  We intend to show those exhibits to

19    Defendant Qualls, although we agree they should not be

20    admitted as evidence in the case.  We think that we're

21    entitled to cross examine him about them.

22         THE COURT:  All right.  Mr. Tyrrell?

23         MR. TYRRELL:  I believe Miss Grady is misstating the

24    deposition testimony.  Lieutenant Qualls' deposition testimony

25    said, to my recollection, no, in response to a question about

4

1    allegations that Miss Morris made against him.  They are still

2    irrelevant, unduly prejudicial to my client and would result

3    in mini trials about each of the lawsuits being brought

4    against him.

5         MS. GRADY:  I can read the testimony.  "Have you ever

6    been accused by any other inmate at Menard Correctional Center

7    for using excessive force against them?"  Answer, "Not to my

8    knowledge, ma'am."

9         The evidence that we have shows that Sgt. Qualls not

10   only was accused of using excessive force, he was served with

11   the lawsuits, he answered those complaints, he denied the

12   allegations and he'll be entitled to say that, but we're

13   entitled to cross examine him about his deposition testimony

14   that was not about recollection, but was, to my knowledge, I

15   have never been accused about this before.

16        MR. TYRRELL:  That doesn't impeach him on the fact

17   that to his knowledge he had never been sued before at the

18   time of his deposition.  Clearly you can review the complaint

19   and answer he had been sued before, but he said to his

20   knowledge at that time he was not aware of any prior

21   accusations of force.

22        MS. GRADY:  Your Honor, the allegations, the service,

23   the answer, that all occurred before his deposition.  It

24   directly impeaches his testimony that to his knowledge, not to

25   my recollection, but to his knowledge he has never been

5

1   accused of this before.  That is critical in this case because

2   in opening statements and as I expect during the defendant's

3   exam, they are going to illicit that anything like this, any

4   allegations like this, they would remember.  I think that goes

5   to the heart of this case.

6        MR. TYRRELL:  I disagree, Your Honor.  These are also

7   complaints.  They are not including the merit review order to

8   my understanding based on the review of plaintiff's exhibit

9   that was provided to me.  They are not merit review orders,

10  not an actual finding there was a complaint made against him.

11       THE COURT:  Read the question to me again he was

12  asked in the deposition.

13       MS. GRADY:  Question, "Have you ever been accused by

14  any other inmate at Menard Correctional Center for using

15  excessive force against them?"

16       THE COURT:  You said these lawsuits had been served,

17  because often they are filed.

18       MS. GRADY:  Correct.  They were served, a 1915(a)

19  order was entered.  I am not going to raise that because I

20  don't think that is part of my impeachment.  So Defendant

21  Qualls was not only served, he answered the complaint.

22       THE COURT:  I'll let you get into it in a very

23  limited basis.  We're not going to have mini trials, but if

24  you can show that he had been served with the complaint before

25  that answer was given, I think you have to take his answer.

6

1       So this is a bigger issue than something to take up

2   in a minute before the jury is coming in, but I'll let you get

3   into it briefly, but we're not going to delve into all of the

4   merits of each of the lawsuits.

5       MS. GRADY:  Understood, Your Honor.

6       (Whereupon the following proceedings were held in

7   open Court, in the presence of the jury.)

8       THE COURT:  Be seated everyone.  Welcome back, ladies

9   and gentlemen.  It is nice to see you all back.  Glad you made

10  it in.  Traffic was more than a little crazy this morning, so

11  we're getting off to a little later start than I had hoped.  I

12  am glad everyone here is safe and sound.

13      So we're going to proceed now with the plaintiff's

14  case.  The plaintiff has called one of the defendants.  Is it

15  Sergeant?

16      LT. QUALLS:  Lieutenant.

17      THE COURT:  Lieutenant Qualls.  So Deanna, if you

18  would please administer the oath?

19      LT. WILLIAM QUALLS, PLAINTIFF'S WITNESS, SWORN

20                      DIRECT EXAMINATION

21  Questions by Ms. Grady:

22      COURTROOM CLERK:  State your name and spell your last

23  name for the record.

24  A.    William Qualls, Q U A L L S.

25  Q.    Good morning, sir.

7

1   A.      Good morning.

2   Q.      You are a lieutenant at Menard Correctional Center,

3   correct?

4   A.      Yes, ma'am.

5   Q.      How long have you worked at the prison?

6   A.      20 years and eight months, give or take.

7   Q.      I want to talk to you about what happened on

8   February 5th of 2014.  You were a sergeant at the west cell

9   house at that time, correct?

10  A.      Yes, ma'am.

11  Q.      As a sergeant you were in charge of supervising the

12  west cell house, right?

13  A.      Yes, ma'am.

14  Q.      Including the line movement in and out of the cell

15  house?

16  A.      Yes.

17  Q.      When the lines were moving, can you tell the jury where

18  you would have been standing?

19  A.      I would have been standing at the head of the gallery,

20  at the very front where the grill doors are.

21  Q.      Right across from the holding cell?

22  A.      Yes.

23  Q.      It is your testimony you don't remember anything that

24  happened in the cell house that day, correct?

25  A.      Yes.

8

1   Q.      But it is your testimony that you deny beating

2   Mr. Nicolas up on February 5th of 2014, right?

3   A.      Yes, it is.

4   Q.      If you don't remember, how can you deny it?

5   A.      Because I also don't remember robbing a bank two years

6   ago.

7   Q.      So you agree that the allegations like the ones

8   Mr. Nicolas are making against you, they are serious?

9   A.      Yes, ma'am, they are.

10  Q.      And they are allegations that you would be honest

11  about, right?

12  A.      Yes, ma'am.

13  Q.      They are allegations that you would remember?

14  A.      Yes, ma'am.

15  Q.      It is your testimony that Mr. Nicolas is the first

16  person to have ever made allegations like that against you,

17  right?

18  A.      It apparently is not the first allegation to have ever

19  been made against me.  I have worked there for 20 plus years.

20  Allegations are made almost on daily basis of something

21  happening somewhere in that prison.

22  Q.      Well, it is not just allegations about something

23  happening somewhere in the prison.  This is an allegation that

24  you pulled a prisoner out of the holding cell, sucker punched

25  the prisoner, took him to the shower area and continued to

9

1  punch and beat and kick him until he was lying on the ground.

2  Those are serious allegations, right?

3  A.    Yes, ma'am, it is.

4  Q.    Those are allegations that you would remember, right?

5  A.    I remember them especially because I am in Court

6  because of the allegations.

7  Q.    You would remember if allegations like those had been

8  made against you in the past, right?

9  A.    Possibly so.

10 Q.    Well, you gave a deposition in this case, correct?

11 A.    Yes, I did.

12 Q.    And that happened just about a year ago, right?

13 A.    A little over a year, yes.

14 Q.    July 31st of 2017.  That sound about right to you?

15 A.    Yes, ma'am.

16 Q.    Before you gave testimony at that deposition, you were

17 put under oath, right?

18 A.    Yes, ma'am.

19 Q.    Just like you were put under oath today?

20 A.    Yes, ma'am.

21 Q.    And at that deposition you gave -- you were asked this

22 question and you gave this answer.  Question, "Have you ever

23 been accused by any other inmates at Menard Correctional

24 Center for using excessive force against them?"  Answer, "Not

25 to my knowledge, ma'am."  Were you asked that question and did

10

1    you give that answer on July 31st of 2017 at your deposition?

2    A.    Yes, ma'am, I did.

3    Q.    Now, I am going to show you a copy of a filed legal

4    Complaint.  Can you see it on your screen?

5    A.    No, nothing up here.  There it is.

6    Q.    You see that this Complaint refers to a lawsuit brought

7    against you by a man named David Bentz?

8    A.    Yes, ma'am.

9    Q.    You see your name there as one of the defendants?

10   A.    Yes, I do.

11   Q.    I would like to show you page 43 from this exhibit.

12   This is a receipt for service on you by the U.S. Marshal

13   Service, correct?

14   A.    Yes, ma'am, it is.

15   Q.    I would like to show you page 44 of this exhibit.  This

16   shows that an attorney entered an appearance on your behalf in

17   this case, correct?

18   A.    It appears so, ma'am.

19   Q.    You see there that a woman named JoAnn Scher (phonetic)

20   entered an appearance on behalf of you and some other

21   defendants?

22   A.    Yes, ma'am.

23   Q.    That was filed on June 19th of 2014, right?

24   A.    Yes, ma'am.

25   Q.    About three years before you sat for your deposition in

11

1    this case, right?

2    A.      Yes, ma'am.

3    Q.      Now let's turn back to Mr. Bentz's complaint.  I am

4    going to go to the fourth page of this complaint.  Do you see

5    where Mr. Bentz alleges in paragraph nine --

6            MR. TYRRELL:  Objection, Your Honor, relevance.  May

7    we approach at the side bar?

8            THE COURT:  Let me see counsel at the side bar.

9        (Whereupon the following proceedings were held at sidebar,

10   out of the hearing of the jury.)

11           THE COURT:  What is the objection?

12           MR. TYRRELL:  Your Honor, I understand the rulings,

13   and we already discussed this issue.  I don't think it is

14   necessary to read the allegations in the Complaint.  I think

15   it is appropriate for Miss Grady to say there was an excessive

16   force claim made against him, ask the client to review the

17   paragraph and it would cure the unduly prejudicial nature of

18   this Complaint and not result in a mini trial.

19           THE COURT:  I don't want to get into -- the whole

20   point was he was sued before for excessive force.  Just ask

21   him to read it and then confirm that it was an allegation of

22   excessive force without getting more into it.  Do we have

23   other lawsuits beyond this one?

24           MS. GRADY:  I have other lawsuits.  I don't intend to

25   introduce the allegations, but he also testified he has never

12

1    been sued before.  Here is a lawsuit.  You were served with

2    it.  Here is another lawsuit.  This testimony is not truthful.

3    I don't intend to get into any of the allegations.

4            THE COURT:  Okay.

5            (Whereupon the sidebar proceedings were concluded.

6    The following proceedings were held in open Court.)

7    Questions By Ms. Grady:

8    Q.    Sgt. Qualls, can you review paragraph 19 of the

9    Complaint as it has been presented to you in Plaintiff's

10   Exhibit 27?

11   A.    Ma'am, may I make one correction?  I am a lieutenant

12   now, not sergeant.

13   Q.    Thank you.

14   A.    I appreciate that.  Thank you.

15   Q.    Lieutenant, can you please review paragraph 19?

16   A.    Yes, ma'am.

17   Q.    You agree these allegations say that you used excessive

18   force, correct?

19   A.    I do.

20   Q.    Those are serious allegations, aren't they?

21   A.    Yes, ma'am.

22   Q.    Those are not just allegations that somebody somewhere

23   did something at the prison, right?

24   A.    No, they are not.

25   Q.    They are allegations that you beat someone up?

13

1    A.      Yes, ma'am.

2    Q.      You were aware of those allegations in July of 2014

3    when you answered -- when you filed an answer to this case,

4    correct?

5    A.      What was the date on this again, please?

6    Q.      Well, do you see there the date of the Complaint filed

7    was May 16 of 2014.

8    A.      Yes, ma'am.

9    Q.      And I am going to show you Plaintiff's Exhibit 27, page

10   46.  This is an answer filed from you, filed on your behalf,

11   correct?

12   A.      Yes.

13   Q.      It answers the allegations admitting some, denying

14   others, and saying you don't know about some more, correct?

15   A.      Yes, ma'am.

16   Q.      And that was filed on July 25th of 2014?

17   A.      Yes, ma'am.

18   Q.      As of that date, you were aware of Mr. Bentz's

19   allegations against you that you had used excessive force

20   against him, correct?

21   A.      Yes, ma'am.

22   Q.      So when you testified at your deposition on July 31st

23   of 2017 in this case that you had never been accused of

24   excessive force before, that wasn't the truth, was it?

25           MR. TYRRELL:   Objection, Your Honor.  That misstates

14

1   testimony.

2          THE COURT:   Overruled.

3   Questions By Ms. Grady:

4   Q.     Let's look at your deposition.   You were asked this

5   question, "Have you ever been accused by any other inmate at

6   Menard Correctional Center for using excessive force against

7   them?"  Answer, "Not to my knowledge, ma'am."  That wasn't the

8   truth, was it?

9   A.     At that point in time I may have misspoke a word as far

10  as to my knowledge or to my recollection.   It had been three

11  years and I did not go to Court, so it was not foremost in my

12  mind.   I have never been to a deposition before.   This is my

13  first time in Court ever.

14  Q.     Well, Lt. Qualls, being accused of excessive force you

15  testified is a serious thing, correct?

16  A.     Yes, it is.

17  Q.     So it is your testimony that you just forgot all about

18  that other time you were accused of excessive force?  Is that

19  your testimony here today?

20  A.     Times or time?

21  Q.     How many times have you been accused of excessive

22  force, sir?

23  A.     Ma'am, that was your word, not mine.   You said times.

24  Q.     How many times have you been accused of excessive

25  force?

15

1    A.     This time with Mr. Nicolas, this time with Mr. Bentz.

2    Q.     Any others?

3    A.     Not to my recollection, no.

4    Q.     And I guess it is your testimony now that there may be

5    others that you just don't remember?  Is that true?

6    A.     No, there is not.  To my recollection there are only

7    two to my knowledge from my recollection.  Only two as of

8    today that I am aware of accusations of excessive force

9    against myself.

10   Q.     It is your testimony that you would remember those

11   allegations, correct?

12   A.     If I had gone to Court and it was foremost in my mind,

13   then, yes, I probably would have.

14   Q.     Well, you testified that at your deposition you took

15   the exact same oath you took here today.  Is that true?

16   A.     Yes, ma'am.

17   Q.     Did you take that deposition less seriously than you

18   took your oath that you made here in Court today?

19   A.     No, I did not.

20   Q.     Same oath?

21   A.     Every oath I take, I take with all seriousness.

22   Q.     So it is your testimony that although you testified at

23   your deposition there were no other allegations, not I don't

24   remember or there might have been, but no other allegations,

25   so it is your testimony that we should believe you here today

1  that, yeah, there was one more, but that's it.  Is that what

2  you are asking us to believe?

3  A.    I am asking you to believe that that was not foremost

4  in my mind and I may have misspoke a word by saying to the

5  best of my knowledge or to the best of my recollection.

6  Q.    Well, let's talk about your testimony about

7  accusations.  You testified at your deposition that you had

8  never even been sued before, correct?

9  A.    Yes, ma'am, I believe.

10  Q.    That wasn't the truth either, was it?

11  A.    Again, I have never been to Court for anything.

12  Q.    But you received notice of this case, correct?

13  A.    For the Mr. Nicolas case?

14  Q.    Correct, the case we're here on today.

15  A.    Yes.

16  Q.    You participated in that case after being served but

17  before coming to Court today, right?

18  A.    As in the deposition?  Yes.

19  Q.    Well, you filed an answer in this case denying the

20  allegations made against you, right?

21  A.    Yes, ma'am.

22  Q.    Did you take that seriously?

23  A.    Yes, I did.

24  Q.    And you paid attention to the allegations that have

25  been made against you by Mr. Nicolas in his Complaint, right?

17

1   A.      Again, because I am in Court, yes, that tends to sit a

2   little more in your mind.

3   Q.      Well, you are in Court today?

4   A.      Yes, ma'am.

5   Q.      But you filed an answer to this case a long time ago,

6   right?

7   A.      I could not tell you how long ago it was.

8   Q.      Did you take your responsibility to be truthful in your

9   answer seriously?

10  A.      Yes, I did.

11  Q.      You told us you took your deposition testimony

12  seriously too, correct?

13  A.      Yes, ma'am.

14  Q.      At your deposition you were put under oath and asked

15  this question and gave this answer.

16  A.      "Have you ever been named as a defendant in a lawsuit?"

17  Answer, "Not to my knowledge, no."  Did you give that answer

18  to that question?

19  A.      Again, yes, I did, and as I stated, I misspoke a word

20  as in not to my knowledge, as in not to my recollection.

21  Q.      Before just now, have you ever taken any steps to

22  correct that testimony?

23  A.      No, I have not.

24  Q.      Did you ever notify the plaintiff or anybody else that

25  that testimony, that was not actually true?

18

1    A.      I was not aware of misspeaking the word.

2    Q.      Did you ever ask your attorney to review your

3    deposition testimony?

4    A.      At the end of the deposition it was reviewed by the

5    attorney.

6    Q.      Did you ever look at your deposition testimony?

7    A.      I did yesterday, ma'am.

8    Q.      Did you ever bring to anyone's attention that you had

9    misspoken in any way?

10   A.      That was never brought to my attention that I may have

11   misspoke a word.

12   Q.      Well, is it your testimony here today that when you

13   said, "Not to my knowledge, no," that was just a misstatement

14   and what you had really meant to say was yes?  Is that your

15   testimony?

16   A.      That was not my testimony.

17   Q.      Let's look at Plaintiff's Exhibit 27 again.  I am going

18   to show you another legal Complaint.  You see this Complaint

19   refers to a lawsuit filed against you by a man named Michael

20   Widmer?

21   A.      Yes, ma'am.

22   Q.      Michael Widmer lists Menard Correctional Center as his

23   present place of confinement, right?

24   A.      Yes, ma'am, he does.

25   Q.      Here is another receipt for service on you of

1    Mr. Widmer's lawsuit, right?

2    A.    Yes, ma'am, it is.

3    Q.    It shows that you were served on March 17th of 2014,

4    correct?

5    A.    Yes, ma'am, it does.

6    Q.    That is about three years before you sat for deposition

7    in this case and testified under oath that you had never been

8    sued before, right?

9    A.    Yes, ma'am.

10   Q.    We have already talked about Mr. Bentz's lawsuit.  I am

11   going to show you page 101.  This is a third Complaint showing

12   a lawsuit filed by a man named Kelvin Merritt.  Do you see

13   that?

14   A.    I do.

15   Q.    I am going to turn to the third page here.  That shows

16   that this lawsuit was brought against you as a defendant,

17   correct?

18   A.    Yes, ma'am, it does.

19   Q.    I am going to show you a Waiver of Service of Summons.

20   Do you see this?

21   A.    Yes, ma'am.

22   Q.    That is your signature right there, right?

23   A.    Yes, ma'am, it is.

24   Q.    Acknowledging that you have been served a copy of

25   Mr. Merritt's Complaint?

1    A.      Yes, ma'am.

2    Q.      You signed that on July 1st of 2016, right?

3    A.      Yes, ma'am.

4    Q.      Just about one year before you sat for deposition in

5    this case, correct?

6    A.      Yes, ma'am.

7    Q.      Now I am going to show you the answer filed on your

8    behalf, filed on October 19th of 2016, right?

9    A.      Yes, ma'am.

10   Q.      That is just about nine months before you sat for this

11   deposition, right?

12   A.      Yes, ma'am.

13   Q.      The deposition where you said under oath that you had

14   never been sued before?

15   A.      Yes, ma'am.

16   Q.      So when you said at your deposition that this was the

17   first time you had ever been sued, that was not the truth,

18   right?

19   A.      That I had never been sued or never named as a

20   defendant?

21   Q.      Well, let's look back at that testimony.  You testified

22   when asked this question, "Have you ever been named as a

23   defendant in a lawsuit?"  Your answer was, "Not to my

24   knowledge, no."

25   A.      Your question was been sued, is that correct?

1    Q.     Let me ask you this way.  Your testimony that you had

2    never been named as a defendant, that was a lie, wasn't it?

3    A.     No, it was not.

4    Q.     We know it wasn't the truth.  We just went through the

5    Complaints that you acknowledged you received service of,

6    right?

7    A.     Yes, ma'am.

8    Q.     So it is your testimony that what you said in your

9    deposition was not truthful, correct?

10   A.     Truthful or remembered?

11   Q.     Well, sir, we're not talking --

12   A.     If something is not remembered, does that make it a

13   lie?

14   Q.     Sir, we're not talking about whether you were sued ten

15   times or 15 times.  You testified that you --

16   A.     That seems to be what you are getting at though.

17   Q.     Well, sir, we're talking about whether you had ever

18   been named in a single lawsuit, and your testimony was no.

19   A.     Not to my knowledge, no, of which I probably missed

20   both that word not to my recollection.  I did not remember any

21   of the other ones before from Mr. Widmer or Mr. Bentz.

22   Q.     Because you didn't take them seriously, is that right?

23   A.     That is not -- I could not tell you the reason why I

24   did not remember it.

25   Q.     Let's turn back to the events at issue in this lawsuit.

22

1    It is your testimony that you don't recall any interactions

2    with Mr. Nicolas in the west cell house, right?

3    A.    That is correct.

4    Q.    Instead, the only thing that you recall is Osbaldo

5    Nicolas slipped and fell on some ice while you were walking

6    with him to the segregation unit, correct?

7    A.    Yes.

8    Q.    And today, four and a half years after the event, this

9    fall is the one thing that you do remember, right?

10   A.    Yes, ma'am.

11   Q.    You recall that fall in detail, right?

12   A.    Fairly well, yes.

13   Q.    It is your testimony that when Mr. Nicolas slipped on

14   the ice, he fell onto his chestm and his stomach, right?

15   A.    Yes, he did.

16   Q.    And it is your testimony that he was handcuffed behind

17   his back?

18   A.    As would any inmate that was being escorted to

19   segregation would be, sure.

20   Q.    He slips and falls on the ice.  It is your testimony

21   while he falls on the pavement, he doesn't hit his head,

22   correct?

23   A.    I did not say that he did not hit his head.

24   Q.    Let's look at your deposition in this case.

25   A.    Yes, ma'am.

23

1   Q.     At your deposition were you asked this question and did

2   you give this answer?

3   A.     Yes, I did.

4   Q.     You got to -- let me do the question and answer first.

5   Question, "Did his head hit the pavement?"  Answer, "Not that

6   I am aware of, no."  Were you asked that question and did you

7   give that answer?

8   A.     I gave that answer, yes.

9   Q.     You didn't see him hit his head on the pavement at any

10  point when he slipped on the ice, right?

11  A.     I did not.

12  Q.     It is your testimony he fell with enough force to knock

13  you down too, right?

14  A.     Pulled me down with him on the ice.  His feet slid into

15  my feet.  I am actually hanging on to his forearm.  He slides

16  into me, taking me by surprise and takes me down with him.

17  Q.     You landed on the left side of his back and hip.  That

18  is your testimony, right?

19  A.     Yes, ma'am.

20  Q.     Now it is your testimony that Mr. Nicolas had no

21  injuries from this fall, correct?

22  A.     None that I am aware of, no.

23  Q.     Well, you were walking him, right?

24  A.     Yes, ma'am.

25  Q.     And it is your testimony that when he fell you picked

24

1   him up, right?

2   A.     Yes, ma'am.

3   Q.     And it was your responsibility to be in charge of

4   Mr. Nicolas, right?

5   A.     Yes, ma'am.

6   Q.     It was your responsibility to make sure that he got

7   safely from one point to another, right?

8   A.     Yes, ma'am.

9   Q.     So you looked at him, right?

10  A.     Did I walk around in front of him and look at him?  No,

11  I continued escorting him from behind, which is standard

12  escort position, approximately 45 degrees from the individual.

13  Q.     Okay.  So it is your testimony he goes down, you go

14  down on top of him and you, without looking at him from the

15  front at any point, help him up, is that true?

16  A.     Yes, ma'am.

17  Q.     So you lift him up from behind?

18  A.     I grabbed him under his armpit on his left arm and at

19  his left elbow and assisted him back to his feet.

20  Q.     Did you ask him if he was okay?

21  A.     I did not and he never stated that he was hurt.

22  Q.     You created an incident report about this day, right?

23  A.     Yes, ma'am, I did.  I wrote one, not created one.

24  Q.     That is your handwriting.  I am going to show you what

25  is marked as Exhibit 217.  That is your handwriting?

1    A.    Yes, ma'am, it is.

2    Q.    That is your signature at the bottom there?

3    A.    Yes, ma'am, it is.

4          MS. GRADY:  Your Honor, we would move for admission

5    of Exhibit 217.

6          THE COURT:  Any objection?

7          MR. TYRRELL:  No objection, Your Honor.

8          THE COURT:  217 will be admitted.

9       (Whereupon  Plaintiff's Exhibit 217 was admitted.)

10   Questions By Ms. Grady:

11   Q.    Now you contacted a nurse from health care to see

12   Mr. Nicolas in segregation, right?

13   A.    Yes, ma'am.

14   Q.    But that is not because you saw any injuries of

15   Mr. Nicolas, right?

16   A.    No, ma'am.

17   Q.    It is your testimony that is just your practice,

18   correct?

19   A.    Yes.

20   Q.    You told her what you put here in your incident report.

21   Did you tell her what you put in your incident report, sir?

22   A.    Did I read this entire incident report to her?  No.

23   Q.    Well, you told her--

24   A.    I told her that I had escorted an inmate to seg and she

25   had to come evaluate him.

26

1    Q.    You told her the inmate had slipped on the ice,

2    correct?

3    A.    I do not recall saying that, no.

4    Q.    Well, let's look at your deposition in this case.  Were

5    you asked this question and did you give this answer?

6    Question, "Well what did you say to the nurse, if anything?"

7    Answer, "Basically just reiterated what I wrote in the 434

8    saying that we had fallen on the ice and to please take a look

9    at him."  Were you asked this question and did you give this

10   answer?

11   A.    Yes, I did.

12   Q.    Was that truthful testimony or is that wrong?

13        MR. TYRRELL:  Sorry, Your Honor and Miss Grady.  I

14   don't believe this should be published to the jury.  It has

15   not been admitted.

16        THE COURT:  Let's kill it.  There you go.

17        MR. TYRRELL:  Thank you.

18   Questions By Ms. Grady:

19   Q.    Sir, you told Defendant Lang that Osbaldo Nicolas had

20   fallen on the ice, right?

21   A.    According to this deposition I did.

22   Q.    Are you disputing your testimony?

23   A.    No, ma'am, I am not.  What I am disputing is the fact

24   that this was how many years ago and that I cannot personally

25   recall saying that.

27

1    Q.    Well, the deposition was a year ago, right?

2    A.    Yes, ma'am.

3    Q.    And it was your testimony that you recalled telling her

4    that then?

5    A.    Yes, it was.

6    Q.    You remembered three and a half years after the

7    incident, but you don't remember today?

8    A.    What was your question?

9    Q.    Is it your testimony that you don't remember today,

10   your conversation?

11   A.    That I don't remember what happened today?

12   Q.    Sir, is it your testimony that you don't remember today

13   the conversation that you had with Miss Lang?

14   A.    That conversation happened on what date?

15   Q.    Do you remember the conversation that you had with Miss

16   Lang on February 5th of 2014?

17   A.    No, I do not.

18   Q.    Did you tell her that you beat Mr. Nicolas up?

19   A.    Again, no, I did not.

20   Q.    Did you tell her Mr. Nicolas had been injured?

21   A.    According to my deposition, I did tell her that.  We

22   had fallen on the ice.

23   Q.    You told her that Mr. Nicolas was hurt?

24   A.    I asked her if she could evaluate him.  I did not say

25   he was hurt.

28

1   Q.     Okay.  Because it is your testimony he wasn't hurt,

2   right?

3   A.     To my knowledge he was not hurt.  I am not a medical

4   professional.

5   Q.     Okay.  But you are a person who can see cuts and

6   bruises and bleeding just like anybody else, right?

7   A.     Obviously, yes.

8   Q.     If you had seen that you would have documented that,

9   right?

10  A.     Yes, I would have.

11  Q.     In fact, your incident report -- Your Honor, if we

12  could publish to the jury?  This is Exhibit 217, which has

13  already been admitted into evidence.

14         Your incident report affirmatively asks you whether

15  there are any injuries involved in the incident, right?

16  A.     Yes, it does.

17  Q.     What was your answer to the question?

18  A.     No.

19  Q.     You understand that an incident report is an important

20  document, correct?

21  A.     Yes, ma'am, it is.

22  Q.     It is a document that you are required to fill out any

23  time something unusual happens, right?

24  A.     Yes, ma'am, it is.

25  Q.     It is important to get the details right, correct?

1    A.    Yes, ma'am, it is.

2    Q.    Because this is an official report?

3    A.    It is an official document that can and will go to

4    Court, obviously, because it did.

5    Q.    So it is important to pay attention to the things on

6    this form, right?

7    A.    Yes, ma'am, it is.

8    Q.    You filled out many of these forms in your career,

9    right?

10   A.    Several, yes.

11   Q.    So you know one of the questions that this form is

12   going to ask you is whether that incident led to any injuries,

13   correct?

14   A.    Yes, ma'am.

15   Q.    So you paid attention so that you would know in filling

16   out this form the answer to that question, right?

17   A.    To the best of my knowledge, there were no injuries to

18   Mr. Osbaldo Nicolas.

19   Q.    I want to show you what has been marked as Plaintiff's

20   Exhibit 7.  It is not in evidence, although I do believe there

21   is no objection.  If there is no objection, we would like to

22   admit it.

23          THE COURT:  This is Exhibit 7?

24          MS. GRADY:  Correct.

25          THE COURT:  Any objection?

30

```
 1              MR. TYRRELL:  No objection, Your Honor.

 2              THE COURT:  Okay, so 7 will be admitted and published

 3      to the jury.

 4          (Whereupon  Plaintiff's Exhibit 7 was admitted.)

 5      Questions By Ms. Grady:

 6      Q.    You see this is a medical record?

 7      A.    Yes, ma'am, I do.

 8      Q.    It is a record created on February 5th of 2014?

 9      A.    Yes, ma'am, it is.

10      Q.    It is created at 11:55 a.m., right?

11      A.    Yes, ma'am, it was.

12      Q.    Just after when you say the fall occurred, right?

13      A.    Just after -- exactly what time did the fall happen?

14      Q.    Well, you filled out your incident report, right?

15      A.    Yes, ma'am.  If I could see it, there would be a time

16      and date on it.

17      Q.    Okay.  Just to be clear, that time and date would be

18      important information to get, right, correct?

19      A.    Yes, ma'am, it would.

20      Q.    The date and time of the incident that you have listed

21      in your incident report is 12:30, correct?

22      A.    Yes.

23      Q.    It is your testimony that based on that, this fall

24      occurred at 12:30?

25      A.    Approximately, yes, ma'am.
```

31

1  Q.    As an officer in the west cell house, do you have to

2  fill out an incident report if you see a prisoner with

3  injuries?

4  A.    Myself as an officer?

5  Q.    Yes.

6  A.    I was not -- this incident did not occur when I was an

7  officer in the west cell house.  At this time I was a

8  sergeant.

9  Q.    Right.  You were the supervisor of the west cell house,

10  right?

11  A.    Yes, ma'am.

12  Q.    So if you saw an inmate with injuries, you were

13  required to fill out an incident report documenting that fact,

14  is that right?

15  A.    Yes, ma'am.

16  Q.    You haven't seen any incident report other than the one

17  we're discussing now about Mr. Nicolas that is dated

18  February 5th of 2014 and created by you, right?

19  A.    I did not create an incident report, ma'am.  That would

20  imply fictitious information.

21  Q.    Well, these are forms, right?  When you get the form,

22  the form is blank?

23  A.    The form is blank and it is filled out to the best of a

24  person's knowledge, truthfully filled out.

25  Q.    It is important to get all of the details right, right?

32

1    A.    Again, to the best of that person's knowledge.

2    Q.    You never saw another incident report related to

3    Mr. Nicolas that you filled out on April 5th of 2014?

4    A.    There would have been only one.

5    Q.    Because you never saw Mr. Nicolas, according to your

6    testimony, with any injuries at any point in time on

7    February 5th of 2014?

8    A.    No, ma'am, I did not.

9    Q.    It is your job as sergeant to make sure that the

10   prisoners in the west cell house don't appear suddenly with

11   injuries, right?

12   A.    If they do, then you would inquire as to what happened

13   and fill out an incident report on it.

14   Q.    You pay attention to that, right?

15   A.    Yes, you try to.  Do you know how many inmates are at

16   Menard?  Do you know how many inmates are in the west cell

17   house?

18   Q.    And you agree that up until the point that Osbaldo

19   Nicolas went to segregation, he was in the west cell house,

20   right?

21   A.    Yes, ma'am, he was.

22   Q.    Because you escorted him from the west cell house?

23   A.    To north 2 segregation.

24   Q.    In north 2, that refers to the housing unit where the

25   segregation unit is located, right?

33

1    A.     Yes, ma'am.

2    Q.     So let's go back to Exhibit 7.  You see that at 11:55

3    this medical record shows that Mr. Nicolas reports, "My head

4    hurts, left wrist, right jaw and legs."  Do you see that?

5    A.     Yes, ma'am.

6    Q.     And you don't have any explanation for how he obtained

7    those injuries, right?

8    A.     No, ma'am, I do not.

9    Q.     You see that the medical professional who completed

10   this record noted seeing abrasions on Mr. Nicolas' left side

11   of his forehead.  Do you see that?

12   A.     As I read, superficial abrasion noted to left side of

13   forehead, hairline.

14   Q.     That is an abrasion, right?

15   A.     It would be superficial abrasion, yes.

16   Q.     You didn't see any abrasion right?

17   A.     No, I did not.

18   Q.     You don't have any explanation for how that got there,

19   right?

20   A.     No, ma'am, I do not.

21   Q.     Let's go back to your incident report.  Now you said

22   you would have paid careful attention to filling out this

23   incident report and written the right date and time on there,

24   right?

25   A.     Yes, ma'am.

34

1    Q.    You said this happened at 12:30?

2    A.    I wrote the incident report at 12:30.

3    Q.    That is not what the incident report says.  It asks for

4    the date and time of incident, right?

5    A.    It is what it asks for, yes, ma'am.

6    Q.    All right.  It is your testimony here today that is not

7    when the incident occurred, is that correct?

8    A.    That incident happened, ma'am.

9    Q.    But it is your testimony -- is it your testimony here

10   today it occurred at 12:30, 40 minutes after Mr. Nicolas was

11   already in north 2 cell house?

12   A.    I do not have an answer as to why the times are

13   different.

14   Q.    Okay.  You were interviewed by a lieutenant from

15   internal affairs, correct?

16   A.    I believe Mr. Reichert, Lt. Reichert.

17   Q.    Okay.  I am going to show an exhibit that hasn't been

18   entered into evidence yet.  I want to show you Plaintiff's

19   Exhibit 8, page 12.  This is an interview form.  Do you see

20   that?

21   A.    I do not.  There is nothing on my screen.

22   Q.    Oh, I am sorry about that.  I am sorry, my fault.

23   Thank you.  I am still new to the technology.  You see this

24   document reports an investigational interview was conducted

25   with you?

35

1   A.      Yes, ma'am.

2   Q.      That investigational interview occurred on March 5th of

3   2014 at 8:47 a.m., correct?

4   A.      Yes, ma'am.

5   Q.      That is your signature at the bottom there?

6   A.      Yes, it is.

7   Q.      For the place where the interviewee is supposed to

8   sign?

9   A.      Yes, ma'am.

10  Q.      Then looking at the second page of this portion of the

11  exhibit, the form says "Interviewee substantially stated."  Do

12  you see that?

13  A.      Yes, ma'am, I do.

14  Q.      There are handwritten notes there?

15  A.      Yes, ma'am.

16  Q.      That is your signature at the bottom of the page,

17  right?

18  A.      Yes, ma'am, it is.

19  Q.      This is what you told Lt. Reichert about what happened

20  on February 5th of 2014, correct?

21  A.      Yes, ma'am, it is.

22          MS. GRADY:  Your Honor, I would move for admission of

23  Plaintiff's Exhibit 8, pages 12 to 13.

24          THE COURT:  All right.  Now 1 through 5 had

25  previously been admitted?

36

1          MS. GRADY:  Correct.

2          THE COURT:  Any objections to pages 12 and 13?

3          MR. TYRRELL:  No, Your Honor.

4          THE COURT:  All right, they will be admitted.

5      (Whereupon  Plaintiff's Exhibit 8, pages 12 and 13 were

6  admitted.)

7          MS. GRADY:  May we present them to the jury?

8          THE COURT:  You may.

9          MS. GRADY:  Thank you.

10  Questions By Ms. Grady:

11  Q.    You don't remember telling Lt. Reichert anything that

12  isn't written in this form, correct?

13  A.    I do not recall this interview correctly, no.

14  Q.    Well you would have reviewed this document before

15  signing it to make sure that it accurately summarized the

16  statements you made to Lt. Reichert on March 5th of 2014,

17  right?

18  A.    Yes, ma'am.

19  Q.    Because this was an important thing that was happening,

20  right?

21  A.    Yes, ma'am.

22  Q.    You were being interviewed by internal affairs about

23  allegations of misconduct by you and the officers you

24  supervised in the west cell house, right?

25  A.    Yes, ma'am.

37

1    Q.     You took that allegation seriously, right?

2    A.     Yes, ma'am.

3    Q.     You made sure to tell Lt. Reichert everything that was

4    important about that day?

5    A.     Yes, ma'am.

6    Q.     Everything you remembered?

7    A.     Everything that I could remember at that time, yes,

8    ma'am.

9    Q.     You knew that you were expected to tell the truth about

10   what happened on February 5th of 2014, right?

11   A.     Yes, ma'am.

12   Q.     You told Lt. Reichert that you did remember that day,

13   correct?

14   A.     I believe here it states that I state that I vaguely

15   remember February 5th.

16   Q.     You told Lt. Reichert that you remembered Mr. Diaz and

17   Mr. Jose Nicolas, right?

18   A.     Yes, ma'am.

19   Q.     You remembered that they were in the holding cell

20   because some hooch had been found in the cell, right?

21   A.     Yes, ma'am.

22   Q.     In fact, you remembered that there was a school line

23   somewhere, right?

24   A.     Yes, ma'am.  It says here there was a line of

25   approximately six to eight that had just returned.

38

1   Q.    So you remembered exactly how many inmates were in the

2   school line, right?

3   A.    Six to eight is not an exact number, ma'am.

4   Q.    Pretty close approximation, don't you think?

5   A.    Well, it is not 50, but it is not two either.

6   Q.    Okay.  You were asked about whether staff used force or

7   were otherwise inappropriate, right?

8   A.    Yes, ma'am.

9   Q.    It was your statement to Lt. Reichert that staff were

10  not inappropriate?

11  A.    That's correct.

12  Q.    In fact, you say there were no issues with the inmates,

13  right?

14  A.    Yes, ma'am.

15  Q.    You say they were compliant?

16  A.    Yes, ma'am, as in they were not combative.  They did

17  not refuse to be cuffed up.  They did not fight with us.  They

18  did not --

19  Q.    You didn't say any of that.  You just said they were

20  compliant?

21  A.    They were compliant, yes.

22  Q.    You knew it was important to get this right, right?

23  A.    Mr. Reichert would ask a question, I would answer the

24  question.

25  Q.    He asked you were the inmates compliant on February 5th

39

1   of 2014 and your answer was yes, wasn't it?

2   A.      Yes, they were compliant.

3   Q.      Okay.   I want to show you what has been marked as

4   Exhibit 212 and it has not -- excuse me -- Exhibit 5, but it

5   has not been admitted into evidence yet.   You created another

6   document on February 5th of 2014, didn't you?

7   A.      Yes, ma'am, I did.

8   Q.      That document was that disciplinary report, right?

9   A.      Yes, it is.

10  Q.      With the disciplinary report accusing Mr. Nicolas of

11  repeatedly disobeying your orders, right?

12  A.      Yes, ma'am.   That is not combative.

13  Q.      When you told Lt. Reichert the inmates were compliant,

14  that wasn't the truth, was it?

15  A.      They were either combative or compliant.

16  Q.      You wrote a disciplinary report accusing Mr. Nicolas of

17  not being compliant, right?

18  A.      Of not being combative.

19  Q.      Well, that is not what your disciplinary report says,

20  does it?

21  A.      It does not say that he wasn't compliant.

22  Q.      No, it says that he continually interfered with line

23  movement, right?

24  A.      Yes, ma'am, he did.

25  Q.      You told him to have a seat, right?

40

1    A.    Yes, ma'am.

2    Q.    And that he did not comply with that order, correct?

3    A.    That is not in this report.

4    Q.    You say, "Jose Nicolas was told to stop and have a

5    seat, to which he responded fuck that."  Do you see where you

6    have written that there?

7    A.    Yes, ma'am, I do.

8    Q.    Does an inmate who tells you fuck that in response to

9    your orders to have a seat, is that complying with your order?

10   A.    That is not complying with an order.  That does not

11   mean they're combative.

12   Q.    Again, you didn't say combative to Lt. Reichert.  You

13   said the inmates were compliant, right?

14   A.    The inmates did not refuse to be cuffed up.

15   Q.    That is not what you said to Lt. Reichert, is it, sir?

16   A.    I said the inmates had been compliant, yes.

17   Q.    You wouldn't have made something up that you didn't

18   remember, right?

19   A.    If I don't remember it, then I am going to say I don't

20   recall it, I don't remember it, or it is not to my knowledge.

21   Q.    Let's pull up a disciplinary report, Exhibit 212.  This

22   is another disciplinary report that you created on

23   February 5th of 2014, right?

24   A.    Again, I did not create this document.  It is a form

25   that is filled out.

41

1    Q.      Form that you filled out?

2    A.      Truthfully to the best of that person's knowledge.

3    Q.      The form you filled out regarding Mr. Diaz,

4    Mr. Nicolas' cellmate, right?

5    A.      Yes, ma'am.

6    Q.      You accused Mr. Diaz on February 5th of 2014 of

7    interfering with line movement, right?

8    A.      Yes, ma'am.

9    Q.      And you say that you told or that Diaz was told to stop

10   and have a seat, right?

11   A.      Yes, ma'am.

12   Q.      You say that in response to those orders, he refused

13   all orders given, right?

14   A.      Yes, ma'am.

15   Q.      Refusing all orders given -- that is not being

16   compliant, is it, sir?

17   A.      No, ma'am, it is not.

18   Q.      Sir, isn't it true that Mr. Nicolas and Mr. Diaz were

19   talking to other prisoners at Menard as they walked out of the

20   cell house to chow?

21   A.      Talking would not be the word that I would use.

22   Q.      Isn't it true that Mr. Nicolas did refuse to sit down

23   when you ordered him to do so?

24   A.      Yes.

25   Q.      Isn't it true that that made you mad?

42

1    A.    Made me mad?

2    Q.    You had given Mr. Nicolas orders, right?

3    A.    Yes, ma'am.

4    Q.    He wasn't respecting your authority.  Is that true?

5    A.    That would be your phrase, not mine.

6    Q.    Sir, isn't it true that when Mr. Nicolas refused your

7    orders, you decided to teach him a lesson?

8    A.    No.

9    Q.    Isn't it true that when Mr. Nicolas refused to sit

10   down, you decided to teach him a lesson by giving him a

11   beating, isn't that true?

12   A.    That is not true.

13   Q.    Didn't you then take Mr. Nicolas to the shower area and

14   punch and kick him to show who was in charge of the west cell

15   house?

16   A.    Ma'am, I have never punched or kicked Mr. Nicolas.

17   Q.    Let's go back and look at your investigation interview.

18   If we could publish this to the jury, it has already been

19   admitted into evidence.  This is Plaintiff's Exhibit 8.  Now

20   again, you told Lt. Reichert everything that you remembered

21   from February 5th, right?

22   A.    Yes, ma'am.

23   Q.    This is on March 5th, just one month after it happened,

24   right?

25   A.    Yes, ma'am, approximately 30 days later.

43

1    Q.      You don't see anywhere on there that you mention the

2    slip and fall on the ice, do you?

3    A.      Mr. Reichert never asked about the slip and fall on the

4    ice.

5    Q.      But you already admitted earlier today that you

6    understood the seriousness of what you were being asked about?

7    A.      Yes, ma'am, it is.

8    Q.      You didn't think it was relevant when you were being

9    accused of excessive force to bring up an incident that ended

10   up with both you and the inmate on the ground?

11   A.      Mr. Reichert never asked if I had fallen on the ice.

12   If he wanted that answer, he would have asked for the answer.

13   Q.      If he wanted that answer, he would have told you what

14   to say, is that right?

15   A.      He would have told me what to say?  Why would he do

16   that?

17   Q.      You never mentioned the fall, did you?

18   A.      No.  Again, it was never asked about.

19   Q.      It is your testimony this fall did occur, right?

20   A.      Yes, ma'am, it is.

21   Q.      You didn't call anyone on the radio to let them know

22   there was a patch of ice?

23   A.      That patch of ice was over 100 yards long.

24   Q.      You didn't tell staff at Menard there was a huge patch

25   of ice that caused an inmate and you to fall that could have

44

1    caused anyone who walked on that path to fall?  You didn't

2    bother to tell anyone about that?

3    A.    Do you know what the weather conditions were for

4    February 5th at Menard Correctional Center?

5    Q.    Sir, you didn't tell anyone about that on that day?

6    A.    It was cold, it was raining, it was snowing.

7    Q.    Sir, would you answer my question, please?

8    A.    No, I did not tell anyone there was ice on the street.

9    Q.    Even though you knew there was another inmate coming

10   along right behind you, you didn't bother to tell the officer?

11   A.    He was not right behind me either.

12   Q.    But he was coming along behind you and you didn't

13   bother to tell him, hey man, watch out, there is ice, be

14   careful?  You didn't bother to tell him?

15   A.    I also didn't bother to tell anyone it was raining

16   outside today either, ma'am.

17   Q.    It is your testimony here today that it was raining at

18   that time?

19   A.    That it is raining outside today.  Why would I state

20   the overly obvious?

21   Q.    Well, if it was so obvious, why did you walk on a path

22   that was clearly dangerous?

23   A.    No clear path through it or around it.  It is like

24   trying to avoid the rain.

25   Q.    But it is your testimony that this walk was so icy and

45

1    yet you took no precautions to protect the prisoner that you

2    were responsible for escorting who you knew wasn't going to be

3    able to protect himself in the event of a fall.  You took no

4    precautions to protect him?

5    A.      Precautions such as?

6    Q.      Such as choosing a different path, such as calling on

7    your radio to ask if there was another way you could get to

8    segregation, such as calling your lieutenant and letting him

9    know before you could have even gotten to segregation that

10   maybe we need to wait and get the path clear.  You never made

11   calls like that, did you?

12   A.      No, I did not.

13   Q.      It is your testimony that Mr. Nicolas' fall caused you

14   to go down too, right?

15   A.      Yes, ma'am, it is.

16   Q.      Neither you nor Mr. Nicolas received any injuries,

17   correct?

18   A.      To my knowledge, neither one of us received any

19   injuries.

20   Q.      You didn't bother to tell Nurse Lang you had fallen.

21   Is that true?

22   A.      I believe it is in my 434 that I told her either in the

23   434 or deposition, I did tell her that we had fallen on the

24   ice, could she take a look at him.  You brought that up.

25   Q.      So you told Lang that you had fallen on the ice and she

1   didn't examine you?

2   A.      I had no injuries.  I have no reason to be examined.

3   Q.      You told us you are not a medical professional.  How

4   did you know you didn't have any injuries?

5   A.      Because I know when I hurt and don't hurt.

6   Q.      You didn't bother to tell anyone that you had slipped

7   and fallen, right?

8   A.      No, ma'am, I did not.  Nobody by word.  I put it in my

9   434 that we had fallen on the ice.  Inmate Nicolas went down,

10  taking my feet out from underneath me, me falling on him.  He

11  said nothing about an injury and I had no injuries.

12  Q.      Then it is your testimony you have no explanation for

13  how five to 15 minutes later Mr. Nicolas appears with pain in

14  his wrist and his back and his legs and abrasions to the left

15  side of his forehead, right?

16  A.      If there was an injury to Mr. Nicolas, it would have

17  happened during the fall that I did not notice any injuries to

18  him.

19  Q.      Well, you testified that he went down on his front and

20  he didn't hit his head, right?

21  A.      Stomach and chest area, yes.

22  Q.      So that is not the left side of his temple, right?

23  A.      That would depend on which way his face was turned.  If

24  you fall straight forward and your face is turned to the

25  right, you hit the left side of your head.  If you fall

47

1   straight forward and your face is turned to the left, you hit

2   the right side of your face if you hit your face.

3   Q.    It is your testimony today he fell on Front hard enough

4   he took you out, right?

5   A.    Again, it is on ice, so it is slippery.

6   Q.    Again, he is handcuffed, so he doesn't have anything to

7   break his fall, right?

8   A.    No, ma'am, he would not go uncuffed.

9   Q.    Right.  So he is --

10  A.    So that is a standard thing.  If you are being walked

11  to seg as an inmate, you are going in cuffs.

12  Q.    Sure.  My point is when he goes down, you agree that he

13  goes down without hands like you would normally use to break

14  your fall.  He goes straight down, right?

15  A.    He slid down on the ice, yes.

16  Q.    It is your testimony despite falling down without the

17  use of his hands so hard he took you out, you didn't notice

18  any injuries at all.  Again, is that your testimony today?

19  A.    On ice he slid into me, taking my feet out from under

20  me.

21  Q.    So it is your explanation that the abrasions he got

22  from the left side of his forehead must have been because he

23  turned his head.  Is that your testimony here today?

24  A.    If he sustained an injury, that would have been where

25  it came from if he sustained that injury during the walk.

48

1    Q.    Sorry, this is not admitted.  You see that on

2    February -- you see this medical record, correct?

3    A.    Yes, ma'am.

4    Q.    This is a medical record that is created at Menard when

5    medical staff see inmates at the prison, right?

6    A.    Yes, ma'am.

7    Q.    You see that on February 7th of 2014, two days later?

8    A.    Yes, ma'am.

9    Q.    Mr. Nicolas tells medical staff that he was hit in his

10   cheek, face and jaw.  It hurts bad, correct?

11   A.    Yes.

12   Q.    Now you dispute hitting him, right?

13   A.    Absolutely I do.

14   Q.    Okay.  But you don't have any explanation for how

15   Mr. Nicolas' jaw would hurt on February 7th of 2014, right?

16   A.    No, ma'am, I do not.

17   Q.    In fact, it is not just even two days later that

18   Mr. Nicolas complained about his jaw.  I would like to publish

19   for the jury Plaintiff's Exhibit 7, which has been admitted

20   into evidence.

21        THE COURT:  All right, we'll publish that.

22   Q.    He tells a nurse on February 5th, ten minutes later,

23   that his right jaw hurts, right?

24   A.    Yes, ma'am.

25   Q.    Now it is your testimony if he got a cut to the side of

49

1    his head, it is because his head turned this way, right?

2    A.    If he sustained a cut during the fall, then, yes.

3    Q.    To be clear, you don't have any other explanation for

4    how he got a cut on the side of his head, right?

5    A.    No, ma'am, I do not.

6    Q.    So if it is your testimony that if he had a cut, it

7    happened when he turned his head, so then how did his jaw get

8    injured?  You don't have any explanation for that, do you?

9    A.    I have no explanation for that.

10   Q.    I want to go back to your incident report.

11   A.    Yes, ma'am.

12   Q.    You are asked a number of things in this report and you

13   have testified it is important to get these details right,

14   correct?

15   A.    Yes, ma'am.

16   Q.    One of those things that you are asked is were

17   restraints used as part of the incident, right?

18   A.    Yes, ma'am.

19   Q.    You have testified here today that restraints were

20   being used on Mr. Nicolas, right?

21   A.    During the escort, yes.

22   Q.    You didn't put yes to that question, right?

23   A.    No, ma'am, I did not.

24   Q.    That is because if you had answered that question yes,

25   you would have to send a copy of this incident report to legal

1    services at the prison, right?

2    A.    It does state that, yes.

3    Q.    Let's talk about the people you have identified here.

4    You identified Mr. Nicolas as one of the people involved in

5    this incident, right?

6    A.    Yes, ma'am.

7    Q.    This incident is the falling on the ice, right?

8    A.    Yes ma'am, it is.

9    Q.    Why did you list Mr. Diaz?

10   A.    He was also being escorted to north 2 seg.

11   Q.    So he saw the fall, right?

12   A.    The falling on the ice would have been after the

13   initial shake down, finding the hooch, interfering with line

14   movement.

15   Q.    Well, but you listed him as someone who is involved in

16   this fall, right?

17   A.    Mr. Diaz was not involved in the fall, no.

18   Q.    Is there anything else mentioned in the 434?

19   A.    Anything?

20   Q.    I am sorry, I am confused.

21        THE COURT:  Hold on.  One at a time or Barb is going

22   to have smoke coming out of her ears.  One at a time and she

23   gets to ask the questions and you get the answers.  You ask a

24   question.

25

1  Questions By Ms. Grady:

2  Q.      You list Mr. Diaz as a person who is involved in this

3  incident, right?

4  A.      Yes, ma'am, as in the 304 and 403.

5  Q.      Okay.  So you listed him because he was involved.  He

6  was a person who was involved in the refusing to comply with

7  orders, is that true?

8  A.      Yes, ma'am.

9  Q.      That is what the 304 and 403 refer to.  Those are

10 disciplinary codes that refer to inmates who aren't being

11 compliant, right?

12 A.      That are being insolent and disobeying direct orders.

13 Q.      Not complying with your orders, right?

14 A.      Yes.

15 Q.      And you weren't the only one to see them refusing

16 orders, right?

17 A.      No, ma'am.

18 Q.      There were other officers who were there in the cell

19 house and saw them not responding to the orders given by you?

20 A.      Yes, ma'am.

21 Q.      Those officers were Officer Berry, right?

22 A.      Now Sgt. Berry.  He was an officer at that time, yes.

23 Q.      That included Officer Purdom, right?

24 A.      Yes, ma'am, it does.

25 Q.      That included Officer Schnell as well, correct?

52

1   A.     Now he's Sgt. Schnell, but, yes, he was an officer at

2   that time.

3   Q.     You didn't list them in the inmates or staff involved,

4   right?

5   A.     No, ma'am.

6   Q.     You didn't want to put their names on the incident

7   report?

8   A.     Not that I did not want to, no.

9   Q.     You testified at your deposition that you had a copy of

10  this incident report that you kept at your house, right?

11  A.     I try to keep a copy of most all of the incident

12  reports that I write.

13  Q.     In fact, you testified that when you got sued in this

14  case you went to that personal copy at your house and you dug

15  it out to look at it, right?

16  A.     No, I don't remember.  I don't recall saying that.

17  Q.     Well, let's look at your deposition.

18  A.     Yes, ma'am.

19  Q.     You were asked these questions and you gave these

20  answers.  Question --

21         MR. TYRRELL:  I am going to object, Your Honor, for

22  relevance.

23         THE COURT:  What is the relevance of this?

24         MS. GRADY:  Your Honor, Sgt. Qualls testified that at

25  the time of this deposition he had a copy of his 434, but he

53

1   submitted sworn testimony in his interrogatory -- but his

2   testimony will be it no longer exists despite sworn testimony

3   in his interrogatory that no documents in this case have ever

4   been destroyed.

5          THE COURT:  The objection is overruled.  This is

6   cross examination.

7   Questions By Ms. Grady:

8   Q.     You were asked these questions and you gave these

9   answers.  Question, "So when did you go back and review that

10  434, if ever?"  Answer, "When I got my packet that I was being

11  sued and that was approximately a year ago."  Question, "Did

12  it come with the packet or did you specifically request?"

13  Answer, "No, ma'am, it did not."  Then there is a broken off

14  question.  Then it continues.  "So how did you go about

15  requesting that 434?"  Answer, "When you write a 434, it is

16  very common practice to make a copy of your 434."  Were you

17  asked those questions and did you give those answers at your

18  deposition on July 31st of 2017?

19  A.     Yes, ma'am.

20  Q.     And you gave that testimony under oath, correct?

21  A.     Yes, ma'am.

22  Q.     And you were asked this question and you gave this

23  answer?  "And so you made your own copy of it?"  Answer, "Yes,

24  ma'am."  Were you asked that question and did you give that

25  answer?

54

1  A.     Yes, ma'am, I did.

2  Q.     We asked shortly before the trial for you to bring the

3  personal copy of the incident report to Court yesterday and

4  you said you didn't have it any longer, right?

5  A.     Yes, ma'am.

6  Q.     That you had discarded that?

7  A.     That I cannot find it.

8  Q.     Well, you understood that this was a case that we were

9  going to Court on, right?

10 A.     Yes, ma'am, I do.

11 Q.     You knew that it was important, right?

12 A.     I looked for it and I cannot find it.

13 Q.     You looked thoroughly, right?

14 A.     Yes, ma'am, I did.

15 Q.     I want to show you what has been marked as Plaintiff's

16 Exhibit 10.   It is not in evidence.   Go to page one.   These

17 are a copy of interrogatories that were sent to you in this

18 case, correct?

19 A.     Yes, ma'am.

20 Q.     You understood that these interrogatories asked you

21 questions that you were required to answer truthfully under

22 penalty of perjury, right?

23 A.     Yes, ma'am.

24 Q.     You took that responsibility to answer those questions

25 truthfully seriously, right?

1   A.     Yes, ma'am.

2   Q.     You understood that if the answer to those questions

3   changed at any time, you had a responsibility to tell someone,

4   right?

5   A.     Why would the answer change?

6   Q.     Well, let's look at your answers.

7          MS. GRADY:  Your Honor, I would move for admission of

8   this exhibit, Plaintiff's Exhibit 10.

9          THE COURT:  Any objection?

10         MR. TYRRELL:  No objection, Your Honor.

11         THE COURT:  10 will be admitted.

12     (Whereupon  Plaintiff's Exhibit 10 was admitted.)

13         THE COURT:  Ladies and gentlemen, these are

14  interrogatories.  They are essentially written questions that

15  are sent to a party to answer under oath while the case is in

16  the discovery phase, so do you want this published?

17         MS. GRADY:  Yes, Your Honor.

18         THE COURT:  10 will be admitted and published.

19  Questions By Ms. Grady:

20  Q.     Just to be clear, these are your responses to the

21  interrogatories we sent to you, right?

22  A.     Yes, ma'am.

23  Q.     That is your signature on page nine of the Exhibit 10,

24  right?

25  A.     Yes, ma'am, it is.

56

1   Q.      You signed this document declaring under penalty of

2   perjury the answers in this document are true and correct,

3   right?

4   A.      Yes, ma'am.

5   Q.      You signed this document on April 16th of 2017, right?

6   A.      Yes, ma'am.

7   Q.      Before you signed this document, you reviewed those

8   answers to make sure that, in fact, those interrogatory

9   responses were true and correct, right?

10  A.      To the best of my knowledge I did, yes.

11  Q.      Well, to the best of your knowledge you reviewed them,

12  or to the best of your knowledge you reviewed them to make

13  sure they were to the best of your knowledge?

14  A.      They are true to the best of my knowledge.

15  Q.      You testified that you had actually physically located

16  your 434 when you received notice of the lawsuit in this case,

17  right?

18  A.      Yes, ma'am.

19  Q.      And so you knew at the time it got to you that you had

20  a copy, that personal copy, in your hands, right?

21  A.      At my residence, yes.

22  Q.      But today you don't have that copy, right?

23  A.      No, ma'am, I do not.

24  Q.      It is your testimony that you don't know whether it has

25  been lost, destroyed or discarded, right?

57

1    A.    I do not know what happened to it.

2    Q.    You can't find it?

3    A.    Right.

4    Q.    You see here you were asked in your responses to

5    interrogatories to describe any documents that had been lost

6    or discarded or destroyed.  Do you see that?

7         MR. TYRRELL:  I am going to object.  Can I request

8    side bar?

9         THE COURT:  All right, we'll have brief side bar.

10   Ladies and gentlemen, feel free to stand up and stretch.

11     (Whereupon the following proceedings were held at sidebar,

12   out of the hearing of the jury.)

13        THE COURT:  What is your objection?

14        MR. TYRRELL:  I understand where Miss Grady is going

15   with the line of questioning.  The incident report has not

16   been destroyed.  We have -- the original incident report was

17   turned over during discovery.  I don't believe there is a

18   requirement we keep every single copy of the same document.

19        THE COURT:  You have one that was officially

20   produced, but he had his own copy and that is what you are

21   saying?

22        MS. GRADY:  Exactly.  We have made clear in the

23   interrogatories and if the testimony requires us to get into

24   it, we instruct the witness that it is different copies that

25   matter and his personal copy, which, obviously, came up at his

58

1   deposition, was important.  We're not going to seek to

2   introduce exfoliation instruction, but it is relevant.  He is

3   saying in the discovery there is no documents lost or

4   destroyed.  He is now testifying that is not true.

5           THE COURT:  What is the date of the interrogatory?

6           MS. GRADY:  April of 2017.

7           THE COURT:  So before his deposition.

8           MS. GRADY:  Right.  He testifies at his deposition it

9   still exists.  As of the date of the trial he testified that

10  it no longer exists and I am going to elicit he never

11  supplemented the interrogatory.

12          THE COURT:  I think you need to make it clear it is

13  his copy that no longer exists, that it is not that it was

14  somehow destroyed.  You know we have a copy of it, obviously,

15  but make it clear.  I don't think that was made clear.

16          MS. GRADY:  All right.  I will make it clear.

17          (Whereupon the sidebar proceedings were concluded.

18  The following proceedings were held in open Court.)

19          THE COURT:  Are you doing okay, ladies and gentlemen?

20  Can you bear with me a little longer?  Ask your next question.

21  Questions By Ms. Grady:

22  Q.    I want to make sure we all know what we're talking

23  about.  A 434 and incident report, those are the same things,

24  right?

25  A.    Yes, ma'am.

59

1    Q.    So when we discuss your deposition testimony about

2    having a personal copy of a 434, we're talking about the

3    incident report, right?

4    A.    Yes, ma'am.

5    Q.    We are talking about your personal copy that you made

6    for yourself after you filled this out back in February of

7    2014, right?

8    A.    Yes, ma'am.

9    Q.    You would have made that personal copy before you

10   submitted it to be processed through the layers of supervisors

11   and chain of command at Menard, right?

12   A.    Yes, ma'am.

13   Q.    So for example, that copy, which is different from the

14   copy produced in our case, would not have contained -- this is

15   Exhibit 217 that has already been admitted into evidence -- it

16   would not have contained the signature of the person accepting

17   report, right?

18   A.    Yes, ma'am.

19   Q.    My statement is correct?

20   A.    Yes, ma'am.

21   Q.    It would not have contained that signature under

22   administrative assessment?

23   A.    That is not on my screen.

24        THE COURT:  At the very bottom.

25   A.    Yes, ma'am.

60

1   Q.     Do you know what that refers to, T O T?

2   A.     I could not tell you what that refers to.

3   Q.     It wouldn't have had the chief administrative officer's

4   signature on the bottom or the stamp that is not very well

5   copied, it wouldn't have had that on your copy of the form,

6   right?

7   A.     No, ma'am.

8   Q.     Did you take any notes on your personal copy of the

9   form?

10  A.     No, ma'am.  I don't remember taking any notes other

11  than what was wrote on the 434 here.

12  Q.     We don't have that form, do we?

13  A.     No, ma'am.  Again, I do not have it.

14  Q.     When you were asked before you sat for your deposition

15  is there any document that has been lost, discarded or

16  destroyed, you said no, I am not aware of any, right?

17  A.     Yes, ma'am.

18  Q.     Then you sat for your deposition and the topic of your

19  personal copy of the 434, the incident report that came up in

20  that deposition, right?  You talked about that?

21  A.     Yes, ma'am.

22  Q.     You knew that was important, that personal copy?

23  A.     Yes, ma'am.

24  Q.     You don't have it today?

25  A.     I do not have it today, no.

1    Q.    You are paid for your work as a correctional

2    lieutenant, right?

3    A.    Yes, ma'am.

4    Q.    You were paid for your work as a correctional sergeant

5    too, right?

6    A.    Yes, ma'am.

7          MR. TYRRELL:  Objection, Your Honor, relevance.

8          THE COURT:  Well, I assume this is going somewhere,

9    so overruled.

10         MS. GRADY:  Yes, Your Honor.  Goes to punitive

11   damages.

12   Questions By Ms. Grady:

13   Q.    Fair to say you make about $6,500 per month?

14   A.    Yes, ma'am.

15   Q.    With overtime, that comes out to about $89,000 to

16   $92,000 per year, right?

17   A.    If you will look at those dates, that was just prior to

18   me making sergeant, making sergeant, and then becoming

19   lieutenant.  So there is overtime at different promotional

20   rates.

21   Q.    I see.

22   A.    So from officer to sergeant --

23   Q.    Sorry.

24   A.    -- to lieutenant.

25   Q.    You made more in overtime as a sergeant than you do in

1    overtime as a lieutenant, or is it backwards?

2    A.    That would be backwards.

3    Q.    You make more in overtime as a lieutenant?

4    A.    As a lieutenant, yes.

5    Q.    You're getting time and a half on your lieutenant

6    salary, right?

7    A.    Yes, ma'am.

8    Q.    Okay.  So if, in 2016, you made 90, about $92,000 per

9    year, you would expect that to increase now that you have been

10   promoted, right?

11   A.    In 2016 I was already lieutenant.

12   Q.    Okay, so stay about the same?

13   A.    Stayed exactly the same.

14   Q.    As part of -- As a correctional sergeant, as you were

15   in February 5th of 2014, you had to wear a uniform, right?

16   A.    Yes, ma'am.

17   Q.    And can you tell me in terms of foot wear, what did

18   that uniform consist of?  Did you have any requirements about

19   what kind of shoes to wear?

20   A.    The requirement is black boots or shoes.

21   Q.    What did you prefer?

22   A.    I preferred to wear boots.

23   Q.    Black boots?

24   A.    Yes, ma'am.

25   Q.    Like the heavy duty ones?

63

1   A.      Black boots, ma'am.

2   Q.      Sir, you agree that nothing Mr. Nicolas did or said on

3   February 5th of 2014 justified using force against him, right?

4   A.      Justified using force or using excessive force?  Could

5   you clarify that, please?

6   Q.      Let me put it this way.  Nothing that Osbaldo Nicolas

7   did on February 5th of 2014 justified sucker punching him in

8   the jaw, right?

9   A.      Nothing he did would have justified that.

10  Q.      Nothing he did on February 5th of 2014 would have

11  justified kicking him in the stomach, right?

12  A.      Nothing.

13  Q.      Nothing he did on that day would have justified

14  punching him in the stomach, right?

15  A.      No, ma'am.

16  Q.      Nothing would have justified slamming his head into the

17  wall, right?

18  A.      Nothing, ma'am.

19  Q.      Any of those types of actions would have been a

20  violation of Menard's policies, right?

21  A.      Yes, ma'am.

22  Q.      They would have been excessive force, right?

23  A.      Yes, ma'am, it would have.

24          MS. GRADY:  I don't have anything further, Your

25  Honor.

64

1      THE COURT:  Now Mr. Tyrrell, do you have any

2   questions for Lt. Qualls at this time?

3      MR. TYRRELL:  Yes, Your Honor.  I believe the parties

4   have agreed to waive scope, so we're also presenting our case

5   in chief at this time.

6      THE COURT:  Ladies and gentlemen, let me explain.  He

7   is, obviously, a defendant.  He was called as an adverse

8   witness, so what she did just basically was cross examination.

9   So Mr. Tyrrell can normally clarify, but what we're going to

10  do to save time, you are going to ask any questions you want

11  to ask, correct?

12     MR. TYRRELL:  Yes, Your Honor.

13     THE COURT:  This will be kind of part of the

14  defendant's case and clarifying the cross examination and the

15  plaintiff's case.

16     MR. TYRRELL:  Thank you, Your Honor.

17                      CROSS EXAMINATION

18  Questions by Mr. Tyrrell:

19  Q.     Lieutenant Qualls, I want to kind of go back to the

20  beginning and talk about how you started with the Department

21  of Corrections.  When did you first become employed by the

22  Department of Corrections?

23  A.     November 10th of 1997.

24  Q.     Now have you always worked at Menard Correctional

25  Center since November 10th of 1997?

1   A.      No, I have not.

2   Q.      Have you worked at any other correctional facilities

3   then?

4   A.      I have never worked at any other correctional facility.

5   Q.      As part of your employment with the Illinois Department

6   of Corrections, do you have to go through any training?

7   A.      Yes, sir, I do.

8   Q.      What sort of training do you have to go through?

9   A.      Six weeks of training at Springfield where you go over

10  administrative directives, use of force, how to apply

11  restraints, how to fill out forms.

12  Q.      Do you also go through training on an annual basis to

13  refresh on different policies and procedures?

14  A.      Yes, sir, we do.  It is three to five days long.

15  Q.      You mentioned use of force is one of the elements of

16  your training at the academy.  Is that also covered during

17  these annual training sessions?

18  A.      Yes, sir, it is.

19  Q.      It is my understanding there is different levels of

20  force that can be used against an offender, is that correct?

21  A.      Yes, sir.

22  Q.      Can you describe the different levels of use of force?

23  A.      There are different levels of force.  The most or least

24  aggressive amount of force that can be used would be an

25  officer's presence in an area up to and including the most

66

1    extreme, which would be the possibility of using firearms.

2    There are steps in between.  Saying something to an inmate

3    could be construed as using force.  Contact between yourself

4    and an offender could be construed as force.  Placing an

5    offender in handcuffs would be using force.  Mace or chemical

6    agents would be a degree of force, less than lethal, but more

7    than just your officer presence.

8    Q.    Now I want to talk about February 5th of 2014.  You

9    were working in the west cell house of Menard Correctional

10   Center on February 4 of 2015, correct?

11   A.    Yes, sir.

12   Q.    I believe you testified you were the correctional

13   sergeant on that day?

14   A.    Yes, I was.

15   Q.    What did your job duties and responsibilities include

16   as a correctional sergeant?

17   A.    As a correctional sergeant in a cell house, you're

18   responsible for all staff inside of your cell house,

19   responsible for all inmates inside of your cell house.

20   Q.    This was -- considering the events on February 5th of

21   2014, this happened during the 7:00 a.m. to 3:00 p.m. shift,

22   correct?

23   A.    Yes, sir.

24   Q.    There is also a 3:00 to 11:00 p.m. shift?

25   A.    Yes, sir.

1    Q.      11:00 p.m. to 7:00 a.m. shift?

2    A.      Yes, sir.

3    Q.      As part of your duties as sergeant of the west cell

4    house, you were overseeing the different officers that worked

5    in the cell house on that shift on February 5th of 2014,

6    correct?

7    A.      Yes, sir.

8    Q.      Approximately how many officers would have been present

9    in the west cell house on February 5th of 2014?

10   A.      There would be approximately 12 to 13 officers assigned

11   to the west cell house.

12   Q.      Now do you recall specifically how many inmates were in

13   the west cell house at Menard on February 5th of 2014?

14   A.      On that particular day I do not know, I know at maximum

15   capacity the west cell house as 494 inmates.

16   Q.      Okay.  That is both the odd and even side we already

17   heard testimony about?

18   A.      Yes, sir.

19   Q.      Just to get a sense of the layout, how many different

20   galleries are in west cell house?

21   A.      There are ten galleries with five galleries on the odd

22   side, five galleries on the even side and tiered section.

23   Q.      So it was basically five different floors in the west

24   cell house?

25   A.      Yes, sir.  Two gallery on the bottom or entry level

68

1   followed by 4, 6, 8 gallery respectively.

2   Q.    And the odd side is the opposite, so one and two on the

3   same level and 3 and 4 on the same level?

4   A.    Yes, sir.

5   Q.    How many cells on each gallery?

6   A.    There are 25 cells on each gallery.

7   Q.    These cells can accommodate up to two offenders?

8   A.    Yes, sir.

9   Q.    In terms of the physical layout of the west cell house,

10  if I am on the even side of the west cell house and I am

11  inside one of the cells, what am I looking at?

12  A.    If you look straight out of your cell, you are going to

13  be looking at a concrete wall that is approximately 12 to 15

14  feet away.

15  Q.    So if I am looking out of the cell on the even side,

16  what is behind me then?

17  A.    There would be another concrete wall directly behind

18  you and concrete wall on your left and right.

19  Q.    Okay.  Then is it the same for the odd side, meaning

20  there are concrete walls on all of the sides of the cell

21  except they are facing out towards an outside area that is

22  concrete wall?

23  A.    Yes, sir.

24  Q.    There are also windows on the exterior concrete wall,

25  correct?

69

1   A.     Yes, sir.

2   Q.     And then in terms of the -- there is different doors in

3   the cells, correct?

4   A.     Yes, sir.

5   Q.     What kind of doors are on the cells in west cell house?

6   A.     These doors are barred doors.  The bars are

7   approximately four inches apart.  As far as width, the bars

8   are 12 inches tall I believe.

9   Q.     So ventilation can come through the bars?

10  A.     Yes, sir.

11  Q.     Offenders and officers can exchange communication

12  through the bars?

13  A.     Yes, sir.

14  Q.     I believe you were present when Mr. Clayborn Smith

15  testified yesterday, correct?

16  A.     Yes, sir, I was.

17  Q.     He testified he was able to get his mirror and hand out

18  of the bar.  Is that something you have seen before?

19  A.     Yes, sir, I have.

20  Q.     Now speaking of Mr. Smith, we heard testimony that

21  there was different line movements going to -- I believe you

22  said feed lines going on.  Do you recall that?

23  A.     Yes, sir, there were chow lines, yes.

24  Q.     But what is a chow line?

25  A.     Chow line is where all of the inmates that are not --

70

1    that may not be on deadlock, those inmates are available to go

2    to chow.  So we'll send two officers to the back of the

3    gallery.  Remaining staff stay up front.  The grill door is

4    closed.  There is a crank box at the front that can roll all

5    of the doors to open and all of the inmates leave for chow,

6    get your doors.  All of the inmates would pull the doors, step

7    out, close their doors, and once they came to the front and

8    were ready to go, we would send the entire line out.

9    Q.    I'm just going to go back to some of those terms the

10   jury might not be familiar with.  I believe you used the term

11   deadlock.  What does that mean?

12   A.    Deadlock -- there are actually two locks on each door,

13   top lock, bottom lock.  One lock is for deadlock where the

14   crank box cannot roll it to open.  If for any reason an inmate

15   is on deadlock, such as disciplinary or for having to go to a

16   must honor pass, if we were going to yard or rec, the inmate

17   would not be allowed to go anywhere but to the must honor

18   pass.  Must honor would be something like health care pass,

19   video visit, Court video, something of that nature.

20   Q.    Now you also mention the crank box.  What is that?

21   A.    The box is approximately 20 inches tall, about 12 to

22   13 inches wide.  There is a large rolling crank on the inside

23   of it that can roll the doors either to lock or open.

24   Q.    Now Menard Correctional Center, it is a relatively

25   older correctional facility, correct?

1    A.      Yes, sir, late 1800's.

2    Q.      Okay.  So in my mind I am envisioning electronic

3    buttons you can push to unlock cells.  Those don't exist?

4    A.      No, those are not at Menard, no.

5    Q.      So to allow a cell to be unlocked as opposed to using a

6    key, there is a crank box?

7    A.      There is a crank box.

8           MS. GRADY:  I am going to object to relevance at this

9    point.

10          THE COURT:  What is the relevance?

11          MR. TYRRELL:  General background.  Given the

12   terminology used, I want to make sure the jury understands

13   what he was talking about, Your Honor.

14          THE COURT:  The objection is overruled.  Let's not

15   get into it too far.

16          MR. TYRRELL:  I think we have a clear understanding.

17   We can move on to a different topic.

18   Questions By Mr. Tyrrell:

19   Q.      Now thinking back to February 5th of 2014, how were

20   inmates taken to the chow hall?  The chow is the cafeteria,

21   correct?

22   A.      Yes, sir, it is.

23   Q.      How are inmates transported from the west cell house to

24   the cafeteria or chow?

25   A.      They'll be cranked out on chow line.  They'll be walked

72

1    out, counted out the door, then they will walk themselves

2    straight to the chow line or to the dining room, enter there.

3    After a set amount of time, which is approximately 15 to 20

4    minutes, when they are done eating they'll be called out and

5    returned to the cell house in the same manner.

6    Q.    Are these offenders restrained on the movement to chow?

7    A.    No, sir, they are not.

8    Q.    No handcuffs on them?

9    A.    There are no handcuffs on them.

10   Q.    When it is lunch time in the west cell house and as

11   existed back on February 5th of 2014, was it the entire cell

12   house went to lunch at the same time, or portions of it?

13   A.    No, sir, it would be one gallery at a time.

14   Q.    Okay.

15   A.    So at the most it would be 50 inmates out of the house.

16   Q.    So if it was time for the even side, gallery ten of

17   west cell house to go, those offenders would go to chow,

18   correct?

19   A.    Yes, sir.

20   Q.    The remaining offenders would be inside their cells?

21   A.    Yes, sir.

22   Q.    Or perhaps in different movement somewhere else?

23   A.    If there was a school line, small school line that had

24   come back, they would also be out of the cells.  The school

25   line I believe that you are questioning me about or asking

73

1    about would be in the shower area.

2    Q.      We'll get there in a second.   Just in terms of the

3    general procedure for chow lines, when the gallery 10 is done

4    in the chow and the cafeteria, they return to their cells,

5    correct?

6    A.      Yes, sir.

7    Q.      The next gallery up, hypothetically, gallery 8 would go

8    to chow?

9    A.      Yes, sir.

10   Q.      That is not the case that the entire even side or odd

11   side or cell house are going to chow at the same time?

12   A.      Oh, absolutely not, no.

13   Q.      I believe you already testified to this, but is it fair

14   to say you don't recall every specific detail that happened on

15   February 5th of 2014?

16   A.      That's correct, sir.

17   Q.      But your memory has certainly been aided by the

18   different incident reports and testimony you have heard and

19   disciplinary tickets, correct?

20   A.      Yes, sir.

21   Q.      Is it fair to say you don't recall every lawsuit made

22   against you?

23   A.      That is fair, yes.

24   Q.      This isn't back on February 5th of 2014.   We're talking

25   about that today, which is about four and a half years later?

74

1   A.     Yes, sir.

2   Q.     I want to direct your attention, lieutenant, to what

3   was already admitted in evidence as Exhibit 217, all right.

4   Again, Exhibit 217 is your incident report, correct?

5   A.     I do not have anything on my screen.  There it is.

6   Yes, sir, it is my incident report.

7   Q.     There is the number at the bottom so you can see it.

8   Now Miss Grady asked you some questions about the time that

9   was written at the top of the incident report.  You would

10  agree with me it says 12:30?

11  A.     Yes, sir.

12  Q.     Now I want to direct your attention toward the bottom

13  of the incident report.  What is at the bottom of Exhibit 217

14  above reporting employee?

15  A.     That would be my name, my badge number, time and date

16  that it was written.

17  Q.     Okay.  So this time is different from the time at the

18  top, correct?

19  A.     Yes, sir.

20  Q.     What time does this say?

21  A.     This says 11:30.

22  Q.     So it is your testimony you wrote the date and time of

23  the incident on this line as opposed to the line at the top

24  where it says 12:30?

25  Q.     Yes, sir.

1    Q.     So was 12:30 the time you wrote the incident report?

2    A.     12:30 was the time I wrote the incident report.

3    Q.     It is your testimony 11:30 is actually the time the

4    incident happened?

5    A.     Yes, sir.

6    Q.     Okay.  As part of your employment at the Department of

7    Corrections at Menard, you have written incident reports

8    before, correct?

9    A.     Yes, sir.

10   Q.     When you complete an incident report, what is the next

11   step in that process?

12   A.     That it would go to the shift commander, which would be

13   a major or above.  He would review it, sign it and date it.

14   Then that copy or that incident report would go to the

15   warden's office I do believe.  It would be disseminated there

16   to either medical or internal affairs.

17   Q.     So once you submit the incident report to the shift

18   commander and major, it is kind of out of your hands, right?

19   A.     Yes, sir.

20   Q.     It is up to the majors and above to determine what

21   steps, if any, to take based on the incident report?

22   A.     Yes, sir.

23   Q.     Okay.  Turning to the top of the page, Miss Grady asked

24   you questions about line F, which is any injuries or

25   hospitalization, and you marked the box no, correct?

76

1    A.    Yes, sir.

2    Q.    At the time of the incident, did you observe any

3    injuries on yourself or Mr. Nicolas?

4    A.    No, I did not.

5    Q.    Did you have a careful examination of Mr. Nicolas

6    before you wrote the incident report?

7    A.    No.

8    Q.    Why is that?

9    A.    Because I am not a trained medical professional.

10   Q.    Mr. Nicolas was being taken to north 2 at the time of

11   the incident, correct?

12   A.    Yes, sir.

13   Q.    North 2 is a different building in Menard Correctional

14   Center, right?

15   A.    Yes, sir.

16   Q.    North 2 is the segregation area at Menard Correctional

17   Center or one of them, correct?

18   A.    Yes, it is.

19   Q.    Do you recall why Mr. Nicolas was being taken to

20   segregation on February 5th of 2014?

21   A.    I believe he was being taken because we had found hooch

22   in his cell and he had become insolent and disobeyed direct

23   orders and that Lieutenant Payne had ordered him to be taken

24   to north 2.

25   Q.    Okay.  During this walk to segregation, Mr. Nicolas was

77

1    handcuffed, correct?

2    A.    Yes, sir.

3    Q.    How many people would have -- do you know how many

4    people escorted Mr. Nicolas on February 5th of 2014 from west

5    cell house to north 2?

6    A.    One.

7    Q.    That was you?

8    A.    Yes, sir, it was.

9    Q.    Okay.  So it was one on one contact with an offender?

10    A.    Yes, sir, it was.

11    Q.    Now, when someone is being taken to segregation, are

12    there other offenders that could have been in the area?

13    A.    No.

14    Q.    Could there have been other line movements going on at

15    that time?

16    A.    We would not walk a north 2.  Any inmate being walked

17    to segregation would not be walked past other line movement.

18    Q.    Okay.  That is for everyone's safety?

19    A.    Including that inmate's safety.

20    Q.    Okay.  Once you arrive with Mr. Nicolas in north 2,

21    what happened next if you can recall?

22    A.    Mr. Nicolas was placed in a holding cell.  A north 2

23    officer came, retrieved my cuffs from Mr. Nicolas and then I

24    left.

25    Q.    So you didn't have anymore contact with Mr. Nicolas on

78

1   February 5th of 2014 after you placed him in the holding cell?

2   A.      None.

3   Q.      You said -- I think you said multiple times today you

4   are not a medical professional.  Do you have any sort of

5   medical training?

6   A.      Other than CPR, I have no medical training at all, no.

7   Q.      So you are not qualified to find a serious medical

8   need?

9   A.      Absolutely not.

10  Q.      Other than perhaps if someone was actively bleeding or

11  compound fracture or something like that?

12  A.      Yes, sir.

13  Q.      You didn't observe any of that in Mr. Nicolas, correct?

14  A.      No, I did not.

15  Q.      Now there was some testimony today about this patch of

16  ice on the walk from west cell house to north 2.  I believe

17  you said it might have been a substantial piece of ice,

18  correct?

19  A.      Yes, sir.

20  Q.      Did you intentionally try to make Mr. Nicolas and

21  yourself fall on this ice?

22  A.      No, I did not, no.

23  Q.      Was there any other, to your recollection, was there

24  any other way of avoiding the ice?

25  A.      There was no way around it.  It was all the way across

1    the street.

2    Q.    When you say street, what do you mean by that?

3    A.    We refer to it as Front Street.  That is where most all

4    of your line movement comes from.

5    Q.    So just maybe to be clear, the west cell house and

6    north 2 buildings aren't connected by a building, they're

7    connected by a walkway?

8    A.    It is a fairly large walkway, yes.

9    Q.    How far would you say it would have been from west cell

10   house to north 2?

11   A.    Quarter mile, perhaps longer.

12   Q.    So a decent walk?

13   A.    Yes, sir.

14   Q.    Okay.  When you saw this ice, you would have been

15   careful walking on it with Mr. Nicolas?

16   A.    Yes, sir.

17   Q.    You would want to make sure he didn't fall down?

18   A.    Yes, sir.

19   Q.    You want to make sure you also didn't fall down on the

20   ice, right?

21   A.    Yes, sir.

22   Q.    At the time you wrote this incident report, did you

23   know that Mr. Nicolas would have been seen by medical staff?

24   A.    Could you ask it again?

25   Q.    Sure.  Maybe I'll rephrase it.  So this incident report

80

1    indicates that Nurse Lang was notified so that she could

2    evaluate the inmate, meaning Mr. Nicolas, upon arrival to

3    north 2.  That is in that incident report?

4    A.    Yes, sir.

5    Q.    So at the time this incident report was written, you

6    understood that Mr. Nicolas should have been seen by Nurse

7    Lang or had been seen by Nurse Lang?

8    A.    Yes, sir.

9    Q.    If Mr. Nicolas had told you that he had some sort of

10   injury after he fell on the ice, would you have reported that

11   in your incident report?

12   A.    That would have been noted in my incident report, sir.

13   Q.    I am going to turn your attention to Plaintiff's

14   Exhibit 8 turning to page 13, already admitted into evidence.

15   I apologize.  Actually, I show you page 12 of the same

16   document.  Do you know Lt. Kevin Reichert?

17   A.    Yes, sir, I do.

18   Q.    Thinking back to February 5th of 2014, do you recall

19   what position he held at Menard Correctional Center, if any?

20   A.    I believe he was the supervisor for internal affairs.

21   Q.    What, to your knowledge, is internal affairs?

22   A.    They have two functions.  One is to keep track of

23   security threat groups, which is one side of the internal

24   affairs house, and the other side of internal affairs also

25   investigates staff misconduct.

81

1    Q.    Okay.  So this is the first page of summary of

2    interview that you gave to Mr. Reichert, correct?  I

3    apologize, Lt. Reichert?

4    A.    Yes, sir.

5    Q.    Okay.  This first page indicates that the interview

6    happened on March 5th of 2014 at 8:47 a.m., correct?

7    A.    Yes, sir.

8    Q.    So at some point on March 5th of 2014 in the morning,

9    do you understand that you have been told you are going to

10   speak to Lt. Reichert about something?

11   A.    Yes, sir.

12   Q.    Okay.  You already understood on March 5th of 2014 that

13   Mr. Mike Reichert -- part of Mr. Reichert's responsibility was

14   to investigate allegations of staff misconduct, correct?

15   A.    Yes, sir.

16   Q.    So is it fair to say that when you went into this

17   interview with Lt. Reichert, you understood that you may be

18   investigated for staff misconduct?

19   A.    Yes, sir.

20   Q.    Then would you agree with me that, in fact, during this

21   interview Lt. Reichert asked you questions about potential

22   staff misconduct or allegations of staff misconduct, correct?

23   A.    Yes, sir.

24   Q.    I believe you already testified Lt. Reichert didn't ask

25   you about Mr. Nicolas falling on the ice, correct?

82

1    A.    He did not ask me about the ice, no.

2    Q.    It is not contained in the investigational interview,

3    correct?

4    A.    Yes, that's correct.

5    Q.    Is it your understanding Lt. Reichert would be charged

6    with investigating an inmate falling on the ice?

7    A.    To my knowledge he would not be charged with that

8    investigation.

9    Q.    So to make it clear, at the time Lt. Reichert was

10   interviewing you on March 5th of 2014, you understood he was

11   investigating you for allegations of staff misconduct?

12   A.    Yes, sir.

13   Q.    The accident and the accident of Mr. Nicolas falling on

14   the ice along with yourself wasn't probably in your mind at

15   the time of the interview, correct?

16   A.    No, sir.

17          MR. TYRRELL:  Thank you, Your Honor.  No further

18   questions at this time.

19          THE COURT:  All right.  Miss Grady, do you have very

20   much for recross?

21          MS. GRADY:  I have some, Your Honor.  Maybe we could

22   go for a little.

23          THE COURT:  Okay.  Are you doing okay ladies and

24   gentlemen?  How about the interpreter?  Do you need a break?

25   I figured so.  We'll take about a 15 minute break.

83

1          (Whereupon a recess was taken.  The following proceedings

2     were held in open Court.)

3               THE COURT:  Miss Grady, you may proceed.

4                         CROSS EXAMINATION

5     Questions by Ms. Grady:

6     Q.     Lt. Qualls, before we took a break you had talked with

7     your attorney about an area of the prison, I believe you

8     testified, you used to transport Mr. Nicolas.  You referred to

9     it as Front Street?

10    A.     Yes, ma'am.

11    Q.     Can you tell me -- that is the pathway that leads out

12    of west house?

13    A.     Not directly, no.

14    Q.     Can you just explain to the jury where Front Street is?

15    A.     Front Street is a long section of road, basically, that

16    runs lengthwise with the prison.  The street that directly

17    connects the west cell house is perpendicular to that at the

18    far end of the institution.

19    Q.     Okay.

20    A.     So it is a large L shape.

21    Q.     So Front Street, that is sort of the main area where

22    lines are moved on?

23    A.     Yes, ma'am.

24    Q.     Okay.  And that is the street or the path that you took

25    to transport Osbaldo from west cell house to north 2 to the

84

1   segregation unit, right?

2   A.     Yes, ma'am.

3   Q.     I think you testified earlier that the practice at

4   Menard is that you wait until all line movements have gone to

5   transport prisoners when they are coming to or from

6   segregation?

7   A.     Yes, ma'am, we do try to.

8   Q.     That is what you did on February 5th of 2014, correct?

9   A.     Yes, ma'am.

10  Q.     So it was just you and Mr. Nicolas and then Mr. Diaz

11  and then the officer escorting him who would have been on that

12  pathway on Front Street on February 5th at around 11:30 a.m.,

13  right?

14  A.     Yes, ma'am.

15  Q.     Do you remember as you sit here today who that officer

16  was that walked with Mr. Diaz to segregation?

17  A.     I do not recall, no.

18  Q.     You knew that after you got these inmates to the

19  segregation unit, lines were probably going to start moving

20  again, right?

21  A.     Relatively soon, yes.

22  Q.     They were holding back lines so that you could do this

23  movement to segregation?

24  A.     Yes, ma'am.

25  Q.     Okay.  You see this very obvious patch of ice on the

1   street, right?

2   A.      Yes, ma'am.

3   Q.      It is your testimony you didn't ask any prisoners to

4   come clear the ice, right?

5   A.      No, ma'am.

6   Q.      You didn't radio to any towers that let them know there

7   is a patch of ice that needs to be cleared off, right?

8   A.      No, ma'am.

9   Q.      You didn't ask anyone to bring salt, right?

10  A.      No, ma'am.

11  Q.      You didn't tell any other officers, hey, man, when line

12  movements get going again you got this ice you got to watch

13  out for, right?

14  A.      No, I did not.

15  Q.      It is not just prisoners that move on Front Street, it

16  is nurses too?

17  A.      Nurses, maintenance.

18  Q.      Everyone in the prison.  The main way people get from

19  one place to another place, right?

20  A.      Yes, ma'am, it is.

21  Q.      It is your testimony right before you went to north 2

22  cell house, there were line movements moving on Front Street

23  like to and from chow, to and from other places like lines

24  going to commissary, other places like that, right?

25  A.      I am not aware of who might have been going where, but

86

1    I know there is movement on Front Street.  We wait for it to

2    clear.

3    Q.      Okay.  Like we're talking about 11:30, so that is a

4    time when there are inmates going to and from chow, right?

5    A.      At 11:30 they should have been done with chow on Front

6    Street.

7    Q.      Well, you wrote a disciplinary report on this day,

8    right?

9    A.      Yes, ma'am.

10   Q.      And this has not been admitted into evidence.  If you

11   can show it to the witness, please?  Lieutenant, can you see

12   that on your screen?

13   A.      Yes, I can.

14   Q.      You again had accused Mr. Nicolas of insolence, right?

15   A.      Yes, ma'am.

16   Q.      Not complying with direct orders, right?

17   A.      Yes, ma'am.

18   Q.      You said that this noncompliance, that happened at

19   11:30, right?

20   A.      Yes, ma'am.

21   Q.      And at 11:30 the noncompliance you say was occurring

22   was that Mr. Nicolas was interfering with line movement,

23   right?

24   A.      Yes, ma'am.

25   Q.      Including rec, including commissary, including chow?

1  A.     That could have included any number of those lines.  I

2  believe we were running chow lines at that time.

3  Q.     Okay.  So right at this time inmates were going to and

4  from chow on Front Street, right?

5  A.     At this time they should be done or the last line

6  should be leaving.  They are not usually running chow lines

7  after 11:30.

8  Q.     Okay, but there are lines moving around at that time,

9  right?

10  A.     Yes.

11  Q.     Any time a line moves, an officer has to move with the

12  line?

13  A.     Yes.

14  Q.     That is a movement officer?

15  A.     Escorting officer, yes.

16  Q.     So it is your testimony that Mr. Nicolas slipped and

17  fell on the obvious ice, right?

18  A.     Yes.

19  Q.     No one ever gave you a heads up about this huge patch

20  of ice on Front Street despite the fact there were lines

21  moving back and forth during the minutes or hours that

22  preceded it?

23  A.     No, ma'am.

24  Q.     Now you were asked questions about your incident report

25  and I would like to show that and publish it to the jury

88

1    because it has been admitted.  One of the things we talked

2    about was the time.  Now it is your testimony here today that

3    you just got the times flipped, right?

4    A.     Yes, ma'am.

5    Q.     So you were filling out this form at 12:30, right?

6    A.     Yes.

7    Q.     But you signed it at 11:30.  I am sorry, it is your

8    testimony today that you were filling it out at 12:30

9    referring to an event that happened at 11:30, right?

10   A.     Yes, ma'am.

11   Q.     You filled out incident reports like this several times

12   in your, I believe, 20 years at Menard?

13   A.     Yes, ma'am.

14   Q.     And you know the format.  These are all formatted the

15   same way, right?

16   A.     Yes, ma'am.

17   Q.     In fact, all of your incident reports call for the time

18   and date at the top, right?

19   A.     Yes, ma'am.

20   Q.     You know that refers to the time of the incident,

21   right?

22   A.     That is what I said, time and date of incident.

23   Q.     That is something you have done what, hundreds of times

24   filling out incident reports?

25   A.     Possibly hundreds.

1    Q.    How many times have you gotten that wrong?

2    A.    I would have to look at every one of my 434s.

3    Q.    In fact, when you sat down and wrote this, you knew

4    that the above date and time at that time at the top refers to

5    the time of the incident because you start your narrative by

6    saying on the above date and approximate time, right?

7    A.    Yes, ma'am.

8    Q.    So you knew as you were sitting down and writing it,

9    the time you were putting up at the top, that is the time you

10   were going to say that is the time this happened, right?

11   A.    That is what it should have said, yes.

12   Q.    You don't have any personal knowledge as to what time

13   you actually sat down and wrote this on February 4th of 2014,

14   right?

15   A.    By looking at the report I would say 12:30 is when I

16   sat down to write this report.

17   Q.    Do you remember sitting down and writing it?

18   A.    No, I do not.

19   Q.    You signed it down there for reporting employee, right?

20   A.    Yes, ma'am.

21   Q.    You knew when you were signing it that is what you were

22   signing, that I have completed this and it is correct, right?

23   A.    Yes, ma'am.

24   Q.    You wrote the date and time.  That time is wrong,

25   right?

1   A.      It appears to be those times have been switched.

2   Q.      Isn't that because you actually wrote this incident

3   report much later, on February 5th of 2014?

4   A.      How much later are you referring to?

5   Q.      Well, isn't it true, sir, that you wrote this after you

6   had an opportunity to talk with the other officers involved

7   and come up with a story that would explain Mr. Nicolas'

8   injuries after the beating that you inflicted on him on

9   February 5th of 2014?

10  A.      Ma'am, there was no beating inflicted on Mr. Nicolas.

11  Q.      Isn't it true that you wrote this report omitting any

12  officers involved because you needed an explanation for

13  Mr. Nicolas's injury as Aimee Lang observed them on

14  February 5th of 2014?

15  A.      No, that is not true.

16  Q.      It is your testimony or it was your testimony earlier

17  that you would have told Reichert about the fall on the ice if

18  he only would have asked you, right?

19  A.      Yes.

20  Q.      You knew on March 5th of 2014 when you were asked about

21  this incident that this was about allegations that you had

22  punched and kicked and beaten a prisoner that was supposed to

23  be under your care at the west cell house at Menard, right?

24  A.      Yes.

25  Q.      And you knew when you were being investigated about

91

1    this event on March 5th of 2014 that that inmate had alleged,

2    and that a third party prisoner had alleged, that he was

3    really injured as a result of those events, right?

4    A.      Yes.

5    Q.      And you didn't think knowing that this prisoner had

6    accused you of beating him up such that he had these serious

7    injuries, you didn't think it relevant to say to Reichert,

8    hey, you know, I got to tell you here is what happened and how

9    he got those injuries?  That didn't cross your mind?

10   A.      No, ma'am.

11   Q.      Today we have talked about the allegations that are

12   made against you about the beating of February 5th of 2014,

13   right?

14   A.      Yes.

15   Q.      And you have talked at length about the fall on the

16   ice, right?

17   A.      Yes, ma'am.

18   Q.      You agree it is centrally relevant to the issues in

19   this case, right?

20   A.      Yes, ma'am, it is.

21   Q.      But you didn't bring it up with Reichert?

22   A.      No, I did not.

23          MS. GRADY:  I don't have anything further.

24          THE COURT:  Mr. Tyrrell, anything else?

25          MR. TYRRELL:  Yes, briefly, Your Honor.

92

RECROSS EXAMINATION

Questions by Mr. Tyrrell:

Q.    Lieutenant, I believe you already testified a couple of different times that on February 5th of 2014 you were not aware of any injuries Mr. Nicolas sustained as a result of the fall, correct?

A.    That's correct.

Q.    Do you have access to inmate medical records?

A.    I do not.

Q.    Do you recall Nurse Aimee Lang talked to you about any injuries Mr. Nicolas may have suffered on February 5th of 2014?

A.    I recall no such.

Q.    Is it possible you didn't know Mr. Nicolas had any injuries when you talked to Mr. Reichert on March 5th of 2014?

A.    I was not aware of it.

        MR. TYRRELL:  Nothing else.  Thank you, Your Honor.

        THE COURT:  You may step down.  Call your next witness.

        MS. GOODWIN:  Your Honor, defendants call Aimee Lang.

        THE COURT:  Deanna, if you would administer the oath?

        AIMEE LANG, DEFENDANT'S WITNESS, SWORN

                    DIRECT EXAMINATION

Questions by Ms. Goodwin:

        COURTROOM CLERK:  Please be seated.  Would you please

93

1   state your name and spell your first and last name for the

2   record?

3   A.      Aimee Lang, A I M E E, Lang, L A N G.

4   Q.      Miss Lang, focusing back on February 5th of 2014, you

5   were employed as a medical technician at Menard Correctional

6   Center, correct?

7   A.      Yes.

8   Q.      All right.  You are certified as an LPN?

9   A.      Yes.

10  Q.      That is a nursing certification, correct?

11  A.      Yes.

12  Q.      As a nurse, it was your job to care for patients at

13  Menard Correctional Center, is that correct?

14  A.      Yes.

15  Q.      You examined the patients?

16  A.      Yes.

17  Q.      You would routinely take the vitals of patients?

18  A.      If what I was doing at the time deemed so, yes.

19  Q.      You would routinely assess their medical needs?

20  A.      If that was my assignment at the time, yes.

21  Q.      As part of assessing a patient's medical needs, you

22  would determine whether an inmate would need to be referred to

23  a doctor?

24  A.      Somewhat, yes, and according to the paperwork that we

25  use.  Some things automatically would warrant a referral.

94

1   Q.      Okay.  So you would decide if an inmate had needs that

2   automatically warranted referral to a doctor?

3   A.      Per our protocol sheets, yes.

4   Q.      You could use your own determination based on your

5   medical training as to whether an inmate needed a referral to

6   a doctor?

7   A.      In other instances, yes.

8   Q.      You could also put an inmate on a list to see a doctor,

9   is that correct, or a nurse?

10  A.      It's a referral, and then they get scheduled.

11  Q.      Okay.  Of course, you could use your medical judgment

12  to determine if an inmate had a medical emergency that

13  required immediate medical care as well?

14  A.      Yes.

15  Q.      As far as your job in referring parties to either a

16  nurse or doctor, that could be done for patients in

17  segregation as well as in general population, correct?

18  A.      Yes, the whole institution.

19  Q.      Now as a nurse then on February 5th of 2014, you were

20  asked by Defendant Qualls to examine Mr. Nicolas, correct?

21  A.      I'm not sure if it actually came from him, but I knew

22  of an inmate coming to segregation from west house that I

23  needed to evaluate, yes.

24  Q.      Okay.  But you have no independent recollection sitting

25  here today of treating Mr. Nicolas, correct?

1    A.     No.   I assessed him.

2    Q.     Do you have an independent recollection sitting here

3    today of assessing Mr. Nicolas?

4    A.     Like do I remember the actual?  I am sorry, I don't --

5           THE COURT:  Do you remember it just from your memory?

6    A.     Oh, no, I do not.  Not without documentation, no.

7    Q.     You were sitting here, of course, during Lt. Qualls'

8    testimony, correct?

9    A.     Yes.

10   Q.     And you heard Defendant Qualls tell you that he told

11   you that plaintiff needed medical attention because they had

12   slipped on the ice?

13   A.     If he did tell me that, I don't recall.

14   Q.     Okay.  But you have no way to dispute that what

15   Defendant Qualls just testified to in Court is wrong?

16   A.     No, because I don't recall.

17   Q.     Okay.  All right, I would like to pull up -- I

18   apologize, Your Honor, this is a new technology.  I would like

19   to pull up the February report and it has already been

20   admitted into evidence.

21           THE COURT:  What is the exhibit number?

22           MS. GOODWIN:  Exhibit 7.

23   Questions By Ms. Goodwin:

24   Q.     Ma'am, is this your handwriting on the report in front

25   of you?

96

1    A.    Yes.

2    Q.    When did you fill out this report?

3    A.    On February 5th.

4    Q.    You filled out this report after you spoke with

5    Defendant Qualls, correct?

6    A.    I'm unaware if I talked to him.  I don't recall who I

7    talked to.

8    Q.    Okay.  Again, you were here when Defendant Qualls

9    testified that he spoke to you?

10   A.    Yes.

11   Q.    You have no way to dispute that, no reason to dispute

12   it?

13   A.    I suppose not.

14   Q.    Defendant Qualls told you back in February of 2014 that

15   Mr. Nicolas and himself had fallen on the ice on Front Street,

16   is that correct?

17   A.    That's what I have written on the documentation.

18   Q.    Okay.  You yourself used Front Street as a means to

19   walk back and forth between buildings, correct?

20   A.    Correct.

21   Q.    Do you know when you filled out this report?

22   A.    The time would be on the back side of this report.

23   Q.    Before we get there -- all right, ma'am, when you

24   examined Mr. Nicolas, what medical supplies did you have with

25   you?

97

1    A.     I can't say exactly, but I would assume that I would

2    have taken blood pressure cuff, stethoscope, thermometer.

3    Q.     Which of those medical supplies did you use in

4    evaluating Mr. Nicolas?

5    A.     Per recollection, I don't know of any, but per my note

6    it is documented that I did not use any.

7           MS. GOODWIN:  Okay.  Your Honor, I apologize, but

8    could I take a quick break to get the exhibit in order?

9           THE COURT:  To get what?

10          MS. GOODWIN:  The exhibit in order.  I really

11   apologize.

12          THE COURT:  How much time do you need?  Go ahead,

13   we'll just wait.

14          MS. GOODWIN:  I apologize, Your Honor.

15          THE COURT:  No need to apologize.  I deal with it

16   every day.

17   Questions By Ms. Goodwin:

18   Q.     All right, backing up then, you used no medical

19   supplies, no thermometer, no stethoscope, no blood pressure

20   cuff when you were evaluating Mr. Nicolas, correct?

21   A.     Per my notes, no.

22   Q.     Okay.  Isn't it true that you observed Mr. Nicolas

23   laying on the floor throughout the entire examination?

24   A.     No.

25   Q.     Is that something that you remember?

1   A.      Per my documentation, I don't believe I remember

2   reading anything that said he was lying on the floor.

3   Q.      Was he standing?

4   A.      I don't remember him lying on the floor.

5   Q.      Was he standing?

6   A.      I would assume to be standing.

7   Q.      All right.  Ma'am, you gave a deposition in this

8   matter, correct?

9   A.      Yes.

10  Q.      At that time of the deposition in June of 2017 you took

11  an oath, correct?

12  A.      Yes.

13  Q.      You took an oath to tell the truth just like you took

14  here today, correct?

15  A.      Yes.

16  Q.      Okay.  Page 32, lines 2 through 4.  You were asked

17  these questions and did you give these answers?  "Okay, do you

18  recall if Mr. Nicolas was standing while you were speaking

19  with him?  I do not."  Were you asked that question and did

20  you give that answer?

21  A.      If that is what is on my deposition, yes.

22  Q.      All right.  So, ma'am, when you were asked the

23  questions at the deposition you did not remember one way or

24  the other whether Mr. Nicolas was standing or sitting down,

25  correct?

99

1    A.      Correct.

2    Q.      You heard him testify in Court just yesterday that he

3    was not standing, that he was laying on the floor during the

4    entire examination, is that correct?

5    A.      No.

6    Q.      You did not hear that?

7    A.      When he was asked when I assessed him, he said he was

8    standing.

9    Q.      All right.  Ma'am, you have no way to dispute

10   Mr. Nicolas' statement that he was laying on the floor during

11   your examination, is that correct?

12   A.      Other than the fact that he said yesterday he was

13   standing.

14   Q.      Now when you assessed plaintiff, he was behind a caged

15   gate, correct?

16   A.      Bars.

17   Q.      He was behind bars?

18   A.      Yes.

19   Q.      Can you describe the bars?

20   A.      They are the bars that would be in front of all cells

21   like Lt. Qualls had described, approximately three to four

22   inches apart.  There is a foot, foot and a half long, and then

23   there is a long horizontal steel plate type and then there is

24   another set of bars and so on and so on.

25   Q.      So are these what you are describing -- is it your

1    testimony that Mr. Nicolas was behind vertical bars?

2    A.      Yes.

3    Q.      And the kind of bars like Clayborn Smith said you could

4    stick your hand through with a mirror?

5    A.      Correct.

6    Q.      Ma'am, at the same deposition in June of 2017, were you

7    asked these questions and did you give these answers, page 22,

8    lines eleven through 19?  "Now describe the bars on the gate

9    for me.  It is like just vertical and horizontal bars that are

10   probably only spaced with maybe a square of approximately a

11   three by three or two by two inch opening.  Okay.  So you

12   observed Mr. Nicolas through those bars?  Yes."

13          So those are vertical and horizontal creating a cage,

14   correct?

15   A.      Yes.

16   Q.      That is what you observed Mr. Nicolas through?

17   A.      There are two spots where there is interview or

18   assessment or evaluation could have happened, and at the time

19   of the deposition I was not aware of which location that was,

20   so the description that I put in my deposition is one of the

21   locations, yes.  However, at that time I did not know that the

22   evaluation took place on two gallery at the bars.

23   Q.      At your deposition we talked in length about the

24   examination of Mr. Nicolas, correct?

25   A.      I would assume so.

1   Q.      We reviewed documents at your deposition?

2   A.      I would assume so.

3   Q.      The same documents that we're going to look at today?

4   A.      Yes.

5   Q.      It is your testimony today that you saw Mr. Nicolas

6   through bars even though you went through the same testimony

7   earlier a year ago and testified that you saw him through a

8   little cage, two by two or three by three opening, correct?

9   A.      What I was describing was something that could have

10  happened.  I believe in any deposition I put there are two

11  areas that he could have been seen and this was one of the

12  areas.  At the time, no, I did not know which location even

13  with all of the documentation that you had given me or that I

14  had already looked at.  It did not tell me at that time what

15  location it would have been at.

16  Q.      Ma'am, you were also asked at that same deposition,

17  where again we talked about this at length about where the

18  examination of Mr. Nicolas took place, you were asked on page

19  20, lines 23 to 24, you were asked, or I apologize, eleven to

20  24, you were asked, "Wherever we were at that time I was not

21  able to get to him because he was uncooperative."  And we

22  talked about that, which we will get to in a second.  Then you

23  answered on line 23 that he would be behind a cage door.  Do

24  you remember providing testimony about that?

25  A.      Yes.  Once again, it was in reference to the area that

1    I thought could have been the location of the assessment.

2    Q.    All right.

3    A.    Until trial I did not realize or know because I did not

4    have all of the information until I found out it was actually

5    on the gallery.

6    Q.    In fact, you testified previously that you were not

7    able to assess his vitals because he was behind that cage

8    door?

9    A.    I would not have been able to assess his vitals at

10   either location with him being uncooperative.

11   Q.    Okay.  Now he was handcuffed, correct?

12   A.    Yes.

13   Q.    He was handcuffed during the entirety of your

14   examination?

15   A.    Yes.

16   Q.    And Mr. Nicolas told you that he had injuries to his

17   wrist, correct?

18   A.    Yes.

19   Q.    And you did not unhandcuff him in order to examine his

20   wrist?

21   A.    No.

22   Q.    You never examined his wrist, correct?

23   A.    No.  I looked at all areas that I was able to see.

24   Q.    So you never examined his wrist?

25   A.    I can still see his wrists even if he has handcuffs on.

1    Q.     He was wearing long sleeves?

2    A.     I have no idea if he was wearing long sleeves.  He was

3    in -- he would have been in a seg jumpsuit.  Seg jumpsuits

4    don't have sleeves.

5    Q.     Inmates are permitted to wear sweaters or long sleeve

6    shirts, correct?

7    A.     Correct.

8    Q.     Okay.  You have no recollection of this incident?

9    A.     Of whether he had on --

10   Q.     Long sleeves?

11   A.     I do not know if he had anything on underneath.  I am

12   assuming no because I was able to say that there were no other

13   deformities or swelling or bruising noted to the other areas

14   of the complaint, so I am going to say no.  I don't believe I

15   even recall or would have seen him wearing a shirt.

16   Q.     You have no independent recollection of this incident,

17   correct?

18   A.     Correct.  I'm going off of my notations.

19   Q.     You have no way to dispute that Mr. Nicolas was wearing

20   a long sleeve shirt, correct?

21   A.     I do because of my notations.

22   Q.     You do dispute that he was wearing long sleeves?

23   A.     My notations state that I did not see any swelling,

24   bruising, any deformities or abnormalities of any type noted

25   to all areas of complaint.

104

1  Q.    All right.  Now Mr. Nicolas also told you that he had

2  pain on his legs, correct?

3  A.    Yes.

4  Q.    Okay.  He was wearing pants?

5  A.    Jumpsuit.

6  Q.    And did you look at his legs?

7  A.    From the jumpsuit I was able to see the top part of his

8  legs and that was it.

9  Q.    And what part do you mean by the top part of his legs?

10  A.    From his boxers to like mid thigh or whatever type of

11  underwear he had on at the time.

12  Q.    Did you ask him to remove his clothing?

13  A.    No, his jumpsuit would have been opened.  He would have

14  just put this on.

15  Q.    Ma'am, you have no recollection of this, correct?

16  A.    I do not, but per my notes that is how I am getting the

17  information to answer your questions.

18  Q.    There is nothing in your notes that states that you

19  asked him to remove his clothing or open his jumpsuit or even

20  that he was wearing a jumpsuit or that he had already changed

21  at that time, is that correct?

22  A.    By the time I get to them they would have already been

23  stripped out and put in a jumpsuit.

24  Q.    All right.  Showing you what has been previously marked

25  as Exhibit 7.  This is an inmate injury report, correct?

1    A.    Yes.

2    Q.    This is a document that was filled out by yourself?

3    A.    Yes.

4    Q.    That is your signature at the bottom?

5    A.    Yes.

6    Q.    And this form indicates that you evaluated Mr. Nicolas

7    at 11:55 a.m. Is that accurate?

8    A.    Yes.

9    Q.    All right.  Is it your testimony that 11:55 a.m. --

10    well, strike that.  Mr. Nicolas told you that his head hurt,

11    his left wrist hurt, his right jaw hurt and his legs hurt.  Is

12    that accurate?

13    A.    That is what I wrote.  That is what he said.

14    Q.    All right.  It is your testimony that you examined

15    Mr. Nicolas' legs?

16    A.    What I could see of them.

17    Q.    Okay.  In your medical training, how do you evaluate

18    complaints of pain?

19    A.    You ask numerous questions related to the area of

20    complaint and the types of pain that they are having.

21    Q.    What numerous questions did you ask of Mr. Nicolas?

22    A.    There were not many questions because he was

23    uncooperative, so the assessment did not last long.

24    Q.    We have mentioned this uncooperative note.  You have no

25    recollection of how Mr. Nicolas was uncooperative, is that

1    correct?

2    A.    Correct.

3    Q.    Okay.  But yet sitting here today you're telling us

4    that the assessment didn't last long because he was

5    uncooperative?

6    A.    Once again, per my notations.  That's all I can go by.

7    Since I do not actually remember the exact date, I have to go

8    off of my documentation.

9    Q.    How was Mr. Nicolas uncooperative?

10   A.    Like I said, I don't recall February 5th at 11:55 in

11   2014.  I am only going by my documentation.

12   Q.    Backing up, what are the numerous questions that you

13   would typically ask an inmate who comes to you with complaints

14   of pain?

15   A.    Depends on what type of pain, where the pain came from,

16   how long they have had it.

17   Q.    Well --

18   A.    I mean there is --

19   Q.    In regard to Mr. Nicolas then on February 5th of 2014,

20   he told you that he had been beaten up by guards in the west

21   house, is that correct?

22   A.    No.

23   Q.    He never told you that?

24   A.    I would have had it somewhere in my notation had he

25   said that.

107

1   Q.      Now switching topics a bit.  Defendant Qualls was a

2   sergeant at the time of this incident?

3   A.      I assume.

4   Q.      You had no idea?

5   A.      I mean I knew he was a sergeant.  I couldn't have told

6   you what assignment he had at that time or what his exact

7   title was in 2014.

8   Q.      All right.  Well, you worked with officers,

9   correctional officers, every day, correct?

10  A.      Yes, I do.

11  Q.      You form working relationships with them?

12  A.      I do.

13  Q.      You seek to have good relationships with them, correct?

14  A.      I do.

15  Q.      And Qualls may not have been your direct supervisor at

16  the time, but he was a sergeant, correct?

17  A.      I assume he was at that time.

18  Q.      Had you recorded on your incident report or the inmate

19  injury report that Mr. Nicolas had said that he was beaten up

20  by guards in the west house, where would that incident report

21  have been?  Where would that have gone in a chain of offices?

22  Who would have received the report next?

23  A.      This report?

24  Q.      Correct.

25  A.      Nurse supervisors take care of the rest.  It gets

1    logged.  What they do with it after that, I do not know.

2    Q.    Ma'am, if you had recorded on this document that

3    Mr. Nicolas had told you that he had been beaten up by

4    officers in the west house, is it your testimony that the form

5    would have just been passed on and put into the medical

6    records or passed off to higher ups at the prison?

7    A.    I misunderstood the question.  You are saying if I had

8    wrote all of that on there?

9    Q.    If you had wrote that Mr. Nicolas had been beaten up by

10   officers in the west house, who, then, would have received

11   this form?

12   A.    It still would have been the same, however, there would

13   have been other paperwork beyond that.

14   Q.    Okay.  You didn't want to fill out the paperwork,

15   correct?

16   A.    That is -- you are putting words in my mouth.

17   Q.    Because, in fact, you didn't want to fill out this

18   paperwork, correct?

19   A.    I filled this paperwork out, so --

20   Q.    You heard plaintiff's testimony yesterday where he

21   stated that he asked why you weren't writing this down and

22   that you laughed.  You don't remember this incident and you

23   have no way to dispute that, correct?

24   A.    Correct.

25   Q.    All right.  Would you agree that pain throughout an

1    inmate's body, throughout a patient's body, is a serious

2    medical need?

3    A.     Depends.

4    Q.     If somebody comes to you saying my stomach, my groin

5    area hurts, my legs hurt, that is a serious medical need,

6    correct?

7    A.     Depends.

8    Q.     It's something, because it would be internal pain that

9    would require follow-up care, correct?

10   A.     Depends.

11   Q.     You would agree that if an inmate laying on the floor

12   of his cell during your examination would be in an obvious

13   medical -- would have an obvious medical condition?

14   A.     If that had happened, yes, but it did not happen.  It

15   is not in my notation.

16   Q.     When someone is laying on the floor of a cell, it is

17   obvious to you as a medical professional that he would need

18   help, correct?

19   A.     Not necessarily.

20   Q.     All right.  Would you agree that there is a difference

21   in an inmate who is not cooperative because he is defiant

22   compared with an inmate who can not participate in his care

23   because he is laying on the floor of the cell?

24   A.     Would I agree if there is a difference?

25   Q.     Is there a difference?

110

1    A.    Well, I would say yes.

2    Q.    Yes.  There is a difference between an inmate who just

3    refuses to cooperate with the care versus an inmate who

4    physically cannot cooperate with the care, correct?

5    A.    Correct.

6    Q.    Okay.  That is something that you should have evaluated

7    during the evaluation of Mr. Nicolas?

8    A.    Are you making a statement or asking me a question?

9    Q.    You should have evaluated whether Mr. Nicolas was

10   laying on the floor because he could not get up or because he

11   was being uncooperative?

12   A.    He was not lying on the floor.

13   Q.    But you have no recollection.

14   A.    If he would have been lying on the floor incapacitated,

15   unable to move, unable to get up, unable to move and show me

16   anything or show me injuries, that definitely would have been

17   documented in my notes.  Him even lying on the ground would

18   have been documented in my notes.  It is not, so, therefore,

19   he was not lying on the ground.  I don't need recollection to

20   know that.

21   Q.    Now that is based on your examination of Mr. Nicolas,

22   correct, what you just said?

23   A.    The incident report.

24   Q.    What you just said, that is based on your examination

25   of Mr. Nicolas?

1    A.    Well, yes, I can only speak for myself.

2    Q.    And from that examination, you likely talked about --

3    had the opportunity to either let Mr. Nicolas continue on to

4    segregation or to help him and put him on a list or give him

5    referral to see further a doctor or nurse, is that correct?

6    A.    Correct.

7    Q.    You had those two options.  You could say follow-up as

8    needed or you could say I am going to help you see a doctor,

9    correct?

10   A.    Correct.

11   Q.    Okay.  In this instance suggested, you sent Mr. Nicolas

12   straight to segregation, correct?

13   A.    With follow-up as needed.

14   Q.    Follow-up as needed.  What does that mean for an

15   inmate?  Practically speaking, what does that mean?

16   A.    If at any point in time after the incident, say the

17   next day, your back starts to hurt or your leg starts to hurt

18   or whatever, something changes, then you are to inform medical

19   or you can inform security and they can inform medical or

20   write a sick call slip, get evaluated, and an assessment is

21   done and then depending on what is found during the

22   assessment, they could either be given something at that time,

23   items that we're allowed to issue, or get referred to the

24   doctor.

25   Q.    Okay.  So follow-up as needed as you suggested in the

112

1   care for Mr. Nicolas is putting the burden on the inmate to be

2   able to reach out and get that follow-up care, correct?

3   A.    I don't believe it is a burden.  It is his right to do

4   that.

5   Q.    It would be his responsibility to track down medical

6   staff or his responsibility to fill out a sick call slip?

7   A.    A slip, yes.  It can be on any type of paper.  He

8   doesn't have to track any special form down.

9   Q.    Okay.  If I could show you without publishing it to the

10  jury -- I believe Deanna stepped out.

11            THE COURT:  Do you have the paper copy?

12            MS. GOODWIN:  We do have the paper.

13            THE COURT:  She'll be back.  She just went to grab

14  the jury lunches.

15            MS. GOODWIN:  May I proceed, Your Honor?

16            THE COURT:  You may.

17            MS. GOODWIN:  Your Honor, may I approach the witness?

18            THE COURT:  You may.

19  Questions By Ms. Goodwin:

20  Q.    Ma'am, I am showing you what has been marked as

21  Plaintiff's Trial Exhibit 26.  Go ahead and look at this

22  document and let me know if you recognize it.

23  Q.    Recognize it as being mine, or just knowing what it is?

24  A.    Well, this is a medical record, correct?

25  A.    Yes.

113

1   Q.     Of Mr. Nicolas?

2   A.     Yes.

3   Q.     This is the type of medical record that is maintained

4   at Menard in the normal course of business, correct?

5   A.     Correct.

6        MS. GOODWIN:   Okay.  Your Honor, I would like to

7   publish this to the jury and to admit it as Plaintiff's

8   Exhibit 26.

9        THE COURT:   Is this all of his medical records or --

10        MS. GOODWIN:   Just page 63.

11        THE COURT:   Any objection?

12        MR. TYRRELL:   No, Your Honor.

13   (Whereupon  Plaintiff's Exhibit 26, page 63 was admitted.)

14   Questions By Ms. Goodwin:

15   Q.     Just so we're clear, this is not a medical record that

16   you filled out, correct?

17   A.     Correct.

18   Q.     But this is a medical record of Mr. Nicolas, is that

19   correct?

20   A.     It is a preprinted progress note that we use with

21   assessments, yes.

22   Q.     This document -- this is a medical record for

23   Mr. Nicolas, right?

24   A.     A progress note, yes.

25   Q.     And it was created on February 7th of 2014?

1    A.    Yes.

2    Q.    At just before 10:00 o'clock a.m.?

3    A.    Yes.

4    Q.    So that is just two days after you examined him,

5    correct?

6    A.    Correct.

7    Q.    This assessment was also performed by a medical

8    technician.  Is that accurate?

9    A.    Yes.

10   Q.    Okay.  In this report Mr. Nicolas told that medical

11   technician that he was hit in his cheek, in his face, in his

12   jaw and that it hurt bad.  Do you see that there?

13   A.    Yes, I do.

14   Q.    That would be words that Mr. Nicolas told to the

15   medical technician on February 7th, correct?

16   A.    I am assuming so since she wrote it.

17   Q.    This medical technician also recorded that the injury

18   occurred on February 5th of 2014?

19   A.    Per her note, yes.

20   Q.    That it occurred due to an altercation?

21   A.    Per her note, yes.

22   Q.    Do you have any explanation, based on your examination

23   of Mr. Nicolas, as to how his cheek, face and jaw would still

24   be hurting two days after the incident after you examined him?

25   A.    There could be many reasons.  I don't know his medical

1  history.

2  Q.     On this date on February 7th, this medical technician

3  took the step of referring Mr. Nicolas to an M.D., correct?

4  A.     She has circled refer to M.D., but then also wrote sent

5  to dental.  I don't know who saw them.

6  Q.     She also wrote or underlined that there was deformity,

7  severe pain and swelling, correct?

8  A.     Per her note, yes.

9  Q.     This M.D. two days later also provided Mr. Nicolas with

10  a cold pack and Tylenol.  Is that accurate?

11  A.     The who?

12  Q.     This medical technician also provided Mr. Nicolas with

13  a cold pack and Tylenol?

14  A.     I assume she did since she marked it.

15  Q.     So those are three things, the referral, the Tylenol

16  and the cold pack, that this medical technician did on 2-7 and

17  that you failed to do on 2-5, is that correct?

18  A.     Symptoms can change in the span of two days.

19  Q.     Okay.

20         MS. GOODWIN:  Your Honor, I would like to show the

21  witness Plaintiff's Trial Exhibit 26.

22         THE COURT:  Is this a different page?

23         MS. GOODWIN:  It is.

24         THE COURT:  What page?

25         MS. GOODWIN:  Page 65.  May I approach the witness?

116

1              THE COURT:  You may.  So did we admit page 63?

2              MS. GOODWIN:  Yes.

3              THE COURT:  Are you going to eventually admit the

4    entire record or just --

5              MS. GOODWIN:  Certain pages.

6              THE COURT:  All right.  Okay, so this is page 65?

7              MS. GOODWIN:  Correct.

8    Questions By Ms. Goodwin:

9    Q.    All right, ma'am, take a look at this document.  This

10   too is a medical record and this is a medical record of

11   Mr. Nicolas, is that correct?

12   A.    Yes.

13   Q.    And then this is also a medical record that is

14   maintained at Menard in the normal course of business?

15   A.    Yes.

16             MS. GOODWIN:  Your Honor, I would like to admit page

17   65 of Plaintiff's Exhibit 26 into evidence and publish it to

18   the jury.

19             THE COURT:  Any objection?

20             MR. TYRRELL:  No objection, Your Honor.

21             THE COURT:  So page 65 of Exhibit 26 will be

22   admitted.

23        (Whereupon  Plaintiff's Exhibit 26, page 65, was

24   admitted.)

25

1    Questions By Ms. Goodwin:

2    Q.    All right, ma'am, if I can direct your attention to the

3    bottom of the page, you will see here that this is an M.D.

4    note.  Do you see that?

5    A.    Yes.

6    Q.    And that it is written on March 7th of 2014?

7    A.    Yes.

8    Q.    Okay.  And in this note Mr. Nicolas tells the doctor

9    that he has pain in the left groin and two bumps or

10   deformities, correct?

11   A.    Two bumps, yes.

12   Q.    Okay.  These injuries to his left groin, that is

13   consistent with the injuries that you examined him for on

14   February -- I am sorry, February 5th of 2014?

15   A.    I am sorry?

16   Q.    These injuries to his left groin, the two bumps, those

17   are consistent with what you examined him for back on

18   February 5th of 2014?

19   A.    No.

20   Q.    That is not consistent?

21   A.    He didn't complain of groin pain.

22   Q.    Okay.  All right, going back to the 3-7 note.  This

23   doctor noted softness around the groin, is that correct, the

24   third line down?

25   A.    His abdominal area was soft.

1   Q.    This doctor examined Mr. Nicolas' abdominal area, is

2   that correct?

3   A.    I mean I assume he did.  I was not there.

4   Q.    That is something that you failed to do on February 5th

5   of 2014?

6   A.    I did not fail to do that.  I was unable to do that.

7   Q.    Okay.  How was it that you examined Mr. Nicolas' head?

8   A.    I am sorry, I don't --

9   Q.    When you examined Mr. Nicolas on February 5th of 2014,

10  how did you examine his head?

11  A.    By looking at it.

12  Q.    Did you look at the front?  Did you look at the back?

13  What did you do?

14  A.    I looked at whatever he was able to show me.

15  Q.    What do you mean able to show you?

16  A.    Because I do not recall the actual day, I can only go

17  by my notations.  From my notations I wrote that he had a

18  superficial abrasion to his forehead.

19  Q.    That was on his left side?

20  A.    I believe it said left forehead, hairline area.

21  Q.    Did you ask him how he received that abrasion?

22  A.    I don't recall if I did or didn't.

23  Q.    Were you ever asked by anybody at the prison, anybody

24  from internal affairs or anyone higher up to discuss with them

25  anything about this injury, this examination of plaintiff on

119

1    February 5th of 2014?

2    A.      I don't recall.

3    Q.      No one from internal affairs came to talk to you,

4    correct?

5    A.      I don't recall if they did or didn't.

6             MS. GOODWIN:  Okay.  Your Honor, may I have one

7    moment?  Your Honor, no further questions.

8             THE COURT:  Mr. Tyrrell, do you have very much for

9    the witness?

10            MR. TYRRELL:  I imagine about 20 or 30 minutes.

11            THE COURT:  Let's break for lunch.  Your lunch is

12   here.  We will resume at 12:30.

13            Miss Lang, you can, of course, take a lunch break.

14   Remember you are under oath.  Don't talk to anyone about your

15   testimony.  Be back, ready to go, at 12:30.

16            (Whereupon the interpreter, Rafael Saloma-Gonzalez,

17   is sworn.)

18            THE COURT:  Be seated everyone.  Welcome back, ladies

19   and gentlemen.

20            Mr. Tyrrell, you can proceed with questioning.  You

21   are going to do the same thing here, clarify and ask your

22   questions.

23            MR. TYRRELL:  Yes, Your Honor.

24

25

120

CROSS EXAMINATION

Questions by Mr. Tyrrell:

Q.      Good afternoon, Miss Lang.  Before I talk about February 5th of 2014 and your interactions with Mr. Nicolas, I want to go back and talk about your career with the Illinois Department of Corrections.  When did you first start working for the Illinois Department of Corrections?

A.      November 13th of 2006.

Q.      Thank you.  Did you start working for the Department of Corrections at Menard Correctional Center?

A.      Yes.

Q.      What was your title when you first started working for the Department of Corrections?

A.      Correctional medical technician.

Q.      Is that the same title you hold today?

A.      Yes.

Q.      Have you always worked at Menard Correctional Center?

A.      Since that date, yes.

Q.      What sort of duties or responsibilities do you have as a medical technician at Menard Correctional Center?

A.      Various.  We do perform sick call where we do initial assessments, assist doctors, do M.D. or N.P. referrals, vital signs, pass medication, administer insulin, answer emergencies.

Q.      Now I believe when you testified earlier you said you

121

1   are currently an LPN, is that correct?

2   A.     Yes.

3   Q.     In your role as a medical technician in the Menard

4   Correctional Center, are you allowed to prescribe medications?

5   A.     No.

6   Q.     Can you order diagnostic testing such as x-rays or an

7   MRI?

8   A.     No.

9   Q.     Can you order any specialty medical visits like sending

10  someone out to see a different physician?

11  A.     No.

12  Q.     Okay.  Are there different assignments you could have

13  as a medical technician working at Menard?

14  A.     Yes.

15  Q.     What are some of those assignments?

16  A.     You could be on a call line, have a cell house

17  assignment or be a float or an assistant to the third floor,

18  CN-2 or CN-1 in the health care unit.

19  Q.     CN-1 and CN-2 are corrections nurses?

20  A.     Yes, RNs.

21  Q.     I believe you mentioned one of the possible assignments

22  is to a cell house.  Could someone be assigned to the north 2

23  housing unit?

24  A.     Yes.

25  Q.     To your knowledge, north 2 is segregation, correct?

122

1    A.      Part of it is, yes.

2    Q.      Does north 2 segregation have a -- or what sort of --

3    strike that.  What sort of area do you have at north 2, if

4    any, to see patients there?

5    A.      In north 2 and every cell house has a medical unit or

6    medical station.

7    Q.      What is the medical unit or medical station?

8    A.      A desk, scale, paperwork, stethoscope, thermometer,

9    pulse ox, an emergency bag in some cell houses, dressing

10   change supplies.  It just kind of varies depending on who has

11   had the assignment and what supplies they put in there and

12   over the counter medications.

13   Q.      Okay.  Now thinking back to February 5th of 2014, do

14   you recall if you were assigned to north 2 to work there?

15   A.      I believe I was, but I am not for certain.

16   Q.      Okay.  Have you ever worked in the north 2 cell house?

17   A.      Yes.

18   Q.      So you're kind of familiar with seeing patients in the

19   north 2 cell house?

20   A.      Yes, it was my assignment for a little over two and a

21   half years.

22   Q.      So you're very familiar with working with patients in

23   the north 2 cell house?

24   A.      Yes.

25   Q.      Okay.  If an offender in the north 2 cell house --

123

1  strike that.  Were you working in the north 2 cell house

2  generally in the beginning of 2014 including February of 2014?

3  A.     If I was back on day shift, yes, that would have been

4  my assignment.  I was on midnights for a little while.  I'm

5  thinking by then I did go back to days though.

6  Q.     You are generally familiar with how an offender

7  assigned to north 2 could request health care service?

8  A.     Yes.

9  Q.     How can an offender assigned to north 2 request health

10  service?

11  A.     Just like any other cell house except they are not able

12  to drop their slip in the actual sick call.  It is like a

13  mailbox.  They would have to give it to a person or put it in

14  the bars on midnight shift.  The midnight shift officers grab

15  all of those and stick them in the sick call box for them.

16  Q.     If an offender wanted to see a medical professional,

17  they write it down, place it in the bars and it gets picked up

18  on the midnight shift?

19  A.     Correct, or they could give it to passing medical staff

20  they saw.

21  Q.     Medical staff pass through the north 2 cell house?

22  A.     Yes.

23  Q.     How often?

24  A.     Day shift, when I had the assignment, you're supposed

25  to walk every gallery every day whether it is segregation or

124

1    not.  So every day I walked the whole entire cell house, all

2    three wings.  Then on second shift, every gallery is going to

3    get walked also because medication passes on evening shift,

4    and once again, it would get walked, the whole cell house, on

5    midnights because there is another medication pass.

6    Q.    Can offenders stop the medical professionals that walk

7    through the galleries?

8    A.    Yes.

9    Q.    Can they request medical service?

10   A.    They can.  If it is emergency situation, they would

11   deal with it.  If it is not, they would instruct them to

12   follow policy, which would be putting in sick call slip or

13   they could hand a sick call slip to the individual and they

14   could put it in the box for them.

15   Q.    Okay.  I believe earlier you testified there was two

16   different locations this interaction with Mr. Nicolas may have

17   taken place.  Do you recall testifying to that?

18   A.    Yes.

19   Q.    What are these two different locations your

20   interactions on February 5th of 2014 with Mr. Nicolas may have

21   taken place?

22   A.    The one where he was actually at that I didn't know

23   about was the area held on 2 gallery in the shower area and

24   the other one is off the north 2 visiting room area and there

25   is a small area where there is a holding cage for only two

125

 1    individuals separated into two small areas that have the

 2    horizontal and vertical bars like I had described in my

 3    deposition.

 4    Q.    Right.  I note -- I believe you testified to that

 5    during your deposition.  You testified that you didn't recall

 6    where the location took place?

 7    A.    Right.  So I described the one because I said it could

 8    have been this one.

 9    Q.    How do you know now it is the other location, the

10    shower area you just described?

11    A.    Due to other testimony and other paperwork that was

12    provided throughout the case.

13    Q.    That was during this trial the last couple of days?

14    A.    Yes.

15    Q.    Okay.  I want to show you what has already been

16    admitted into evidence as Plaintiff's Trial Exhibit No. 7.

17    Again, this is an inmate injury report that you completed,

18    correct?

19    A.    Yes.

20    Q.    This concerns the plaintiff, Mr. Jose Nicolas?

21    A.    Yes.

22    Q.    Looking at the second page I see an S O A P on the left

23    hand side.  Are you familiar with that term or letters?

24    A.    Yes, it is called a SOAP note.

25    Q.    What is a SOAP note?

126

1    A.     The S is subjective, what the inmate says or the

2    offender says.  The O is your actual findings, what you

3    visually see, what your assessment is.  The A is assessment,

4    what was the need for the visit.  P is your plan or treatment

5    or any follow-up care.

6    Q.     Okay.  I believe you said the S is what the offender

7    tells you?

8    A.     Yes.

9    Q.     Based on this document, can you tell me what

10   Mr. Nicolas said to you on February 5th of 2014 when you

11   examined him?

12   A.     He said my head hurts, left wrist, right jaw and legs.

13   Q.     If Mr. Nicolas had complained about other areas of the

14   body, would you have noted that in the subjective portion?

15   A.     In the subjective?

16   Q.     Yes.

17   A.     Yes.

18   Q.     So based on this document, to your knowledge, the areas

19   mention in the subjective inmate account portion is the only

20   areas Mr. Nicolas complained about to you?

21   A.     Correct.

22   Q.     Okay.  Then I believe you said the objective or the O

23   findings is what you actually observed, correct?

24   A.     Correct.

25   Q.     Now there has been discussion about this already, but

127

1    can you read aloud what you observed on February 5th of 2014

2    because there are medical terms in there?

3    A.      Superficial abrasion noted to left side

4    forehead/hairline, no bleeding noted, no swelling, bruising,

5    bleeding, deformities noted to jaw, right, left wrist, or

6    bilateral thighs.  No apparent distress, that is the NAD,

7    noted at -- I am sorry, noted period.  No other injuries

8    noted.  A and O times three, is alert and oriented times

9    three.

10   Q.      This symbol right here, that means no?

11   A.      Correct.

12   Q.      Then we already talked about the plan and this is

13   getting down here with the F/U PRN, and that means follow-up

14   as needed?

15   A.      Correct.

16   Q.      Okay.  Now there was some discussion about whether or

17   not Mr. Nicolas was standing up or lying down for this

18   examination.  Do you recall testifying about that or

19   discussing that with plaintiff's attorney?

20   A.      Yes.

21   Q.      Okay.  It doesn't indicate in here whether or not he

22   was standing or lying down, does it?

23   A.      No.

24   Q.      If Mr. Nicolas was lying down, would you have noted

25   that?

128

1    A.    Yes.

2    Q.    Would you agree with me it doesn't indicate that

3    Mr. Nicolas was conscious for your examination in this note.

4    Do you agree with me?

5    A.    That he was conscious?

6    Q.    Yes.

7    A.    Yes.

8    Q.    Why didn't you note that he was conscious?

9    A.    Because he is giving me answers.

10   Q.    It wasn't a pertinent detail for your medical note?

11   A.    I mean it is pretty much obvious if he is able to give

12   me answers, he is awake.

13   Q.    Now if Mr. Nicolas was unconscious, would you have

14   noted that in your medical note?

15   A.    Yes.

16   Q.    Okay.  So is it fair to say that you note pertinent

17   findings in your medical notes?

18   A.    Yes.

19   Q.    I am going to show you a document that has not been

20   admitted into evidence yet.  This is what is labeled for

21   identification purposes as Defendant's Exhibit 200-1.  Do you

22   recognize this document?

23   A.    Yes.

24   Q.    Tell me what it is.

25   A.    It is my SOAP note in relation to filling out the

129

1    injury report.

2    Q.    This is a SOAP note for the plaintiff, Mr. Jose

3    Nicolas, correct?

4    A.    Correct.

5    Q.    This is part of Mr. Jose Nicolas' medical records?

6    A.    Yes.

7    Q.    Medical records are maintained by the Illinois

8    Department of Corrections in the regular course of business?

9    A.    Correct.

10            MR. TYRRELL:  Your Honor, at this time we ask for

11   admission of Defendant's Exhibit 200-1.

12            THE COURT:  Any objection?

13            MS. GOODWIN:  No, Your Honor.

14            THE COURT:  Just so I am clear, this is not part of

15   26, Plaintiff's 26?

16            MS. GRADY:  We have it included as Plaintiff's 26 as

17   well.

18            MR. TYRRELL:  It was not admitted during their --

19            THE COURT:  200-1 is the February 5th of 2014

20   progress note?

21            MR. TYRRELL:  Correct.

22            THE COURT:  Okay, that will be admitted.

23       (Whereupon  Defendant's Exhibit 200-1 was admitted.)

24            MR. TYRRELL:  Publish please?

25

130

1   Questions By Mr. Tyrrell:

2   Q.     So Miss Lang, this is another note you would have

3   completed at or about the time of your examination of Mr. Jose

4   Nicolas?

5   A.     Yes.

6   Q.     Again, can you go ahead and read the subjective

7   finding?

8   A.     My head hurts, left wrist, right jaw and legs.

9   Q.     Which is consistent with the injury report, correct?

10  A.     Yes.

11  Q.     Now can you read the objective finding?  Let me zoom in

12  a little bit so you can see it a little clearer.

13  A.     Unable to assess vital signs due to location of

14  evaluation/uncooperative witnessed by Officer McMillan.

15  Superficial abrasion noted to left side forehead/hairline.  No

16  bleeding noted.  No swelling, bruising, bleeding, deformities

17  noted to all -- I am sorry -- to other areas of complaint.  No

18  other injuries noted and A and O times three.

19  Q.     Thank you.  You were in Court yesterday when Mr. Jose

20  Nicolas was testifying, correct?

21  A.     Yes.

22  Q.     I believe at one point Jose Nicolas testified he wanted

23  to show you somewhere around his private parts, but he

24  initially didn't want to.  Do you recall that testimony?

25  A.     No.  I'm sorry, the testimony of him saying that?

1    Q.    Yes.

2    A.    Yes.

3    Q.    So you do recall Mr. Jose Nicolas saying initially he

4    didn't want to show you his private parts area?

5    A.    That he stated that yesterday?

6    Q.    Yes.

7    A.    Yes.

8    Q.    You don't recall him saying that specifically on

9    February 5th of 2014?

10   A.    Correct.

11   Q.    If an inmate complains about pain or anything else in

12   specific parts of his body but refuses to show it to you,

13   would you qualify that as uncooperative?

14   A.    Yes.

15   Q.    I want to turn your attention to Plaintiff's

16   Exhibit 26, page 63, which has been admitted.  Miss Goodwin

17   asked you questions about this already, but this isn't in a

18   progress note that you created, correct?

19   A.    No, it is not.

20   Q.    Okay.  Again, this subjective finding on the SOAP

21   protocol is meant to reflect what the offender reported to the

22   medical professional, correct?

23   A.    Yes.

24   Q.    Can you read the subjective finding in this section?

25   A.    I was hit in my cheek, face and jaw.  It hurts bad.

132

1    Q.    Okay.  And that doesn't contain any mention of being

2    assaulted by staff, does it?

3    A.    No.

4    Q.    It just generally says an altercation occurred as the

5    form of the injury?

6    A.    Correct.

7    Q.    I want to turn your attention to what was already

8    admitted in evidence as Plaintiff's Exhibit 26, page 65.  This

9    is a document Miss Goodwin also showed you, correct?

10   A.    Yes.

11   Q.    And there is a doctor's note from March 7th of 2014

12   that Miss Goodwin asked you questions about, correct?

13   A.    Correct.

14   Q.    Now I want to show you a different document that has

15   not been admitted yet.  It is Plaintiff's Exhibit 26, page 64.

16   Do you recognize this document?

17   A.    Yes.

18   Q.    Can you tell me what it is?

19   A.    It is a progress preprinted note for non specific

20   discomfort.

21   Q.    It is from Mr. Osbaldo Jose-Nicolas?

22   A.    Yes.

23   Q.    This was written on February 28th of 2014 according to

24   the document?

25   A.    Yes.

133

1    Q.    And now you didn't create this note, did you?

2    A.    No.

3    Q.    Again, this is part of Mr. Jose-Nicolas' medical

4    records maintained by the Illinois Department of Corrections,

5    correct?

6    A.    Yes.

7          MR. TYRRELL:  Your Honor, at this time we ask for

8    admission of Plaintiff's Exhibit 26, page 64?

9          MS. GOODWIN:  No objection, Your Honor.

10         THE COURT:  Exhibit 26, page 64, will be admitted.

11   Now we have pages 63, 64, 65.

12      (Whereupon  Defendant's Exhibit 26, page 64 was admitted.)

13   Questions By Mr. Tyrrell:

14   Q.    Again, Miss Lang, this progress note is dated

15   February 28th of 2014, correct?

16   A.    Yes.

17   Q.    You saw the plaintiff on February 5th of 2014, correct?

18   A.    Yes.

19   Q.    We already saw Plaintiff's Exhibit 26, page 63, which

20   is the February 7th, 2014 medical encounter, correct?

21   A.    Correct, yes.

22   Q.    We just showed you the doctor's note from March 7th of

23   2014, which was Plaintiff's Exhibit 26, page 65, correct?

24   A.    Correct.

25   Q.    So would you agree with me this medical encounter

134

1    occurred after you saw Mr. Jose Nicolas and before he saw the

2    doctor on March 6th of 2014?

3    A.     Yes.

4    Q.     Okay.  Again, the subjective portion is what the

5    offender reported to the medical professional, correct?

6    A.     Yes.

7    Q.     Can you read what was written in the subjective portion

8    of this document?

9    A.     I have two hernias in my left groin.  Hurts bad.

10   Q.     Below that it says allergies?

11   A.     N K A, no known allergies.

12   Q.     Location of pain and discomfort, left groin, correct?

13   A.     Yes.

14   Q.     If you go down a couple of lines, have you had this

15   pain before and how was it treated.  Do you see that?

16   A.     Yes.

17   Q.     What was the answer provided by Jose Nicolas to the

18   medical professional?

19   A.     No.

20   Q.     As of February 28th of 2014, based on this document,

21   Mr. Jose Nicolas had complained of two hernias that had never

22   happened before?

23          MS. GOODWIN:  Objection, Your Honor, foundation.

24          THE COURT:  Well, to the extent that she can answer

25   based on this one medical record.

135

1          MR. TYRRELL:  Right, Your Honor.

2          THE COURT:  I'll let you answer.

3   A.     Repeat the question again, please.

4   Q.     Sure.  So I'll repeat the question, rephrase it a

5   little bit too.  So again, it says, "Have you had this pain

6   before and how was it treated?  No."  Did I read it

7   accurately?

8   A.     Yes.

9   Q.     Again, the pain Mr. Jose Nicolas was complaining about

10  was two hernias in my left groin, hurts bad, correct?

11  A.     Yes.

12  Q.     And this was on February 28th of 2014, correct?

13  A.     Yes.

14  Q.     So based on your understanding of this document, do you

15  agree with me this is the first time Mr. Jose Nicolas reported

16  to a medical professional that he had two hernias?

17         MS. GOODWIN:  Objection, Your Honor, foundation.

18         THE COURT:  Well, that will be sustained.  Ever in

19  time -- you don't know because you are only looking at the one

20  medical record, so.

21         MR. TYRRELL:  That's fine.  I'll take it away.

22  A.     Can I say something about the doctor's appointment

23  note?

24  Questions By Mr. Tyrrell:

25  Q.     Sure.

136

1  A.    The note you just had on there, the 2-28 of '14, that

2  nurse sick call referral for the hernias, that is what that

3  doctor visit was for a referral from this note.

4  Q.    So based on your understanding of this document, the

5  medical professional that saw Mr. Jose Nicolas on

6  February 28th of 2014 referred him to doctor and that led to

7  the March 7th doctor visit?

8  A.    Yes, correctional medical technician assessed him at

9  sick call on this date, 2-28, and as you see under the plan

10  she circled M.D. referral and put a check next to patient

11  presents with signs of acute severe discomfort and he was

12  referred and the date of 3, I am sorry, 4.

13  Q.    I believe 3-7.

14  A.    3-7.  That would be in reference to that referral.

15  Q.    Going back, there is some discussion during your

16  earlier testimony about whether or not Mr. Jose Nicolas was

17  wearing a jumpsuit versus, I believe, his long sleeve shirt

18  and pants.  Do you recall that?

19  A.    Yes.

20  Q.    I believe you testified that you believe that Mr. Jose

21  Nicolas was wearing a jumpsuit during the February 5th of 2014

22  encounter.  Do you recall that?

23  A.    Yes.

24  Q.    Why do you believe Mr. Jose Nicolas was wearing a

25  jumpsuit on February 5th of 2014?

1    A.    Because generally by the time you get there to assess

2    them, they would have already changed them out and then also

3    because of my documentation.

4    Q.    So while you don't specifically recall whether or not

5    he was wearing a long sleeve shirt and pants or jumpsuit,

6    based on your practice and experience you believe he was

7    wearing a jumpsuit?

8    A.    Correct.

9         MR. TYRRELL:  Thank you, Your Honor.  I don't have

10   anything further.

11        THE COURT:  All right.  Do you have anything further

12   Miss Goodwin?

13        MS. GOODWIN:  Yes, Your Honor.

14                  REDIRECT EXAMINATION

15   Questions by Ms. Goodwin:

16   Q.    All right.  Ma'am, after your evaluation of

17   Mr. Nicolas, it is your understanding that he was placed in

18   the segregation cell, correct?

19   A.    I assume he was.

20   Q.    And you have no knowledge as to what supplies, what

21   Mr. Nicolas brought with him into segregation, if anything?

22   A.    Security deals with that.  I do not.

23   Q.    You have no knowledge if he had pens in his cell when

24   he arrived at segregation?

25   A.    Security deals with it.  I do not.

138

1   Q.      You have no knowledge if he had any paper in his cell

2   when he arrived at his segregation cell?

3   A.      I have nothing to do with that.  That is security.

4   Q.      Okay.  Now you were asked questions by counsel that as

5   an LPN, with that certification you can't prescribe

6   medication, you can't order tests or order a specialist to see

7   a patient.  Is that accurate?

8   A.      Yes.

9   Q.      You can give an ice pack?

10  A.      Yes.

11  Q.      You can give something like Tylenol?

12  A.      If it is on the progress note that I am using, yes.

13  Q.      What you can also do is refer the patient, refer the

14  inmate to medical to get on a doctor list, correct?

15  A.      Yes, if it is deemed necessary.

16  Q.      Okay.  Here you did not take that step?

17  A.      Because at that point there was no need.  It was not

18  needed.

19  Q.      Now in looking at Defendant's Exhibit 25, medical

20  report --

21          THE COURT:  What exhibit is this?

22          MS. GOODWIN:  This is Defendant's Exhibit 200-1.

23          THE COURT:  200-1, okay.

24  Questions By Ms. Goodwin:

25  Q.      These are offender outpatient progress notes, correct?

139

1    A.      Correct.

2    Q.      This is the document that you fill out during your

3    examination of the plaintiff, correct?

4    A.      The one I used that day, yes.

5    Q.      This is the medical record that is created in the

6    normal course of sitting down or interacting with the patient

7    and evaluating them and writing down what you see and what

8    they tell you, right?

9    A.      We have lots of different forms that are considered

10   offender outpatient progress notes.

11   Q.      This is the offender outpatient progress note you used

12   on February 5th?

13   A.      Yes.

14   Q.      This is what you used that you testified that you

15   looked at Mr. Nicolas and assessed him and provided him with

16   the medical examination, correct?

17   A.      As I stated, yes, this is the one I used that day.

18   Q.      Then you also filled out the inmate injury report?

19   A.      Yes.

20   Q.      If I could show you -- well, we have looked at this.

21   This is the inmate injury report, correct?  You filled out an

22   inmate injury report, is that correct?

23   A.      Yes.

24   Q.      Okay.  That was a completely separate document than

25   what you filled out in regard to this exhibit, the offender

140

1    outpatient progress note, right?

2    A.    Yes.

3    Q.    They are completely separate forms?

4    A.    Correct.

5    Q.    You filled out the inmate injury report because you

6    were told before the plaintiff arrived in segregation that he

7    needed to see a nurse to evaluate his injuries, correct?

8    A.    Correct.

9    Q.    That is a separate form that you would have been

10   notified that the plaintiff was coming to segregation and

11   needed to see you and you would have picked up this report

12   because you were told that he was coming with an injury,

13   correct?

14   A.    I don't know if I was told while he was coming or if he

15   has already been there or he might have just showed up and I

16   was there.  I don't know the exact time line on how it

17   happened.

18   Q.    You did not see an inmate named Edgar Diaz on

19   February 5th of 2014, did you?

20   A.    No.

21   Q.    You were specifically notified that Mr. Nicolas was

22   coming to segregation and needed to be seen?

23   A.    Yes.

24   Q.    You were also asked in the subjective portion of your

25   medical records that you noted injuries that you saw such as

1    the superficial abrasion, correct?

2    A.     In the subjective you said?

3    Q.     Correct.

4    A.     No, subjective is what the inmate says.

5    Q.     You noted injuries then in the objective report?

6    A.     Yes, in the objective.

7    Q.     You noted the injuries that you saw like the

8    superficial abrasion?

9    A.     Yes.

10   Q.     And you didn't note any injuries, of course, that you

11   didn't see, correct?

12   A.     Correct.

13   Q.     You admit that he may have been -- Mr. Nicolas may have

14   had injuries, you just didn't determine that any further ones

15   existed, correct?

16   A.     I did not see any.

17   Q.     Of course with the injuries that you didn't see --

18   well, strike that.  With the injuries that Mr. Nicolas

19   presented with when he said that his head hurt, his jaw hurt,

20   that he had pain; those injuries are the type that can change

21   over the course of two days, correct?

22   A.     Correct.

23   Q.     Swelling does not happen immediately when you are

24   punched or kicked, correct?

25   A.     Generally, no.

142

1   Q.      Bruising doesn't necessarily happen immediately when

2   you are punched or kicked?

3   A.      Generally, no.

4   Q.      Pain can even worsen over the course of a couple of

5   days when you are just punched in the jaw, correct?

6   A.      It may or may not.

7   Q.      All right.  So also referring to the inmate injury

8   report.  Well, what language were you speaking with

9   Mr. Nicolas?

10  A.      English.

11  Q.      So you can't tell us that sitting here today if

12  Mr. Nicolas was uncooperative due to a language barrier or for

13  any other reason, correct?

14  A.      He spoke English, or else I would have asked for

15  interpreter.  I would have documented unable to communicate

16  due to language barrier, needs assistance with interpreter.  I

17  would have noted that in my documentation.

18  Q.      You never would have just walked away, correct?

19  A.      Correct.

20  Q.      You never would have put down quick notes and left the

21  inmate on the floor, correct?

22  A.      Absolutely not, and he was not on the floor.

23  Q.      Well, you don't recall though, right?  You don't recall

24  this incident?

25  A.      If he would have been on the floor it would have been

143

1    in my documentation.

2    Q.    You control what goes in your documentation, correct?

3    A.    Correct, so I would not put he is on the floor if he

4    was not on the floor.  If he was on the floor, I would most

5    definitely have put it on my notes.

6         THE COURT:  We have been over the same thing several

7    times.  Let's get moving.

8         MS. GOODWIN:  All right, ma'am.  I don't have any

9    further questions.

10        THE COURT:  Anything else, Mr. Tyrrell?

11        MR. TYRRELL:  No, Your Honor.

12        THE COURT:  You may step down.

13        Ladies and gentlemen, let's take a short break.  I

14   need to take something up with the lawyers and we will resume

15   in about five minutes.

16        (Whereupon a recess was taken.  The following

17   proceedings were held in open Court, out of the presence of

18   the jury.)

19        THE COURT:  Now is Mr. Diaz our next witness?

20        MS. GRADY:  No, Your Honor, we're calling Mr. Schnell

21   as our next witness, but we do anticipate being able to put on

22   Mr. Diaz by the end of the day.

23        THE COURT:  Well, that would be good.  He has been

24   downstairs all day.  Is there any reason why we can't do it

25   now because that's why I took a break now was to get him on

144

1    the stand.

2        MS. GRADY:  Well, Your Honor, I think it's -- in our

3    case we intend to present Diaz, given the switch up with the

4    writs, as our last witness, and I do anticipate we'll be able

5    to do that today.  So it would be our --

6        THE COURT:  So you have Snell and then --

7        MS. GRADY:  We have Snell and Purdom and Berry.  All

8    of those will be quite short and then Mr. Diaz will testify.

9        THE COURT:  Okay, we'll take a short break, let the

10   interpreter and court reporter take a short break and we will

11   resume.  So let me write it down.  Snell, Berry and Purdom and

12   then Diaz?

13       MS. GRADY:  Yes, Snell, Purdom, Berry and then Diaz.

14       THE COURT:  Okay.  So we will take a break.  We'll go

15   through those three and take a break and get Mr. Diaz on the

16   stand.

17       (Whereupon a recess was taken.  The following

18   proceedings were held in open Court, in the presence of the

19   jury.)

20       THE COURT:  Officer Snell, come on down.  Be seated

21   everyone.  Plaintiff may call his next witness.

22       MS. CROSLEY:  Plaintiff calls Justin Snell.

23

24

25

1          JUSTIN SNELL, PLAINTIFF'S WITNESS, SWORN

2                    DIRECT EXAMINATION

3     Questions by Ms. Crosley:

4          COURTROOM CLERK:  Please be seated.  State your name

5     and spell your last name for the record.

6     A.     Justin Snell, S N E L L.

7     Q.     Mr. Snell, are you currently employed by the Illinois

8     Department of Corrections?

9     A.     Yes.

10    Q.     What is your rank?

11    A.     Sergeant.

12    Q.     And what facility do you work at?

13    A.     Menard Correctional Center.

14    Q.     How long have you been with the Illinois Department of

15    Corrections?

16    A.     Since October 29th of 2001.

17    Q.     As of February of 2014, were you working at Menard?

18    A.     Yes.

19    Q.     And at that time was your rank correctional officer?

20    A.     Yes.

21    Q.     As an Illinois Department of Corrections officer, you

22    receive training on the Illinois Department of Corrections

23    policies regarding the use of force, is that correct?

24    A.     Correct.

25    Q.     Specifically, you were taught that it is only

146

1    appropriate to use physical force in certain situations, is

2    that correct?

3    A.    Correct.

4    Q.    Okay.  And for example, you may use physical force when

5    your physical safety is threatened?

6    A.    Correct.

7    Q.    You can use physical force when the physical safety of

8    someone else is threatened?

9    A.    Correct.

10   Q.    Okay.  But you also learned that it is not appropriate

11   to use physical force as a form of punishment, correct?

12   A.    Correct.

13   Q.    Okay.  So as a corrections officer or as a sergeant,

14   you are not allowed to hit or punch or kick an inmate because

15   he has broken a rule, is that correct?

16   A.    Correct.

17   Q.    Even if the broken rule was that the inmate disobeyed a

18   direct order?

19   A.    Correct.

20   Q.    I want to direct your attention to the day of February

21   5th of 2014.  Were you working at Menard on that date?

22   A.    Yes.

23   Q.    That was on the day shift?

24   A.    7:00 to 3:00, yes.

25   Q.    7:00 a.m. to 3:00 p.m.?

1    A.    Yes, ma'am.

2    Q.    Were you working in the west house?

3    A.    Yes.

4    Q.    On that date was your sergeant Qualls?

5    A.    Yes.

6    Q.    Okay.  The lieutenant was Payne?

7    A.    Yes, but the documentation shows all of that, so, yes.

8    Q.    As of today, you don't have an independent recollection

9    of that today?

10   A.    I do now with looking at all of the documentation from

11   yesterday and today.

12   Q.    Okay, thank you.  You have heard testimony over the

13   last couple of days that in the mid to late mornings is when

14   chow lines are run, is that correct?

15   A.    Yes, ma'am.

16   Q.    And chow lines, as we have discussed, is prisoners

17   being escorted from the living unit to the dining areas?

18   A.    Correct.

19   Q.    Okay.  In west house, inmates that are being brought

20   from the even side, they go past a holding cage when they are

21   exiting the building?

22   A.    Correct.

23   Q.    They also pass the same holding cage if they are coming

24   into the building, correct?

25   A.    Correct.

148

1   Q.      And that holding cage is actually right near the exit

2   to go outside?

3   A.      Correct.

4   Q.      Okay.  So the wall along or the side of the holding

5   cage that is along that walkway that prisoners would walk on,

6   that is made of bars, right?

7   A.      Correct.

8   Q.      It is not a solid wall?

9   A.      Correct.

10  Q.      Presumably the prisoners walking along it can see into

11  the holding cage?

12  A.      Correct.

13  Q.      Anyone in the holding cage can see prisoners walking

14  outside of the holding cage?

15  A.      Yes.

16  Q.      All right.  Do you recall that on February 5th of 2014

17  at some point in the late morning there were two prisoners

18  being held in the even side holding cage?

19  A.      After reading the documentation, yes.

20  Q.      Okay.  As of this point, you know those two inmates

21  were Edgar Diaz and Osbaldo Jose Nicolas, correct?

22  A.      As of now, yes.

23  Q.      Before today you didn't know who Osbaldo Nicolas was?

24  A.      No.

25  Q.      You wouldn't have been able to pick him out of a crowd?

1    A.      No, ma'am.

2    Q.      What about Diaz?  Could you pick him out of a crowd?

3    A.      No, ma'am.

4    Q.      Do you recall if you were assigned to work on the even

5    side then or the odd side or you don't recall either way?

6    A.      I don't recall.

7    Q.      Okay.  Now you recall that on that day Mr. Nicolas was

8    disrupting line movement, is that correct?

9    A.      After reading the documentation, yes.

10   Q.      Okay.  So you keep talking about after reading the

11   documentation.  Is that your way of saying that without

12   reading the paper, you would have no memory of this day as

13   compared to any of the other hundreds of thousands of days you

14   have worked as a corrections officer, correct?

15   A.      Right.

16   Q.      Do you recall at this point that at some point someone

17   told Mr. Nicolas to stop talking?

18   A.      With the documentation I believe it said he was ordered

19   to stop talking.

20   Q.      Okay.  Presumably that was either a corrections officer

21   or sergeant, maybe a lieutenant, who told him to stop talking?

22   A.      I don't know exactly who it was.

23   Q.      Well, presumably it wasn't another prisoner?

24   A.      Correct.

25   Q.      Okay.  Who do you recall being in the area of the

150

1   holding cell around the time chow lines were going on that

2   day?

3   A.      I don't recall.

4   Q.      Okay.  But again reviewing the documents you now have a

5   recollection that Sgt. Qualls was there or at the time Sgt.

6   Qualls was there?

7   A.      Yes.

8   Q.      And you have a recollection that Sgt. Berry, who was a

9   CO then, he was there?

10  A.      Yes, with the paperwork.

11  Q.      And Officer Purdom as well?

12  A.      Yes.

13  Q.      But you don't right now remember anyone else that might

14  have been there that day?

15  A.      No, ma'am.

16  Q.      So presumably it could have been any one of those

17  individuals who told Mr. Nicolas to stop talking?

18  A.      Yes.

19  Q.      Okay.  But could it have been you?

20  A.      It could have been.  I don't recall.

21  Q.      But you don't recall, all right.  Now, do you recall

22  that -- do you recall what happened after Mr. Nicolas was

23  ordered to stop talking?

24  A.      Well, after seeing the documentation, he refused the

25  orders and continued to talk.

1   Q.     Okay.  Do you remember that you gave an interview with

2   Lt. Reichert the next month, is that correct?

3   A.     I would need to see the documentation.

4   Q.     Okay, one moment.

5   A.     Yes, ma'am.

6   Q.     Okay.  I am going to show you some pages from what has

7   previously been marked as Plaintiff's Exhibit 8.  Do you see

8   this document in front of you?

9   A.     Yes.

10  Q.     Okay.  This is page 10 of what we have marked as

11  Exhibit 8.  Do you see your signature there on the bottom?

12  A.     Yes.

13  Q.     That is, in fact, your signature?

14  A.     Yes.

15  Q.     And this document indicates that --

16       THE COURT:  Let me stop you for a second.  This is

17  page 10?

18       COURTROOM CLERK:  We have not admitted page 10 yet.

19       MS. CROSLEY:  I apologize.

20       THE COURT:  Let's just show it to the witness.

21  Questions By Ms. Crosley:

22  Q.     This is a document showing you were interviewed on

23  March 4th of 2014.  Would you agree that is what the document

24  shows?

25  A.     Yes.

152

1    Q.     And as you said, that is your signature on the bottom

2    of that document?

3    A.     Yes.

4    Q.     Okay.  I am going to show you the next page in this

5    same exhibit.  This is page 11.  There is some handwriting on

6    the top and on the bottom is your signature, is that correct?

7    A.     Yes.

8    Q.     Also after the writing at the top, on the bottom right

9    there, are those your initials?

10   A.     Yes.

11        MS. CROSLEY:  Okay.  At this point we would move to

12   admit this document.

13        MR. BRACEY:  No objection.

14        THE COURT:  So this is page 10?

15     (Whereupon  Plaintiff's Exhibit 8, page 10 was admitted.)

16        MS. CROSLEY:  This is page 11 now.

17        THE COURT:  Page 11, okay.

18   Questions By Ms. Crosley:

19   Q.     You can see this is a summary of the statement that you

20   allegedly gave to Lt. Reichert.  Would you agree?

21   A.     Yes.

22   Q.     Now Lt. Reichert is from the Internal Affairs

23   Department, correct?

24   A.     Yes.

25   Q.     You understand that internal affairs has two duties?

153

1    First is to investigate allegations of staff misconduct is one

2    of those duties?

3    A.     Yes.

4    Q.     Okay.  So at the point in which you were being

5    interviewed by Lt. Reichert from IA, you had already -- you

6    knew that he was investigating staff misconduct?

7    A.     No.

8    Q.     Okay.  Did he inform you during the course of talking

9    to you what he was talking to you about?

10   A.     As I got up there and started the interview, yes.

11   Q.     So what you are saying is that at the point you were

12   called to meet with him, you didn't know what it was about,

13   but once you started talking to him you figured out what it

14   was about?

15   A.     He told me what the allegations were.

16   Q.     What do you recall he told you the allegations were?

17   A.     The reason why we're here.

18   Q.     Okay.  That excessive force had been used against

19   Mr. Nicolas?

20   A.     Yes.

21   Q.     Okay.  You gave a statement in which you said --

22   recalling that there were two inmates in the cell, in the

23   holding cell, that they were disrupting the line by talking to

24   multiple inmates, however, you go on to say that there were no

25   issues and the inmates were compliant, is that correct?

154

1   A.      Correct.

2   Q.      Okay.  But they were talking to inmates, is that

3   correct?

4   A.      Yes.

5   Q.      You don't mention anything in here about anyone telling

6   them to be quiet?

7   A.      He didn't ask.

8   Q.      Okay.  You don't mention anything in here about Nicolas

9   disobeying a direct order?

10  A.      He didn't ask.

11  Q.      Okay.  But you did say that the inmates were compliant,

12  is that correct?

13  A.      After the lines went through, yes.

14  Q.      And so you would agree -- so did he then ask you, were

15  they compliant?

16  A.      I don't remember the exact verbiage that he asked.

17  Q.      Okay.  Well, I mean I am asking because you just said I

18  didn't say that they disobeyed a direct order because he

19  didn't ask me if they disobeyed a direct order, is that

20  correct?  Is that what you just told me?

21  A.      Yes.

22  Q.      Okay.  So but you did tell him that they were

23  compliant?

24  A.      He might have asked if they were compliant.  I don't

25  know.

1   Q.     Okay.

2   A.     I do not recall.

3   Q.     I understand.  You are aware that Sgt. Qualls wrote an

4   incident report -- I am sorry, wrote Mr. Nicolas a ticket that

5   day?

6   A.     As of today, yes.  I do not recall.

7   Q.     So you don't have any -- before today you didn't have

8   any recollection of that?

9   A.     Not after four years, no.

10  Q.     But would you have remembered a month after the

11  incident do you think?

12  A.     I can't answer that.  I don't know.

13  Q.     Okay.  Who did you talk to -- I am sorry.  Did you have

14  an opportunity to talk to anyone else that was there on

15  February 5th before you met with Lt. Reichert?

16  A.     About what?

17  Q.     About the fact that you were going to talk to Lt.

18  Reichert?

19  A.     I don't recall who I talked to four years ago.

20  Q.     After you talked to Lt. Reichert, did you talk to Sgt.

21  Qualls about the interview that you had done with Lt.

22  Reichert?

23  A.     I don't recall talking to Sgt. Qualls.  No.

24  Q.     You don't recall, so that means you may have?

25  A.     That means I don't recall.

1   Q.     And do you recall if you talked to Officer Berry after

2   you gave your interview with Lt. Reichert?

3   A.     I don't recall.

4   Q.     How about Officer Purdom?

5   A.     I don't recall.

6   Q.     So it is fair to say at this point in time most of what

7   you recall is based on the testimony you have heard over the

8   last two days?

9   A.     The testimony and the documents that I was provided

10  with.

11  Q.     Okay.  You have no independent recollection of what

12  happened on that day?

13  A.     Just what I see on the paperwork, ma'am.

14  Q.     Okay.  According to your paperwork, the inmates were

15  compliant?

16  A.     Yes.

17         MS. CROSLEY:  One moment.  Nothing further of this

18  witness.

19         THE COURT:  All right.  Mr. Tyrrell, do you have any

20  questions of this witness at this time, or Mr. Bracey?

21         MR. BRACEY:  That will be me, Your Honor.

22                      CROSS EXAMINATION

23  Questions by Mr. Bracey:

24  Q.     I just have a few questions to follow-up to try to

25  clarify a couple of things.  You were asked a lot of questions

1    about whether you recall that specific day.  Is it fair to say

2    you don't remember every random day four years ago?

3    A.      Correct.

4    Q.     If you saw something that day that was out of the

5    ordinary as a correctional officer at the time, is there any

6    way you would document something like that, something that is

7    out of the ordinary?

8            MS. CROSLEY:  Objection, foundation to what he would

9    have done.

10           THE COURT:  I am sorry, what was the last of what you

11   said?

12           MR. BRACEY:  I can rephrase.

13           THE COURT:  Okay, rephrase the question.  What do you

14   mean by "out of the ordinary"?

15   Questions By Mr. Bracey:

16   Q.     Officer, or excuse me, Sgt. Snell, can you tell me what

17   a 434 is?

18   A.      434 is legal state document that you would write for an

19   unusual incident, anything that would a happen out of the

20   ordinary.

21   Q.     We have heard a lot about these allegations today that

22   Qualls and Berry assaulted the plaintiff.  The allegation

23   against you is that you witnessed it and did nothing.  If

24   something like that happened on February 5th of 2014, would

25   you have documented that in a 434?

158

1    A.     Yes.

2           MS. CROSLEY:   Objection as to what he would have

3    done.

4           THE COURT:   Well, overruled.   I think it is clear

5    what he is asking is part of his normal procedure.

6    A.     Do you want me to reanswer that?

7    Questions By Mr. Bracey:

8    Q.     I believe you answered already.   Do you recall ever

9    seeing Sgt. Qualls sucker punch any inmate on February 5th of

10   2014 inside of the holding cage in the west cell house?

11   A.     No, because it did not happen.

12   Q.     Do you recall seeing Sgt. Qualls sucker punch any

13   inmate at the corner of the sergeant's cage in the west cell

14   house on February 5th of 2014?

15   A.     No, because it did not happen.

16   Q.     Did you see then Correctional Officer Berry slam any

17   inmate's head into the door of the shower area of the west

18   cell house on February 5th of 2014?

19   A.     No, because it did not happen.

20   Q.     Did you see or hear then Sgt. Qualls or then Officer

21   Berry take any inmate into the shower in the west cell house

22   on February 5th of 2014 to kick and punch that inmate?

23   A.     No, because it did not happen.   And I believe with the

24   documentation there was a school line in that shower at the

25   approximate time.

159

1    Q.      When you say that there may have been a school line in

2    the shower, does that mean that you would not have been able

3    to put inmates from the holding cage into the shower?

4    A.      Correct, especially if they were cuffed.  You do not

5    put inmates who are restrained with inmates who are

6    unrestrained and have no reason to put inmates in that shower.

7    That was in the holding cage.

8    Q.      Why could you not put inmates who were restrained with

9    other inmates that are not restrained?

10   A.      Because that would be a violation and they would have

11   no way of protection if someone would try to do something to

12   harm them.

13   Q.      Did you write any 434 from February 5th of 2014 that

14   said that any of these things happened?

15   A.      No, sir.

16   Q.      In this case the allegation was that then Sgt. Qualls

17   sucker punched the plaintiff.  At that time you were a

18   correctional officer, correct?

19   A.      Correct.

20   Q.      Okay.  Does the fact that Mr. Qualls was a sergeant at

21   that time -- that would mean he was your supervisor, correct?

22   A.      Correct.

23   Q.      Okay.  If you saw him sucker punch an inmate, you would

24   still report it?

25   A.      Yes, sir.

1    Q.      Would you -- how would you do that if he was your

2    supervisor?

3    A.      How would I report it?

4    Q.      Yes.

5    A.      I would acknowledge and let my lieutenant know, then go

6    up the chain of command.  I would skip over the sergeant since

7    the report and incident was involving him, write my 434.  I

8    would turn it into the shift commander.

9    Q.      You would kick it up the chain?  You would bypass that

10   person if you had seen them commit some sort of serious

11   allegation like that?

12   A.      Correct.

13        MR. BRACEY:  I have nothing further, Mr. Snell.

14                      REDIRECT EXAMINATION

15   Questions by Ms. Crosley:

16   Q.      Sgt. Snell, you said that if you saw your superior

17   sucker punch an inmate you would report it, correct?  You

18   didn't say that you would try to intervene, is that correct?

19   A.      I was not asked.

20   Q.      You testified just now that you didn't see Sgt. Qualls

21   punch Mr. Nicolas because it didn't happen, is that correct?

22   A.      Yes.

23   Q.      Okay.  But you also testified earlier you don't even

24   know where you were that day.

25   A.      I was in the west cell house.

161

1    Q.      But you testified that other than from the

2    documentation, you don't have an independent recollection of

3    what happened that day.

4    A.      That's just what is on the paperwork, ma'am.

5    Q.      You don't recall if you were working on the even side

6    or odd side that day?

7    A.      We go all over the cell house, ma'am.

8    Q.      If you don't remember what happened that day, how can

9    you know what did or did not happen that day?

10   A.      Because of the violation like that from a staff member

11   that would assault an inmate, I would remember that because I

12   would have had documentation.  I would document it and we

13   would have that here today.  That is how I know it did not

14   happen.

15   Q.      Okay.  You would have documented it.  You wouldn't have

16   intervened?

17   A.      I would have done what was necessary to do at the time.

18   Now if you ask me if I would have intervened, I would have

19   said yes.

20   Q.      Back to -- you acknowledged before that you now are

21   aware that Sgt. Qualls wrote a disciplinary ticket for

22   Mr. Nicolas, is that correct?

23   A.      Yes.

24   Q.      Are you aware that you were listed as a witness on that

25   disciplinary ticket?

1    A.    I see my name on there, yes.

2    Q.    Subsequent to a disciplinary ticket being written,

3    there is a disciplinary hearing process that an inmate goes

4    through, is that correct?

5    A.    It is called the adjustment committee.

6    Q.    Adjustment committee, thank you.  As part of the

7    adjustment committee process, they reach out to the relevant

8    officers involved in an incident, is that correct?

9    A.    They can sometimes.

10   Q.    Okay.  Do you recall being contacted by the adjustment

11   committee regarding the ticket that Mr. Nicolas got?

12         MR. TYRRELL:  Objection, relevance.

13         THE COURT:  Overruled.

14   A.    I do not recall.

15   Questions By Ms. Crosley:

16   Q.    Is there anything that would refresh your memory?

17   A.    Documentation.

18   Q.    Okay.  I would like to show you, but not publish a

19   document.  Do you recognize what this document is?

20   A.    It appears to be a conclusion of what the adjustment

21   committee summary is.

22   Q.    I am sorry, I didn't mean to -- I meant to have it

23   unfold.  I apologize.  This is Exhibit 204.  If you could take

24   a moment to review that and let me know when you have had a

25   chance to review it and let me know whether or not it has

1  adjusted your recollection of whether or not you were

2  contacted by the adjustment committee?

3  A.    It doesn't have a name on there anywhere, ma'am, that I

4  can see unless you see it somewhere.

5  Q.    So in the middle under the paragraph that says basis of

6  decision, if you could read the last line to yourself of that

7  paragraph?  Do you need me to make it bigger?

8  A.    All right, now I see my name.

9  Q.    Okay.  Has your memory been refreshed as to whether or

10 not the disciplinary committee reached out to you after Qualls

11 wrote that ticket?

12 A.    No, but if it is on there I'm sure they did.  They

13 wouldn't have falsified documents.

14 Q.    Is it now your recollection that you confirmed that

15 Nicolas had disobeyed a direct order on that date?

16 A.    Like I said, if they say they contacted me -- I said --

17 it says that I stated the IDR is correct as written, so yes.

18        MS. CROSLEY:  Nothing further.

19        THE COURT:  All right.  Mr. Snell, you may step down.

20 Call your next witness.

21        MS. GOODWIN:  Your Honor, plaintiff calls Defendant

22 Purdom.

23        THE COURT:  Deanna, if you would please administer

24 the oath?

25

164

```
 1              MATTHEW PURDOM, PLAINTIFF'S WITNESS, SWORN

 2                        DIRECT EXAMINATION

 3    Questions by Ms. Goodwin:

 4              COURTROOM CLERK:  Could you state your name and spell

 5    your last name for the record?

 6    A.     Matthew Purdom, P U R D O M.

 7    Q.     Sir, you are currently employed with the Illinois

 8    Department of Corrections at Menard Correctional Center,

 9    correct?

10    A.     Correct.

11    Q.     You were employed there at Menard on February 5th of

12    2014 as a correctional officer?

13    A.     Correct.

14    Q.     As a correctional officer, are you familiar with the

15    phrase "chain of command"?

16    A.     Yes.

17    Q.     Can you tell the jury what that phrase means?

18    A.     It means you follow your chain of command.  I am the

19    lowest as an officer.  Next is sergeant, then lieutenant.

20    Then it is your cell house major and shift captain and then it

21    keeps going on up.

22    Q.     Okay.  So as a correctional officer, sergeant would be

23    your immediate supervisor?

24    A.     Yes, ma'am.

25    Q.     You, as an officer, would have to follow what your
```

1  sergeant tells you to do?

2  A.    Yes, ma'am.

3  Q.    And you have worked at Menard for many years now?

4  A.    Yes, ma'am.

5  Q.    How many years?

6  A.    Just at Menard?

7  Q.    Correct.

8  A.    I transferred there in '03, so that would be 15 years

9  at Menard.

10  Q.    You transferred from a different Department of

11  Corrections?

12  A.    Yes, different institution.

13  Q.    Okay.  The whole 15 years that you have been at Menard

14  and even your entire career as a correctional officer, you

15  have operated under the same chain of command the entire time?

16  A.    Yes, just with different people filling in.

17  Q.    All right.  Now as a correctional officer, wherever you

18  are stationed in a cell house, you are stationed with the

19  sergeant too, correct?

20  A.    Yes.

21  Q.    And it is the sergeant's role within the cell house to

22  supervise line movement of inmates?

23  A.    His and ours.

24  Q.    Okay, but the sergeant is always present when inmates

25  are in line or moving back and forth, whether it be to the gym

166

1    or chow that we have heard?

2    A.    Yes.

3    Q.    It is the sergeant that makes decisions about the

4    inmates moving around, correct?

5    A.    Correct.

6    Q.    Now on February 5th of 2014 you were watching the line

7    movement in the west house, correct?

8    A.    I believe so.

9    Q.    Were you assigned at that time regularly to the west

10   house?  Was that like your regular duty?

11   A.    I believe it was.

12   Q.    Defendant Berry was at his regular assignment as well?

13   A.    I would have to see like a roster or something to be

14   for sure whether I could say yes or no on that.

15   Q.    Was it Sgt. Qualls' regular assignment to be in the

16   west house?

17   A.    Yes.

18   Q.    Around that time, all right.  Now you were in the west

19   cell house on the even side on the morning of February 5th of

20   2014, correct?

21   A.    I do not know for sure, but if that's what all of the

22   information says.

23   Q.    All right.  Well, you heard Qualls testify this morning

24   that he was there, right?  Is that correct that you heard

25   that?

167

1    A.    Yes.

2    Q.    He testified that he was toward the front of the

3    building by the grill door, is that correct?

4    A.    Yes.

5    Q.    Do you recall being under him on February 5th of 2014?

6    A.    I do not recall that.  I could have been by him or I

7    could have been at the back of the gallery.  That I do not

8    remember.

9    Q.    In the back of the gallery.  Can you describe where

10   that is for me?

11   A.    No.  Depends which gallery they're coming off.  If they

12   are coming off the gallery he keeps talking about on 2

13   gallery, I'll be at 25 cell.  Everybody else would be off to

14   the front of it.  I would be helping pushing the inmates off

15   the gallery.

16   Q.    You have no recollection, correct?

17   A.    I cannot remember it.

18   Q.    If there was testimony that you were at the front of

19   the cell house by Sgt. Qualls, you would have no way to

20   dispute that, correct?

21   A.    Correct.

22   Q.    Now yesterday you heard Clayborn Smith.  He testified

23   that you were there in the west cell house on February 5th of

24   2014, correct?

25   A.    I guess so, yes.

1   Q.      He testified that you were more toward the front of the

2   building, correct, by the holding cell?

3   A.      Yes.

4   Q.      You were standing by the sergeant station?

5   A.      I would have to be.  There is not a whole lot of room

6   in there.

7   Q.      There were chow lines moving back and forth?

8   A.      Yes.

9   Q.      And then the cell house kind of just emptied out?

10  A.      Probably for a second.

11  Q.      Then you saw Sgt. Qualls punch Mr. Nicolas right

12  outside of the holding cell?

13  A.      Wrong.

14  Q.      You saw Mr. Nicolas' head get slammed into a concrete

15  wall?

16  A.      No, I did not, ma'am.

17  Q.      You saw Mr. Nicolas get kicked and beaten?

18  A.      No, I did not, ma'am.

19  Q.      You heard the beating that took place?

20  A.      No, I did not, ma'am.

21  Q.      You heard the keys jangling like Clayborn Smith

22  described?

23  A.      No, I did not, ma'am.

24  Q.      You heard the blows landing on Mr. Nicolas?

25  A.      No, I did not, ma'am.

169

1    Q.      You never reported those events happening?

2    A.      I can't report what I don't see or hear, ma'am.

3    Q.      You never intervened to stop the beating from

4    happening?

5    A.      I did not see anything like that, so there was no way I

6    could intervene in it, ma'am.

7    Q.      Now you were there though, regardless of what took

8    place, you were there in the west cell house on February 5th

9    of 2014?

10   A.      Correct.

11   Q.      Did anyone from the investigation unit talk to you in

12   regard to that date?

13   A.      Negative.

14   Q.      You were never interviewed about it?

15   A.      No.

16   Q.      Did you ever talk to any of the other defendants here

17   about it around the time that this occurred?

18   A.      No.

19   Q.      At some point Mr. Nicolas and Sgt. Qualls left the west

20   cell house, correct?

21   A.      According to the documents.

22   Q.      Did you know that Qualls was going to take the

23   plaintiff out to receive medical care?

24   A.      Usually when they take a guy to seg, they have to see

25   medical care.

1   Q.     To your knowledge did both Mr. Diaz and Mr. Nicolas see

2   medical care on February 5th of 2014?

3   A.     That I have no idea.  They are supposed to, but I have

4   no idea.

5   Q.     So you have no knowledge -- strike that.  You had no

6   knowledge on that date, on February 5th of 2014, that

7   Defendant Qualls was going to take Mr. Nicolas over to

8   medical?

9   A.     No.

10          MS. GOODWIN:  Okay.  No further questions.

11          THE COURT:  Okay.  Mr. Bracey, do you have any

12  questions at this time?

13          MR. BRACEY:  Yes, real briefly.

14                          CROSS EXAMINATION

15  Questions by Mr. Bracey:

16  Q.     You were asked questions toward the end there whether

17  you knew or not if the plaintiff and Mr. Diaz were treated by

18  medical care.  Do you recall that?

19  A.     Yes.

20  Q.     I believe you mentioned something that when inmates are

21  taken to segregation, are they typically then evaluated by

22  medical care at that time?

23  A.     Yes, they are.

24  Q.     So you wouldn't know one way or the other if an inmate

25  in the segregation unit is seen by medical care, correct?

171

1    A.     No, I would not.

2           MR. BRACEY:  I have nothing further.

3           THE COURT:  All right.  Anything else?

4           MS. GOODWIN:  No, Your Honor.

5           THE COURT:  All right, you may step down.  Call your

6    next witness.

7           MS. GRADY:  Your Honor, the plaintiff calls Nathan

8    Berry.

9           THE COURT:  All right.  Officer Berry, come up.

10   Deanna, if you would please administer the oath?

11          NATHAN BERRY, PLAINTIFF'S WITNESS, SWORN

12                    DIRECT EXAMINATION

13   Questions by Ms. Grady:

14          COURTROOM CLERK:  Please state your name and spell

15   your last name for the record.

16   A.     Nathan Berry, B E R R Y.

17   Q.     Good afternoon, sir.

18   A.     Good afternoon.

19   Q.     Can you please tell us where you currently work?

20   A.     Menard Correctional Center.

21   Q.     What is your job title there?

22   A.     Sergeant.

23   Q.     You have worked at Menard Correctional Center for how

24   long now?

25   A.     October will be five years.

172

1  Q.    So back in February of 2014 you were a correctional

2  officer, correct?

3  A.    Yes.

4  Q.    And you have been sitting here.  You know we're talking

5  about February 5th of 2014.  Can you tell me during that time

6  where you were assigned?

7  A.    West cell house.

8  Q.    Part of your job as a correctional officer at west cell

9  house is to run lines, correct?

10 A.    Correct.

11 Q.    Can you tell the jury where you stand while that is

12 happening?

13 A.    I am sorry, I didn't hear you.

14 Q.    Can you tell the jury where you typically stand while

15 lines are running in the west cell house at Menard?

16 A.    Depends if you are running the line off, it could be

17 two in the back, the rest up front.

18 Q.    When you say two in the back, you mean two in the back

19 of whatever gallery you're on, right?

20 A.    Yes, ma'am.

21 Q.    On February 5th of 2014, do you know, during the lines

22 going to chow, do you know which one of those two you were

23 assigned to?

24 A.    With all the paperwork saying I was in the front.

25 Q.    So that -- that would have been near the exit, right?

173

1    A.    Well, with that drawing, yes, I guess.

2    Q.    Is there something about this drawing that doesn't make

3    sense to you?

4    A.    Yeah, it would be in that area.

5    Q.    Okay.  So you are sort of -- these are mail boxes,

6    right?  You heard testimony right near the exit there are a

7    bunch of mail boxes where prisoners put things going to

8    different departments?

9    A.    Yes.

10   Q.    That is true, right?  There are mail boxes there?

11   A.    Correct.

12   Q.    And officers line up kind of right here when the lines

13   are moving?

14   A.    Yes.

15   Q.    There would be multiple officers there, right?

16   A.    Yes.

17   Q.    The purpose is to make sure that the prisoners, they

18   are going out or doing what they are supposed to be doing,

19   right?

20   A.    Correct.

21   Q.    Are there west house officers or west house people who

22   are assigned to stand outside to make sure that the prisoners

23   sort of go in the direction they're supposed to go as they are

24   exiting the cell house?

25   A.    Yes, there would be a door officer, sometimes

174

1    lieutenant, and if we had extra officers it would be a couple

2    out there with us inside.

3    Q.    There is actually someone whose job it is to be the

4    guard of the door, right?

5    A.    Yes.

6    Q.    The lieutenant typically sits out there too?

7    A.    Yes.

8    Q.    And do you recall what line it was that was moving on

9    February 5th of 2014 that sort of preceded the events that we

10   have been here to talk about today?

11   A.    I don't know which gallery, so --

12   Q.    You don't have any memory in your mind as you sit here

13   on the stand today of seeing what line it was going past,

14   right?

15   A.    Correct, not without, you know, if I stated in my

16   incident reports, all of that, I would probably know then, but

17   just right now I wouldn't know which gallery.

18   Q.    You will remember by your statements.  You don't have a

19   memory in your mind as you sit here today about what happened,

20   right?

21   A.    Right.

22   Q.    There are multiple chow hours at Menard, aren't there?

23   A.    In that particular cell house, that would be ten chow

24   lines.

25   Q.    Two galleries can go to chow at a time, right?

175

1    A.    Depending on -- you can go two, depending how many go.

2    If you have ten go out, you might be able to send another

3    gallery.  Depends on how things are running that day.

4    Q.    Yeah, and you, if possible, you want to be efficient

5    and get the guys in and out of chow as efficiently as

6    possible, right?

7    A.    Correct.

8    Q.    Okay.  Who is in charge of making that decision?

9          COURTROOM CLERK:  The interpreter is having a hard

10   time hearing you.

11   Q.    Can you tell me who in the cell house is responsible

12   for making the decision that, hey, enough guys stayed on 2

13   gallery that we can send 4 gallery out to chow too?

14   A.    Possibly the sergeant or the lieutenant.

15   Q.    Sgt. Qualls would have had the authority to make that

16   decision?

17   A.    Yes.

18   Q.    He is the sergeant that is in charge of west house,

19   right?

20   A.    At that time.

21   Q.    Is he still in charge of west house?

22   A.    I don't know.

23   Q.    At that time he was your direct supervisor, right?

24   A.    Correct.

25   Q.    He was the guy right above you in the chain of command?

176

1   A.    Yes.

2   Q.    If he gave you an order you had to follow it, right?

3   A.    Yes.

4   Q.    Now we established that you don't remember what

5   happened on February 5th of 2014.  You have heard testimony

6   today about what Osbaldo Nicolas remembers about that day,

7   right?

8   A.    Correct.

9   Q.    This wasn't the first time that you were aware of those

10  allegations that have been made against you, right?

11  A.    Correct.

12  Q.    Because you were interviewed by Lt. Reichert of

13  Internal Affairs?

14  A.    Correct.

15  Q.    On March 5th of 2014, right?

16  A.    Yes.

17  Q.    And he told you about the allegations that had been

18  made against you, right?

19  A.    Yes.

20  Q.    Now how long had you been working at the prison when

21  Lt. Reichert interviewed you?

22  A.    Can I see a date, please?

23  Q.    Sure.  Can we put -- it hasn't been admitted into

24  evidence, but can we put it to the witness?  I am showing you

25  what is marked as page eight of Plaintiff's Exhibit 8.  Do you

1    see here this is an interview.  This is a form indicating that

2    you were interviewed by Lt. Reichert on March 3rd of 2014,

3    right?

4    A.    Correct.

5    Q.    And that is your signature at the bottom under the

6    space marked for interviewee?

7    A.    Yes.

8    Q.    Okay.  You were interviewed about 11:58 a.m.?

9    A.    Yes.

10   Q.    And this was the day before Officer Snell testified

11   that he was interviewed by Lt. Reichert about this event,

12   right?

13   A.    What day did you say?

14   Q.    This has already been admitted into evidence.

15   Plaintiff's Exhibit 8 shows that Sgt. Snell was interviewed by

16   Lt. Reichert on March 4th of 2014, right?

17   A.    Correct.

18   Q.    And this is -- your interview with Lt. Reichert

19   happened two days before Sgt. Qualls was interviewed by Lt.

20   Reichert, right?

21   A.    Yes.

22   Q.    That interview happened on March 5th of 2014.  When Lt.

23   Reichert interviewed you, he wrote down and took notes about

24   what you were saying, right?

25   A.    Correct.

1    Q.    He asked you to review your statement, right?

2    A.    Yes.

3    Q.    You made sure that statement was accurate, correct?

4    A.    To the best of my ability, yes.

5    Q.    And can you tell me on March 3rd of 2014, how long had

6    you been there?

7    A.    On that date it was approximately six months.

8    Q.    You were still pretty new, correct?

9    A.    Correct.

10   Q.    You knew this was serious, right?

11   A.    Yes.

12   Q.    Six months on the job and you are being accused of

13   being present while an inmate is being beaten up, right?

14   A.    Correct.

15   Q.    Did you see Clayborn's letter on that day?

16   A.    No.

17   Q.    You knew this was an allegation of excessive force

18   against you, right?

19   A.    After we started the interview, yes.

20   Q.    Okay.  In addition to initialing what you -- the notes

21   that were taken of what you said, you also signed this

22   document, right?

23   A.    Yes.

24         MS. GOODWIN:  Your Honor, at this time I would move

25   for admission of pages eight and nine of Plaintiff's

179

1    Exhibit 8.

2          MR. TYRRELL:  No objection, Your Honor.

3          THE COURT:  All right, eight and nine will be

4    admitted.

5       (Whereupon  Plaintiff's Exhibit 8, pages 8 and 9, were

6    admitted.)

7    Questions By Ms. Goodwin:

8    Q.    Okay, so we have heard that Officer Snell, then Officer

9    Snell, Sgt. Snell now, was interviewed on 3-4 and Lt. Qualls

10   was interviewed on 3-5.  So you go two days before that on

11   3-3, right?

12   A.    Correct.

13   Q.    You say -- and you reviewed this statement and it

14   contained all of the information that you recalled about your

15   interaction with the two prisoners on that day at the time of

16   your interview, right?

17   A.    Yes.

18   Q.    That was just less than a month after this happened,

19   right?

20   A.    Let me see the date on the reports.

21   Q.    Sure.  Let's turn to page eight.  I'll show you

22   Exhibit 217, which was already admitted into evidence.  The

23   incident report created by Qualls that talks about the fall,

24   that is 2-5-14, correct?

25   A.    Yes.

1  Q.     So your interview happens on 3-3, less than a month

2  later, right?

3  A.     Correct.

4  Q.     This is just six months after you had started, right?

5  A.     Yes.

6  Q.     So like 150 days into your job as a correctional

7  officer at Menard?

8  A.     Yes.

9  Q.     Okay.  You told Lt. Reichert that you remembered

10  writing the IDR on the hooch, right?

11  A.     Yes, if the document is saying that.

12  Q.     Well, I am asking about what you told Lt. Reichert on

13  March 3rd of 2014.

14  A.     Yes.

15  Q.     IDR refers to disciplinary report, right?

16  A.     Correct.

17  Q.     Hooch refers to alcohol?

18  A.     Home made intoxicants.

19  Q.     It's the rules at Menard that when you find something

20  like that in a cell during a shake down, you write a ticket

21  for both prisoners in the cell, right?

22  A.     Yes.

23  Q.     You don't do an investigation into who had what.  You

24  find something, you write them both up, you let someone else

25  sort it out, right?

1          MR. TYRRELL:  Objection, Your Honor, relevance.

2          THE COURT:  Overruled.

3    A.     To the best of my knowledge.  That is you remove the

4    intoxicants from the cell and then do a little process, finish

5    reports, tickets.

6    Questions By Ms. Goodwin:

7    Q.     Right.  You don't do any investigation or try to figure

8    out whose it was or who knew about it, anything like that?

9    A.     No, that was above me.

10   Q.     Okay.  So you agree that according to your statement

11   you have a memory of that day as of March 3 of 2014, right?

12   A.     Correct.

13   Q.     And that would make sense, less than a month later, new

14   into a job, right?

15   A.     Yes.

16   Q.     Do you know whether this was your first shake down,

17   first cell search?

18   A.     Can you rephrase it please?

19          THE COURT:  Sorry.  Can you please speak up?  I

20   didn't hear you.

21   A.     Can you repeat it please?

22   Q.     Yes.  Let me back up and help us get there in a

23   straighter line.  So this incident happened because of a

24   routine cell search, right?

25   A.     Correct.

182

1  Q.     One of those things done at Menard from time to time?

2  A.     Yes.

3  Q.     No warning to the prisoners and you decide maybe at

4  random to search a certain number of cells on a regular basis,

5  correct?

6  A.     Correct.

7  Q.     That is to make sure that everybody stays safe and no

8  one has stuff they are not supposed to, stuff like that,

9  correct?

10 A.     Correct.

11 Q.     To be clear, you don't tell the prisoners, hey, we're

12 going to search your cell tomorrow, right?

13 A.     No.

14 Q.     In fact, the whole point is no notice?

15 A.     Correct.

16 Q.     So do you know whether this was the first random search

17 of a cell that you had done as a correctional officer at

18 Menard on February 5th of 2014?

19 A.     I wouldn't remember that.

20 Q.     You don't remember one way or the other?

21 A.     I wouldn't remember if it was my first one.

22 Q.     Fair enough.  You did remember it during your

23 interview.  You talk about Mr. Diaz and Mr. Nicolas being in

24 the holding cage, right?

25 A.     Correct.

183

1    Q.    So that is something you remember too?

2    A.    Correct.

3    Q.    Now do you remember as you sit here today what side of

4    west cell house Mr. Diaz and Mr. Nicolas were on?

5    A.    Even.

6    Q.    It is your testimony they were -- sorry, my question

7    was not clear.  Do you remember whether they were assigned to

8    a cell that was on the odd side of west cell house or even

9    side of west cell house?

10   A.    I think it states it.  I wouldn't know right now

11   without seeing the paperwork.

12   Q.    Do you agree you heard testimony here that Mr. Nicolas

13   and his cell mate were assigned to a cell on the odd side,

14   right?

15   A.    Correct.

16   Q.    7 gallery?

17   A.    Yes.

18   Q.    That is a fourth gallery up?

19   A.    Yes.

20   Q.    Okay.  One, three, five, seven?

21   A.    Yes.

22   Q.    Okay.  You have heard lots of testimony about how

23   Mr. Diaz and Mr. Nicolas were on even side of the holding

24   cage?

25   A.    Correct.

184

1    Q.     Do you remember why you put him on the even side

2    holding cage?

3    A.     Yes.

4    Q.     What is that for?

5    A.     When we're running chow lines, the cells are divided.

6    There's a divider door and everything.  You have to check

7    down, all of that happened, move him to the even side holding

8    cell because we were running lines and going in and out of the

9    door there.  That way we can keep an eye on them, make sure

10   they are not harming themselves, anything in particular like

11   that.

12   Q.     So you put them on the even side south, and you

13   remember them talking, right?

14   A.     From all this, yes.

15   Q.     Well, according to the statement that you signed, you

16   affirmatively told Lt. Reichert that you recalled Mr. Diaz and

17   Mr. Nicolas talking to inmates on the chow line, right?

18   A.     I don't see that on here.

19   Q.     Sure.  Let me pull it up.  See, that states they were

20   talking to inmates on the chow line?

21   A.     Yeah.

22   Q.     You also remembered that someone told them to stop

23   talking, right?

24   A.     Correct.

25   Q.     And that according to your statement to Lt. Reichert,

185

1    it was your statement that they complied with that order,

2    right?

3    A.    Correct.

4    Q.    We have heard that word, complied, before, haven't we?

5    A.    Yes.

6    Q.    We heard that word, complied or compliant, appears in

7    Lt. Qualls statement too, right?

8    A.    Correct.

9    Q.    Made two days later, right?

10   A.    After looking at his statement, yes.

11   Q.    Sure, I'll pull you there.  This has already been

12   admitted into evidence.

13         THE COURT:  What exhibit is this again?

14   Q.    Exhibit 8, page 13.  Do you see Lt. Qualls uses that

15   word, compliant, too?  Do you see that?

16   A.    Correct.

17   Q.    And Lt. Qualls isn't the only one to use compliant in

18   addition to you.  Officer Snell uses it too.  One day after

19   you tell Lt. Reichert that the inmates were compliant, Snell

20   tells him they were compliant as well, correct?

21   A.    Correct.

22   Q.    Now as you sit here today, you don't remember

23   compliant, not compliant, what happened, right?

24   A.    They were compliant.

25   Q.    Okay.

186

1   A.     Surely.

2   Q.     Let me show you -- this was not admitted into evidence.

3 This is a ticket Sgt. Qualls created accusing Jose Nicolas of

4 disobeying a direct order, correct?

5   A.     Correct.

6   Q.     Disobeying a direct order is not being compliant, is

7 it?

8   A.     Depends.  There is different compliance I guess.

9   Q.     Well, this was a disobeying of a direct order so

10 sufficient that Sgt. Qualls felt he needed to create a record

11 about it, right?

12   A.     Right.

13   Q.     I mean you have seen times when you give someone an

14 order, they pop back to you, you say hey, man, listen to me.

15 You don't write everyone an order for every time they don't

16 immediately and directly obey, do you?

17   A.     I don't usually have that problem.

18   Q.     Yeah.  You're given discretion.  Sometimes you can calm

19 down a situation and that is the end of it, right?

20   A.     Correct.

21   Q.     And that is the whole -- you want to keep things calm

22 at Menard, right?

23   A.     Yes.

24   Q.     Because that keeps everybody safe?

25   A.     Yes.

187

1   Q.    You see here Sgt. Qualls decided that the level of

2   disobedience was so significant that he had to write a

3   disciplinary report about it, right?

4   A.    Right.

5   Q.    And he lists some witnesses there, right?

6   A.    Yes.

7   Q.    And who did he list?

8   A.    Snells and CO Berry.

9   Q.    That is you, right?

10  A.    Correct.

11  Q.    So you agree that is inconsistent with your contention

12  as you made it to Lt. Reichert on March 3rd of 2014 that the

13  inmates were compliant?

14  A.    They were compliant.  There is no issue with not

15  cuffing up.  That is being noncompliant.

16  Q.    Did you offer to be a witness on Mr. Nicolas' behalf to

17  contest this ticket?

18  A.    No.

19  Q.    Let's look at another disciplinary report.  Sgt. Qualls

20  didn't just accuse Mr. Nicolas of disobeying an order, he

21  accused his cellmate of doing the same thing, right?

22  A.    Correct.

23  Q.    In fact, he accused Mr. Diaz of refusing "all orders

24  given", right?

25  A.    Correct.

188

1   Q.    He listed you as a witness to that refusal, that

2   noncompliance, right?

3   A.    Yes.

4   Q.    You did not offer to testify on Mr. Diaz's behalf, did

5   you?

6   A.    No.

7   Q.    Sir, isn't it true that Sgt. Qualls gave an order to

8   Mr. Nicolas to sit down in the cell house on February 5th of

9   2014?

10  A.    Direct order, yes.

11  Q.    Isn't it true that Mr. Nicolas did not sit down in

12  accordance with that order?

13  A.    It appears to be they both would not stop talking.

14  Q.    Isn't it true that that response made Sgt. Qualls

15  angry?

16  A.    No.

17  Q.    Was it your testimony you remember the temperament of

18  Sgt. Qualls on February 5th of 2014?

19  A.    I do not recall.

20  Q.    I am sorry, can you say it again?

21  A.    I do not recall.

22  Q.    You don't know whether the response made Sgt. Qualls

23  visibly angry, quietly angry or somewhere in between, right?

24  A.    Right.

25  Q.    You don't have any idea what happened next, right?

189

1  A.     I think in my 434, it would be easier to go off of

2  that.

3  Q.     Well, sir, I don't have a 434, so if you wrote one I

4  would like to see it.

5  A.     I don't know if I do, if I even wrote one.  I'm a

6  witness.

7  Q.     Menard's policy would have required you as a witness to

8  complete an incident report, right?

9  A.     Not necessarily.

10 Q.     Well, we heard testimony earlier from Lt. Qualls that

11 when an unusual event occurs an incident report is required,

12 right?

13 A.     Correct.

14 Q.     There were unusual events being testified to today,

15 weren't there?

16 A.     Yes.

17 Q.     But you have never seen an incident report that you

18 completed, right?

19 A.     I don't recall.

20 Q.     Isn't that because you know that completing an incident

21 report that correctly documented the events that occurred on

22 February 5th of 2014 would have seriously risked the ability

23 of your direct supervisor to continue advancing within the

24 Illinois Department of Corrections?  Isn't that true?

25 A.     That is not true.

190

1   Q.    Isn't it true that if you had completed an honest

2  incident report as policy required you to do on February 5th

3  of 2014, that internal affairs would have had to face the

4  misconduct that occurred on that day?

5  A.    That is not true.

6  Q.    Well, sir, you agree that you have never seen and we

7  have never looked at here today any 434 or any incident report

8  that you wrote on that day, right?

9  A.    I thought I had paperwork.

10  Q.    All right.  Have you ever seen an incident report that

11  you completed?

12  A.    Not that I recall.

13  Q.    Let's talk about the other part of the investigation

14  interview you gave on March 3rd of 2014.

15        Your Honor, if you could publish that to the jury?

16  It was already admitted.

17        THE COURT:  Which exhibit is this again?

18        MS. GRADY:  It is frozen on my end.

19        COURTROOM CLERK:  I would suggest unplugging it.

20  Questions By Ms. Goodwin:

21  Q.    We're back at your statement you gave on March 3rd of

22  2014.  One of the other things that you say is that you

23  remember walking with Diaz to segregation, right?

24  A.    Correct.

25  Q.    You remember that there were no issues with the

191

1    inmates, right?

2    A.      No issues.

3    Q.      That you remember that the inmates didn't say anything,

4    right?

5    A.      According to this paper here.

6    Q.      That you remember that neither inmate had any issue

7    being removed from the case, right?

8    A.      According to this document.

9    Q.      And that neither issue had any inmate during the walk

10   to seg, right?

11   A.      Yeah.

12   Q.      You wouldn't have told Lt. Reichert that if that wasn't

13   something that you remembered, right?

14   A.      Correct.

15   Q.      You would have told him I don't remember the walk to

16   segregation, right?

17   A.      Yes.

18   Q.      You did remember the walk to segregation, correct?

19   A.      According to the interview here, yes.

20   Q.      Sure.  As of March 3rd of 2014 you had a memory in your

21   mind of walking Diaz and Nicolas to segregation, didn't you?

22   A.      Yeah, it says escort into seg here.

23   Q.      You said there were no issues walking to seg, right?

24   A.      There were no issues walking to seg.

25   Q.      You didn't mention any slips on the ice, right?

192

1    A.    I wouldn't have walked -- they don't walk together.

2    Q.    You didn't say that you don't -- you remember one

3    walking to seg just fine, but I don't remember anything about

4    the other.  You affirmatively told Lt. Reichert on March 3rd

5    of 2014 that you remembered walking up to segregation and that

6    there were "no issues", isn't that true?

7    A.    He might have wrote it down wrong possibly.  I meant

8    Diaz.

9    Q.    Well, you read this report.  You reviewed it and this

10   was the first time you had ever been interviewed by internal

11   affairs for an allegation of excessive force, right?

12   A.    Right.

13   Q.    You took it seriously, right?

14   A.    Yes.

15   Q.    You wanted to make sure that every single detail you

16   told Lt. Reichert was correct, right?

17   A.    Yes.

18   Q.    You wanted to make sure that everything he wrote down

19   accurately reflected what you said, right?

20   A.    Yes.

21   Q.    And then you initialed after carefully reading that

22   document indicating that you had read that and that was an

23   accurate reflection of what you had told Lt. Reichert on that,

24   right?

25   A.    To the best of my knowledge, yes.

193

1    Q.      You admit that you walked Mr. Diaz to segregation,

2    correct?

3    A.      According to this paperwork.

4    Q.      You have no memory of that walk today, right?

5    A.      Correct.

6    Q.      We have heard testimony that Mr. Diaz followed

7    Mr. Nicolas to segregation, right?

8    A.      Correct.

9    Q.      And that Mr. Nicolas was escorted by Sgt. Qualls,

10   correct?

11   A.      Yes.

12   Q.      And Mr. Diaz was escorted by you, correct?

13   A.      Correct.

14   Q.      So Nicolas moves first and Diaz moves second, correct?

15   A.      Correct.

16   Q.      You never saw Mr. Nicolas fall on the ice, did you?

17   A.      I did not.

18   Q.      And you never heard from anybody, hey, there is ice to

19   watch out for, right?

20   A.      Correct.

21   Q.      You didn't see any ice, did you?

22   A.      The whole street was ice, but --

23   Q.      Well, you didn't mention that to Lt. Reichert, did you?

24   A.      I did not.

25   Q.      You sat here today and told us you couldn't remember a

194

1    single detail about what happened on February 5th of 2014 as

2    you sit here in this courtroom today, right?

3    A.    Correct.

4    Q.    But it is now your testimony that you can recall

5    exactly the conditions on Front Street four and a half years

6    ago?

7    A.    I was just going off the testimony.

8    Q.    Okay.  So that you were just taking Lt. Qualls word on

9    that, right?

10   A.    No.

11   Q.    What do you mean you're going off the testimony?

12   A.    Going off what you been telling me.

13   Q.    Well, let me ask you this, sir.  Do you have any

14   recollection of there being ice on Front Street on

15   February 5th of 2014 as you escorted Mr. Diaz to segregation?

16   A.    I do not recall.

17   Q.    If you had recalled any issues escorting Mr. Diaz to

18   segregation, you would have told them to Lt. Reichert,

19   correct?

20   A.    Correct.

21   Q.    If you would have remembered any detail about seeing

22   anything occur to Mr. Nicolas that might have explained his

23   injuries, you would have told Lt. Reichert on March 3rd of

24   2014, right?

25   A.    That's correct.

1    Q.    Now we have heard some testimony about an injury

2    report.  I want to ask you a little bit about that.  Menard

3    policy requires you to fill out an incident report any time

4    that you observe a prisoner with injuries, right?

5    A.    Correct.

6    Q.    They also require you to actually affirmatively contact

7    medical to obtain medical care for that inmate, right?

8    A.    Yes.

9    Q.    You have never filled out a 434 about this day, right?

10    A.    About --

11    Q.    About February 5th of 2014.

12    A.    Not to my recollection, no.

13    Q.    And I am going to show you what has been marked and

14    admitted into evidence as Plaintiff's Exhibit 7.  You don't

15    have any explanation for how Mr. Nicolas got an abrasion to

16    his left side forehead, right?

17    A.    Correct.

18    Q.    You don't have any explanation for how Mr. Nicolas --

19    why Mr. Nicolas just minutes after he left west cell house

20    came up with complaints of -- had complaints of his head

21    hurting, left wrist hurting, right jaw hurting and his leg

22    hurting, right?

23    A.    Correct.

24    Q.    And you don't have any explanation for why -- this is

25    already in evidence, page 63 of Plaintiff's Exhibit 26 -- for

196

1    why two days after he is moved from west cell house to north 2

2    he tells nursing staff that he was hit in his cheek, face and

3    jaw, it hurts bad?  You don't have any explanation for that,

4    right?

5    A.     Right.

6    Q.     In segregation prisoners are kept, literally,

7    segregated from general population, is that right?

8    A.     That's correct.

9    Q.     They are kept in restriction, in their cells, right?

10   A.     Yes.

11   Q.     You would agree with me there is not much opportunity

12   for any fights to happen in north 2 segregation, right?

13   A.     I would not agree with that.

14   Q.     Well, if correctional staff are doing their job, that

15   segregation unit stays pretty locked down, right?

16   A.     No.

17   Q.     Sir, isn't it true that on February 5th of 2014

18   Mr. Nicolas was hit in his cheek and he was hit in his face

19   and he was hit in his jaw and he was hit in his back and he

20   was hit in his legs and he was hit on his body and he was hit

21   in those places by officers assigned to west house at Menard

22   Correctional Center?

23   A.     That is not true.

24   Q.     But it is your testimony you don't remember that day,

25   right?

1    A.    To the best of my knowledge it is not -- it wouldn't

2    have happened or I would have documented it.

3    Q.    It is your testimony that if you had seen that, that is

4    something you would have filled out an incident report on,

5    right?

6    A.    Correct.

7    Q.    Would you have stepped in?

8    A.    To stop it?  If something like that would happen, I

9    would step in to keep it from happening any worse.

10   Q.    Even if it is your supervisor?

11   A.    Even if it is my supervisor.

12   Q.    You told us earlier if your supervisor gives you an

13   order, you got to follow that order, right?

14   A.    People know what's right and what's wrong.

15   Q.    Officer Berry -- sorry -- Sgt. Berry, you are

16   compensated for your work as a correctional sergeant, correct?

17   A.    Correct.

18   Q.    And back when you were a correctional officer you were

19   also compensated for that work, correct?

20   A.    Correct.

21   Q.    And can you tell the jury approximately what you make

22   in a year?

23            MR. TYRRELL:  Objection, Your Honor, for relevance.

24            THE COURT:  This goes to punitive damages?

25            MS. GRADY:  Correct.

198

```
 1              THE COURT:  Okay, overruled.
 2   A.      No, I wouldn't know.  It just popped up a minute ago.
 3   Questions By Ms. Grady:
 4   Q.      I would be happy to show it to you to refresh your
 5   recollection, but I think we probably want to admit it.  So
 6   the top line there for 2018 that shows you as of the current
 7   date, and the bottom two lines I believe show you for the full
 8   year for 2017 to 2016.  Does that refresh your recollection as
 9   to approximately what your income is per year?
10   A.      Yes.
11   Q.      Can you tell me what that is?
12   A.      Looks like about an average of 59 to 57,000, somewhere
13   in between there.  Varies.
14   Q.      You agree there is nothing that we have talked about
15   today that would indicate that you made any phone calls to
16   medical care to insure that Mr. Nicolas was seen and treated
17   appropriately on February 5th of 2014, correct?
18   A.      I don't quite understand the question.
19   Q.      Yeah.  There is no document that shows that you made a
20   phone call to medical care, right?
21   A.      Correct.
22   Q.      And that is the sort of thing that you would document
23   if you had done it, right?
24   A.      Yes.
25   Q.      You disagree that you did not call medical care to make
```

199

1    sure that Mr. Nicolas was seen on February 5th of 2014, right?

2    A.      Right.

3    Q.      You agree that the kind of force that Mr. Nicolas

4    testified he suffered on February 5th of 2015, that was

5    excessive force, right?

6    A.      There is no suggested force used.

7    Q.      You sat in the courtroom and heard Mr. Nicolas tell you

8    about the beating he suffered on February 5th of 2014, right?

9    A.      Right.

10   Q.      He testified he suffered that beating after being told

11   by Sgt. Qualls to sit down and when he refused being told by

12   Sgt. Qualls to sit the fuck down, and when he refused being

13   yanked out of his cell and punched and beaten, right?

14   A.      It didn't happen.

15   Q.      You heard that testimony, didn't you?

16           THE COURT:  If that happened, would that be

17   excessive?

18   A.      Yes, it would be excessive.

19   Questions By Ms. Grady:

20   Q.      There would be no justification for use of that kind of

21   force, right?

22   A.      Correct.

23   Q.      That would be against Menard's policies?

24   A.      It is against IDOC policy.

25   Q.      That would be against what is right, right?

200

1   A.     Right.

2         MS. GRADY:  Nothing further.

3         THE COURT:  All right.  Mr. Tyrrell, Mr. Bracey, do

4   you have brief clarification?

5         MR. TYRRELL:  Yes, Your Honor.

6                 CROSS EXAMINATION

7   Questions by Mr. Tyrrell:

8   Q.     Sgt. Berry, on February 5th of 2014 did you slam the

9   plaintiff's head into a wall or any door?

10   A.     No, I did not.

11   Q.     Did you kick the plaintiff on February 5th of 2014?

12   A.     No, I did not.

13   Q.     Did you punch the plaintiff on February 5th of 2014?

14   A.     I did not.

15   Q.     Did you witness Lt. Qualls do any of those things to

16   the plaintiff on February 5th of 2014?

17   A.     No, I did not.

18   Q.     Did you witness any staff members at Menard

19   Correctional Center assault the plaintiff on February 5th of

20   2014?

21   A.     No, I did not.

22   Q.     If you had observed it, would you have reported it?

23   A.     Of course.

24   Q.     Do you remember seeing any injuries on Mr. Nicolas on

25   February 5th of 2014?

201

```
 1    A.    No, I did not.

 2    Q.    If you had seen any injuries and you saw he needed

 3  medical attention, would you have seen to it he received

 4  medical attention?

 5    A.    Yes.

 6    Q.    Would you agree with me that an offender can disobey

 7  one order and then comply with another order?

 8    A.    Yes.

 9    Q.    Based on the documents you created, would you agree

10  with me that Mr. Nicolas refused the initial order by Lt.

11  Qualls and then complied with an order to turn around and cuff

12  up?

13          MS. GRADY:   Objection, form and foundation, Your

14  Honor.

15          THE COURT:   Overruled.

16  Questions By Mr. Tyrrell:

17    Q.    You can answer.

18    A.    Yes.

19    Q.    Would you agree with me on February 5th of 2014

20  Mr. Nicolas disobeyed one direct order but complied with other

21  direct orders?

22    A.    Yes.

23    Q.    Do you recall one way or the other if Mr. Nicolas was

24  the first to walk to segregation or Mr. Diaz?

25    A.    I don't recall, but from the paperwork saying Diaz did.
```

202

1   Q.     That Diaz walked first to segregation?

2   A.     Yes.

3   Q.     And so you walked Offender Diaz to segregation?

4   A.     The other way around, Nicolas.

5   Q.     You believe Nicolas walked first to segregation?

6   A.     Yes.

7   Q.     You don't recall whether or not Mr. Nicolas fell down

8   on the ice?

9   A.     I would not.  I don't recall.

10  Q.     You don't recall seeing it?

11  A.     I wouldn't recall seeing it at all.

12  Q.     Okay.  Just going back to your interview with Lt.

13  Reichert, I believe you testified you understood Lt. Reichert

14  was interviewing you because of allegations of excessive

15  force, is that correct?

16  A.     That's correct.

17  Q.     Do you recall whether or not Lt. Reichert asked you if

18  Mr. Nicolas slipped on the ice?

19  A.     I don't recall.

20  Q.     Do you recall Lt. Reichert ever asking you about any

21  injuries Mr. Nicolas may have had?

22  A.     I don't recall.

23  Q.     You have no knowledge about why Mr. Nicolas had any

24  injuries, correct?

25  A.     Correct.

203

1   Q.     But if Mr. Nicolas had any injuries on February 5th of

2   2014, it is not at the hands of any of the officers in this

3   room today, correct?

4   A.     Correct.

5          MR. TYRRELL:  Thank you, Your Honor.  Nothing else.

6          MS. GRADY:  Very briefly, Your Honor.

7                         REDIRECT EXAMINATION

8   Questions by Ms. Grady:

9   Q.     It is your testimony here today that you just don't

10  recall whether or not you remember Mr. Nicolas slipping on

11  ice, right?

12  A.     Yes.

13  Q.     You heard Sgt. Qualls testify that the reason he wrote

14  the report was slipping on ice is an unusual event and

15  requires an officer to create a 434 incident report, right?

16  A.     Correct.

17  Q.     You didn't create one, did you?

18  A.     Not about falling on ice.

19  Q.     And if you had seen an officer go down by slipping on

20  the ice, you would have gone to help him up, right?

21  A.     If he was with an offender or officer, either one, yes.

22  Q.     You would have gone to help whoever it was slipped on

23  the ice, right?

24  A.     Yes.

25  Q.     You would want to make sure they were both okay, right?

204

1    A.      Correct.

2    Q.      You would have looked them over, made sure you didn't

3    need to take any steps to do anything else, right?

4    A.      Correct.

5    Q.      You would have contacted someone and said, hey, can we

6    get the ice off Front Street?

7    A.      If it was not already salted, yes.

8           MS. GRADY:  I don't have anything else.

9           THE COURT:  All right, thank you.  You may step down.

10   Ladies and gentlemen, about a 15-minute break.

11          (Whereupon a recess is taken.  The following

12   proceedings were held out of the presence of the jury.)

13          THE COURT:  Be seated everyone.  Mr. Diaz is next.

14   Let's do whatever we need to do to get Mr. Diaz up here in the

15   stand and you can all take a break.  Let's plan to resume

16   about five minutes till.

17          (Whereupon a recess was taken.  The following proceedings

18   were held in open Court, in the presence of the jury.)

19          MS. CROSLEY:  The plaintiff calls Edgar Diaz.

20          EDGAR DIAZ, PLAINTIFF'S WITNESS, SWORN

21                    DIRECT EXAMINATION

22   Questions by Ms. Crosley:

23          COURTROOM CLERK:  State your name for the record.

24   A.      Edgar Diaz.

25   Q.      Good afternoon, Mr. Diaz.  How are you today?

205

1    A.    I'm all right.

2    Q.    Mr. Diaz, are you currently a prisoner at the Lawrence

3    Correctional Center in Sumner, Illinois?

4    A.    Yes, I am, ma'am.

5    Q.    You are there because you were previously convicted of

6    a felony, is that correct?

7    A.    Yes.

8    Q.    Back in February of 2014, were you a prisoner at the

9    Menard Correctional Center?

10   A.    Yeah.

11   Q.    As of the start of February of 2014, did you share a

12   cell with Osbaldo Jose Nicolas?

13   A.    Yes.

14   Q.    How long did you share a cell with Osbaldo?

15   A.    I'm not too sure.  I think it was like five months.

16   Q.    Okay.  I want to direct your attention to Wednesday,

17   February 5th of 2014.  Do you remember that day?

18   A.    Yeah.

19   Q.    Why do you remember that day?

20   A.    Because we got -- should I just go with the whole

21   story?  We got shook down and a lot of things happened that

22   day.

23   Q.    Okay, thank you.  That day started out with you and

24   Osbaldo sharing a cell in the west house, is that correct?

25   A.    Yes.

206

1  Q.    I understand that the west house was divided into an

2  even side and odd side, is that correct?

3  A.    That's true.

4  Q.    The cell that you shared with Osbaldo, was that on the

5  even side or odd side?

6  A.    The odd side.

7  Q.    Okay.  And on the ground floor of the west house there

8  are some holding cells, is that correct?

9  A.    There are two of them.

10 Q.    Two of them.  Is that one on the odd side and one on

11 the even side?

12 A.    Yeah.

13 Q.    Those holding cells, is it just like a square or

14 rectangular room?

15 A.    It is bars.  Square though.

16 Q.    Square.  Would you say how big it is?

17 A.    I can't really say.  I mean like this (indicating).

18 Probably a little bit smaller.

19 Q.    So that kind of box you're in right now, maybe about

20 that size?

21 A.    Something like that.

22 Q.    You said there are bars.  You mean some of the walls

23 are made of bars instead of solid walls?

24 A.    All bars.  Mostly like a little wall.

25 Q.    How many of the sides are bars and how many of the

1    sides are walls?

2    A.     On that side it is all bars, like two walls is.

3    Q.     Okay.  So two walls and the rest is bars?

4    A.     Yes.

5    Q.     Okay.  So thinking about the holding cell on the even

6    side, if you are standing in the holding cell and you look at

7    the door to get out of the holding cell, okay, if you were to

8    walk out of the door, what would be immediately on your left?

9    A.     On my left to come outside?

10   Q.     The door to go outside, like into the outdoors.

11   A.     Right, yeah.

12   Q.     If you were to walk out that door and turn immediately

13   to your right, what is to your right?

14   A.     I mean really nothing but a walkway to go to Front

15   Street or whatever.

16   Q.     From the holding cell?

17   A.     Oh, no, my bad.  You say from the right side?  That

18   would be the shower.

19   Q.     You walk out of the door of the holding cell and you

20   turn right.

21   A.     Okay, that is the gallery.

22   Q.     By gallery, that is where the housing cells -- where

23   the cells are?

24   A.     2 gallery.

25   Q.     When you walk out of the holding cell, is there kind of

208

1    an area if you walk straight ahead of where you walk out of

2    the door?

3    A.      What do you mean?

4    Q.      Like so if you are on the even side holding cell.

5    A.      Right.

6    Q.      You walk out of the door.  Can you keep going straight?

7    A.      Yes, that is the shower area.

8    Q.      If you keep going straight, do you end up in the

9    showers or is there a hallway you have to go through a door?

10   A.      You got to go through a door, but usually they leave

11   the odd side door open for the showers.

12   Q.      But on the even side, do you know?

13   A.      Sometimes they do when they run showers, but like on a

14   basic day, most of the time they leave the odd side open.

15   Q.      Okay.  On February 5th of 2014, at some point you and

16   Osbaldo were placed in the holding cage on the even side, is

17   that correct?

18   A.      Yeah.

19   Q.      All right.  Were you placed in -- you said earlier

20   something about how they had shaken down your cell.

21   A.      Yes.

22   Q.      By shaken down, you mean an officer or another officer

23   searched your cell?

24   A.      Yes.

25   Q.      And did they discover hooch in your cell?

209

1    A.    Yes.

2    Q.    Whose hooch was that?

3    A.    That was mine.

4    Q.    What is hooch?

5    A.    Homemade wine.

6    Q.    Okay.  It is against the rules to have hooch in your

7    cell?

8    A.    Yeah, contraband.

9    Q.    Because they found hooch in your cell, at some point

10   you and Osbaldo were taken to the holding cell?

11   A.    Yeah.

12   Q.    When you were in the holding cell, were you handcuffed?

13   A.    No.

14   Q.    Was Osbaldo handcuffed?

15   A.    No.

16   Q.    Did you have any other restraints on?

17   A.    No.

18   Q.    Was there anyone else in the holding cell besides you

19   and Osbaldo?

20   A.    No, just me and him.

21   Q.    Okay.  Outside of the cage, could you see if there were

22   any staff members in the area?

23   A.    Yeah, they were just standing right there by the gate.

24   Q.    What staff members do you remember specifically being

25   there that day?

210

1    A.      Anybody that was right here.

2    Q.      Can you identify some of the guys by name?

3    A.      Berry, Snell, Purdom and Qualls.

4    Q.      So, obviously, you recognize the gentlemen by face?

5    A.      By face, yeah.

6    Q.      On that date, did you know who all of them were?

7    A.      No, besides Qualls.

8    Q.      Okay.  How did you come to learn who they were?

9    A.      Just by coming back to the prison because I had

10   previously been in a different prison, so I came back and then

11   so I got used to seeing the faces, learned the names.  Just by

12   being there.

13   Q.      So you were a prisoner at Menard and they were staff at

14   Menard, you got to know their names?

15   A.      Right.

16   Q.      Do you remember if there were any other staff members

17   present besides these four?

18   A.      Yeah, there was a few more.  I can't really recall.

19   Q.      You can't recall what their names were now?

20   A.      Yeah.

21   Q.      While you were in the holding cell, were they running

22   lines?

23   A.      Yeah, they were running lines for commissary, which is

24   like inmate store, to go to lunch and like I think health

25   care.

211

1  Q.    So that means what you are saying is there were inmates

2  to go to commissary you said?

3  A.    Different areas of the prison.

4  Q.    Health care and lunch?

5  A.    Yes.

6  Q.    Okay.  Might there have been lines going other places

7  too?

8  A.    Probably.

9  Q.    Okay.  As those lines were being, lines of prisoners

10  were being taken, did they walk past the holding cell you were

11  in?

12  A.    Yeah.

13  Q.    The part that they walk past is a part with bars, is

14  that correct?

15  A.    Yeah.

16  Q.    Okay.  And so could you see the prisoners as they

17  walked by then?

18  A.    Yeah.

19  Q.    Okay.  Presumably they could see you as far as you

20  know?

21  A.    Yeah.

22  Q.    While you were in the cage, were you sitting or

23  standing if you remember?

24  A.    I was standing up at first, walking around pacing back

25  and forth.

212

1    Q.      What about Osbaldo?

2    A.      Doing the same probably that I can remember.  We were

3    both -- we in the cage, so we gonna move around, not stay

4    still.

5    Q.      Is there any bench or anything like that in the cage?

6    A.      A who?

7    Q.      Bench or chair or seat.

8    A.      It wasn't a bench, it was just a bunch of wood like

9    stacked.

10   Q.      Like 2 x 4s?

11   A.      No, it is like a wood they use to stack it up.  It is

12   like they use it like a ladder, but it is made out of metal

13   and they put the wood going across when they paint or stuff

14   like that.

15   Q.      I think I understand what you are saying.  So there was

16   some of that in the cell?

17   A.      Yeah, just a bunch of wood though.

18   Q.      Okay.  As the various lines were going by, do you

19   remember if you either said anything to anybody in the line or

20   they said anything to you?

21   A.      Yeah, I mean I was talking.

22   Q.      What about Osbaldo?  Did he say anything to anybody in

23   the line?

24   A.      Yeah, he was talking.

25   Q.      Do you remember if anyone told you guys, either both of

213

1    you together or Nicolas specifically, or I am sorry, Osbaldo

2    specifically or you specifically, do you remember being told

3    to stop talking?

4    A.      Yeah.

5    Q.      Do you remember who told you to stop talking?

6    A.      I mean at the time I think it started off with Snell.

7    He was telling us to just be cool, stop talking.

8    Q.      All right.  That sounds like at some point someone else

9    told you to be quiet?

10   A.      Eventually, yeah.

11   Q.      Who was that?

12   A.      Qualls.

13   Q.      Do you remember what words he used specifically?

14   A.      Shut the fuck up.

15   Q.      After Qualls told you guys to shut the fuck up, did you

16   stop talking?

17   A.      Yeah, eventually I did.

18   Q.      What about Osbaldo?

19   A.      I think he kept on talking.

20   Q.      Okay.  Do you remember if anyone told you to sit down?

21   A.      Yeah.

22   Q.      Do you remember who told you to sit down?

23   A.      Qualls.

24   Q.      Did you sit down?

25   A.      Yeah.

214

1    Q.      Okay.  Do you remember if anyone told Osbaldo to sit

2    down?

3    A.      Yeah, same person.

4    Q.      Qualls?

5    A.      Yeah.

6    Q.      Okay.  Do you remember exactly what words were used to

7    say sit down?

8    A.      I mean I could have swore he said -- I can't really

9    remember real good and shit, but I could have swore he said

10   something about sit the fuck down, turn around and just shut

11   the fuck up, something around there.

12   Q.      So in general, do you recall that he was using some

13   obscenities?

14   A.      Yeah.

15   Q.       Okay.  After Osbaldo was told to sit down, do you

16   recall if he sat down?

17   A.      No, I don't recall that.

18   Q.      You don't recall either way?

19   A.      No.

20   Q.      Okay.  Do you remember at some point if you were told

21   to cuff up?

22   A.      Yeah.

23   Q.      Okay.  What does cuff up mean?

24   A.      Turn around and put the handcuffs on.

25   Q.      You don't put your own handcuffs on?

1    A.      Let them put them on.

2    Q.      In order to do that, do you have to go by where the

3    bars are so they can reach you?

4    A.      Yeah.

5    Q.      You said yes?

6    A.      Yes.

7    Q.      Do you recall who told you to cuff up?

8    A.      Qualls and somebody else, but I don't remember the CO

9    name.

10   Q.      Was it one of the COs here or you are not sure which CO

11   it was?

12   A.      It was just Qualls and another CO.

13   Q.      That other CO is someone who is not here today?

14   A.      Yeah.

15   Q.      Okay, I understand.  Did you comply with that order?

16   A.      Yeah.

17   Q.      Okay.  And so someone put handcuffs on you?

18   A.      Yeah.

19   Q.      Do you recall who put handcuffs on you?

20   A.      I can't recall that.

21   Q.      Do you recall if Osbaldo was also told to cuff up?

22   A.      Yeah.

23   Q.      Yes, you recall he was told to cuff up?

24   A.      Yes.

25   Q.      Who told him to cuff up?

1    A.    Qualls.

2    Q.    Do you recall if he cuffed up?

3    A.    Yeah.

4    Q.    Okay.  What did you do after you were handcuffed?

5    A.    After I was handcuffed I was told to face the wall.

6    Q.    Who told you to face the wall?

7    A.    Qualls.

8    Q.    Did you face the wall?

9    A.    Yeah.

10   Q.    Which wall did you face?

11   A.    The one that is facing the door to come outside the

12   building.

13   Q.    So imagine again we're standing in the holding cell and

14   the door is here, the door to leave the holding cell is to --

15        THE COURT:  Hold on.  One at a time.

16   Q.    Is the door to your left?

17   A.    Right.

18   Q.    And what do you remember happening after you faced the

19   wall?

20   A.    He was cuffed up and he kind of made like a weird face

21   because we both were like why I got to face the wall, you know

22   what I'm sayin', because it was awkward.

23   Q.    Who is he?

24   A.    Me and Osbaldo were kind of looking like why I got to

25   face the wall.  It was awkward situation, but we was told by

1    Qualls to -- well, Qualls told me to face the wall.  It was

2    kind of awkward like what we got to face the wall for.

3    Q.     Then what happened?

4    A.     Then after he opened the gate -- somebody opened the

5    gate.  Not too sure who it was.  Once he opened the gate, they

6    snatched the handcuffs, pulled them back and then Qualls

7    struck Osbaldo in the face.

8    Q.     Let's back up.  You said they snatched the handcuffs.

9    Do you know who?

10   A.     I'm not too sure.

11   Q.     The handcuffs -- you mean the handcuffs that were on

12   Osbaldo?

13   A.     Yeah.

14   Q.     Okay.  So someone used their hand where his handcuffs

15   were and yanked him?

16   A.     Yeah, like snatched.

17   Q.     In what direction?  Like out into the hallway?

18   A.     Yeah, backwards.

19   Q.     Okay.  Then you said you next saw Qualls punch Osbaldo

20   in the face?

21   A.     Right.

22   Q.     Was it the face?

23   A.     Yeah.

24   Q.     Was it open fist or closed fist?

25   A.     Closed fist.

218

1    Q.    If you were facing the wall, how could you see that?

2    A.    Because I could still look sideways.  Like it was

3    awkward situation.  I'm not gonna just face the wall and this

4    rarely happens, so why would you tell me to face the wall and

5    I am just cuffed up so I can't do anything to nobody unless I

6    am good with my feet or something.

7    Q.    How far away was Osbaldo from you when Qualls punched

8    him in the face?

9    A.    Not that far away.

10   Q.    Like as far as you and I are from each other?

11   A.    No, because the door is right there.  Probably from

12   here to probably that wall right there (indicating).

13   Q.    Okay.  What happened next?

14   A.    He punched him another time because that would be the

15   end of the walkway to go either outside or to shower, so once

16   he punched him once again, he fell and then he kicked him.

17   Then somebody picked him up.

18   Q.    When you say he punched him, you mean Qualls punched

19   Osbaldo?

20   A.    Qualls.

21   Q.    That second punch, was it in the face or somewhere

22   else?

23   A.    It was in his face.

24   Q.    Then you said he fell.  Do you mean Osbaldo fell?

25   A.    Yeah.

219

1    Q.      Then he fell and you said someone picked him up?

2    A.      Yeah, try to pick him up.  Before that the person --

3    this guy Qualls kicked him in like his torso somewhere.

4    Q.      Do you recall who it was that tried to pick Osbaldo up?

5    A.      It was the same person trying to cuff us up.

6    Q.      You don't recall who that person is?

7    A.      No.

8    Q.      It is not one of the people that is here?

9    A.      No.

10   Q.      What happened after you saw him fall and then someone

11   tried to pick him up?  Do you remember what happened next?

12   A.      Berry came into the bullpen and moved me against the

13   other wall.

14   Q.      Okay.  When you say bullpen, do you mean the holding

15   cell?

16   A.      Yeah, the cage.

17   Q.      By the other wall, do you mean the wall opposite?

18   A.      Yeah, so I couldn't see sideways.

19   Q.      Did Berry say anything to you?

20   A.      Not that I remember.

21   Q.      What happened next?

22   A.      I couldn't really see them, but I heard.  I mean I'm

23   assuming because once he came out, I heard like stomping

24   coming from like the shower area because it was like so

25   hollow, ain't nobody in there, so you could just hear that.

220

1    Q.      So an echo kind of?

2    A.      Like echo, yeah.

3    Q.      So you heard stomping noises?

4    A.      Yeah.

5    Q.      Did you hear anybody saying any words or making any

6    noises?

7    A.      Oh, yeah, Nicolas was like crying, fuckin' grunting,

8    making noise like he was in pain.

9    Q.      Okay.  Do you remember what the noise sounded like?

10   A.      No.

11   Q.      Now at that point you are hearing this, correct?

12   A.      Right.

13   Q.      But you can't see Osbaldo?

14   A.      No, because I be facing the opposite wall.

15   Q.      Did Officer Berry stay with you in the holding cell?

16   A.      Yeah.

17   Q.      Did anyone else come in the holding cell?

18   A.      Snell came right after that.  I kept moving around.

19   Q.      What happened when Snell came in the holding cell?

20   A.      Came over there, man, don't make it worse for yourself,

21   so I just left it alone.  I ain't gonna get my ass whooped.

22   Q.      Okay.  Did either Berry or Snell put their hands on

23   you?

24   A.      No.

25   Q.      Okay.  Do you recall about how long the stomping and

1    yelling sounds lasted?

2    A.    It wasn't that long, but I can't really say.

3    Q.    Under five minutes?

4    A.    Probably like five to eight minutes, somewhere around

5    there.

6    Q.    Okay.  And at some point after that, were you taken out

7    of the building?

8    A.    Yeah.

9    Q.    Had the noise stopped before you were taken out of the

10   building?

11   A.    Yeah.

12   Q.    Who took you out of the building?

13   A.    I don't remember the correctional officer that took me

14   out the building, but it wasn't Snell or Berry.

15   Q.    Was it Purdom?

16   A.    No, he was just standing right there.

17   Q.    Okay.  As they took you out -- and where did this

18   person -- was there one person that took you out or more than

19   one person?

20   A.    There was just one person.

21   Q.    Did he kind of stand next to you or behind you or --

22   A.    Behind me.

23   Q.    Was he like holding onto your arms or holding onto you

24   by the cuffs?

25   A.    Handcuffs.

222

1    Q.     Sorry?  You said by the handcuffs?

2    A.     Handcuffs.

3    Q.     We've got to try not to talk over each other.  I know

4    it is hard.  So you guys walked, and where did you go?

5    A.     We were on the way to seg.

6    Q.     What is the route to seg?

7    A.     You got to go to Front Street, which is few cell houses

8    -- you got health care, dining area, administration building,

9    bunch of buildings.

10   Q.     So Front Street is just a big road?

11   A.     Yeah, like a big street, two lane street.

12   Q.     Who uses that road?

13   A.     I mean majority of the institution.

14   Q.     Okay.  So the prisoners if they are going to --

15   A.     Like health care, chapel, store.

16   Q.     Okay.  They have to walk along through there?

17   A.     They got to walk through there.

18   Q.     Do inmates walk anywhere without an escort?

19   A.     No.

20   Q.     Have you ever seen anyone else walk along Front Street

21   like medical staff or administrative staff?

22   A.     Yeah, everybody gots to walk through there.

23   Q.     Okay.  And do you remember what the weather was like

24   that day, February 5th?

25   A.     It was cold.

223

1    Q.    Do you remember if there was ice on the ground?

2    A.    No.

3    Q.    Do you remember if there was ice on Front Street?

4    A.    No.

5    Q.    Okay.  When you got to Front Street, could you see

6    Osbaldo?

7    A.    Yeah.

8    Q.    Where was he?

9    A.    He was walking -- he was walking a little distance from

10   me, but I can't really say how far away.  Like 30 feet?  I'm

11   not sure.

12   Q.    Walking in front of you?

13   A.    Yeah.

14   Q.    Was someone escorting him?

15   A.    Yeah, it was Qualls and another CO.  They were grabbing

16   him under his armpits.

17   Q.    How did it look?  How was Osbaldo walking?

18   A.    Like he was stumbling.  He could barely walk.  He was

19   having trouble.  He was bent over.

20   Q.    Bent over?

21   A.    Yes.

22   Q.    Do you mean at the waist?

23   A.    Yeah.

24   Q.    Bent forward?

25   A.    Yeah.

224

1    Q.    At any point did you see Osbaldo fall?

2    A.    He fell down in Front Street by the tower, right across

3    the street from the north house.

4    Q.    Did it look like he had slipped on ice?

5    A.    No, because there wasn't no ice.

6    Q.    What did it look like?

7    A.    Like he got tired of walking, I don't know, like he

8    couldn't walk no more.

9    Q.    Like his legs just stopped carrying him?

10   A.    Yeah.

11   Q.    Did you see Qualls fall too?

12   A.    No.

13   Q.    Did you see anybody else fall?

14   A.    No.

15   Q.    Did you slip on any ice that day?

16   A.    No.

17   Q.    Do you remember, and I know this was awhile ago, but do

18   you remember if there was any salt or sand on the walkway that

19   day?

20   A.    No, I can't.

21   Q.    Okay.  Did eventually you get to the segregation

22   building?

23   A.    Yeah.

24   Q.    Is that north 2?

25   A.    Yeah.

1   Q.      Had you seen Osbaldo get to north 2 before you got

2   there?

3   A.      Yeah.

4   Q.      Did you see him go into north 2?

5   A.      Yeah.

6   Q.      When you got to the north 2, did you go in?

7   A.      Yeah.

8   Q.      Where did you go once you got into north 2?

9   A.      I went into a shower on 2 gallery.

10  Q.      Okay.  Was anyone in the shower with you?

11  A.      No.

12  Q.      What happened when you were in the shower?

13  A.      A few COs and lieutenants came in and asked me what was

14  going on.  I told them like, man, the CO just beat him up.

15  They were like for what, and I was like I don't know.

16  Q.      Okay.  Do you remember, did you see Osbaldo once you

17  got into segregation?

18  A.      Yeah, because I was passing by.

19  Q.      Where was he?

20  A.      He was on the floor.

21  Q.      On the floor where?

22  A.      On the floor of the shower.

23  Q.      Did you see him when you were walking into segregation?

24  A.      Yeah.

25  Q.      So you walked past the shower area where he was?

226

1   A.      I seen his feet right there.

2   Q.      How do you know it was his feet?

3   A.      Well, because when I came out the shower going upstairs

4   to 4 gallery going to my cell, which was like 413, I am not

5   too sure, but somewhere around there, I could see him inside

6   of the shower.

7   Q.      Was he -- do you remember if he was standing up,

8   sitting down?

9   A.      No, he was laying down.

10  Q.      Laying down on the ground?

11  A.      On the ground.

12  Q.      Was he still handcuffed?

13  A.      I can't really recall.

14  Q.      Okay.

15  A.      Probably though.

16  Q.      While you were in segregation, did you get seen by any

17  medical staff?

18  A.      No.

19  Q.      Was this your first time going to segregation?

20  A.      No.

21  Q.      Was that your last time going to segregation?

22  A.      No.

23  Q.      In the subsequent times you went to segregation, were

24  you seen by medical?

25  A.      Before then?

227

1  Q.     Yes.

2  A.     No.

3  Q.     What about after this February 5th incident?

4  A.     I know for sure -- was it 2016, February?  I don't

5  recall the date though.

6  Q.     So I guess what I am trying to ask you is did you have

7  any knowledge of whether there was some kind of policy or rule

8  when an inmate got taken to segregation, first he had to be

9  seen by medical?

10  A.     They weren't doing it before, but all of a sudden they

11  started doing it.

12  Q.     By before, do you mean were they doing it in February

13  of 2014 to your knowledge?

14  A.     No.

15  Q.     But since then they started doing that?

16  A.     Last time I went to seg, right after that when I got

17  out of the seg, I think that same year, 20 -- what was it, of

18  '14?  I forgot when.  But no, it never happened.

19  Q.     Okay.  You said that on that day you were placed in a

20  cell in segregation, is that correct?

21  A.     Yeah.

22  Q.     Was that -- did you share a cell with Osbaldo while you

23  were in segregation?

24  A.     No.

25  Q.     Okay.  How long were you in the segregation unit that

228

1    time?

2    A.      For six months.

3    Q.      Okay.  Even though you didn't see or share a cell with

4    Osbaldo, did you see him at all over that six month period

5    that you were in segregation?

6    A.      Yeah.

7    Q.      Okay.  Where would you see him?

8    A.      In the yard.

9    Q.      So yard is like the outdoor area where you have

10   recreation?

11   A.      Yeah, the recreation yard.

12   Q.      When you say that you saw him, do you mean you said oh,

13   look, there is Osbaldo, or do you mean you actually had

14   conversations?

15   A.      I mean you can't miss the people.  It is only a few

16   people in the seg yards.

17   Q.      But every time you saw him, did you have a conversation

18   with him?

19   A.      No.

20   Q.      Did at some point you have a conversation with him?

21   A.      Yes.

22   Q.      After February 5th?

23   A.      Yes.

24   Q.      Did that conversation take place in the yard?

25   A.      Yeah.

229

1    Q.    Were you able to kind of stand next to each other and

2    have a normal conversation?

3    A.    No.

4    Q.    Was that because he was in a different part of

5    segregation?

6    A.    No, it was just they separate.  It is four different

7    individual yards, so that is how they got it.

8    Q.    So he was in a different yard?

9    A.    Yeah.

10    Q.    Okay.  When you had the conversation, how far apart

11    would you have been then?

12    A.    I mean it is not that far from each other.  It is like

13    from here probably to the picture (indicating).

14    Q.    In order to speak to each other, would you have had --

15    could you have used your normal speaking voice?

16    A.    No.

17    Q.    Did you have to raise your voice?

18    A.    I had to raise my voice, yeah.

19    Q.    Okay.  Do you remember -- so at some point did you have

20    a conversation with him on the yard in which you had a

21    conversation about what had happened on February 5th?

22    A.    Yeah.

23    Q.    Okay.  Do you remember precisely what date that was

24    that conversation happened?

25    A.    No.

230

1    Q.     Could you hazard a guess; weeks, days?

2    A.     No, I can't really say.

3    Q.     Okay.  During that conversation, did he or did you guys

4    talk specifically about what you each remembered happening on

5    February 5th?

6    A.     No.

7    Q.     Okay.  During that conversation, did he ask you to

8    write an affidavit or other statement about what happened on

9    February 5th?

10   A.     Yeah, he asked me if I could write an affidavit for

11   him.

12   Q.     Okay.  Did he tell you specifically what to put in that

13   affidavit?

14   A.     No.

15   Q.     Did you eventually write an affidavit for him?

16   A.     Yeah.

17   Q.     Okay.  At some point subsequent to that, did you learn

18   that Osbaldo had filed a lawsuit about what had happened on

19   February 5th of 2014?

20   A.     Yeah.

21   Q.     Okay.  And at some point after you learned that, were

22   you contacted about coming here to testify today?

23   A.     Yeah.

24   Q.     Did you agree to come and testify today?

25   A.     Yeah, of course.

231

1   Q.     Why did you agree to come and testify?

2   A.     I mean it was only right thing to do.

3   Q.     Why is it right thing to do?

4   A.     Because of what he went through.

5   Q.     Did you ever have any hesitation about testifying?

6   A.     Yeah.

7   Q.     What was your hesitation?

8   A.     It is just I didn't think I should get involved in none

9   of this.

10  Q.     Why would you not want to get involved?

11         MR. BRACEY:  Irrelevant, objection.

12         THE COURT:  Overruled.

13  Questions By Ms. Crosley:

14  Q.     Why would you not want to get involved?

15  A.     I mean it could be various things, retaliation.  I

16  didn't think his grievance or whatever he was going to

17  actually do, I didn't think he was like smart enough to

18  actually do it.

19  Q.     When you say retaliation, who do you mean?

20  A.     By the correctional officers.

21  Q.     Uhm, at some point you were no longer in Menard, is

22  that correct?

23  A.     Right.

24         MS. CROSLEY:  One moment.  That is all.  Thank you.

25         THE COURT:  Cross examination?

232

1          MR. BRACEY:  Yes, Your Honor.

2                    CROSS EXAMINATION

3   Questions by Mr. Bracey:

4   Q.     Hi, Mr. Diaz.  I got a few follow-up questions to

5   clarify a couple of things.

6   A.     All right.

7   Q.     As we're sitting here today, you clearly remember what

8   happened on February 5th of 2014?

9   A.     Yeah.

10  Q.     Even though it was four years ago?

11  A.     Yeah, as best as I can.

12  Q.     Now I believe you said earlier that Mr. Osbaldo asked

13  you to write an affidavit on his behalf?

14  A.     Yeah.

15  Q.     When did he ask you to do that?

16  A.     In the seg yard.

17  Q.     So shortly after, you two were both in segregation back

18  in February of 2014?

19  A.     Yeah, somewhere around that time.

20  Q.     When did you actually write the affidavit?

21  A.     I can't really say.  I can't really give you a date or

22  none of that.

23  Q.     Did you write it right then when he asked you, or a

24  year later?

25  A.     I had wrote it like around that time I was in seg, but

233

1    I had redid the affidavit because when I sent it out to get it

2    notarized and printed out, it came back with like part of it

3    was missing, because you can't really read like one side of it

4    because it was like all blurry.

5    Q.    Well, am I correct that you were in segregation for

6    about six months during that period beginning in February?

7    A.    Yeah.

8    Q.    So would it surprise you that your affidavit was

9    notarized on March 15th of 2015?

10   A.    That was the second one.

11   Q.    But we had never seen the first one, right?

12   A.    Right.

13   Q.    Okay, so what was the delay from when you got out of

14   segregation?  Why did you not get it notarized until March of

15   the next year?

16   A.    Because like I said, I didn't want nothing to do with

17   it.  I felt like I was going to get retaliated against and

18   then at the same time I had troubles trying -- cause I was

19   going to have trouble trying to send it to the east house

20   because that's where he was at originally right after he got

21   out of seg.

22   Q.    Did you have your deposition taken during this case?

23   A.    Yeah.

24   Q.    On August 3rd of 2017?

25   A.    I think so.

234

1  Q.     Okay.  During that deposition you swore to tell the

2  truth, is that correct?

3  A.     Yeah.

4  Q.     Okay.  So let's go back to your descriptions of what

5  happened when you and Mr. Osbaldo were both in the holding

6  cell.

7  A.     All right.

8  Q.     I believe you said Qualls was the one that told you

9  both to be quiet and sit down?

10  A.     Right.

11  Q.     And you said you then did sit down?

12  A.     Right.

13  Q.     You said at some point you were told to cuff up,

14  correct?

15  A.     Right.

16  Q.     And who did you say then cuffed you up?

17  A.     Not too sure.  I don't know if it was Qualls or the

18  other CO, correctional officer.

19  Q.     Did someone cuff Mr. Osbaldo up prior to anyone hitting

20  him?

21  A.     Yeah.

22  Q.     Who cuffed him up?

23  A.     That I am not too sure.  It was between the two COs,

24  which it was Qualls and another CO.

25  Q.     Was it Qualls and another CO who then took him out of

1    the holding cell?

2    A.    Yeah.

3    Q.    Where exactly were they when the first punch occurred?

4    A.    Right there by the door.

5    Q.    By the door of the holding cell?

6    A.    Yeah.

7    Q.    Were they inside of the holding cell or outside of the

8    holding cell?

9    A.    Inside.  Well, he was -- Osbaldo was basically inside.

10   Q.    Okay.  I believe you said there was a second punch at

11   some point after this, is that correct?

12   A.    Right.

13   Q.    Where did that occur?

14   A.    Outside.

15   Q.    Outside of the holding cell?

16   A.    Yeah.

17   Q.    Can you be any more specific than that?

18   A.    Well, I mean -- I mean it is probably like this would

19   be the cage right here (indicating), and then probably like

20   the cage for the CO is probably like right here (indicating).

21   Q.    So in between the holding cell --

22   A.    Somewhere in there, yeah.

23   Q.    Okay.  Were both of those punches, did they connect on

24   the face or somewhere else?

25   A.    Somewhere in the head area and face.

236

1    Q.    Sgt. Qualls threw both of the punches?

2    A.    Yeah.

3    Q.    I believe you said someone was with you inside of the

4    holding cell, is that correct?

5    A.    Yeah.

6    Q.    I believe you said someone either told you to face the

7    wall or was holding you against the wall?

8    A.    Yeah.

9    Q.    Can you clarify that, who was --

10   A.    Who was the people?

11   Q.    Who told you to face the wall?  Let's start there.

12   A.    In the beginning, it was Qualls.

13   Q.    Then did someone then come and hold you there or stand

14   next to you or what happened then?

15   A.    What's his name, Berry, came in there first and held me

16   against the wall and then moved me to the opposite wall which

17   I couldn't really see sideways no more toward the shower.

18   Q.    Did Berry come in before either of the two punches?

19   A.    Came afterwards.

20   Q.    After the two punches?

21   A.    Right.

22   Q.    Okay.  Did you ever see Berry shove Osbaldo's head into

23   the wall at any point?

24   A.    No.

25   Q.    Did you ever see Berry go into the shower with Osbaldo?

1  A.    No.

2  Q.    I believe you said some of the other defendants here

3  today, that they were just kind of in the general area.  Would

4  that be Snell and Purdom?

5  A.    Yeah.  Well, he ended up coming to the cage too, like

6  put against the wall.

7  Q.    Which one?

8  A.    Snell.

9  Q.    So Snell and Berry were with you inside of the cage?

10  A.    Yeah.

11  Q.    And this is at the same time you heard punching and

12  kicking coming from the shower?

13  A.    Yeah.

14  Q.    I believe you said that after Mr. Osbaldo was brought

15  out of the shower that he was then taken to segregation before

16  you?

17  A.    Yeah.

18  Q.    Do you recall who escorted you to segregation?

19  A.    No.  It wasn't Berry or Snell.

20  Q.    It was not Berry or Snell?

21  A.    No.

22  Q.    Why do you specifically remember that it was not them?

23  A.    Because I mean you can't -- they be -- Snell used to be

24  always in the west house and Berry was always in seg that I

25  could remember and that's how I started noticing his name.  So

238

1    I mean I be in seg a lot, so that is how I can remember that

2    name.

3    Q.    So did any of the other defendants escort you to --

4    A.    No, no.

5    Q.    So it was some other officers?

6    A.    Yeah.

7    Q.    How many other officers were present during all of this

8    that are not in this courtroom?

9    A.    I can't really say.  It was a few though because I

10   think each one has a gallery.  So it is ten galleries in the

11   cell house.

12   Q.    Would they have been able to see all of this happening?

13   A.    They were all right, that I can remember, a bunch of

14   them standing in line.  Every time they run lines for

15   anything, going into the dining hall, commissary, anything

16   like that, they all stand together.

17   Q.    Were there any lines running during either of the first

18   two punches?

19   A.    No.

20   Q.    So did you ever see Berry punch or kick Mr. Osbaldo at

21   any time?

22   Q.    I believe earlier you said that when you were walking

23   to segregation that you guessed that you were probably around

24   30 feet behind Mr. Osbaldo, is that correct?

25   A.    Yeah.

1  Q.    Okay.  I believe you said you did see him fall, is that

2  correct?

3  A.    Yeah.

4  Q.    Did you ever hear Mr. Osbaldo asking for medical care

5  while you two were in the west cell house?

6  A.    While we were cellies?

7  Q.    No, I mean while all of this was going on, all of the

8  incidents.

9  A.    Oh, the incident.  No.  I just heard him crying.

10  Q.    Did you ever request medical care?

11  A.    No.

12  Q.    Were you injured in any way?

13  A.    No.

14  Q.    So there would have been no reason for you to see any

15  medical staff when you arrived in segregation?

16  A.    No.

17  Q.    Do you know another inmate named Clayborn Smith?

18  A.    No.

19  Q.    Did you see any other inmates holding out mirrors or --

20  I'll start there.  Did you see any other inmates on 2 gallery

21  holding out mirrors watching all of this?

22  A.    No, everything happened so fast, so I really wasn't

23  paying attention.  My back would have been against the

24  gallery, so I couldn't be able to see.

25  Q.    I am getting -- I apologize if I am asking the same

240

1    question.  I think you said Snell and Berry were with you

2    inside of the holding cage?

3    A.    Yes.

4    Q.    Did you ever hear them yell to tell any other inmates

5    to put down their mirrors?

6    A.    Not that I can recall.  I can't really say.

7    Q.    Am I correct that you didn't see any injuries on

8    Mr. Osbaldo?

9    A.    No, I couldn't tell because of the distance and only

10   thing I could tell, he could barely walk.  He was steady

11   crying.

12   Q.    I believe you said when you arrived in segregation you

13   saw Mr. Osbaldo again on the floor of the shower, is that

14   correct?

15   A.    Yes.

16   Q.    Which shower was he at?

17   A.    I can't really say.  It is only like three to four

18   showers in each gallery, seg gallery.  They are all right next

19   to each other though.

20   Q.    Was he wearing a seg jumpsuit at the time?

21   A.    No, because when I first came in, we still had our

22   blues on and then they make us take our blues off and give

23   them our blues and put on seg jumpsuit.

24   Q.    So were you put in the shower holding cell when you

25   arrived?

241

1   A.    Yeah, when I came in I was put in the shower area.

2   Q.    Okay.  Then they change your clothes in the shower or

3   somewhere else?

4   A.    No, in there.  I change them on my own.

5   Q.    So when you say you change them on your own, I assume

6   that means you were not cuffed when you were inside the --

7   A.    They took the handcuffs off and I ended up putting on

8   the jumpsuit.

9   Q.    Sure.  Just so it is clear since I didn't get a chance

10   to finish, I just was asking that you were not cuffed when you

11   were in the segregation shower cell, correct?

12   A.    Once I went in there, no, cause I got to put on my

13   jumpsuit and then I can put on the handcuffs again.

14   Q.    Then after that they took you to your cell in

15   segregation?

16   A.    Yeah, eventually.

17   Q.    Have you talked to anyone recently about this case?

18   A.    Yeah.

19   Q.    Who was that?

20   A.    I think -- I believe her name is Miss Goodwin.

21   Q.    How recently was that?

22   A.    I think it was Sunday.

23   Q.    Did you two discuss your upcoming testimony?

24   A.    Yeah, she had a couple of questions about the

25   deposition.

242

Q.      What kind of questions about the deposition?

A.      Well, I guess it was a page where she couldn't

understand what I meant by what I was saying.

Q.      What was that page describing?

A.      Something about did I see Nicolas or something.  I

can't remember.  But the whole thing was I don't really -- I

can't really remember exactly word for word.

Q.      I am not asking exactly what the words were, but what

were you discussing, what was this page about generally?

A.      It was something about did I see Nicolas or something

about walking by or something, but she took it as -- I don't

know, I can't really say, but she was -- if I read the

deposition then I can probably tell you what I am trying to

tell you.

Q.      Well, I understand that, but I don't know what page you

were looking at, right?

A.      It was page 63.

Q.      Okay.  So on page 63 -- this may or may not be what you

were talking about, but lines 12 through 17 you were asked the

question, "What types of injuries did you see on his body, on

Mr. Nicolas' body after he left the shower area?"

A.      Right.

Q.      Your answer was, "I can't really say because I left

first, so he just stayed in there."

A.      That was it right there.  She didn't understand what I

243

1    was meaning by that.

2    Q.    Well, it is also not very clear to me.  What do you

3    mean right there?

4    A.    I took it as they were asking me when I was coming out

5    the shower going to my cell in like 413.

6    Q.    So you're talking about in segregation?

7    A.    Yeah.  She couldn't really understand what I was

8    talking about.

9          MR. BRACEY:  I have no further questions.

10         THE COURT:  Do you have any more questions?

11                    REDIRECT EXAMINATION

12   Questions by Ms. Crosley:

13   Q.    Mr. Diaz, when you said that on Sunday Miss Goodwin

14   came to talk to you, did you actually mean me?

15   A.    Yeah.

16   Q.    I am not Miss Goodwin.

17   A.    My bad.

18   Q.    It's okay.  In all the times that you were at Menard,

19   how many times had you done the walk to segregation?

20   A.    A lot of times.

21   Q.    More than five?

22   A.    Yeah.

23   Q.    Okay.  Do you remember every single officer that ever

24   escorted you to segregation?

25   A.    No.

244

1   Q.      We talked about Mr. Nicolas falling on the walk to

2   segregation.  Do you remember that?

3   A.      Yeah.

4   Q.      Now I just wanted to clarify.  You said you saw him

5   fall, but you said you did not see Qualls fall, is that

6   correct?

7   A.      Yeah.

8   Q.      Okay.  Couple more questions.  Now back to when you are

9   still in west house.  You said Snell was in the holding cell

10  with you at some point?

11  A.      Right.

12  Q.      Berry was in the holding cell with you at some point?

13  A.      Right.

14  Q.      But Purdom was in the area?

15  A.      Yeah, he was standing with all of the other COs against

16  -- they had the wall against the cage because they got a cage

17  that is in between the walkway, so it goes from the odd side

18  to the even side and goes like that.

19  Q.      There is an officer cage near the holding cage?

20  A.      Yeah, it is like in between so they can see the odd

21  side cage and the even side cages.

22  Q.      Okay.  Do you recall if Purdom was in the cage or

23  outside of the cage?

24  A.      He was outside.

25  Q.      He was outside of the cage.  How far would that have

245

1    made him from the holding cage?

2    A.      Not that far.

3    Q.      Like across the walkway?

4    A.      Yeah, he is right there.

5    Q.      Okay.  After the point that you were told to turn

6    against the second wall --

7    A.      Right.

8    Q.      -- from that point through the rest of the day did you

9    have an opportunity to view Mr. Nicolas' face?

10   A.      Was I able to see the face?

11   Q.      Yes.

12   A.      No.

13   Q.      Then one last question, which is about the first punch

14   thrown the first time Qualls punched Mr. Nicolas.  Do you

15   remember that?

16   A.      Right.

17   Q.      Did that happen as he was pulling him out of the

18   holding cell?

19   A.      Yeah.

20   Q.      Okay, so --

21   A.      He snatched.

22   Q.      So they were all kind of in the doorway of the holding

23   cell.  Would that be fair to say?

24   A.      What do you mean by all?

25   Q.      Qualls and Mr. Nicolas.

1  A.      Yeah, yes.

2          MS. CROSLEY:  Okay.  Nothing further.  Thank you.

3          THE COURT:  All right, ladies and gentlemen.  It is

4  3:47 and I need to finalize your final jury instructions with

5  the lawyers, so if you wouldn't be disappointed I'll send you

6  home early and what we will do then is resume tomorrow at

7  8:30, so you if you will be here and ready to go, I just think

8  our time for the rest of the day would be better used doing

9  jury instructions and I'll see if we have any more witnesses.

10  We'll start with them tomorrow and I expect at some point you

11  will get the final instructions and closing arguments.

12          (Whereupon the following proceedings were held out of

13  the presence of the jury.)

14          THE COURT:  Mr. Diaz, you can step down.  Now do you

15  have any more witnesses for the plaintiff?

16          MS. GRADY:  We have no more witnesses.

17          MS. GOODWIN:  Plaintiff has no more witnesses and we

18  rest, Your Honor.

19          THE COURT:  Mr. Tyrrell, do you wish to make a motion

20  at this time?

21          MR. TYRRELL:  I do, Your Honor, very briefly.

22          Your Honor, I would ask for clarification if the

23  assault and battery claim is still --

24          MS. GRADY:  Your Honor, if I could have about three

25  more minutes?

247

1          THE COURT:  You know what, I bet the court reporter

2    and interpreter could use a break.  I'll give you about five

3    minutes and we'll come back and do that.  Are you going to

4    have any witnesses?

5          MR. TYRRELL:  We're still -- I need to consult with

6    co-counsel.  We might have a very brief witness tomorrow

7    morning.

8          THE COURT:  Someone other than one of the defendants?

9          MR. TYRRELL:  Correct.  It would be Lt. Tony Payne.

10         THE COURT:  All right. I was kind of hoping we could

11   do final instruction conference today, but I figured it was

12   best to send the jury home.  Confer on that, we'll do the

13   motion and I'll get you a copy.  We'll have to finalize the

14   instructions based on what you say.  I also thought based on

15   what came out with Mr. Diaz we should probably put the

16   instruction I don't like about interviewing a witness back in.

17   I'll be back in five minutes.

18         (Whereupon a recess was taken.  The following

19   proceedings were held in open Court, out of the presence of

20   the jury.)

21         THE COURT:  We're back on the record.  I understand

22   that there is some issue about communications with Mr. Jose

23   Nicolas and the interpreter?

24         MS. GRADY:  We would like to confirm that the Court,

25   who is paying for the translator, if we communicate with our

248

1    client through the translator it would still be protected by

2    attorney client privilege.

3             THE COURT:  Mr. Tyrrell, do you have any intention of

4    seeking what they are talking to him about?

5             MR. TYRRELL:  I have no such intention.

6             THE COURT:  Haven't you been using your --

7             MS. GRADY:  We have, Your Honor.  It is just such a

8    formal -- we do just want to be very clear.

9             THE COURT:  That is fine.  Absolutely.  Mr. Gonzales,

10   of course, anything that you're translating will be protected

11   by the attorney client privilege when it is direct

12   communication between counsel and Mr. Nicolas.

13            THE COURT:  What is the decision?

14            MS. GRADY:  At this time the plaintiff will dismiss

15   his claims against all defendants for assault under state law

16   and battery under state law as well.

17            THE COURT:  Okay, that motion will be granted.  We

18   will remove those references from the jury instructions and

19   the verdict form.

20            So Mr. Tyrrell, do you want to make your motion at

21   this time?

22            MR. TYRRELL:  Very briefly, Your Honor.  Your Honor,

23   defendants move for judgment as a matter of law pursuant to

24   Federal Rule of Civil Procedure 50 on the following claims.

25            We move, as it concerns plaintiff's excessive force

249

1   claim against Defendant Berry -- I don't think there was any

2   testimony that Berry hit the plaintiff.  The only question the

3   plaintiff said or answered concerning Defendant Berry was

4   Defendant Berry or someone else caused an injury to him.

5   Mr. Diaz basically said that Defendant Berry had no

6   involvement at all in assaulting the plaintiff.  So for that

7   reason we would move for judgment as a matter of law

8   concerning the excessive force claim as it applies to Sgt.

9   Berry.

10          Your Honor, we would also move to dismiss plaintiff's

11  state law willful and wanton conduct claim.  I believe it is

12  duplicative of their punitive damage request.  It is a very

13  similar standard.  As the Court is aware, the plaintiff cannot

14  recover twice for the same injury, for the same event.  That

15  would be by Seventh Circuit case law.  I can cite the specific

16  case for Your Honor.  *B. Duran v. Town of Cicero, Illinois*,

17  653 F.3d at page 632.  I believe the claim would be

18  duplicative and justifies dismissing the willful and wanton

19  claim.

20          Last, Your Honor, we ask that the defendants be

21  entitled to Rule 50 on plaintiff's punitive damages claim due

22  to lack of evidence of malicious or reckless disregard as it

23  concerns the defendants intent.

24          For those reasons we ask that the Court dismiss the

25  claims against the defendants as stated.

1          THE COURT:  Thank you.  Would you like to respond?

2          MS. GRADY:  Yes.  Thank you, Your Honor.

3          First as it relates to plaintiff's claim for

4    excessive force against Sgt. Berry.  Plaintiff testified that

5    it was his memory that it was Sgt. Berry who used excessive

6    force against him on February 5th of 2014 driving inferences

7    in plaintiff's favor, which the Court must, and a judgment as

8    a matter of law based on the evidence presented, the jury

9    could conclude that plaintiff prevails on that claim.

10          Turning next to the willful and wanton misconduct

11   claim.  I believe counsel's argument is it is duplicative of

12   the punitive damages claim.  I don't actually think those two

13   things match up.  Willful and wanton misconduct sets out a

14   tort and says if you commit that the tort then you're entitled

15   as a plaintiff -- it says if the defendants commit the tort,

16   you're entitled as the plaintiff for the damages you suffered,

17   compensatory damages you suffered.  Punitive damages, as the

18   Court is well aware, are never required and have a higher bar,

19   but they are never required.  And the things that you can

20   consider in determining the amount is the amount required to

21   deter, punish, to send a message; all things that I think it

22   would actually be improper for a jury to award to compensate

23   Mr. Nicolas on his willful and wanton misconduct claim.  I

24   don't think they are duplicative really much at all.

25          As this Court, I believe, has indicated, the jury

1  verdict form will set out two different lines as to each -- as

2  to plaintiff's claims.  One is compensatory damages and that

3  is just one line, so there is no concerns about duplicative or

4  double recovery.

5       Lastly as to the punitive damages claim, I think the

6  evidence construed in our favor clearly amounts to the type of

7  intent required to ask for punitive damages and we intend to

8  ask for punitive damages in this case.

9       THE COURT:  I am going to take the Rule 50 motion

10  under advisement, but I am going to go ahead and instruct with

11  Sgt. Berry on the excessive force claim and on the willful and

12  wanton claim.  And certainly the punitives come down to who

13  the jury believes.

14       That motion will be taken under advisement.  I am

15  going to instruct them on each of those claims.

16       Now I want to take up a few things informally about

17  jury instructions and then get you another copy to look at.  I

18  would like to ideally do the formal conference tonight so we

19  can get the copies made for the jury.  I give each juror a

20  copy.

21       Mr. Tyrrell, are you going to have any witnesses for

22  us tomorrow?

23       MR. TYRRELL:  No, defendants do not intend to call

24  witnesses at this time.

25       THE COURT:  Remind me in the morning to have you both

252

 1   formally rest on the record.  And so like I said I would like

 2   to have informational discussions it seems to me the parties

 3   could go.  I don't know that we need Mr. Nicolas or the

 4   defendants while we do informational and then formal

 5   conference unless the lawyers disagree.

 6          MS. GRADY:  We think that is appropriate.

 7          THE COURT:  Mr. Tyrrell?

 8          MR. TYRRELL:  I agree with that as well, Your Honor.

 9          THE COURT:  Let me ask Mr. Gonzales.  Once again,

10   have you accurately translated the proceedings today here as

11   you indicated you would do when taking the oath?

12          MR. GONZALEZ:  To the best of my knowledge, yes, Your

13   Honor.

14          THE COURT:  Mr. Nicolas, have you understood the

15   translations provided by both Mr. Gonzalez and Miss Angel

16   earlier?  Did you understand everything?

17          MR. NICOLAS:  Yes, Your Honor.

18          THE COURT:  Well, the parties and the interpreter are

19   excused.  If the lawyers would just stick around, we'll

20   finalize the jury instructions.  Everybody be back here ready

21   to go at 8:30 tomorrow morning.

22          (Whereupon a recess was taken.  The following

23   proceedings were held in open Court, out of the presence of

24   the jury.)

25          THE COURT:  Are we ready for the formal conference on

253

1    jury instructions?

2          MS. GOODWIN:  Yes, Your Honor.

3          THE COURT:  For the record, I received proposed

4    instructions from both sides and a number of joint

5    instructions, which I do compliment the lawyers on and

6    appreciate.  It is amazing how often I say that and it never

7    happens.  I appreciate you doing that.  As to the other, we

8    held several informal conferences to work out the details and

9    try to come up with instructions that accurately and fairly

10   state the law, and I think we have that now put together.  So

11   I have given the parties a packet of 34 pages of instructions

12   as well as a four page verdict form.  I will first look to

13   counsel for the plaintiff as to the 34 pages of proposed

14   instructions.  Do you have any objections to any of these

15   instructions?

16         MS. GRADY:  No objections, Your Honor.

17         THE COURT:  Are there any instructions that I did not

18   include in this packet that you think should be included?

19         MS. GRADY:  No, Your Honor.

20         THE COURT:  Mr. Tyrrell, I will ask you the same.  Do

21   you have any objections to anything in the 34 pages of

22   instructions?

23         MR. TYRRELL:  I do, Your Honor.  I will be brief.

24         THE COURT:  Just refer to the page number.

25         MR. TYRRELL:  Defendants would object to page number

254

1    23, the Court's instruction, which is a version of plaintiff's

2    proposed instruction number 22.  Specifically, Your Honor,

3    defendants contend that the element of proximate cause is

4    missing from the pattern instruction which was articulated in

5    *Peraline vs. United States,* 134 Supreme Court reporter

6    1--7108, page 1719.  We think that is a required element for

7    the excessive force claim.

8           Turning to page 24, which is plaintiff's proposed

9    instruction number 23, Your Honor, we object to this

10   instruction for two reasons.  One, we believe the case law --

11   I apologize, Your Honor, only one reason.  We also would

12   request the proximate cause language be added.  We believe it

13   is missing from the pattern instruction.

14          Concerning page 25, which is the deliberate

15   indifference instruction, here we have two objections.  We

16   would object to the use of the language "reasonable measures".

17   It is defendant's position that the use of the language

18   "reasonable measures" is inappropriate.  Reasonable measures

19   would defeat a claim of liability.  We disagree with it that

20   it is a required element.  We believe the case law cited in

21   defendant's proposed instruction number 24 supports for a

22   different standard for deliberate indifference.  We also would

23   contend the proximate cause element needs to be added to this

24   instruction.

25          Your Honor, I understand the Court doesn't intend to

255

1   give defendant's deliberate indifference instruction, so we

2   withdraw defendant's proposed instruction number 1, which is a

3   definition of deliberate indifference.

4            THE COURT:  If you want to submit that, because --

5   you say withdraw.  That was something you initially submitted

6   or proposed?

7            MR. TYRRELL:  Yes, Your Honor.  I don't actually have

8   a clean copy of just defendants.  The only copy I have is

9   combined plaintiff and defendant version.

10           THE COURT:  Do you think that should be given?

11           MR. TYRRELL:  We wouldn't ask it be given if the

12   Court gives our version of the deliberate indifference

13   instruction.

14           THE COURT:  Which I am not going to do.

15           MR. TYRRELL:  Right.

16           THE COURT:  Do you have any other objections to

17   anything within this packet?

18           MR. TYRRELL:  No, Your Honor.

19           THE COURT:  Okay.  Well, your objections are noted

20   for the record.  Again, I think that the instructions in my

21   packet accurately state the law and, of course, I look

22   strongly to the Seventh Circuit pattern instructions in

23   crafting these, so your objections are noted.  I don't think

24   it is necessary for you to give an alternative.  You stated

25   what you think should be added or changed in these

256

1    instructions.  Now other than your objections to the

2    instructions I intend to give, do you have any other

3    instructions that are not in this packet that you think should

4    be given?

5         MR. TYRRELL:  No, Your Honor.

6         THE COURT:  Okay.  Then I will ask the plaintiff,

7    have you reviewed the four page jury verdict form and do you

8    have any objection to that form?

9         MS. GRADY:  Yes, Your Honor, we reviewed it.  No

10   objections.

11        THE COURT:  Mr. Tyrrell, any objections to the

12   verdict form?

13        MR. TYRRELL:  Your Honor, just briefly.  I apologize.

14   This might have been something better for the informal

15   conference, but defendants would object to the language on

16   four, denial of medical care.  We would ask that it be

17   restated as deliberate indifference to a serious medical need.

18   Sorry, number three.

19        THE COURT:  Number three.  Any problem with that?

20        MS. GRADY:  Well, that would be the first time the

21   jury has heard the term deliberate indifference.  I wouldn't

22   object to denial of adequate medical care.

23        MR. TYRRELL:  I am fine with that, Your Honor.

24        THE COURT:  We'll change it to denial of adequate

25   medical care.

257

 1          MR. TYRRELL:  Apart from that objection, I have no

 2     additional objections.

 3          THE COURT:  That will conclude the formal conference

 4     on jury instructions.  Anything else to take up today counsel?

 5          MR. TYRRELL:  Not for defendants, Your Honor.

 6          MS. GRADY:  Not from plaintiff, Your Honor.

 7          THE COURT:  Do you want to go over the exhibits?

 8     Have you met informally with Deanna.

 9          COURTROOM CLERK:  Yes, I did.

10          THE COURT:  We did yesterday what was admitted.  I

11     don't have that in front of me.  Deanna, can you go over what

12     we admitted today?

13          COURTROOM CLERK:  Sure.  Exhibits 7, Exhibit 8, pages

14     eight, nine, ten, 11, 12, 13 and Exhibit 10, and I was just

15     notified that they have agreed to redact that to just include

16     a few pages and they will get that to me.  Exhibit 26, pages

17     63, 64, 65, Exhibit 200-1 and Exhibit 217.

18          THE COURT:  All right.  Do you agree that is all of

19     the exhibits that were admitted today?

20          MS. GRADY:  Yes, Your Honor, for plaintiff.

21          THE COURT:  Okay.  For defendant?

22          MR. TYRRELL:  Yes, Your Honor.

23          THE COURT:  Okay.  Deanna will work with you, but

24     make sure that we have the proper electronic versions.

25     Everything is scanned in PDF and then I guess everything that

258

1    has been admitted is going back to the jury so we don't have

2    that issue.

3              Anything else?

4              MS. GRADY:  No, Your Honor.

5              MR. TYRRELL:  No, Your Honor.

6              THE COURT:  Have a nice evening.  Please be here by

7    8:15 so we're ready to go at 8:30.

8

9

10

11

12

13

14

15        (Court is adjourned.)

16

17              I certify that the foregoing is a correct transcript
     from the record of proceedings in the above-entitled matter.
18
     SS/Barbara Kniepmann                        March 25, 2019
19

20

21

22

23

24

25

259

1                          I N D E X

2   WITNESSES

3                                              PAGE  LINE

4   WILLIAM QUALLS

5        DIRECT EXAMINATION                     6    20

6        CROSS EXAMINATION                      64   17

7        CROSS EXAMINATION                      83   4

8        RECROSS EXAMINATION                    92   1

9   AIMEE LANG

10       DIRECT EXAMINATION                     92   23

11       CROSS EXAMINATION                      120  1

12       REDIRECT EXAMINATION                   137  14

13  JUSTIN SNELL

14       DIRECT EXAMINATION                     145  2

15       CROSS EXAMINATION                      156  22

16       REDIRECT EXAMINATION                   160  14

17  MATTHEW PURDOM

18       DIRECT EXAMINATION                     164  2

19       CROSS EXAMINATION                      170  14

20  NATHAN BERRY

21       DIRECT EXAMINATION                     171  12

22       CROSS EXAMINATION                      200  6

23       REDIRECT EXAMINATION                   203  7

24  EDGAR DIAZ

25       DIRECT EXAMINATION                     204  21

260

1   CROSS EXAMINATION                          232   2

2   REDIRECT EXAMINATION                       243   11

3

4

5

6

7

8

9

10

11

12

13

14                      E X H I B I T   I N D E X

15

16     Plaintiff's Exhibit 217  was admitted 25

17      Plaintiff's Exhibit 7  was admitted  30

18      Plaintiff's Exhibit 8, pages        36

19   12 and 13  was admitted

20      Plaintiff's Exhibit 10  was admitted 55

21      Plaintiff's Exhibit 26, page        113

22   63  was admitted

23      Plaintiff's Exhibit 26, page        116

24   65,  was admitted

25      Defendant's Exhibit 200-1  was admitted 129

261

```
 1        Defendant's Exhibit 26, page      133

 2     64  was admitted

 3        Plaintiff's Exhibit 8, page 10    152

 4     was admitted

 5        Plaintiff's Exhibit 8, pages 8    179

 6     and 9,  was admitted

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```